Brock Boone
Randall C. Marshall
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179

RECEIVED

2018 FEB -b A 11: 10

Rose Saxe
ACLU LGBT & HIV Project / ACLU Foundation
125 Broad St., 18th Floor
New York, NY 10004

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| DARCY CORBITT, DESTINY CLARK, and JOHN DOE,<br><br>Plaintiffs,<br><br>vs.<br><br>HAL TAYLOR, in his official capacity as Secretary of the Alabama Law Enforcement Agency; Colonel CHARLES WARD, in his official capacity as Director of the Department of Public Safety; DEENA PREGNO, in her official capacity as Chief of the Driver License Division, and JEANNIE EASTMAN, in her official capacity as Driver License Supervisor in the Driver License Division<br><br>Defendants. | Civil Action No. 2:18-cv- 91<br><br><br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs Darcy Corbitt, Destiny Clark, and John Doe[1], through their undersigned

attorneys, complain against Defendant Hal Taylor, in his official capacity as Secretary of the

Alabama Law Enforcement Agency, Charles Ward, in his official capacity as Director of the

Department of Public Health, Deena Pregno, in her official capacity as Chief of the Driver

---

[1] A Motion to Proceed Under a Pseudonym accompanies this Complaint.

License Division, and Jeannie Eastman, in her official capacity as Driver License Supervisor and supervisor of the Medical Unit in the Driver License Division, as follows:

## INTRODUCTION

1.     Defendants are responsible for the establishment and enforcement of a policy that prevents transgender people in Alabama from obtaining a driver license that reflects their gender, unless they undergo surgical procedures and disclose information about those procedures to the government. Under the policy, proof of surgery is required for an accurate driver license regardless of whether the surgery is necessary, desired, safe, or within the financial means of the individual.

2.     Defendants accept only some forms of gender-confirming surgery, while rejecting others. Thus, even when a transgender person has undergone surgery, Defendants may continue to deny access to a driver license that reflects the gender of the transgender person. Thus, Defendants' practice sweeps even further than the language of the already unlawful and discriminatory policy.

3.     As a result of the state's driver license policy, many transgender Alabamians cannot obtain a license that they can use without disclosing highly sensitive information, risking discrimination and attack, compromising their own health and wellbeing, and endorsing a message about their gender with which they strongly disagree.

4.     The plaintiffs, Ms. Darcy Corbitt, Ms. Destiny Clark, and Mr. John Doe, have all been personally harmed by this policy. Ms. Corbitt was loudly called an "it" in a public area of a crowded driver license office. Ms. Clark avoids lawful activities that could lead her to have to show her license. Mr. Doe experiences distress whenever he sees the gender listed on his own license.

5. The policy is not rationally related to any legitimate purpose, much less narrowly tailored to serve a compelling one.

6. Defendants' policy violates the privacy, due process, free speech, and equal protection rights of Ms. Corbitt, Ms. Clark, Mr. Doe, and transgender people in Alabama.

## JURISDICTION AND VENUE

7. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1343 because Plaintiffs seek redress for the deprivation of rights secured by the Constitution of the United States. Plaintiffs' federal claims are brought pursuant to 42 U.S.C. § 1983.

8. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201-2202, Fed. R. Civ. P. 57, 65, and the legal and equitable powers of this Court.

9. Venue is proper in the Middle District of Alabama pursuant to 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to Plaintiffs' claims have occurred.

## PARTIES

10. Plaintiff Darcy Corbitt is an adult living in Auburn, Alabama. She is a woman who has not been able to obtain an Alabama driver license.

11. Plaintiff Destiny Clark is an adult residing in St. Clair County, Alabama. She is a woman with an Alabama driver license that wrongly describes her as male.

12. Plaintiff John Doe is an adult residing in Alabama. He is a man with an Alabama driver license that wrongly describes him as female.

13. Defendant Hal Taylor is the Secretary of the Alabama Law Enforcement Agency (ALEA). In that capacity, he serves as the executive head of the agency and the head of the Department of Public Safety. Ala. Code § 41-27-2 (a).

14.     Defendant Charles Ward is the Director of Public Safety within ALEA. In that capacity he has the power to create rules concerning the operation of motor vehicles in the state. Ala. Code § 32-6-13.

