**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| DARCY CORBITT, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:18-cv-91-MHT-GMB |
| | ) | |
| HAL TAYLOR, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS .................................................................................................. ii

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ..............................................................................................2

  Policy Order 63 .........................................................................................................2

  Plaintiffs ....................................................................................................................9

    A. Darcy Corbitt ...................................................................................................9

    B. Destiny Clark ................................................................................................13

    C. Jane Doe ........................................................................................................16

  Alabama Driver Licenses .......................................................................................23

ARGUMENT ................................................................................................................25

  I. Policy Order 63 Violates the Equal Protection Clause ......................................25

    A. Defendants Discriminate Against Transgender People by Denying Them Driver's Licenses Matching Their Gender. ......................................................................25

    B. Defendants' Policy Receives Heightened Scrutiny Because It Classifies Based On Sex 26

    C. The Policy Requires Heightened Scrutiny Because It Discriminates Against Transgender People, a Group That is at Least Quasi Suspect. ...............................................27

    D. Defendant's Policy is Not Narrowly Tailored to a Compelling State Interest, Nor Is It Substantially Related to Achieving an Important Government Objective. ..........................30

    E. Policy Order 63 Can Not Withstand Even Rational Basis Review. ...............................33

      1.     Policy Order 63 is arbitrary and based on animus ................................33

      2.     Policy Order 63 undermines the ability to identify holders of Alabama driver's licenses .........................................................................................................37

      3.     Policy Order 63 is not rationally related to applying sex specific policies in correctional or law enforcement contexts .....................................................40

      4.     Policy Order 63 is not rationally related to the interest of providing emergency medical care. ........................................................................................................43

      5.     Revealing information about people's genital anatomy is not a legitimate government interest .....................................................................................43

  II. Defendants' Policy Violates Plaintiffs' Due Process Right to Privacy. .............................43

  III. Defendants have deprived Plaintiffs of Due Process of Law by Conditioning Receipt of a Benefit on Giving up the Constitutional Right to Refuse Medical Treatment ......................48

  IV. Policy Order 63 Violates the First Amendment Because It Compels Plaintiffs to Endorse the State's Message About Sex ...................................................................................51

CONCLUSION .............................................................................................................54

CERTIFICATE OF SERVICE .....................................................................................56

## INTRODUCTION

The Alabama Law Enforcement Agency (ALEA) policy preventing transgender people from changing the sex designation on an Alabama driver's license unless they have had genital surgery puts transgender people in an impossible position. A driver's license is an extension of everyday life for Alabamians. Getting groceries, keeping a job, attending public civic events, going to church, and visiting loved ones are just a small sample of life in Alabama that is difficult or impossible to access without driving. Many people also use a driver's license for identification when requesting or amending government records, qualifying for professional licenses, applying for a job, buying alcohol, picking up prescriptions, checking in to a hotel, traveling by plane, and more. A license that shows the wrong sex designation is a license that transgender people cannot use without sacrificing their health, privacy, dignity, autonomy, integrity, and safety.

As a practical matter, transgender people in Alabama have three "options." One, they can go without a driver's license, and lose the ability to support themselves and otherwise participate in public life. Two, they can carry and show a license with the wrong sex designation, conveying an inaccurate message about their gender that they find abhorrent; revealing them to be transgender to strangers who might harass, discriminate against, or even attack them; and compromising their dignity and fundamental sense of self. Three, if they have the financial means and are medically able to do so, they can undergo sterilizing surgical procedures and provide information about that surgery to a government agency, violating their bodily integrity and privacy.

 Policy Order 63 facially applies only to transgender people. It deprives Plaintiffs of equal protection of the law, conditions their access to a government benefit on forfeiting their rights to maintain their privacy and make their own decisions about their medical care, and

1

forces them to convey an ideological message with which they disagree. This policy is not justified by any legitimate government interest, much less any important or compelling government interest. Indeed, most states do not require transgender people to provide proof of surgery or an amended birth certificate to update the sex designation on a driver's license. The undisputed facts show that Policy Order 63 is arbitrary, and based solely on uninformed opinions about transgender people that Defendants hold. Defendants' personal opinions about what being a man or a woman means cannot justify infringement of Plaintiffs' fundamental rights or the guarantee of equality under the law.

<u>STATEMENT OF FACTS</u>

**Policy Order 63**

1.      The Driver's License Division of the Department of Public Safety, a department of the Alabama Law Enforcement Agency (ALEA), has responsibility for issuing Alabama driver's licenses. *See* Ala. Code § 32-2-5. Defendants are ALEA officials. Answer ¶ 13-16, ECF No. 40.

2.      ALEA's Policy Order 63 provides for changing the sex designation on a driver's license only "due to gender reassignment surgery," and requires applicants to submit "[a]n amended state certified birth certificate and/or a letter from the physician that performed the reassignment procedure." Policy Order 63 (D2), attached as Pls.' Ex. 1. Defendants have no alternative procedure in place for a transgender person whose surgeon has died or retired from practice. Eastman 30(b)(6) Dep. 61:14-20, attached as Pls.' Ex. 2.

3.      Defendants interpret the policy to require what they refer to as "complete" gender reassignment, by which they mean that a transgender person must receive at least penile and vaginal surgery before changing the sex designation on a driver's license. *Id.* at 53:9-54:1;

66:19-22; 67:4-18; Pregno 30(b)(6) Dep. 85:12-20, attached as Pls.' Ex. 3; Spencer Dep. 61:10-20; 63:13-17, attached as Pls.' Ex. 4.

4.     Defendant Deena Pregno, in her capacity as Chief of the Driver's License Division within ALEA, issued the most recent version of Policy Order 63. Policy Order 63; Pregno Dep. 26:9-11.

5.     Policy Order 63 was developed by ALEA administrators, including Chief Pregno and Defendant Jeannie Eastman, in consultation with ALEA's legal department, and without any consultation with transgender people, experts in transgender health, ALEA's own Medical Advisory Board, or medical professionals of any kind. Pregno Dep. 39:18-40:18; 47:16-21.

6.     The policy was purportedly originally developed to create a formal written policy that maintains consistency with the state's policy for sex designation changes on birth certificates. Pregno Dep. 45:3-13.

7.     It was purportedly revised to provide "more latitude" to transgender people while maintaining consistency with the state birth certificate policy. *Id*. 47:4-6. Instead of requiring both a letter from a surgeon who performed surgery on an applicant *and* an amended birth certificate, in 2015 the agency changed its policy to require a surgeon's letter *or* an amended birth certificate. Policy Order 63 of 2012 (D1), attached as Pls.' Ex. 5; Policy Order 63 (D2).

8.     According to Defendants, Policy Order 63 was not created or revised for any other purpose. *Id*. 45:10-13; 47:21-23.

9.     No Alabama statute requires individuals to provide an amended birth certificate or proof of surgery to change an Alabama driver's license or non-driver identification card to document a person's correct gender.

3

10.     While a statute requires surgery to correct the gender on a person's Alabama birth certificate, that statute does not apply to driver licenses or non-driver identification cards. Ala. Code § 22-9A-19(d); *see also* Pregno Dep. 43:17-20.

11.     No Alabama statute refers to gender on driver's licenses or non-driver identification cards. A statute requires that a license contain a color photograph, name, birthdate, address, signature, and "description of the licensee." Ala. Code § 32-6-6.

12.     Defendants permit applicants to change other descriptive characteristics listed on driver's licenses, such as height, weight, and hair color, without measurements or medical documentation. Pregno Dep. 71:12-20. For instance, if someone has lost significant weight, Defendants do not require proof of gastric bypass surgery—nor do they require the person to step onto a scale. They simply take the applicant's word for these characteristics.

13.     Defendants have issued no written guidance explaining how to apply Policy Order 63 or defining "gender reassignment surgery." Eastman Dep. 45:10-12.

14.     The records of people who have applied to change the sex designation on their licenses reflect some inconsistencies in how ALEA has applied Policy Order 63.[1]

15.     Several people's applications were granted despite not specifying anything about genitals or genital surgery. Eastman Dep. 94:2-95:22; Letter from Christine McGinn, D.O., Papillon Center, to Whom It May Concern (June 22, 2015) (D1170) attached as Pls.' Ex. 6; Letter from Harold M. Reed to Vital Statistics (May 16, 2017) (D1154) attached as Pls.' Ex. 7; Letter from Daniel A. Medalie, M.D., MetroHealth, to Whom It May Concern (Aug. 1, 2014) (D1166) attached as Pls.' Ex. 8; Affidavit from Charles E. Garramone, D.O. to Whom It May Concern (Nov. 30, 2015) (D1174) attached as Pls.' Ex. 9.

---

[1] Most of the records Defendants produced were of successful applications. While they were able to produce some records of unsuccessful applications, they explained that there was no way to search for applications that had been denied. Eastman Dep. 10:21-11:7. Thus, records of most unsuccessful applications likely were not produced.

16.     At least two people's applications were granted despite the medical provider not using the word "complete" to characterize the individual's surgery. Letter from Harold Reed, M.D., F.I.C.S. to Whom It May Concern (May 7, 2009) (D1139) attached as Pls.' Ex. 10; Letter from Christine McGinn, Pls.' Ex. 6.

17.     One person's application was denied despite reflecting that the author performed surgery to "irreversibly correct [the applicant's] anatomical male appearance," because the surgeon's letter was not on letterhead and the surgeon did not use the word "complete." Letter from William J. Hedden, M.D. to Whom It May Concern (May 23, 2013) (D1226) attached as Pls.' Ex. 11.

18.     One person's application was denied because the letter, while stating that the applicant had "completed gender reassignment," did not state that the physician who wrote the letter had performed surgery. Letter from Jerry Gurley, M.D., FACOG, FACS to Whom It May Concern (May 3, 2010) (D1250) attached as Pls.' Ex. 12.

19.     Sometimes, when a surgeon's letter does not include the word "complete," ALEA calls the applicant's physician without the person's knowledge or consent, and without a warrant or court order, to obtain additional information about the person's medical history. *See e.g.* Letter from Stephen Steinmetz, M.D., F.A.C.S., to Whom It May Concern (Nov. 9, 2016) (D226) attached as Ex. 13; Eastman Dep. 37:17-41:10. ALEA makes these calls despite the language of its own policy, which indicates calls to physicians are only necessary when there is some doubt as to the authenticity of the letter. Policy Order 63; Eastman Dep. 32:6-33:10.

20.     The federal government allows transgender people to change the sex designation listed on their identification documents to match their gender identity without proof of any particular form of medical care. The U.S. Department of State requires a letter from a medical

5

provider stating that the applicant has had "appropriate clinical treatment for gender transition to the new gender" in order to obtain a passport with the correct gender. U.S. Dep't of State, 7, Foreign Affairs Manual 1300 Appendix M (2016), attached as Pls.' Ex. 14.

21.     The U.S. Office of Personnel Management, the Veterans Health Administration, the United States Citizenship and Immigration Services, Department of Defense, and the Social Security Administration have similar policies.  *See* U.S. Office of Pers. Mgmt., The Guide to Personnel Recordkeeping, 4.14-15 (2017), attached as Pls.' Ex. 15; Dept. of Veteran Affairs., VHA Directive 2013-003 (4)(b)(1)(b) (2017), attached as Pls' Ex. 16; U.S. Citizenship and Immigration Servs., Adjudicator's Field Manual, 10.22 (2012), attached as Pls.' Ex. 17; Soc. Sec. Admin., Program Operations Manual System, 10212.200 (2013), attached as Pls.' Ex. 18.