15.     Defendant Deena Pregno is the Chief of the Driver License Division, a division within ALEA and the Department of Public Safety. Driver License Policy Order No. 63 ("Policy Order 63") states that it is the policy of the Chief of the Driver License Division. *See Policy Order 63, Exhibit A, attached.*

16.     Jeannie Eastman supervises the Medical Unit, a unit within the Driver License Division. In that capacity, she implements and interprets Policy Order 63.

## FACTUAL ALLEGATIONS

### I.     Policy Order 63

17.     Policy Order 63 provides for changing the gender on a driver license only "due to gender reassignment surgery," and requires applicants to submit "[a]n amended state certified birth certificate and/or a letter from the physician that performed the reassignment procedure."

18.     Defendants Hal Taylor, Charles Ward, and Deena Pregno, or their predecessors, caused Policy Order 63 to be issued.

19.     Upon information and belief, Defendants have issued no written guidance explaining how to apply this policy or defining "gender reassignment surgery."

20.     Defendant Jeannie Eastman has refused to change the gender marker for a driver license even when a transgender person has complied with the language of Policy Order 63. Upon information and belief, Defendants accept only some forms of gender-confirming surgery as sufficient, while rejecting others as insufficient.

4

21.    No Alabama statute requires individuals to provide an amended birth certificate to change an Alabama driver license or non-driver identification card to document a person's correct gender.

22.    No Alabama statute requires gender-confirming surgery to update the gender listed on a state driver license or non-driver identification card.

23.    No Alabama statute refers to gender on driver licenses or non-driver identification cards. A statute requires that a license contain a color photograph, name, birthdate, address, signature, and "description of the licensee." Ala. Code § 32-6-6.

24.    A statute requires gender-confirming surgery to correct the gender on a person's Alabama birth certificate. Ala. Code § 22-9A-19(d). That statute does not apply to driver licenses or non-driver identification cards.

25.    Upon information and belief, Defendants permit applicants to change other descriptive characteristics, such as height and hair color, on a driver license or non-driver identification card without any additional documentation or medical certification.

26.    Upon information and belief, Defendants permit transgender people to receive a driver license that reflects their gender without surgery if and only if they move to Alabama for the first time after having updated their gender marker in another state that does not require surgery. That is so because Defendants do not routinely inquire about transgender status, transgender people moving to Alabama for the first time could present documents that showed only their actual gender, and Defendants would have no previous records listing a different gender.

27.    Policy Order 63 and Defendants' practices, by placing onerous, and in many cases insurmountable, obstacles to prevent transgender persons from correcting the gender listed on their Alabama driver licenses, stands in contrast with the decisions of the federal government and

numerous states to align the gender listed on a person's identification documents with the gender the person lives as every day without requiring proof of any particular medical care. These decisions are designed to conform policies to current scientific knowledge, the medical standard of care for treating persons diagnosed with gender dysphoria, and the needs and dignity of transgender community members.

28. The U.S. Department of State requires only that a doctor certifies that a person seeking a gender change on a passport "has had appropriate clinical treatment for gender transition to the new gender" in order to obtain a passport with the correct gender. 7 Foreign Affairs Manual 1300 Appendix M (March 31, 2016), https://fam.state.gov//FAM/07FAM/07FAM1300apM.html.

29. The U.S. Office of Personnel Management, the Veterans Health Administration, the United States Citizenship and Immigration Services, Department of Defense, and the Social Security Administration have similar requirements to change gender markers in their records. None of these agencies require evidence of surgery. *See The Guide to Personnel Recordkeeping*, U.S. Office of Pers. Mgmt. 4.14-15 (2017), http://bit.ly/2FOcwvW; VHA Directive 2013-003(4)(b)(1)(b) (2017), https://www.va.gov/vhapublications/publications.cfm?pub=1; *Adjudicator's Field Manual*, U.S. Citizenship and Immigration Servs. 10.22, https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-1067/Chapter10-22.html; 32 C.F.R. § 161.23(d) (Table 33) (DoD); *Program Operations Manual System*, Soc. Sec. Admin. 10212.200 (2013), https://secure.ssa.gov/poms.nsf/lnx/0110212200.