22.     To change the gender marker on a driver's license, most states accept a form filled out by any medical professional, and do not require documentation of any specific form of medical or surgical treatment. Am. Ass'n of Motor Vehicle Adm'r., Resource Guide on Gender Designation on Driver's Licenses and Identification Cards (2016), attached as Pls.' Ex. 19. The American Association of Motor Vehicle Administrators notes that modernized policies do not require surgery, *id*. at 3, and recommends consultation with outside interest groups and medical advisory boards in updating policies, *id*. at 4.

23.     An increasing number of U.S. jurisdictions, including Minnesota, California, Oregon, and the District of Columbia, do not require any provider certification at all, and instead rely on self-attestation from the applicant, similar to what Alabama currently requires to update other descriptive characteristics. *See* Driver and Vehicle Servs., Div. Minnesota Dep't of Pub. Safety, Self-Designated Descriptors, attached as Pls.' Ex. 20; 2017 Cal. Legis. Serv. Ch. 853 (S.B. 179); Oregon Driver and Motor Vehicle Servs., Changing Your Sex Identifier on Your

Driver License or ID Card (last visited Feb. 2, 2019), attached as Pls.' Ex. 21; District of Columbia Dep't of Motor Vehicles, Procedure for Establishing or Changing Gender Designation on a Driver License of Identification Card (2017), attached as Pls. Ex. 22. Only eleven states require surgery, an amended birth certificate, or a court order to change the sex designation on a driver's license. National Center for Trans Equality, *How Trans-Friendly is the Driver's License Gender Change Policy in Your State?* attached as Pls.' Ex. 23.

24.     Defendants allow transgender people to receive a driver's license that correctly reflects their gender identity without having had any form of surgery if they move to Alabama for the first time after having updated their gender marker on their passport and their license in another state that does not require surgery. Defendants do not routinely inquire about transgender status. Woodruff Dep. 87:2-6, attached as Pls.' Ex. 24. Defendants do not require applicants for a driver's license to show a birth certificate if they have other suitable identification. ALEA, Document Requirements and Fees, attached as Pls.' Ex. 25; Eastman Dep. 127:14-16. Transgender people moving to Alabama for the first time could present documents that showed only their gender identity, and Defendants would issue a license reflecting that gender, regardless of their surgical status. Woodruff Dep. 87:2-89:10.

25.     Defendants also permit transgender people born in a state other than Alabama that permits sex designation changes on birth certificates without surgery to change the sex designation on their Alabama driver's license without surgery, because those transgender people can produce an amended birth certificate consistent with the policy. Policy Order 63; Eastman Dep. 59:13-18. These are the only two circumstances under which Alabama permits transgender people to have the correct sex on their driver's license without surgery.

26.     Defendants have asserted that Policy Order 63 serves governments interests in identification, application of sex-specific law enforcement and corrections policies to transgender people, provision of emergency medical care, and disclosure of information about people's genitals. Pregno Dep. 55:9-56:6.

27.     Defendants have no reason to believe that their interests in identification differ from those of other states. *Id.* at 71:8-9.

28.     Defendants are aware of no circumstances where the sex designation on a driver's license would influence the emergency medical care provided to an individual.  *Id.* at 101:10-102:7.

29.     In support of the interest in law enforcement and corrections policies, Defendants offered the opinion of Donald Leach, an experienced jail administrator who lacks medical expertise. Leach report attached as Pls.' Ex. 26; Leach Dep. 145:4-12 attached as Pls.' Ex. 27.

30.     Defendants' expert stated that correctional and law enforcement agencies have an interest in receiving information about sex on a driver's license, but did not express any opinion about what the best definition of sex would be to serve law enforcement or correctional interests. Leach Dep. 32:9-13.

31.     Defendant's expert explained that using the sex designation on a driver's license, regardless of the policy for when that designation can be changed, assists agencies because it reduces their liability risk. *Id.* at 53:13-54:6. He testified that a policy reflecting a person's gender identity would satisfy the same law enforcement and correctional interests that Policy Order 63 does. *Id.* at 32:14-19.

32.     Defendants' expert also testified that in his experience running a Kentucky jail, he rarely employed sex-based policies, and he recommends other correctional and law enforcement

8

agencies apply sex-based policies to transgender people based on the individual transgender person's preference, rather than based on surgical history, genitalia, or driver's license sex designation. *Id.* at 98:8-15; 110:21-111:8; 112:8-15.

**Plaintiffs**

   A. <u>Darcy Corbitt</u>

     33.    Plaintiff Darcy Corbitt currently lives in Alabama. Decl. of Darcy Corbitt, attached as Pls.' Ex. 28 ("Corbitt Decl."), at ¶ 4; Corbitt Dep. 13:1-8 attached as Pls.' Ex. 29. Ms. Corbitt is a transgender woman. *Id.* at 23:4-16. Ms. Corbitt was assigned male at birth. *Id.* at 8:21-23.

     34.    Ms. Corbitt's earliest memory is identifying as a woman and finding out that that identification was not consistent with how others saw her. *Id.* at 22:17-22. When she was sixteen years old, she received an Alabama driver's license with a male sex designation. *Id.* at 19:2-4.

     35.    When Ms. Corbitt was twenty years old, she learned for the first time that there was a term that explained how she felt—"transgender"—and that there was a future for her. *Id.* at 24:2-13. Around that same time, in or around 2013, Ms. Corbitt received a diagnosis of gender dysphoria. *Id.* at 30:1-8.

     36.    In May 2013, Ms. Corbitt began her social transition, which included introducing herself consistently as "Darcy" and asking people who already knew her to call her by that name. *Id.* at 25:2-11; 28:4-29:4.

     37.    Ms. Corbitt completed a legal name change on July 22, 2013, changing her first and middle names from the traditionally masculine names she was originally given to "Darcy Jeda." Name Change Order for Darcy Jeda Corbitt (redacted), attached as Pls.' Ex. 30.[2] When

---

[2] Because their previous legal names are not material to this case, and because seeing those names is painful to them, Plaintiffs have redacted those names from relevant exhibits. Should the Court wish to view unredacted versions of these documents, Plaintiffs respectfully request that they be permitted to file those unredacted versions under seal.

the court granted her name change, it made Ms. Corbitt "feel somewhat normal for the first time in [her] life to have…a legal identity that was closer to who [she] was as a person." *Id.* at 25:2-21.

38.     Ms. Corbitt moved to North Dakota in 2015. *Id.* at 11:20-12:1. While living in North Dakota, Ms. Corbitt began updating the gender listed for her in government records. She used a letter from her health care provider that indicated she had "appropriate clinical treatment for gender transition to the female gender" and that all documents "including but not limited to Passport, Driver's License, Birth Certificate and Work Identification should reflect the new gender." Letter from Jennifer Demma to Whom it may concern, attached as Pls.' Ex. 31. Ms. Corbitt's North Dakota driver's license, United States passport, and Social Security records now reflect her gender as female. Corbitt Dep. 21:9-11; 79:4-10; Corbitt driver's license (redacted), attached as Pls.' Ex. 32, Corbitt passport (redacted), attached as Pls.' Ex. 33.

39.     When Ms. Corbitt received a license and passport that accurately reflected her female gender, she was moved to tears. Corbitt Decl., at ¶ 6. In the weeks that followed, she felt like a burden had lifted from her shoulders. She felt as if she were a "full participant in life and that my government was accepting me as a human being worthy of being treated equally and with dignity." *Id.* Ms. Corbitt no longer had to avoid making large purchases, ordering alcohol in restaurants, or doing any other activities that required identification. *Id.* at ¶ 7. "When I show my driver's license, I no longer feel embarrassed, ashamed, or afraid." *Id.*

40.     In the summer of 2017, Ms. Corbitt returned to Alabama to attend graduate school at Auburn University, where she is pursuing a Ph.D. in developmental psychology. Corbitt Dep. 13:7-21. In August 2017, Ms. Corbitt visited the Lee County Driver License Office to obtain an Alabama license to replace her North Dakota license. She presented her North Dakota license

10

and her U.S. passport. At first, the clerk in the office referred to Ms. Corbitt correctly as a woman and treated her with courtesy and respect, maintaining friendly conversation. *Id.* at 41:11-43:21.

41.    The clerk asked Ms. Corbitt whether she had ever had a license in Alabama before. *Id.* at 41:11-43:21. She said that she had. *Id.* at 41:11-43:21. When the clerk reviewed agency records from when Ms. Corbitt lived in Alabama previously, Ms. Corbitt perceived her demeanor to change abruptly. She became quiet and brusque. *Id.* at 41:11-43:21. She asked whether Ms. Corbitt's weight had changed. *Id.* at 41:11-43:21. Ms. Corbitt updated her weight and her address without being asked for any additional documentation. *Id.* at 41:11-43:21.

42.    The clerk prepared paperwork to issue Ms. Corbitt an Alabama driver license. The clerk asked Ms. Corbitt to review the papers and sign to verify that the information was accurate. Ms. Corbitt saw that the clerk had listed her gender as male on the papers and explained that she could not verify them, because the gender information was not accurate. *Id.* at 41:11-43:21.

43.    The clerk said that she knew the sex designation was not accurate, but that she could not update it. Ms. Corbitt said she needed to find out how to update it, because she did not need an inconsistency with her other identity documents. *Id.* at 41:11-43:21.

44.    The clerk called over her supervisor, and then called ALEA's Montgomery office. *Id.* at 43:16-44:7. Each time, she referred to Ms. Corbitt's transgender status out loud.[3] "There was someone to the right of me and to the left of me. The person to the right of me was a woman and she looked at me very pityingly. The people on the left were two men, and they looked at me

---

[3] Ms. Corbitt vividly recalls the clerk referring to her as a "he" and an "it." Corbitt Dep. at 43:16-44:7. In an e-mail about the incident, the sergeant at the Lee County Driver's License office intentionally misgenders Ms. Corbitt as well. *See* Email from Ronni Fetty to Darin Holifield (Aug. 16, 2017) (D977), attached as Pls.' Ex. 34. A statement from the clerk who interacted with Ms. Corbitt suggests possible dispute over whether and by whom Ms. Corbitt was misgendered in the office. Statement of Examiner Teresa Smith (Feb. 9, 2018) (D978), attached as Pls.' Ex. 35 (denying misgendering Ms. Corbitt). Any dispute on this point, however, is not material.

with disgust. There was also a state trooper present who looked at me and I was afraid of the way she was looking at me. I didn't know what it meant. I felt very afraid." *Id.* at 44:8-46:19.

45.     The clerk said that Ms. Corbitt would need to get an amended birth certificate or a doctor's note saying that she had had surgery before the license could be updated. *Id.* at 46:8-46:12. Ms. Corbitt left with her North Dakota license and without an Alabama license. She ran to her car because she was afraid the men who had overheard the conversation were going to physically attack her. *Id.* at 46:13-19.

46.     Ms. Corbitt could only have gotten an Alabama driver's license if she had lied about who she was. *Id.* at 47:7-9.

47.     The humiliating way she was treated at the driver's license office has had a significant impact on Ms. Corbitt. She has lost sleep and has had to miss work hours because of the incident. *Id.* at 36:21-23; 37:1-11.

48.     Ms. Corbitt, while she remains as a student in Alabama, can continue to use her North Dakota license, but if she found a job in her home state after graduation, she would have to give up driving or lie about who she is and put herself at risk. *Id.* at 47:4-9, 64:3-10; 36:19-38:13; Corbitt Decl., at ¶ 15.

49.     Ms. Corbitt would have liked to consider relocating to Alabama permanently after completing her studies if she could find a position in her field in the state. Corbitt Decl., at ¶ 12. Auburn University would be an attractive place for her to work after graduation.  Corbitt Dep. 17:3-19. Because of Policy Order 63, Ms. Corbitt does not believe it would be possible for her to remain in the state permanently without sacrificing her integrity, safety, privacy, autonomy, and dignity. Corbitt Decl., at ¶ 12.