30. To change the gender marker on a driver license, most states accept a form filled out by any medical professional, and do not require documentation of any specific form of medical or surgical treatment. American Association of Motor Vehicle Administrators, *Resource Guide on Gender Designation on Driver's Licenses and Identification Cards* (2016),

https://www.aamva.org/Best-Practices-and-Model-Legislation/. The American Association of Motor Vehicle Administrators (AAMVA) instructs states to not require surgery, a court order, or an amended birth certificate. Instead, AAMVA instructs states to accept certification of gender identity from a variety of licensed providers and to accept passports, birth certificates, or other identification cards from governmental agencies as an alternative to medical provider certification. *Id.* at 4.

31.     Thus, Policy Order 63 and Defendants' practices are not required by any state law, and are at odds with the requirements and recommendations of the federal government, the majority of state governments, the D.C. government, and AAMVA, as well as with ALEA's own policies and practices for other descriptive information. Because transgender people who move to Alabama for the first time after changing their gender marker in another jurisdiction may not need to produce evidence of surgery, Policy Order 63 and Defendants' practices are not even consistently applied.

**II.     Transgender People, Gender, and Gender Dysphoria**

32.     Transgender people are people who have a gender identity different from their assigned sex at birth.

33.     Gender identity refers to a person's fundamental, internal sense of belonging to a particular gender. There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

34.     According to the American College of Physicians, American Psychiatric Association, and other major medical organizations, every person has a gender identity, which "cannot be altered voluntarily" and "cannot be ascertained immediately after birth." Brief of Amici Curiae American Academy of Pediatrics, American Psychiatric Association, American College of Physicians, and 17 Additional Medical and Mental Health Organizations in Support

of Respondent at 8, *Gloucester Cty. Sch. Bd. v. G.G.*, No. 16-273, 2017 WL 1057281 at *8 (U.S.).

35. The gender marker designated on a birth certificate at the time of birth ("assigned sex at birth") is almost always based solely on the appearance of an infant's external genitalia.

36. When components of sex, including genitalia, chromosomes, hormones, reproductive anatomy, secondary sex characteristics, and gender identity, do not align as all typically male or all typically female, a person's gender identity is what determines the gender a person lives as, and how the person should be recognized for all social and legal purposes.

37. Gender dysphoria is a medically-recognized condition defined by a marked incongruence between a person's gender identity and the sex they were assigned at birth, when accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning. Many transgender people experience gender dysphoria.

38. Gender dysphoria is a serious medical condition that, if left untreated, can lead to debilitating depression, and even suicidal thoughts and acts.

39. Treatment of gender dysphoria is guided by the Standards of Care ("SOC") set forth by the World Professional Association for Transgender Health ("WPATH"), which was initially published in 1979 and is now in its seventh version. These guidelines reflect the professional consensus about the psychological, psychiatric, hormonal, and surgical management of gender dysphoria.

40. It is the recognized standard of care to address gender dysphoria with treatment designed to bring a person's body and expression of gender in line with their gender identity. This course of treatment has different components depending on the particular needs of each transgender person. A professional recommends an individualized course of treatment based on the exercise of professional judgment to achieve the goal of reducing a patient's gender

dysphoria. As with other forms of healthcare, the patient considers the information from the provider and makes treatment decisions in consultation with that provider.

41. Treatment for gender dysphoria – sometimes called gender reassignment – does not "change" a person's gender. Instead, it brings a person's social interactions, appearance, and body into greater alignment with the person's already-existing gender identity, which helps to alleviate the distress associated with gender dysphoria. Treatment for gender dysphoria may involve one or more of hormone treatment, non-surgical voice therapy, supportive psychotherapy, social transition, or gender-confirming surgery or surgeries.

42. Social transition involves shifting one's presentation and social functioning so that it is consistent with one's gender identity. Typically, it involves some or all of the following:

    a. Change in clothing, hair, or appearance;

    b. Change of name;

    c. Change in pronouns (i.e., "she" "he" or "they");

    d. Change in participating in gender-specific activities, events, or spaces; and

    e. Change of the gender marker on identifying documents, including driver license and passport.

43. Thus, treatment for gender dysphoria includes living one's life consistently with one's gender identity, including using identity documents that reflect one's gender identity.

44. Forcing transgender people to use identity documents that do not match their gender identity, or forcing them to go without identity documents, is inconsistent with medical protocols. It can cause anxiety and distress to the transgender person and result in discrimination and violence against them.