50.     Ms. Corbitt finds it "very difficult" "to navigate the world not having a driver's license in the state where I live." Corbitt Dep. 37: 12-15. If she had to have a license that listed her sex designation as male, it would out her to her employers. *Id.* at 37:19-23. She fears that employers and third parties "will not take kindly to a trans person working" there. *Id.* at 38:1-2. Ms. Corbitt also finds it "incredibly insulting to be treated differently than other people in my state." *Id.* at 38:3-6.

51.     Ms. Corbitt has received death threats for speaking out on transgender issues in the past. Corbitt Decl., at ¶ 11. Currently, Ms. Corbitt is being stalked. *Id.* at 69:14-20. She suspects the person stalking her is targeting her because she is transgender. Corbitt Decl., at ¶ 11. While Ms. Corbitt does not keep her transgender status secret in all circumstances, she wants to be able to keep it confidential in situations where she would be at significant risk, like if she were pulled over by a police officer on a dark country road or carded for buying an alcoholic beverage. Corbitt Dep. 58:1-21.

52.     In those situations where Ms. Corbitt does voluntarily disclose her transgender status, like educational events about transgender issues or her own social media accounts, she can control the narrative, unlike situations where she must show her driver's license. *Id.* at 59:11-21.

53.     It is Ms. Corbitt's "closely held religious belief that God has created [her] as a transgender woman." Corbitt Decl., at ¶ 13. She believes that rejecting her identity as a transgender woman would be tantamount to rejecting God. She does not feel that surgery is right for her at this time.  Corbitt Dep. 60:14-21; Corbitt Decl., at ¶ 14.

B. Destiny Clark

13

54.     Plaintiff Destiny Clark resides in Alabama. Clark Dep. 12:23-13:5, attached as Pls.' Ex. 36. Ms. Clark is transgender and female. She was assigned male at birth, and she knows herself to be female. *Id.* at 8:20-13; 14:13-15; 15:16-19. She first realized she was female when she was five or six years old. *Id.* at 14:16-15:15.

55.     Ms. Clark grew up in Saint Clair County. *Id.* at 9:1-4. She moved away as a young adult, but returned to care for her father when he was ill. Decl. of Destiny Clark, attached as Pls.' Ex. 37 ("Clark Decl."), at ¶ 3. Ms. Clark currently works two jobs and volunteers for various organizations. Clark Dep. 11:20-23; 59:17-23.

56.     Ms. Clark first met and spoke with another transgender person when she was twenty one years old. After talking to that person, she finally felt like she knew who she was and could be who she was. *Id.* at 19:20-20:14. Ms. Clark was diagnosed with gender dysphoria for the first time sometime around 2010. *Id.* at 15:19-26:9.

57.     Ms. Clark completed a legal name change of her first name, which was traditionally masculine, to her current first name, Destiny, in 2015. Name Change Order (redacted) attached as Pls.' Ex. 38. Ms. Clark has corrected her gender with the Social Security Administration. Clark Dep. 35:20-36:12.

58.     Ms. Clark has tried to change the gender listed on her Alabama license three times. *Id.* at 36:17-20. First, Ms. Clark went to the Pell City driver license office in Saint Clair County. There, a clerk told her that they could not help her, and she would have to contact Montgomery. *Id.* at 37:7-15.

59.     Second, Ms. Clark contacted the Medical Unit of ALEA in Montgomery, where she spoke to Defendant Jeannie Eastman. Ms. Eastman advised her to send over her medical

documentation. Ms. Clark did so, but Ms. Eastman declined to change the sex designation on her license. *Id.* at 37:13-22.

60.     Third, after Ms. Eastman had breast augmentation surgery, a form of gender-affirming surgery, Ms. Clark again contacted Ms. Eastman. Ms. Clark sent a letter from her surgeon to Ms. Eastman.  When Ms. Clark did not hear back from Ms. Eastman, she called Ms. Eastman's office. She then learned that Ms. Eastman had contacted her surgeon without her permission to get more information about her medical care, and had again denied her application to change the sex designation on her driver's license. Letter from Robert Bolling, M.D. to Whom It May Concern (Jan. 18, 2017) (D169) attached as Pls.' Ex. 39. Ms. Eastman stated that Ms. Clark needed to have "full surgery." Clark Dep. 41:15-42:13. Ms. Clark does not want or need any additional surgery. *Id.* at 43:1-4.

61.     Ms. Clark's license still designates her as male. Clark driver's license (redacted) attached as Pls.' Ex. 40. She is typically perceived as female, including by strangers. Clark Decl. at ¶ 1. As a result, Ms. Clark experiences a high level of anxiety going about her daily life. *Id.* at ¶ 7. Ms. Clark is afraid to produce her license in public.

62.     Once, when Ms. Clark got pulled over by an officer at night, the demeanor of the officer changed when the officer realized that Ms. Clark was transgender because of her driver's license. While in that situation the officer became rude but did no more than frighten her, Ms. Clark worries that next time, it could be worse. Clark Dep. 33:6-14; 34:3-7.

63.     Ms. Clark avoids ordering alcohol at a restaurant unless she knows the bartender personally. *Id.* at 33:15-19. If she wants to buy alcohol in a store, she asks her boyfriend to buy it for her so she will not have to show her driver's license. Clark Decl., at ¶ 9.

64.     While voting, Ms. Clark was humiliated when the clerk misgendered her in front of around fifty people. This made her afraid about voting because someone could follow her out and attack her. "If someone would have heard the polling person call me sir and refer to me with male pronouns and they wanted to cause a ruckus outside of the polling place, it's a danger to myself." Clark Dep. 33:20-23; 34:1-9.

65.     Ms. Clark does not have a passport. She has never needed one, because she has never traveled outside of the country. *Id.* at 71:7-12. Ms. Clark has worked in the food industry for over thirteen years and she has never had anyone verify their age with a passport. *Id.* at 79:11-15.

66.     Ms. Clark sometimes discloses that she is transgender, such as when speaking or performing at events for the LGBTQ community, and on her Facebook page. When she posts about being transgender online, she understands that she may receive hate mail, but she assesses the risk of physical violence to be low. "They can't necessarily come through the computer screen and punch me in the face." *Id.* at 80:1-10.

67.     When she performs at LGBTQ community events, Ms. Clark also assesses the risk of physical harm to herself as low. Because many LGBTQ people attend those events, she believes that people would quickly come to her aid if anyone tried to hurt her. *Id.* at 81:15-82:6.

68.     By contrast, when she has to show her driver's license to someone, the other person is usually physically close to her, and there usually are not many people around she can count on to defend her. Ms. Clark considers the risks in those situations to be high. "[T]hey could commit violence right there, beat me up, shoot me, do something." *Id.* at 82:7-20.

C. Jane Doe

69.     Jane Doe proceeds in this case under a pseudonym to protect her safety and privacy. Protective Order, ECF No. 41. Ms. Doe grew up in Alabama. Doe Dep. 11:1-6, attached as Pls. Ex. 41. She moved away as an adult, but moved back in 2005 when her mother became sick. *Id.* at 14:20-15:6.

70.     Ms. Doe is transgender. She was assigned male at birth, and she knows herself to be female. *Id.* at 10:15-23. She knew that something was different when she was around six or seven years old, and she identified as a woman beginning in high school. *Id.* at 19:7-12.

71.     When Ms. Doe was a young adult, people at her job heard a rumor that Ms. Doe was a cross-dresser. *Id.* at 21:13-17. They attacked her in a way that caused her serious physical injury, and could have cost her her life. Decl. attached as Pls.' Ex. 42. After that experience, she decided that she had to keep her female and trans identity a secret. Doe Dep 21:5-12.

72.     Later in her life, Ms. Doe began seeking treatment, and she was diagnosed with gender identity disorder (now called gender dysphoria.) *Id.* at 25:6-10; 26:3-5. Ms. Doe changed her given first name, which was traditionally masculine, to her current first name, which is traditionally feminine. Doe name change order attached as Pls.' Ex. 43. She also updated her passport and social security records to reflect her female sex. Doe dep. 29:15-17; 32:21-33:1.

73.     Doe has tried many times to change the sex on her license, but has been unsuccessful. *Id.* at 39-40. Ms. Doe initially was not even permitted to change her name on her license despite having a court order. The clerk told her that because her sex was listed as male, they would not take her photograph while she was wearing makeup. *Id.* at 38:10-39:6. She then went to another office, where they changed her name, but told her that she did not have the correct paperwork to change her sex designation, and she should contact Montgomery. *Id.* at 40:4-10.

17

74.     Ms. Doe then traveled to Montgomery and offered medical documentation of her gender to ALEA. *Id.* at 41:5-21; Letter Certifying Applicant's Gender Change (P6) Attached as Pls.' Ex. 44. ALEA did not accept the documentation, and told Ms. Doe that she had to amend the gender marker on her birth certificate first. Ms. Doe then went to the Department of Vital Statistics, where she offered the same letter. The clerk at that office told her that she had to have a court order instead. Doe Dep. 43:22-44:7.

75.     Ms. Doe then heard that her passport might be enough to change the sex designation. *Id.* at 45:1-17. She called ALEA in Montgomery to ask if she could use her passport and a letter from her primary care physician to change the sex designation on her license. *Id.* The person she spoke to advised her to bring her documentation to a local office. *Id.* Ms. Doe did so, but again was not allowed to change the sex designation on her license. *Id.* at 46:13-21.

76.     She then called ALEA in Montgomery again, and was told that she could only change the sex designation on her license if she took a letter saying she had had "the full surgery" to a judge, got a court order and used it to amend her birth certificate, and took her birth certificate to ALEA to amend her driver's license. *Id.* at 47:19-22; 48:12-49:5. Ms. Doe has not had any gender-affirming surgery because she cannot afford this treatment. Doe Decl., at ¶ 20.

77.     Ms. Doe does not want people to know that she is transgender. *Id.* at 49:14-21. Ms. Doe tries to minimize the situations where she uses her driver's license. For example, she uses her passport to check into hotels, although one hotel worker asked for her license instead. *Id.* at 36:5-10; 79:13-18.

78.     Still, Ms. Doe has experienced discrimination because of the sex designation on her driver's license. During a traffic stop, a police officer saw the feminine name and male sex designation on Ms. Doe's license and inferred that Ms. Doe was transgender. Doe Dep. 35:3-18.

The police officer informed Ms. Doe's employer, and Ms. Doe's employer reacted poorly. She resigned because she believed she was about to be fired. Doe Decl., at ¶ 15; Doe Dep. 35:3-18.

79.     Once, while visiting her credit union, Ms. Doe had to show her driver's license to the teller. The teller responded by telling Ms. Doe that she was "going to hell," saying that she could not "condone this," and refusing to serve her. Doe Dep. 78:11-79:4. Ms. Doe has also faced harassment and negative remarks because her driver's license has outed her to restaurant and bar staff when she has wanted to order a drink. Doe Dep. 35:19-23; 36:1-4; Doe Decl., at ¶ 17.

80.     On February 6, 2018, Plaintiffs filed this constitutional challenge to Policy Order 63 seeking injunctive relief.[4] On July 16, 2018, Plaintiffs filed their First Amended Complaint, which Defendants answered on August 8, 2018. First Amended Complaint, ECF No. 38; Answer to First Amended Complaint, ECF No. 40. Plaintiffs and Defendants completed discovery January 11, 2019.