45. A driver license is a critically important form of identification. For many people, a driver license makes it possible for them to secure a job and otherwise care for their needs and

9

the needs of their family. This is especially true in places like Alabama where most people need to drive every day to go to work, school, stores, doctors' offices, or visits with friends and family, and where identification is required to vote.

46.     Recognizing the importance of identification documents, the American Medical Association has adopted a policy urging states to eliminate any requirement that transgender people have surgery in order to amend their birth certificates. *Conforming Birth Certificate Policies to Current Medical Standards for Transgender Patients H-65.967*, Am. Med. Ass'n (2014), http://bit.ly/2EhkCQy.

47.     Additionally, for those who have struggled for years with the impact of external invalidation of their identity, the knowledge that one's identification documents label one with the wrong gender can, by itself, cause serious psychological injury.

48.     While social transition is adequate to treat gender dysphoria for some transgender people, others need one or more other forms of treatment, such as hormone treatment, supportive psychotherapy, non-surgical voice therapy, or gender-confirming surgery or surgeries.

49.     Gender-confirming surgeries may include augmentation mammoplasty, chest reconstruction surgery, facial feminization surgery, hysterectomy, orchiectomy, vaginoplasty, metaoidioplasty, phalloplasty, and other procedures.

50.     In a recent survey, chest reconstruction surgery was the most common form of treatment other than hormone therapy, counseling, and social transition among men who are transgender. *See* Sandy E. James, et. al, The Report of the 2015 U.S. Transgender Survey 101 (2016), http://bit.ly/2BXZcma ("USTS"). Among women who are transgender, laser hair removal or electrolysis was the most common other form of treatment, followed by nonsurgical voice therapy, vaginoplasty with labiaplasty, and augmentation mammoplasty, in that order. *Id.* at 102.

51.     Like all surgical procedures, gender-confirming surgeries involve some risk. Also, while some gender-confirming surgeries have little or no impact on physical reproductive capacity, others permanently eliminate reproductive capacity.

52.     Gender-confirming surgery is not medically necessary for all transgender people. For some, surgery is not only unnecessary but also medically contraindicated. Additionally, for many, surgery is cost-prohibitive.

53.     Among those who do receive gender-confirming surgery, the specific procedure or procedures received vary based on individual needs. Some transgender people need several surgical procedures in treatment for gender dysphoria, while others need none, one, or two.

54.     Only about one-quarter of transgender people report having had any form of gender-confirming surgery. USTS at 100.

55.     Like other major healthcare decisions – especially those that may involve invasive procedures, impact on one's reproductive options, possible relief of significant suffering, and possible complications—decisions about gender-confirming surgery are profoundly personal.

56.     Transgender people often risk harassment, harm, and social stigma when others learn that they are transgender.

57.     The transgender community is more likely to suffer abuse, harassment, discrimination, and violence than the population at large. According to the USTS:

      a.  Around a quarter (24%) of respondents had been physically attacked in a K-12 school because people thought they were transgender, with higher rates for American Indian (49%), Middle Eastern (36%), multiracial (31%), and Black (28%) respondents. In Alabama specifically, 13% of respondents faced such severe mistreatment that they left a K-12 school.

b. In the year prior to completing the survey, 27% of respondents who had a job reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace due to their gender identity or expression. That number was similar (26%) among Alabama respondents only.

c. Nearly half (47%) of respondents had been sexually assaulted during their lifetime, with higher rates for American Indian (65%), multiracial (59%), Middle Eastern (58%), and Black (53%) respondents.

d. Among respondents who had interacted with police, 58% of those whom the police perceived as transgender experienced some form of mistreatment. The rate was similar (57%) in Alabama. Rates were higher for American Indian (74%), multiracial (71%), Latino/a (66%), Black (61%), and disabled (68%) respondents.

e. Thirty-nine percent of respondents experienced serious psychological distress in the month prior to completing the survey, compared with only 5% of the U.S. population. Among Alabama respondents only, 45% experienced serious psychological distress in the month prior to completing the survey.

f. Forty percent of respondents attempted suicide in their lifetime—nearly nine times the attempted suicide rate in the U.S. population (4.6%).