Transgender People, Safety, and Treatment for Gender Dysphoria

81.     Transgender people have a gender identity—a fundamental sense of self in terms of sex—that is different from the sex they were assigned at birth. Gorton Decl., at ¶ 15, attached as Pls.' Ex. 45. Transgender women are women who were assigned a male sex at birth and know themselves to be women. *Id.* at ¶ 16; Clark Dep. 15:20-16:1. Transgender men are men who were assigned a female sex at birth and know themselves to be men. Gorton Decl., at ¶ 17. Transgender people are a diverse group, hailing from all walks of life.

82.     Roughly 0.3% of adults are transgender. Gary J. Gates, Williams Inst., How Many People are Lesbian, Gay, Bisexual, and Transgender? 1 (2011), attached as Pls.' Ex. 46.

_____

[4] Originally, Ms. Corbitt, Ms. Clark, and John Doe brought this action. John Doe voluntarily withdrew at the same time Jane Doe joined this action through the First Amended Complaint.

Transgender people experience significant discrimination and violence. *Id.* ¶ 30; Sandy E. James, et. al, The Report of the 2015 U.S. Transgender Survey at 89-90 (2016) ("USTS"), attached as Pls.' Ex. 47. at 12; 14, 198 (one in six respondents in major national survey of transgender people who had ever been employed had lost a job because of their gender; more than half of respondents who had interacted with a police officer in the past year had experienced some form of mistreatment; nearly half of respondents had been sexually assaulted). Already in 2019, a transgender woman has been murdered in Alabama. *Alabama Woman Becomes First Known Transgender Person Killed This Year in U.S.*, New York Times, (last visited January 23, 2019) attached as Pls.' Ex. 48. Police refused to identify the victim as a woman and did not acknowledge that she was transgender, disrespecting her in death and delaying broader awareness of the incident, in part because of her "legal documents." *Id.*; *HRC Mourns Dana Martin, the First Known Transgender Person Killed in 2019*, Human Rights Campaign, (last visited January 23, 2019), attached as Pls.' Ex. 49.

83.     Showing ID that does not match one's gender presentation can trigger anti-trans violence and discrimination. According to a 2015 report, 25% of transgender people were verbally harassed, 16% denied services or benefits, 9% asked to leave a location or establishment, and 2% assaulted or attacked after showing identification with a name or gender marker that did not match their gender. USTS at 89-90. Twenty-eight percent of transgender respondents from Alabama had at least one of these experiences. U.S. Trans Survey of 2015: Alabama State Report, attached as Pls. Ex. 50. Additionally, transgender people with ID that reflects the wrong gender sometimes avoid situations where they will need to produce ID, such as "travelling by plane, applying for employment, employing for public benefits, filling prescriptions, purchasing alcohol, applying to and attending college, checking into a hotel,

renting a car, voting, opening and using a checking account, using a credit or bank card, travelling internationally, and number other things that most of us take for granted." Gorton Decl., at ¶ 28.

84.     Many transgender people experience gender dysphoria (GD). Gender dysphoria is a condition characterized by clinically significant distress associated with an incongruence between one's gender identity, one's body, and other people's perceptions of one's gender. Gorton Decl., at ¶ 19. Treatment for gender dysphoria may include social transition, hormone treatment, and one or more surgical treatments. *Id.* at ¶ 20; 21; 23.

85.     The Plaintiffs' expert, Dr. R. Nicholas Gorton, is prepared to testify at trial that changing the sex designation on a driver's license, in and of itself, "has profound health benefits for patient with gender dysphoria as well as significant social, legal, and safety implications for transgender people navigating the world in accordance with their gender identity." *Id.* at ¶ 25. In fact, having an identity document with the correct sex designation has been associated with a "large reduction" in suicidal thinking and suicide attempts.  "The magnitude of this improvement is greater than treating depressed suicidal patients with common antidepressants" *Id.* at ¶ 27.

86.     Dr. Gorton would also testify that, while one or more surgical procedures may be necessary to treat gender dysphoria, some people with gender dysphoria do not need surgical treatment to relieve their symptoms. "It should be remembered that the goal of treatment of GD is to relieve the dysphoria, not to accomplish a laundry list of treatments that may in fact be ill advised in some patients." *Id.* at ¶ 36. Because of other conditions, surgery can be particularly risky for some transgender people. *Id.* at ¶ 38-40. Depending on what is necessary to relieve that individual's gender dysphoria and what the risks of surgical intervention would be for them, surgery may be medically contraindicated. Gorton Dep. 45:16-20, attached as Pls.' Ex. 51.

21

87.     Dr. Gorton also notes that most genital surgeries for treatment of GD, and all genital surgeries for treatment of GD in transgender women, result in "permanent infertility. While this is an unfortunate though acceptable side effect to many transgender people for their treatment, just as it might be for people with cancer, it should only be undertaken when the health benefits of treatment outweigh the risks." Gorton Decl., at ¶ 43.

88.     Dr. Gorton concludes that "it is scientifically inaccurate, clinically inappropriate, and unethical to require a set of medical and surgical procedures to define who should be provided with appropriate identity documentation." *Id.* at ¶ 46. According to a 2015 study, only around 25% of transgender people have had any form of surgery, and the types of surgery range widely. *Id.* at ¶ 33; USTS at 101. Only around 2% of transgender men have had surgery that involves creation of a penis (metaoidioplasty or phalloplasty). USTS at 101.

89.     Dr. Gorton would testify that gender identity is a component of sex, and that even when speaking exclusively about genital anatomy, "penis or vagina" is a vast oversimplification. Gorton Decl., at ¶ 24; 37; 51. People born with intersex conditions, people who have suffered traumatic injuries to their genitals, and people who have undergone certain treatments for cancer, gender dysphoria, and other conditions may have genital anatomy not considered typical for male or female, and may not have genitalia considered typical for the sex they were assigned at birth. *Id.* Defendants' expert Donald Leach, while lacking medical expertise, concurs with Dr. Gorton on these points. Leach Dep. 19:11-21:11.

90.     Dr. Gorton would also testify that it is not sensible to ask a surgeon whether a person has had all of the treatment they need for GD. A surgeon operating on a single body site would not know what other or further treatment, if any, the person would need to relieve their symptoms. Gorton Decl., at ¶ 41.

22

91.     Defendants have produced no evidence to dispute any of Dr. Gorton's statements.

**Alabama Driver Licenses**

92.     Alabama law makes it a crime to drive without carrying a license. See Ala. Code
§ 32-6-1; Ala. Code § 32-6-18. Drivers must comply with requests from law enforcement
officers to show their driver license. *See* Ala. Code § 32-6-9; *Sly v. State*, 387 So. 2d 913, 916
(Ala. Crim. App.), writ denied, 387 So. 2d 917 (Ala. 1980). Drivers must also show their license
to others involved in traffic accidents. Ala. Code § 32-10-2. A driver's license will create a
presumption that one is not unlawfully present in the United States if questioned by a law
enforcement officer. Ala. Code § 31-13-12.

93.     Alabamian adults have little choice but to drive. Even in Alabama's largest city of
Birmingham, the public transportation system has been ranked second worst in the entire
country. Jeremy Gray, Birmingham area's transit use deemed 2nd worst in US, al.com,
September 23, 2011, attached as Pls.' Ex. 52.  Alabama also lacks adequate bike lanes and other
infrastructure for cycling. The League: Bicycle Friendly America: Bicycle Friendly State Report
Card 1 (2017), attached as Pls.' Ex. 53 ("According to federal data, very few people commute by
bike in Alabama and those who do experience some of the least safe conditions in the United
States.").

94.     Additionally, Alabama law permits or requires a driver's license to be used as
proof of permission to drive, identity, age, residence, veteran status, or lawful presence in the
United States in a wide range of circumstances. For example, a driver's license is necessary or
sufficient to meet a requirement for many jobs, professions, and commercial activities. *See e.g.*
Ala. Code § 8-19A-5 (application for license to do telemarketing); Ala. Admin. Code 580-2-9-
.17(6) (criterion for a case manager in a mental illness community program); Ala. Code § 16-27-
4 (application to become school bus driver); Ala. Admin. Code 540-X-16App.A (application for

special purpose license to practice medicine or osteopathy); Ala. Admin. Code 540-X-7App.B

(application for physician assistant license); Ala. Admin. Code 560-X-35-.02(12)(e)(2)

(Medicaid reimbursement as personal care attendant); Ala. Admin. Code 822-X-1-.05

(accreditation for lead hazard reduction); Ala. Code § 45-8-241.01; Ala. Code § 45-1-200

(application for license to do door-to-door sales); Ala. Admin. Code 790-X-2-.01 (application for

real estate license); Ala. Admin. Code 20-X-5-.01 (application for alcoholic beverage license);

Ala. Admin. Code 810-5-12-.01 (application for motor vehicle dealer license); Ala. Admin. Code

620-XApp.A Form3 (application for nursing home administrator license); Ala. Admin. Code

360-X-7-.02 (qualification as certified fire apparatus operator); Ala. Code § 9-12-113(f)

(qualification for commercial fishing); Ala. Admin. Code 20-X-5-.03 Ala. Code § 16-5-54

(eligibility for salary supplement to certain teachers).

95.     A driver's license may or must be used for important aspects of civic

participation, family life, and access to education. *See, e.g.,* Ala. Admin. Code 660-5-29-.02 (to

qualify as a foster parent); Ala. Code § 31-13-28 (to register to vote); Ala. Code § 17-9-30 (to

vote); Ala. Admin. Code 300-4-3-.01(4)(e) (to show eligibility for Alabama student grant

program); Ala. Admin. Code 250-X-5-.12 (to show eligibility for barber and cosmetology

school); Ala. Code § 16-64-3 (to show residency for in-state tuition rates at institutions of higher

learning); Ala. R. J. Admin. Rule 40 (driver's license records used to form master juror list).

96.     Alabama law also calls for driver's licenses in a range of situations relevant to

healthcare and significant life events. *See* Ala. Code § 22-19-60 (to make anatomical gift upon

death); Ala. Code § 20-2-190(5)(a) (to purchase pseudoepinephrine over the counter); Ala.

Admin. Code 580-9-44-.29(14)(iii) (to receive opioid maintenance therapy); Ala. Admin. Code

262-X-4-.02(13)(b)(1) (to show eligibility to receive crime victim's compensation).

97.     Finally, Alabama law conditions participation in various recreational activities on proof of status that a driver's license can supply.  *See* Ala. Code § 9-11-53.1 (application for saltwater fishing license); Ala. Code § 9-11-53 (application for freshwater fishing license); Ala. Code § 9-11-44 (application for hunting license); Ala. Code § 28-11-2 (purchase tobacco products); Ala. Code § 8-17-222 (purchase fireworks); *McLeod v. Cannon Oil Corp.*, 603 So. 2d 889 (Ala. 1992) (purchase alcohol); Ala. Code § 9-14-8 (free entrance to state parks upon presentation of driver's license with veteran designation).

## ARGUMENT

### I. Policy Order 63 Violates the Equal Protection Clause

Defendants' policy facially discriminates against transgender people. Defendants deprive transgender people, and only transgender people, of access to an accurate, usable driver's license without documentation of undergoing surgeries they may not want, need, or be able to afford, and that are wholly irrelevant to their ability to drive. Defendants have offered no justification that would even satisfy rational basis review, much less the heightened scrutiny accorded discrimination on the basis of sex and transgender status.

A. Defendants Discriminate Against Transgender People by Denying Them Driver's Licenses Matching Their Gender.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. 14, §1. The goal of the Equal Protection Clause is to ensure that "all persons similarly circumstanced shall be treated alike." *Reed v. Reed*, 404 U.S. 71, 76 (1971); *see also City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

Policy Order 63 facially discriminates based on sex and transgender status. It establishes the only process for individuals to change the sex designation on their driver's license. The policy explicitly concerns sex, and prevents *only* transgender people from obtaining an accurate and safe driver's license without undergoing surgery and producing documentation of surgery to the government. Defendants treat transgender people differently than similarly-situated cisgender[5] people.