58. People are often asked to show a driver license to verify their identity. A driver license that fails to match one's gender leads to the disclosure of private, intimate information about one's transgender status, and it often leads to physical harm, harassment, discrimination, or groundless accusations of fraud.

59. Twenty-five percent of transgender people were verbally harassed, 16% denied services or benefits, 9% asked to leave a location or establishment, and 2% assaulted or attacked after showing identification with a name or gender marker that did not match their gender

12

presentation. USTS at 82. The rates of assault and attack were twice as high for Black transgender people, three times as high for American Indian transgender people, and almost five times as high for Middle Eastern transgender people. *Id.* at 90. In Alabama specifically, 28% of respondents had had one or more of these negative experiences after showing identification that did not match their gender presentation. Only 9% of Alabama respondents had their gender correctly listed on all their identification documents, while 80% of respondents had no identification document that correctly listed their gender.

### III. Policy Order 63's Impact on Plaintiffs

#### Darcy Corbitt

60.     Plaintiff Darcy Corbitt is a 25-year-old woman who lives in Auburn, Alabama. *Corbitt Photo, Exhibit B, attached.*

61.     Ms. Corbitt is transgender. She was assigned male at birth, and she has known she was female since preschool.

62.     Ms. Corbitt was born in Louisiana, but grew up in Alabama. She moved to North Dakota as a young adult, where she founded a not-for-profit organization that she still runs.

63.     Ms. Corbitt has completed a legal name change.

64.     While living in North Dakota, Ms. Corbitt began updating the gender listed for her in government records. Her North Dakota driver license, United States passport, and Social Security records now reflect her gender as female.

65.     When Ms. Corbitt received a license and passport that accurately reflected her female gender, she was moved to tears. In the weeks that followed, she felt like a burden had lifted from her shoulders.

66.     Because Ms. Corbitt is perceived as a woman in her day-to-day life, every time she had to show a driver license that listed "male," she was forced to disclose that she was

13

transgender. She feared violence or other negative reactions. Ms. Corbitt has received death threats for speaking out on transgender issues in the past.

67.     As a result, before her gender was updated on her driver license, Ms. Corbitt tried to avoid situations where she would have to show identification. With a driver license listing her as female, she no longer had to avoid making large purchases, ordering alcohol in restaurants, or doing any other activities that required identification. When she did show her driver license, she no longer felt embarrassed, ashamed, or afraid.

68.     In the summer of 2017, Ms. Corbitt returned to Alabama to attend graduate school at Auburn University, where she is pursuing a Ph.D. in developmental psychology.

69.     In August 2017, Ms. Corbitt visited the Lee County Driver License Office to obtain an Alabama license to replace her North Dakota license. At first, the clerk in the office referred to Ms. Corbitt correctly as a woman and treated her with courtesy and respect. When the clerk reviewed agency records from when Ms. Corbitt lived in Alabama previously, she saw that Ms. Corbitt had been listed as male. Her demeanor changed abruptly.

70.     The clerk prepared paperwork to issue Ms. Corbitt an Alabama driver license listing her gender as male. The clerk asked Ms. Corbitt to review the papers and sign to verify that the information was accurate. Ms. Corbitt explained that she could not do so because the gender information was not accurate.

71.     The clerk began referring to Ms. Corbitt as a "he" and an "it." She asked Ms. Corbitt for personal information about her anatomy and medical history. The clerk spoke to the clerk's direct supervisor as well as a supervisor at a central ALEA office about Ms. Corbitt's gender. The clerk did all of this loudly, in front of many other people in the office. The clerk declined to issue Ms. Corbitt an Alabama driver license listing her gender as female. Ms. Corbitt left the office without an Alabama driver license.

72.     Ms. Corbitt has completed all necessary medical treatment for her gender dysphoria at this time. She wishes to make future treatment decisions free from government coercion through policies or practices requiring her to have surgery to obtain a driver license.

73.     Ms. Corbitt would have liked to consider relocating to Alabama permanently after completing her studies. However, doing so would require her to trade in her North Dakota license for an Alabama license. Ala. Code § 32-6-1(a). Because of Policy Order 63, Ms. Corbitt does not believe it would be possible for her to remain in the state permanently without sacrificing her safety, privacy, autonomy, and dignity.