B. Defendants' Policy Receives Heightened Scrutiny Because It Classifies Based On Sex.

Defendant's policy warrants at least heightened scrutiny. Classifications based on transgender status are necessarily classifications based on sex, and the Supreme Court has long subjected classifications on the basis of sex to heightened scrutiny. *United States v. Virginia*, 518 U.S. 515, 555 (1996), quoting *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994) ("'A]ll gender-based classifications . . . warrant heightened scrutiny.'")

The Eleventh Circuit has ruled that "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination . . . that is subject to heightened scrutiny under the Equal Protection Clause." *Glenn v. Brumby*, 663 F.3d 1312, 1319; *see also EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018), *cert. pet. filed* (discrimination against a transgender woman is necessarily based on "notions of how sexual organs and gender identity ought to align," which is "impermissible sex stereotyping."); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015) ("[D]iscrimination against transgender individuals is a form of gender-based discrimination subject to intermediate scrutiny."). Classifications based on transgender status are sex-based classifications because they are premised on transgender people's nonconformance with sex stereotypes, as well as

---

[5] Cisgender is a term that refers to a person whose sense of personal identity and gender corresponds with their sex assigned at birth. It refers to anyone who is not transgender. Gorton Decl., at ¶ 18.

transgender people's identification with a sex other than their assigned sex at birth. *See Glenn*, 663 F.3d at 1316 ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. 'The very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior.'") (citation omitted).

Policy Order 63 classifies people based on their transgender status for purposes of sex designations on licenses, and is therefore a sex-based classification. Alabama's Policy Order 63 specifically targets transgender people based on their nonconformity to sex stereotypes, and identification with a sex other than their sex assigned at birth. They are the only group that cannot get a license that reflects the sex with which they identify. The policy only applies to transgender individuals, as Defendants are well aware. Eastman Dep. 42:20-43:6. Moreover, Policy Order 63 facially governs sex designations, and it requires surgery on genitals, a sex-related characteristic. Eastman Dep. 91:10-14. As Policy Order 63 applies only to transgender people, and as it concerns sex designations and sex-related characteristics, it is a sex-based classification that warrants heightened scrutiny.

C. The Policy Requires Heightened Scrutiny Because It Discriminates Against Transgender People, a Group That is at Least Quasi Suspect.

Additionally, transgender people are at least a quasi-suspect class, and classifications based on transgender status should receive at least intermediate scrutiny. To determine whether a classification should be subject to heightened scrutiny, the Supreme Court examines four factors: (1) a history of discrimination against those with the characteristic; (2) the lack of relevance of the characteristic upon which the classification is based; (3) the immutability of the characteristic; and (4) the minority status or political powerlessness of those with the

characteristic. *See Frontiero v. Richardson*, 411 U.S. 677, 684-88 (1973) (plurality opinion) (identifying factors and concluding that classifications based on sex warrant heightened scrutiny); *see also Windsor v. United States*, 699 F.3d 169, 181-82 (2d Cir. 2012) (concluding classifications based on sexual orientation warrant heightened scrutiny), *aff'd*, 570 U.S. 744 (2013). Based on the Supreme Court's four-factor test, transgender status is a suspect class. *See Karnoski v. Trump*, No. C17-1297-MJP, 2018 WL 1784464, at \*9 (W.D. Wash. Apr. 13, 2018), appeal filed and stay of preliminary injunction granted.

First, transgender people have suffered a history of discrimination. *See Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017), cert. denied, 138 S. Ct. 1260, (2018) ("There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity"); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) ("[T]ransgender people as a class have historically been subject to discrimination"); *Brocksmith v. United States*, 99 A.3d 690, 698 (D.C. 2014) ("[T]he hostility and discrimination that transgender individuals face in our society today is well-documented."); *Adkins v. City of New York*, No. 14-cv-7519, 2015 WL 7076956, at \*3 (S.D.N.Y Nov. 16, 2015) ("[T]his history of persecution and discrimination [against transgender people] is not yet history."); *Kerrigan v. Commissioner of Public Health*, 957 A.2d 407, 446 (Conn. 2008) (The "bigotry and hatred" faced by transgender people is "akin to, and, in certain respects, perhaps even more severe than, those confronted by some groups that have been accorded heightened judicial protection."); Gorton Decl., at ¶ 29 ("Unfortunately, transgender people when they are outed as being transgender face starkly increased rates of interpersonal violence.").

28

Second, the classification of transgender status, like other protected statuses, "'bears no relation to the ability to perform or contribute to society'" *Frontiero*, 411 U.S. at 686; *see also Karnoski*, 2018 WL 1784464, at *10 ("Discrimination against transgender people clearly is unrelated to their ability to perform and contribute to society."); *Adkins* 2015 WL 7076956, at *3 (finding no indication that transgender people are "any less productive than any other member of society."). The Plaintiffs in this case, for example, contribute to their communities through their work, volunteer service, and care for their families.

Third, transgender identity is immutable, because it is based on characteristics outside of individual control. *See Glenn*, 663 F.3d at 1316; *Karnoski v. Trump*, 2018 WL 1784464, at *10 (noting "'medical consensus that gender identity is deep-seated, set early in life, and impervious to external influences'") (citation omitted); Gorton Decl., at ¶ 11 (noting that gender identity is "a product of the central nervous system").

Finally, the Supreme Court considers to what extent a group is "a minority or politically powerless." *Bowen v. Gillard*, 483 U.S. 587, 602 (1987). Transgender people share "characteristics that define [them] as a discrete group," *id.* at 602, and only make up approximately 0.3% of the adult population. Gates, *supra,* at 1. Transgender people are also comparatively politically powerless, and are therefore subject to "the discriminatory wishes of the majoritarian public." *Windsor,* 699 F.3d at 185; *see also Karnoski*, 2018 WL 1784464, at *11 (noting that "[t]here are no openly transgender members of the United States Congress or the federal judiciary"). As transgender people belong to a politically powerless minority, classifications that single transgender people out for differential treatment call for heightened scrutiny.

Based on the Supreme Court's four-factor test, transgender status is at least a quasi-suspect class in its own right, and classifications based on transgender status should be analyzed using heightened scrutiny.

D. Defendant's Policy is Not Narrowly Tailored to a Compelling State Interest, Nor Is It Substantially Related to Achieving an Important Government Objective.

The Defendants' actions fail both strict and intermediate scrutiny. Under strict scrutiny, a classification violates equal protection unless the government can show that the classification is "narrowly tailored to further a compelling government interest." *Shaw v. Reno*, 509 U.S. 630, 643 (1993). Under intermediate scrutiny, Defendants must demonstrate that the classification is "substantially related" to achieving an "important government objective." *Craig v. Boren*, 429 U.S. 190, 197 (1976). To adequately defend the policy against intermediate scrutiny, Defendants must "demonstrate an 'exceedingly persuasive justification'" for their action. *United States v. Virginia*, 518 U.S. at 533. Post-hoc rationalizations cannot survive heightened scrutiny. *See id.* at 533 ("The justification must be genuine, not hypothesized or invented post hoc in response to litigation."); *Glenn,* 663 F.3d at 1321 (noting hypothetical justifications cannot satisfy heightened scrutiny).

To be permissible, disparate treatment of a quasi-suspect class must have a factual basis not rooted in overly broad generalizations, and the factual basis relied upon to justify the policy must be substantially related to a governmental objective. *Craig*, 429 U.S. at 204 (relationship between gender and traffic safety "too tenuous" to support gender-based classification); *United States v. Virginia,* 518 U.S. at 533 (justifications may not rely on "overbroad generalizations" about gender). Policy Order 63 does not serve an important governmental objective, let alone a compelling state interest. Moreover, the discriminatory means employed by Defendants through

30

Policy Order 63 are not substantially related, let alone narrowly tailored, to achieving the Defendant's stated objectives.

Courts in Alaska, Idaho, Michigan, and Puerto Rico have all held that policies barring transgender people from obtaining identity documents matching their gender identity lack any adequate government justification. *See Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1142 (D. Idaho 2018); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015); *K.L. v. State, Dept. of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431-CI, 2012 WL 2685183, at *6-8 (Alaska Super. Mar. 12, 2012). Policy Order 63 similarly lacks any sufficient justification.

Chief Pregno testified that Defendants took very little into account when creating and revising Policy Order 63. Defendants claim that Policy Order 63 was motivated by a desire to "stay consistent with . . . the State of Alabama's birth certificate procedure." Pregno Dep. 48:10-12. Consistency is not an important or compelling government interest, though. At most it might amount to administrative convenience, which on its own is not an important government objective. *See Craig*, 429 U.S. at 198; *Stanley v. Illinois*, 405 U.S. 645, 656 (1972); *Frontiero*, 411 U.S. at 690.

Defendants failed to explain any way in which consistency with the state birth certificate law served any interest beyond the interest in consistency itself. When asked why consistency mattered, the only response the agency could offer was circular, repeating that it wanted to mirror the state birth certificate policy. Pregno Dep. 42:23-43:16. In fact, Defendants' policy creates inconsistencies between Plaintiff's licenses and their federal identification documents, like passports and Social Security records, and between their licenses and the sex they, and those in their lives, know them to be. The agency could offer no reason why consistency with the state

birth certificate policy was more important than consistency with federal policies. Pregno Dep. 107:1-18 (when asked why they did not consider consistency with federal records, the defendant responded "We just didn't."). Defendants prioritized rough consistency with the state birth certificate policy over consistency with federal passport and social security policies, most other states' driver's license policies, medical recommendations, and transgender people's own gender identities, for no reason that it articulated at the time or could articulate during a 30(b)(6) deposition.

The only other interests Defendants asserted were wanting a formal written policy rather than an unwritten, informal policy, and then, in the revision, allowing "more latitude" for transgender people to change the sex on their driver's licenses. Pregno Dep. 41:9-19; 35:10-15. Formalizing a policy in writing does not rise to the level of an important or compelling interest, and, more importantly, has nothing to do with the content of the policy. It is that content, which prevents transgender people from getting driver's licenses that they can use safely unless they have had surgery and provide proof of it to the government, that Plaintiffs challenge, not the existence of a written policy in and of itself. And it is not an important or compelling interest to provide "more latitude" while still keeping a corrected and useful license out of reach for most transgender people. To the extent making corrected driver's licenses meaningfully available to transgender Alabamians was the goal, the means to achieve that goal—a surgery requirement—is not remotely well suited to achieving it.

Perhaps most importantly, Defendants have also offered no explanation for how their interests differ from those of the majority of other states that do not require surgery to change the sex designation on a license. Thus, even if the interests the Defendants identified were compelling or important, it would be hard to imagine why the Defendants need Policy Order 63

to advance them when most other states in the United States have found a way to satisfy their interests without a comparable policy. *See Love*, 146 F. Supp. 3d at 857 (noting that "[a]t least 25 of the states and the District of Columbia do not require a transgender person to undergo surgery to change the gender on his or her driver's license or state ID card" and stating "[t]he Court seriously doubts that these states have any less interest in ensuring an accurate record-keeping system").

E. Policy Order 63 Can Not Withstand Even Rational Basis Review.

Even if Policy Order 63 received no more than rational basis review, Plaintiffs would still prevail. While Defendants have offered various post hoc rationalizations for Policy Order 63, they have not identified and cannot identify any legitimate government interest rationally related to the surgery requirement in Policy Order 63. *See Romer v. Evans*, 517 U.S. 620, 632-33 (1996). The policy is arbitrary and motivated by animus, and thus fails rational basis review. Defendants state that its interests are providing information to law enforcement for identification purposes; providing information to law enforcement and correctional agencies to assist them in applying sex-specific policies to transgender arrestees and prisoners; assisting in the provision of emergency medical care; and disclosing information about people's genital anatomy. The first three interests, while legitimate, are not rationally related to Policy Order 63. The last one is not legitimate.