Destiny Clark

74.     Plaintiff Destiny Clark is a 33-year-old woman who lives in Saint Clair County, Alabama. *Clark Photo, Exhibit C, attached.*

75.     Ms. Clark is transgender. She was assigned male at birth, and she knows herself to be female.

76.     Ms. Clark grew up in Saint Clair County. She moved away as a young adult, but returned to care for her father when he was ill. Ms. Clark works in a restaurant and has a leadership role in a community organization.

77.     Ms. Clark has completed a legal name change, and she has corrected her gender with the Social Security Administration.

78.     Ms. Clark has tried to change the gender listed on her Alabama license multiple times.

79.     First, Ms. Clark went to the Pell City driver license office in Saint Clair County. There, a clerk told her that they could not help her, and she would have to contact the Medical Unit in Montgomery.

80.     Ms. Clark contacted the Medical Unit, where she spoke to Defendant Jeannie Eastman. Ms. Eastman advised her to fax her medical documentation. Ms. Clark did so.

81.     Ms. Eastman informed Ms. Clark that the medical documentation was not sufficient, and that her doctor would have to provide more specific information. Ms. Clark obtained an additional letter from her doctor with more information, and sent the letter to Ms. Eastman.

82.     Having not heard back from Ms. Eastman, Ms. Clark called her to check on the status of the letter. Ms. Eastman told Ms. Clark that the treatment was inadequate according to policy and that she did not want to change the gender on her license.

83.     Later, Ms. Clark had medically necessary gender-confirming surgery. She sent a letter to Ms. Eastman from her surgeon to that effect.

84.     Upon information and belief, Ms. Eastman or an individual working under the supervision of Ms. Eastman called Ms. Clark's surgeon's office, identified themselves as a government official, and requested and received detailed information about Ms. Clark's surgery, including the type of anesthesia administered and the exact procedures performed. Ms. Clark did not give permission for this information to be shared.

85.     Even with proof of surgery, Ms. Eastman informed Ms. Clark that she would not change Ms. Clark's license. Ms. Eastman claimed that her decision was required by policy, but did not explain how.

86.     Ms. Clark's license still wrongly lists her gender as male. As a result, Ms. Clark experiences a high level of anxiety going about her daily life.

87.     During a traffic stop in Odenville, a police officer treated Ms. Clark politely when asking for her license. After seeing her license, though, the officer became hostile and accusing.

88. Ms. Clark tries to avoid using her license as much as possible. She does not go to clubs or bars where she believes she will be asked to show identification. She does not order alcohol in restaurants. If she wants to buy alcohol in a store, she asks her boyfriend to buy it for her so she will not have to show her driver license.

89. Because Ms. Clark is typically perceived as a woman, any time she shows her license, the person seeing it observes the male gender designation and learns that she is transgender. As a woman who is transgender, Ms. Clark is at a high risk of discrimination and violence. The wrong gender on her driver license increases that risk.

John Doe

90. John Doe is a man living in Alabama. Because of concerns about his privacy and safety, he seeks to proceed in this case under a pseudonym. *See Motion to Proceed Under a Pseudonym.*

91. Mr. Doe is transgender. He was assigned female at birth, and he knows himself to be male.

92. Mr. Doe was born and raised in Alabama, and he currently lives and works full time in Alabama.

93. Mr. Doe went to the Probate License main office in Montgomery to update his name on his license, and asked for information on how to correct his gender marker. The clerk told him he would have to supply proof of surgery.

94. Mr. Doe has received medical treatment for gender dysphoria, but he has not received any surgical treatment. While he believes one form of surgical treatment will be necessary for him, he is not yet eligible for insurance coverage for the procedure.

95. Because he believes it would be futile, Mr. Doe has not applied to change his gender marker on his Alabama driver license.

96.     Mr. Doe considers his transgender identity and assigned sex at birth to be highly sensitive, personal information. He wishes to keep this information consistently private.

97.     Mr. Doe has been diagnosed with gender dysphoria and depression.

98.     Whenever Mr. Doe pulls his license out of his wallet, he sees the female gender marker, which causes him pain he finds difficult to describe. It sends him into a tailspin, aggravating his gender dysphoria and depression.