   1. *Policy Order 63 is arbitrary and based on animus*

Policy Order 63 is based solely on the uninformed feelings of decision makers about transgender people. It is also arbitrary in its design and application.

 Policy Order 63 disadvantages a conspicuously narrow group of people, singling out transgender people for special requirements and bureaucratic hurdles. To hold a driver's license

that accurately reflects their gender, transgender (and only transgender) Alabamians are required to undergo surgery. The policy makes no sense scientifically or in terms of the realities of transgender people's lives. While imposing a major medical requirement, Defendants did not consult with any medical professionals in developing their policy. Defendants made no reference at any time in explaining the reasons for or implementation of the policy to transgender people's actual medical needs. The policy's requirements disregard medical reality: a large proportion of transgender people have not undergone genital surgery. Gorton Decl., at ¶ 33. Some transgender people do not need any surgery, and no single transgender person receives all forms of possible surgical treatment. Gorton Decl., at ¶ 36. The point of medical treatment is not to produce a body that matches others' expectations, but rather to relieve suffering and prolong life. And what medical care someone has received does not dictate how they should be treated. Gorton Decl., at ¶ 34.

Multiple transgender people have complained about the policy to administrators, including Defendants, explaining that it was outdated and offensive, and administrators sent and received emails from the American Association of Motor Vehicle Administrators and others showing that most states do not have similar requirements. Woodruff Dep. 56:21-57:5; Email from Brian Duke to Jeannie Eastman (Sept. 26, 2016) (D381) attached as Pls. Ex. 54; Email from Nona Short to Deena Pregno and Rufus Washington (Sept. 26, 2016) (D337), attached as Pls. Ex. 55; American Association of Motor Vehicle Administrators, Resource Guide on Gender Designation on Driver's Licenses and Identification Cards (Sept. 2016) (D338-380) attached as Pls. Ex. 56; Email correspondence between Redacted and Jeannie Eastman (Jan. 3, 2018) (D1110-D1114), attached as Pls. Ex. 57. Yet Defendants took no steps to confer with experts in the field of transgender health, representatives of Alabama transgender communities, or even

their own Medical Advisory Board when creating or revising their policy, and the policy still stands. Eastman Dep. 129:6-21. Instead, Defendants have clung to a policy based on their own conviction that "not just everybody" should be able to change the sex on their driver's license, even knowing that it has only been transgender people who have sought to change the sex designation on their driver's license. Eastman Dep. 42:12-43:6.

In fact, it is the personal opinions of administrators about gender and transgender people that form the basis for the policy. When explaining why she requires "complete" surgery from applicants to satisfy the policy (which does not itself contain that requirement in writing), Ms. Eastman stated, "Well, I don't see how a person could be a -- I mean -- let me think which way -- I mean, if you -- how can you change your sex if you don't have the top and bottom done?" Eastman Dep. 53:19-23. When asked, "Where are you getting this from? Correct me if I'm wrong. It sounds like this is coming from you, right?" Ms. Eastman answered, "Yes, I said that." Eastman Dep. 54:4-7. Ms. Eastman is also one of the only people aside from Chief Pregno involved in developing the current version of the policy. Pregno Dep. 46:13-19.

When trying to explain the agency's reasons for adopting the policy, Chief Pregno used the same language for describing her own personal opinions about transgender people as for the official reasons behind the policy. Pregno Dep. 86:19 ("That's who they are physically" when describing reason for policy); 115:19 ("They are physically a male" when describing her personal feelings about a transgender woman who has not had surgery). She does not believe that transgender women are women unless they have surgery that obliterating a penis and creating a vagina. She can base her belief on nothing concrete—she just feels that transgender people are not who they know themselves to be, not even who their doctors say they are, unless they have undergone a form of surgery that they may not want, need, or be able to afford and that results in

35

permanent loss of fertility. She is welcome to her personal opinion about what it means to be a man or a woman, but she has chosen to give that opinion force of law through Policy Order 63, prioritizing it over the safety, dignity, privacy, health, and autonomy of transgender people and even the interests she claims Policy Order 63 ought to serve. "[A] classification of persons undertaken for its own sake" is "something the Equal Protection Clause does not permit." *Romer*, 517 U.S. at 635.

Additionally, Policy Order 63 is arbitrary. By design, it has a vastly different impact on people depending on where they were born. The alternative to submitting a letter from a surgeon, under Policy Order 63, is submitting an amended birth certificate. Someone born in Idaho can change the sex designation on their birth certificate by signing a form before a notary attesting that the sex designation on the birth certificate does not match their gender identity. Idaho Department of Health and Welfare, Instructions to Change the Indicator of Sex on an Idaho Birth Certificate to Reflect Gender Identity, attached as Pls.' Ex. 58.  Someone born in Connecticut must submit a letter from a doctor, nurse practitioner, or psychologist stating that they have "undergone surgical, hormonal or other treatment clinically appropriate for the applicant for the purpose of gender transition." Conn. Gen. Stat. Ann. § 19a-42. Someone born in Alabama must have a court order showing that the "sex of an individual born in this state has been changed by surgical procedure and that the name of the individual has been changed" to change the sex designation on a birth certificate. Ala. Code § 22-9A-19. Someone born in Tennessee can never change the sex designation on their birth certificate no matter what. Tenn. Code Ann. § 68-3-203(d). Thus, depending solely on where someone is born, this alternative avenue of relief may be available for someone who has had no treatment for gender dysphoria; non-surgical treatment for gender dysphoria; or surgical treatment for gender dysphoria as well as a name change—or it

36

may not be available at all. ALEA has not offered any rationale for how its interests vary based on where someone was born.

The Defendants' interpretation of the policy to require use of the word "complete" by the certifying surgeons creates an arbitrary effect as well. While decision makers intend this requirement to prevent people from changing the sex designation on their license without having had at least penile and vaginal surgery, the sex designation on a license can be changed whenever the surgeon happens to use the term "complete." No evidence suggests that surgeons or physicians understand the term "complete" to mean what Defendants think it means, and the undisputed expert testimony shows that surgeons would not be in an appropriate position to assess whether a person's course of treatment has been sufficient to alleviate their gender dysphoria. Gorton Decl., at ¶ 41.

   2. *Policy Order 63 undermines the ability to identify holders of Alabama driver's licenses*

Defendants claim the government interest served by Policy Order 63 is to assist officers "to identify the subject that they're dealing with." Pregno Dep. 55:9-56:6. Identification is a legitimate government interest, and listing a sex designation on a license may bear a rational relationship to that interest—but Policy Order 63 does not. In fact, Policy Order 63 works against law enforcement interests in identification, because it prevents transgender people from updating their licenses with the sex consistent with their identity and other people's perceptions.

In other jurisdictions where agencies have raised this justification for similar policies, courts have consistently rejected it. The Eastern District of Michigan recognized that the state's refusal to correct the sex designation on transgender plaintiffs' driver's licenses "[bore] little, if any, connection to Defendant's purported interests" in maintaining accurate identity documents. *Love*, 146 F. Supp. 3d at 856. Alaska's Superior Court held that the state's refusal to correct a

37

transgender woman's driver's license not only failed to "further[]…the state's interest in accurate document[s] and identification" but, in fact, created a risk of "inaccurate and inconsistent identification documents." *K.L.*, 2012 WL 2685183, at *7. Identity documents bearing a transgender person's birth-assigned sex "inaccurately describe the discernable appearance of the [document] holder by not reflecting the holder's lived gender expression of identity," *id.*, creating problems for the document's owner and all those who need to see it. *See also F.V.*, 286 F. Supp. 3d at 1142 (birth certificate policy prohibiting sex designation changes lacked rational basis); *Arroyo Gonzalez*, 305 F. Supp. 3d at 333 (birth certificate policy prohibiting sex designation changes was "not justified by any legitimate government interest").

Under most situations where law enforcement officers seek to identify whether the person presenting a driver's license is actually its holder, the person's surgical history, genitalia, and reproductive organs are irrelevant. *See* Pregno Dep. 67:20-68:1; Leach Dep. 54:21-57:13. Policy Order 63 means that transgender women who have a female identity, typically female appearance, and typically feminine clothing and mannerisms must present ID with a male sex designation to police officers, and that transgender men who have a male identity, typically male appearance, and typically masculine clothing and mannerisms must present ID with a female sex designation.  It is not plausible, nor would it be lawful, for law enforcement to routinely use genitalia, reproductive organs, or other intimate body parts for identification purposes. *See* Leach Dep. 54:21-57:13. Even Chief Pregno acknowledged the possibility that Policy Order 63 could hinder identification, rather than help with it. Pregno Dep. 68:21-69:16. Defendant's expert acknowledged that a transgender man who had not had surgery could even be arrested and charged with possession of a fraudulent instrument if he presented a license with a female sex designation on it.  Leach Dep. 36:18-38:3 (describing a person being arrested for possession of a

fraudulent instrument for presenting a license with a sex designation the officer did not believe could be accurate based on external appearance); 57:19-58:10 (stating that the same thing could happen to a transgender man).

For this same reason, an Alaska court found that a state policy barring changes to the sex designation on a driver's license violated the Alaska Constitution:

> [b]y not allowing transgender[] individuals to change their sex designation, their license will inaccurately describe the discernable appearance of the license holder by not reflecting the holder's lived gender expression of identity. Thus, when such individuals furnish their license to third-persons for purposes of identification, the third person is likely to conclude that the furnisher is not the person described on the license.

*K.L.*, 2012 WL 2685183, at *7.

Everyone in the Plaintiffs' lives know them to be women, and they are typically accurately perceived to be women by strangers. Clark Decl., at ¶ 10; Doe Dep. 50:5-9; Corbitt Decl, at ¶ 2. The male sex designation on their licenses thus makes it more, not less, difficult for others to identify Ms. Clark and Ms. Doe as the holders of their own licenses, as it would for Ms. Corbitt if she had to acquire an Alabama license. That sex designation would also make it more difficult to identify them as crime suspects or missing persons were such a situation to arise.

The only anecdote ALEA offered about how Policy Order 63 advanced the interest of identification actually only showed that ALEA has an interest in maintaining *internal* records of the changes they make to sex designations on licenses, something Plaintiffs do not challenge. In that situation, according to Chief Pregno, human remains were found. Pregno Dep. 58:21-60:6. The person who had died had a license listing her as female and her name as J-----.[6] Based on the autopsy, she had female-typical genitalia. *Id.* When the District Attorney's office "ran her"—

---

[6] Out of courtesy to the deceased and her family, Plaintiffs omit her name from this memorandum, although it is available in the deposition transcript.

presumably by searching for matches with fingerprints in a criminal database—they found a match with the record of someone listed as a man named C-----. *Id.* The District Attorney called ALEA, and ALEA informed the District Attorney that J---- had changed her name and sex designation with ALEA, and was previously known as C----- and listed as male. *Id.* That information was presumably useful to the District Attorney in confirming the identity of the deceased. Notably, however, the exact same thing would have happened if instead of Policy Order 63, Defendants permitted transgender people to change the sex designations on their licenses without proof of surgery.  If, for example, ALEA changed the sex designation of a license upon receipt of a simple form where applicants could attest to their own gender, like the District of Columbia requires, the exact same interest would have been served. District of Columbia Dep't of Motor Vehicles, *supra,* Ex. 22.

At the end of the day, recording the updated accurate sex of transgender people, regardless of whether they have had surgery, provides more and better information to law enforcement agencies. Policy Order 63 is not rationally related to a government interest in identification.