99.     Because he is typically perceived as male, whenever Mr. Doe shows his driver license to someone, that person observes that his gender is designated as female and begins to question whether Mr. Doe's driver license is real or whether Mr. Doe's gender is truly male. Typically, people who see his driver license learn that he is transgender.

100.    When people refer to him as if he were female upon seeing his driver license, Mr. Doe's symptoms of gender dysphoria and depression intensify.

101.    When Mr. Doe traveled internationally using a passport that incorrectly designated him as female, on three occasions customs or security officers were confused by the contrast between the gender listed on his passport and his appearance. This confusion led to officers questioning him loudly about his gender in front of others, causing stress, embarrassment, and delay.

102.    As a Black man who is transgender, Mr. Doe is at high risk of experiencing discrimination and violence. He wants to minimize the chances that he will experience discrimination or violence. He believes that having a driver license that matches his gender will reduce the chances that he will face discrimination or violence when applying to jobs or graduate schools, as well as in other situations.

## CLAIMS FOR RELIEF UNDER 42 U.S.C. § 1983

## COUNT I

## POLICY ORDER 63 VIOLATES PLAINTIFFS' RIGHT TO PRIVACY

103.    Plaintiffs re-allege paragraphs 1 through 102 as if fully set forth herein.

104.    The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.

105.    Substantive protections of the Due Process Clause include the right to avoid disclosure of sensitive, personal information.

106.    Plaintiffs have a fundamental right of privacy in preventing the release of, and in deciding in what circumstances to release: (1) personal information whose release could subject them to bodily harm; and (2) information of a highly personal and intimate nature.

107.    The Policy Order 63 and Defendants' practices force Ms. Clark and Mr. Doe to disclose highly personal information—that they are transgender—to each person who sees their driver license. Given the high rates of violence against transgender people, this disclosure places Ms. Clark and Mr. Doe at risk of bodily harm. Policy Order 63 and Defendants' practices condition Ms. Corbitt's receipt of an Alabama driver license on being forced to make such disclosures.

108.    No compelling state interest is furthered by Policy Order 63 and Defendants' practices, nor are they narrowly tailored or the least restrictive alternative for promoting a state interest. Policy Order 63 and Defendants' practices are not even rationally related to a legitimate state interest.

109.    In addition, Plaintiffs' privacy interests outweigh any purported interest the Defendants could assert.

## COUNT II

## POLICY ORDER 63 VIOLATES PLAINTIFFS' LIBERTY INTEREST IN REFUSING UNWANTED MEDICAL TREATMENT

110. Plaintiffs re-allege paragraphs 1 through 102 as if fully set forth herein.

111. The Fourteenth Amendment's Due Process Clause protects individuals' substantive rights to be free to make certain private decisions without unjustified governmental intrusion.

112. The right to make certain private decisions without unjustified governmental intrusion includes the right to refuse unwanted medical treatment.

113. Policy Order 63 and Defendants' practices force transgender people who live in Alabama either to undergo certain kinds of gender-confirming surgery to secure a correct driver license or endanger their health and safety with an incorrect driver license.

114. Not all transgender people undergo gender-confirming surgery. For some, the surgery is not medically necessary or even safe. Many do not have health insurance coverage and cannot afford to pay out-of-pocket. Of those who do receive surgical treatment, not all need or receive the same surgical treatment. While some need and receive multiple forms of gender-confirming surgery, others need and receive only one procedure.

115. Ms. Corbitt has not yet determined whether she wants and needs any gender-confirming surgery. She wishes to make this important, intimate healthcare decision without being pushed into a certain outcome by the government. She also wishes to obtain a driver license without having to disclose to the government intimate medical information irrelevant to her ability to drive.

116. Ms. Clark has had gender-confirming surgery, but Defendants have refused to accept her surgery as sufficient. No further gender confirming surgery is medically necessary for her or desired by her.

20

117.    Mr. Doe believes that one form of gender-confirming surgery will likely be necessary for him, but has not yet obtained it. No other forms of gender-confirming surgery are necessary for him or desired by him.

118.    As a result of not having had gender-confirming surgery, Ms. Corbitt and Mr. Doe are unable to secure an Alabama driver license that accurately reflects their gender, and that they can use without risk to their health and safety. As a result of not having had a type of gender-confirming surgery Defendants find acceptable, Ms. Clark also is unable to secure an Alabama driver license that accurately reflects her gender, and that she can use without risk to her health and safety.