3.  *Policy Order 63 is not rationally related to applying sex specific policies in correctional or law enforcement contexts*

The claimed interest in providing information about sex to law enforcement and corrections agencies for purposes of applying various sex-based policies to transgender driver's license holders also bears no rational relationship to Policy Order 63. Chief Pregno disclaimed any knowledge of how law enforcement or correctional agencies apply sex-specific policies to transgender people. Pregno Dep. 79:2-11.  When asked how ALEA knew that Policy Order 63 assists law enforcement or correctional officers in applying their policies, she said, "Well, it

40

just—it just does." Pregno Dep. 79:12-14. When asked to explain how it does, her response was circular, stating (inaccurately) that Policy Order 63 gives officers information about "physically what—who that person is and how the officer should handle them." When asked how she knew that officers wanted to know about genitals, rather than about other characteristics, she said, "I'm going off the information that we use based on the identifiers on the license." Pregno Dep. 80:12-17. The mere fact that ALEA has opted to require surgery under Policy Order 63 does not provide any rational basis to believe that that is a requirement useful to law enforcement.

Defendant's expert, Donald Leach, testified that Policy Order 63 would provide information that law enforcement and correctional agencies may or may not use to apply their sex-based policies. He did not express any opinion about what the best definition of sex would be for law enforcement purposes. Leach Dep. 32:9-13. He testified that a policy reflecting a person's gender identity would achieve the same law enforcement and correctional interests that Policy Order 63 does. *Id.* at 32:14-19. He also testified that in his experience running a Kentucky jail, he rarely employed sex-based policies, and he recommends that other correctional and law enforcement agencies apply sex-based policies to transgender people based on the transgender person's preference, rather than based on their surgical history, genitalia, or driver's license sex designation. *Id.* at 98:8-15; 110:21-111:8; 112:8-15. In short, Defendants' expert believes that having a sex designation on a license can serve law enforcement and corrections purposes, but provides absolutely no support for the surgery requirement of Policy Order 63.

In describing criteria for placing transgender people in men's or women's facilities consistent with the Prison Rape Elimination Act, the regulations for prisons and jails do not mention anatomy or identity documents, and the regulations for immigration detention prohibit placing transgender people in men's or women's facilities based "solely on the identity

41

documents or physical anatomy of the detainee." 6 C.F.R. § 115.42(b). Rather, agencies must consider the transgender person's gender identity, health and safety needs, and own opinion about the best placement. 6 C.F.R. § 115.42(b)-(c); 28 C.F.R. § 115.42(c)-(e).  PREA regulations also refer to permissible and impermissible ways to learn about a transgender person's genitals. "If the detainee's genital status is unknown, it may be determined during conversations with the detainee, by reviewing medical records, or, if necessary, by learning that information as part of a broader medical examination conducted in private by a medical practitioner." 28 C.F.R. § 115.115. Identity documents are not mentioned, and indeed, a driver's license would not be a sensible way for a law enforcement or correctional agency to ascertain this information about a transgender person if it were needed even in Alabama. *See* Gorton Decl., at ¶ 51. ("Because of intersex conditions, traumatic injuries, and medical treatments for various conditions, a significant number of people assigned a female sex at birth who have not undergone genital [sex reassignment surgery] nonetheless do not have female-typical genital anatomy or other female-typical anatomy, and a significant number of people assigned a male sex at birth who have not undergone genital [sex reassignment surgery] nonetheless do not have male-typical genital anatomy or other male-typical anatomy.").

If anything, Policy Order 63 acts contrary to the interest law enforcement and correctional agencies are meant to serve: public safety. In explaining why a policy preventing transgender people from amending the sex designation on their birth certificates did not meet even rational basis review, a district court explained the policy "exposes transgender individuals to a substantial risk of stigma, discrimination, intimidation, violence, and danger." *Arroyo Gonzalez*, 305 F. Supp. 3d at 333.The same is true of Policy Order 63.

4. *Policy Order 63 is not rationally related to the interest of providing emergency medical*
   *care.*

Defendants asserted a government interest in providing emergency medical care. While that is a legitimate interest, it is not rationally related to requiring surgery prior to changing the sex designation on a driver's license. Indeed, Defendants were not aware of any situation in which the sex designation on a license would assist anyone in providing emergency medical care to anyone. Pregno Dep. 101:10-102:7. But requiring people to undergo surgery regardless of whether they want or need it is counter to the interests of promoting health. Gorton Decl., at ¶ 34 ("The care of transgender people, like all other patients, must be individualized. No one would suggest that all diabetics need treatment with insulin, and in the same way not all people with [gender dysphoria] need [hormone replacement therapy] or [sex reassignment surgery].").

5. *Revealing information about people's genital anatomy is not a legitimate government*
   *interest*

To the extent Defendants suggest that they have an interest in revealing information about a person's genitalia to anyone who sees a license, that is not a legitimate government interest. Sharing sensitive information about intimate parts of a person's body for no other reason than to do so cannot justify government action even under rational basis review.

**II. Defendants' Policy Violates Plaintiffs' Due Process Right to Privacy.**

Policy Order 63 violates the Plaintiffs' due process right to privacy.  The policy forces transgender people to disclose that their assigned sex at birth differs from their gender identity—that is, it forces them to disclose that they are transgender—every time they must produce a driver's license. Because many transgender people have gender dysphoria, a condition associated

43

with an incongruence between sex assigned at birth and gender identity, and because surgery is required to change the sex designation on a license, the policy also forces disclosure of medical information. The incorrect driver's license reveals highly intimate information and puts Plaintiffs at risk of bodily harm.

The "constitutionally protected 'zone of privacy'" includes an "individual interest in avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 598-99 (1977). The former Fifth Circuit agreed that a "constitutional right to privacy" was "incorporated in the due process protected by the Fourteenth Amendment." *Plante v. Gonzalez,* 575 F.2d 1119, 1127 (5th Cir.1978) (*citing Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)).[7] The Eleventh Circuit has recognized a right to "informational privacy." *Burns v. Warden, USP Beaumont*, 482 F. App'x 414, 417 (11th Cir. 2012); *see also Hester v. City of Milledgeville*, 777 F.2d 1492, 1497 (11th Cir. 1985). The concept of informational privacy the Eleventh Circuit recognizes is broad; no showing of downstream consequences from the disclosure need to be made. *Plante*, 575 F.2d at 1135. ("When a legitimate expectation of privacy exists, violation of privacy is harmful without any concrete consequential damages. Privacy of personal matters is an interest in and of itself, protected constitutionally[.]")

The right to informational privacy particularly encompasses information that is sexual, medical, or about mental health. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2323 (2016), *as revised* (June 27, 2016) (sexual, medical); *United States v. Kravetz*, 706 F.3d 47, 63 (1st Cir. 2013) (medical, mental health); *United States v. Brice*, 649 F.3d 793, 796 (D.C. Cir. 2011) (medical, mental health); *Aid for Women v. Foulston*, 441 F.3d 1101, 1124 (10th Cir. 2006) (sexual, medical); *Livsey v. Salt Lake Cty.*, 275 F.3d 952, 956 (10th Cir. 2001) (sexual,

---

[7] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (decisions from former Fifth Circuit binding in Eleventh Circuit).

44

medical); *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998) (sexual); *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 580 (3d Cir. 1980) (medical); *Hirschfeld v. Stone*, 193 F.R.D. 175, 183 (S.D.N.Y. 2000) (sexual, medical).

The federal courts that have addressed whether one's transgender status counts as protected information have consistently answered yes. Indeed, there is hardly anything that is more intimate or that involves more core aspects of one's personhood. *See e.g. Arroyo Gonzalez*, 305 F. Supp. 3d at 334; *Love*, 146 F. Supp. 3d at 855 *Darnell v. Lloyd*, 395 F. Supp. 1210, 1214 (D. Conn. 1975). Just being transgender "is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." *Powell v. Schriver*, 175 F.3d 107, 111-12 (2d Cir. 1999). "The excruciatingly private and intimate nature of transsexualism,[8] for persons who wish to preserve privacy in the matter, is really beyond debate." *Id.* "Much like matters relating to marriage, procreation, contraception, family relationships, and child rearing, there are few areas which more closely intimate facts of a personal nature than one's transgender status." *Arroyo Gonzalez,* 305 F. Supp. 3d at 333 (citations omitted).

Defendants' Policy Order 63 violates Plaintiffs' privacy. The information disclosed here—transgender status—is exactly the sort of information courts have consistently found to be constitutionally protected.

While direct negative consequences of disclosure need not be shown to establish a constitutional violation, the potential consequences here shed light on the high stakes for Plaintiffs and other transgender people. The personal safety and bodily integrity of transgender people becomes threatened when the government forces this information to be disclosed. *See Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992) (noting that there is "social stigma attached to

---

[8] Plaintiffs note the term "transsexualism" is outdated and that, modernized, *Powell* addresses transgender people.

being transgender"); *Whitaker ex rel. Whitaker* 858 F.3d at 1051; *In re E.P.L.*, 891 N.Y.S.2d 619, 621 (N.Y. Sup. Ct. 2009). As this Court noted in granting John Doe's motion to proceed under a pseudonym, "transgender status [is] a paradigmatic circumstance for which courts have allowed anonymous pleading" Order, (Doc. 10) (citing *Frank*, 951 F.2d at 324). One's transgender status is a matter that can be "highly sensitive and [of a] personal nature, [a] real danger of physical harm, or where . . . injury" could occur. *Frank*, 951 F.2d at 324.

Ms. Doe has already been denied services by a bank teller who told her she was going to hell after she saw Ms. Doe's license. Ms. Doe also lost her job after the incongruence between her name and her sex designation outed her to a police officer. Ms. Clark fears getting beaten up after voting. Ms. Corbitt literally ran to her car because she feared attack after she was humiliated and outed in an ALEA office. These fears are unfortunately well founded.  According to a 2015 report, twenty-five percent of transgender people were verbally harassed, 16% denied services or benefits, 9% asked to leave a location or establishment, and 2% assaulted or attacked after showing identification with a name or gender marker that did not match their gender. USTS at 82 (2016). Just six days into 2019, a transgender woman was murdered in Alabama. *Alabama Woman Becomes First Known Transgender Person Killed This Year in U.S.*, New York Times, (last visited January 23, 2019).

The court in *Love* found "'no reason to doubt that where disclosure of this [highly intimate] information may fall into the hands of persons' harboring such negative feelings, the … Policy creates a very real threat to Plaintiffs' personal security and bodily integrity." *Love*, 146 F. Supp. at 856 (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1063 (6th Cir. 1998); *see also Powell,* 175 F.3d at 111 (given the "hostility and intolerance" towards transgender people,

46

"the Constitution does indeed protect the right to maintain the confidentiality of one's transsexualism.").

While two of the Plaintiffs have disclosed that they are transgender through their advocacy on transgender issues, as well as on their Facebook pages, this disclosure does not diminish their right to privacy. Voluntarily sharing this personal information with a select group of people who have come specifically to learn about transgender issues or who are transgender themselves, or to people who seek out their social media page, is not the same as sharing information involuntarily to a stranger at a grocery store, school, or traffic stop. *See* Clark Dep. 33:6-14; 34:3-7. In those situations, Plaintiffs are more likely to be face-to-face with someone whose reaction to this information they cannot predict, in a situation where they do not have friends or allies nearby. *See* Corbitt Dep. 41:11-43:21.Dealing with hate messages sent through social media or offensive reactions from an audience member when surrounded with other transgender people does not carry nearly the same level of immediate material threat.