119.    Policy Order 63 and Defendants' practices are neither narrowly tailored nor the least restrictive alternative to further a compelling government interest and therefore violate the liberty interests of Ms. Corbitt, Ms. Clark, and Mr. Doe. Nor are Policy Order 63 and Defendants' practices rationally related to a legitimate governmental interest.

## COUNT III

## POLICY ORDER 63 VIOLATES THE FIRST AMENDMENT

120.    Plaintiffs re-allege paragraphs 1 through 102 as if fully set forth herein.

121.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. It is made applicable to the states through the Fourteenth Amendment. U.S. Const. amend. XIV.

122.    The First Amendment protects the right to speak and to refrain from speaking.

123.    Policy Order 63 and Defendants' practices violate the First Amendment rights of Ms. Clark and Mr. Doe to refrain from speaking by forcing them to disclose to each person who sees their license private information about their transgender status and their medical condition,

and by forcing them to identify themselves to each person who sees their license by a gender that conflicts with their core identity.

124. Policy Order 63 and Defendants' practices further violate the First Amendment rights of Ms. Clark and Mr. Doe to refrain from speaking by forcing them to endorse the government's position on their own gender, as well as on the meaning of gender generally, through the license they must carry daily and show to others. The gender marker listed on Ms. Clark's and Mr. Doe's license conveys the state's ideological message that gender is determined solely by the appearance of external genitals at the time of birth unless modified through certain surgical procedures, a message with which Ms. Clark and Mr. Doe vehemently disagree.

125. Policy Order 63 and Defendants' practices violate Ms. Corbitt's First Amendment rights to refrain from speaking by denying her access to an Alabama driver license unless she signs a form stating something is true that she knows to be false, and then carries a license that forces her to make unwanted personal disclosures, identify herself in a way that conflicts with who she knows herself to be, and endorse a government message about her own gender and gender in general with which she strongly disagrees.

126. Policy Order 63 and Defendants' practices do not further any compelling state interest, nor are they narrowly tailored or the least restrictive alternative for promoting a state interest.

## COUNT IV

### POLICY ORDER 63 VIOLATES EQUAL PROTECTION

127. Plaintiffs re-allege paragraphs 1 through 102 as if fully set forth herein.

128. The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. 14, § 1.

22

129. Policy Order 63 and Defendants' practices are directed solely at transgender people and discriminate against them on the basis of sex, as well as on the basis of transgender status.

130. Defendants deprive transgender people, and only transgender people, access to a driver license that they can use without sacrificing their privacy, health, safety, dignity, and autonomy.

131. The differential treatment of transgender people furthers no compelling or important government interest, nor is the differential treatment narrowly tailored, substantially related to, or the least restrictive alternative for promoting a state interest. Nor is there even a rational connection between any legitimate governmental interest and Defendants' disparate treatment of transgender people.

132. Policy Order 63 and Defendants' practices are subject to heightened scrutiny because they are based on sex and transgender status.

133. Policy Order 63 and Defendants' practices are invalid under any form of constitutional scrutiny because they were put in place for the improper purpose of disadvantaging a specific class, are founded in animus toward transgender Alabamians, and serve no legitimate governmental interest.

LACK OF LEGAL REMEDY

134. Plaintiffs' harm is ongoing and cannot be alleviated except by injunctive relief.

135. No other remedy is available at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

(1) Issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring Policy Order 63 and Defendants' practice of refusing to update the gender marker on driver licenses of transgender people unconstitutional for the reasons and on the counts set forth above;

(2) Permanently enjoin Defendants from enforcing Policy Order 63 unless and until it has been revised to comply with constitutional requirements;

(3) Order Defendants to change the gender marker on Alabama driver licenses for otherwise-eligible transgender people who seek such change;

(4) Award Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

(5) Grant such other relief as the Court finds just and proper.

Respectfully submitted this 6th day of February 2018.

Brock Boone
Randall C. Marshall
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
bboone@aclualabama.org
rmarshall@aclualabama.org

Rose Saxe
ACLU LGBT & HIV Project / ACLU Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2605
rsaxe@aclu.org
*Pro Hac Vice Application Pending*