Also, crucially, in settings like an LGBT event or Facebook page, it is the Plaintiffs' own choice whether and how to disclose this exquisitely private information. When giving a speech or sharing a post on social media, Plaintiffs make the disclosure of their own volition and on their own terms, often providing education about what it means to be transgender and affirming their own womanhood. *See* Corbitt Dep. 58:1-21; 59:11-21; Clark Dep. 80:1-10, 21:15-82:20. When showing their driver's licenses, there is nothing except a bald misstatement of their sex contrasted with their physical appearance and identity in circumstances under which they would *never have otherwise disclosed*. Further, even if the Court were to find that Ms. Corbitt's and Ms. Clark's information is not private, there would be no reason to find the same as to Ms. Doe. The undisputed evidence shows that Ms. Doe tries to prevent disclosure of her transgender

identity, and it has been her driver's license that has kept her from being able to do so. Doe Dep. 35:3-18; 49:14-21; 50:21-51:8.

It is no answer that Defendants put Plaintiffs in the position of having to make the disclosure themselves, rather than sharing this information more directly. "'[W]hat the state may not do directly it may not do indirectly.'" *Lebron v. Sec'y, Fla. Dep't of Child & Fam.*, 710 F.3d 1202, 1217 (11th Cir. 2013) quoting *Bailey v. Alabama*, 219 U.S. 219, 244(1911) (receipt of public assistance could not be conditioned on giving up right to free from unreasonable searches). The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests. . . ." *Perry v. Sindermann*, 408 U.S. 593, 597, (1972) (continued government employment could not be conditioned on giving up right to free speech). Avoiding the unconstitutional violation of their privacy rights would require Plaintiffs to give up the use of their driver's licenses, which would mean, among other things, that Ms. Doe and Ms. Clark could no longer drive legally in the state of Alabama, and Ms. Corbitt would not be able to do so if she stayed in Alabama after graduating. *See* Statement of Facts ¶ 92-97.

The intrusion on Plaintiffs' privacy cannot be justified when weighed against the purported government interests. *See* Section I.D. Because Plaintiffs have shown that Defendants' policy discloses their intimate information, this Court should rule in favor of Plaintiffs' due process privacy claim.

### III. Defendants have deprived Plaintiffs of Due Process of Law by Conditioning Receipt of a Benefit on Giving up the Constitutional Right to Refuse Medical Treatment

Policy Order 63 unjustifiably intrudes on Plaintiffs' fundamental right to bodily integrity and to make one's own important personal decisions. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (acknowledging fundamental right to bodily integrity and to receive abortion, use contraception, and refuse unwanted lifesaving medical treatment); *Whalen v. Roe*, 429 U.S.

48

589, at 599–600 (recognizing an "interest in independence in making certain kinds of important decisions"). As the Supreme Court has stated, "[a]t the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 851 (1992); *see also Arroyo Gonzalez*, 305 F. Supp. 3d, at 334 ("The right to identify our own existence lies at the heart of one's humanity.").

Part of the liberty protected by the Fourteenth Amendment is the right to refuse medical treatment. *See Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) ("[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment[]"); *Washington v. Harper*, 494 U.S. 210, 221 (1990) (recognizing "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs. . . ."). This liberty takes on special importance when the medical intervention impacts procreation. *See Skinner v. Oklahoma*, 316 U.S. 535, 541-42 (1942) (describing procreation as involving "one of the basic civil rights of man" and finding law unconstitutional that imposed sterilization on people convicted of certain crimes); *Planned Parenthood of Se. Pennsylvania,* 505 U.S. at 851 ("Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education…. These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment.").

Because the right to refuse healthcare is fundamental, any infringement on it is subject to strict scrutiny. *See Washington v. Glucksberg*, 521 U.S. at 721 ("[T]he Fourteenth Amendment 'forbids the government to infringe . . . "fundamental" liberty interests *at all,* no matter what

49

process is provided, unless the infringement is narrowly tailored to serve a compelling state interest") (*quoting Reno v. Flores*, 507 U.S. 292, 302 (1993)).

Here, the government requires transgender Alabama residents to undergo surgery that results in permanent sterilization as a condition to obtain a government benefit without anything approaching the procedural safeguards, powerful reasons, or narrow tailoring the Supreme Court has required in comparable cases. It is undisputed that virtually all forms of genital surgery for transgender people, and all forms of genital surgery for transgender women like Plaintiffs, have the effect of sterilization, which brings this requirement into an area of especially great constitutional concern. Gorton Decl. at ¶ 43. Strict scrutiny applies. The government has offered no justification that can satisfy any level of scrutiny, let alone approaching the level of a compelling interest, as described above in section I.D. Unlike with compulsory vaccines in *Jacobson,* for example, no one else's life depends on whether and which gender-affirming surgeries transgender people have received.  *See Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 28 (1905). Also, as explained above, the policy is not narrowly tailored to any of the interests Defendants have offered.

To make decisions about whether to obtain any form of gender-affirming surgery, and which type or types of surgery to obtain if so, transgender people must weigh the risk of complications, the benefit of relief from gender dysphoria, the impact on their reproductive capacity, their financial resources for obtaining and recovering from surgery, the support or censure they may receive from the people closest to them, and their relationship to their own body and gender. They make these decisions in consultation with their medical and mental health providers, often with the family members and loved ones closest to them, and sometimes only after considerable introspection and prayer. These decisions are profoundly intimate, and touch

on core aspects of individual autonomy and bodily integrity sacred to the Constitution in a way that few other choices do. Policy Order 63 withholds an accurate, usable driver's license from transgender people unless they choose to have what the state considers sufficient medical treatment, have the means to get that treatment, and provide proof to the government of having received it. For that reason, it violates the constitution.

## IV. Policy Order 63 Violates the First Amendment Because It Compels Plaintiffs to Endorse the State's Message About Sex

The Supreme Court has repeatedly struck down laws forcing people to express a viewpoint that they disagree with, including through the forced disclosure of information. *See Janus v. Am. Fed'n of State, Cty., and Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018) ("Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning."); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). As the Supreme Court has just affirmed, "the people lose when the government is the one deciding which ideas should prevail." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2375 (2018).

Compelling any speech, whether ideological or factual, violates the Constitution. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797–98 (1988) ("These cases cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech"). However, courts show special concern over speech that expresses or is closely tied to political, ideological, or moral positions. *N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1565 (11th Cir. 1990) (quoting *West Virginia State Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943)) ("Restrictions on government speech seem to spring from one ideal: 'If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics,

nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.'").

Here, Defendants compel Plaintiffs, as well as transgender people in Alabama more generally, to carry and show driver's licenses that convey Defendants' viewpoint about the Plaintiffs' sex, as well as about the meaning of sex generally. Policy Order 63 is based on and represents an anti-transgender ideology that Defendants hold: that a person's sex should only be evaluated based on the sex associated with their external genitalia at birth unless they have had sex reassignment surgery, regardless of the sex they identify with. This view is a controversial one among the public, a minority one among States, and a rejected one within the medical community. *Everything You Need to Know About the Debate Over Transgender People and Bathrooms*, Time (July 28, 2015), attached as Pls.' Ex. 59; National Center for Transgender Equality, *supra,* Ex. 23; Gorton Decl., at ¶ 53. Indeed, the undisputed testimony from both experts is that "sex" includes components other than the ones Defendants take into account. Gorton Decl. ¶ 10; Leach Dep. 11:15-12:17.

The ideological view about gender and transgender people espoused through Policy Order 63 and the sex designation Defendants compel Plaintiffs to carry on their driver's licenses is one with which the Plaintiffs emphatically disagree. Corbitt Dep. 47:4-9; Clark Dep. 32:9-16; Doe Decl., at ¶ 24 While Defendants may choose to embrace this ideology about sex and express it on behalf of the government to the extent doing so does not conflict with other constitutional protections, the First Amendment does not allow them to force the Plaintiffs to endorse that message by repeatedly communicating it to others with their driver's license. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc*., 135 S. Ct. 2239, 2253 (2015), quoting *Wooley* at 715 ("[J]ust as Texas cannot require SCV to convey 'the State's ideological message,' SCV

cannot force Texas to include a Confederate battle flag on its specialty license plates.").

"Government communication is legitimate as long as the government does not abridge an

individual's 'First Amendment right to avoid becoming the courier for such message.'"

*N.A.A.C.P.*, 891 F.2d at 1566 *quoting Wooley v. Maynard*, 430 U.S. at 717. In *N.A.A.C.P.,* the

Eleventh Circuit ruled that Alabama had not compelled speech when it flew the Confederate

flag, because "Alabama does not compel its citizens to carry or post the flag themselves." *Id.*

With respect to driver's licenses, Alabama directly compels its citizens to carry its written

message about their gender. *See supra* Statement of Facts ¶ 92-97.

Ms. Clark and Ms. Doe try to minimize the situations where they need to show

identification because of Policy Order 63, but nonetheless have had to produce their driver's

licenses on numerous occasions despite their aversion to the message it communicates. Doe Dep.

50:21-51:15; 79:13-18; 78:11-21; 35:3-36:11; Clark Dep. 33:3-34:11; 35:2-11; 46:18-47:18;

79:3-23. Ms. Corbitt, while a student, can continue to use her North Dakota license, but if she

found a job in her home state after graduation, she would have to give up driving or lie about

who she is. Corbitt Dep 47:4-9; Corbitt Dep. 64:3-10; Corbitt Dep. 36:19-38:13. She would have

to repeatedly endorse that lie, one that is repugnant to her, not only in order to get a license at all,

but each and every time she carried it with her or had to show it to someone.

Even as Policy No. 63 forces Plaintiffs and others to endorse Defendants' viewpoint

concerning the meaning of sex, it simultaneously prohibits Plaintiffs from conveying their own

constitutionally-protected message about their identity and sex. Forcing Ms. Clark and Ms. Doe

to repeatedly communicate through their driver's license that they are male prevents them from

exercising their right to express their true female identity. *See, e.g., Doe v. Bell*, 754 N.Y.S.2d

846, 851 (Sup. Ct. 2003) (expression of gender was protected message). It forces Plaintiffs and

other transgender individuals to repeatedly and publicly contradict something at the very core of their personal identity, as well as their moral, political, and religious beliefs. And it may have a chilling effect on their participation in public life more broadly:

> Forcing disclosure of transgender identity chills speech and restrains engagement in the democratic process in order for transgender[] [people] to protect themselves from the real possibility of harm and humiliation. The Commonwealth's inconsistent policies not only harm the plaintiffs before the Court; it also hurts society as a whole by depriving all from the voices of the transgender community.

*Arroyo Gonzalez*, 305 F. Supp. 3d, at 333.

The unconstitutionality of forcing this speech is underscored because only Plaintiffs and other transgender individuals are targeted by this compulsion of their speech. Cisgender people are not similarly compelled, because their driver's licenses match who they are, and do not convey a message with which they disagree. Courts should be "deeply skeptical" when "'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Nat'l Inst. of Family & Life Advocates*, 138 S. Ct. at 2378.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant summary judgment in favor of Plaintiffs on all counts in their Complaint.

Respectfully submitted this 8th day of February 2019.

<u>s/ Brock Boone</u>
Brock Boone
Randall C. Marshall
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
bboone@aclualabama.org
rmarshall@aclualabama.org

Rose Saxe
Gabriel Arkles
ACLU LGBT & HIV Project / ACLU Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2605
rsaxe@aclu.org
garkles@aclu.org
*Admitted Pro Hac Vice*
***Counsel for Plaintiffs Darcy Corbitt, Destiny Clark, and Jane Doe***

**CERTIFICATE OF SERVICE**

I certify that on February 8, 2019, I filed the foregoing electronically using the Court's CM/ECF system, which will serve all counsel of record.

s/ Brock Boone