# Exhibit 2

# In The Matter Of:

*Darcy Corbitt, Destiny Clark, and Jane Doe v.*
*Hal Taylor, etc., et al.*

---

*Jeannie Eastman*
*November 13, 2018*

---

*Baker Realtime Worldwide Court Reporting & Video*
*250 Commerce Street*
*Third Floor, Suite One*
*Montgomery, Alabama  36104*
*www.BakerRealtime.com*

Original File 11-13-18 Jeannie Eastman.txt

**Min-U-Script® with Word Index**

1

1       IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3               NORTHERN DIVISION

4

5   CIVIL ACTION NO.: 2:18-CV-00091-MHT-GMB

6

7   DARCY CORBITT, DESTINY CLARK, and JANE DOE,

8       Plaintiffs,

9   V.

10  HAL TAYLOR, in his official capacity as

11  Secretary of the Alabama Law Enforcement

12  Agency, et al.

13      Defendants.

14

15        DEPOSITION OF JEANNIE EASTMAN

16             November 13, 2018

17

18        Taken before Elaine Scott, CCR,

19  Commissioner for the State of Alabama at

20  Large, in the Law Offices of the Alabama

21  Attorney General, 501 Washington Avenue,

22  Montgomery, Alabama, on Thursday, November 13,

23  2018, commencing at approximately 12:59 p.m.

2

1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:

4    AMERICAN CIVIL LIBERTIES UNION FOUNDATION

5    Gabriel Arkles

6    125 Broad Street

7    18th Floor

8    New York, New York 10004

9

10   ALABAMA CIVIL LIBERTIES UNION FOUNDATION

11   Brock Boone

12   Randall C. Marshall

13   P.O. Box 6179

14   Montgomery, Alabama 36106

15

16   FOR THE DEFENDANTS:

17   OFFICE OF THE ATTORNEY GENERAL, STATE OF

18   ALABAMA

19   Brad A. Chynoweth

20   501 Washington Avenue

21   Montgomery, Alabama 36130

22

23

3

1          A P P E A R A N C E S (continued)

2

3   ALSO PRESENT:

4   Meredith Barnes

5

6   COURT REPORTER:

7   BAKER REALTIME WORLDWIDE REPORTING & VIDEO

8   Elaine Scott

9   250 Commerce Street

10   Third Floor, Suite One

11   Montgomery, Alabama 36104

12

13

14

15

16

17

18

19

20

21

22

23

10

1    preparation for the deposition?

2         A.   I spoke to the attorneys.

3         Q.   Did you speak to anyone else who

4    wasn't an attorney about the deposition?

5         A.   Well, Chief Pregno was in one of

6    the meetings.  We had a meeting last week

7    about some documents.

8         Q.   And what was -- if something is

9    privileged, just let me know.  But was

10   anything said in the meeting?  What was said

11   in that meeting with Chief Pregno?

12        A.   It was just how we came about the

13   documents.

14        Q.   Like what was -- like what about

15   the documents?

16        A.   We -- that she ran a query on

17   driver's license where the sex had been

18   changed on them so we could get -- pull the

19   documents of the ones that had sexual

20   reassignment surgery.

21        Q.   What about documents that were

22   denied?

23        A.   There's really no way to pull those

11

1   without driver's license numbers.

2          Q.  So we, as in the opposing side, I

3   guess, aren't able to see who's denied; is

4   that right?

5          A.  No.  Like I said, there's no way to

6   pull those documents without driver's license

7   numbers.

8          Q.  Who else was present at the time of

9   the meeting with Chief Pregno?

10         A.  Meredith and Jennifer Colquitt.

11  She's one of the IT people.

12         Q.  Why was she there, Jennifer

13  Colquitt?

14         A.  Because she's the one that ran the

15  query.

16         Q.  In your opinion do you think

17  anything might be missing from the discovery?

18         A.  No, sir.

19         Q.  Is there any reason why you

20  wouldn't be able to answer my questions fully

21  and accurately today?

22         A.  No, sir.

23         Q.  Is it your understanding that

31

1    would do?

2         A.   I would probably comment in the

3    system.

4         Q.   Where?

5         A.   In the DB2.

6         Q.   Is there a section for comments

7    under that individual person?

8         A.   It's under their driver's license.

9         Q.   What do you do with the doctor's

10   letter?

11        A.   We would scan that into our Paper

12   Vision System.

13        Q.   Would you write anything on there

14   like denied or anything like that?

15        A.   Yes, usually.  And probably just

16   put -- like if they -- like if it didn't say

17   that they had the surgery, then I would write

18   that on there, that that's what we needed, a

19   doctor's letter stating that they had the

20   complete surgery.

21        Q.   Do you ever make any phone calls?

22        A.   I have called the doctor's office.

23        Q.   How come?

32

1          A.  Because the letter did not say that

2     the surgery was complete.

3          Q.  Where do you get that guidance

4     from?

5          A.  What do you mean?

6          Q.  Who told you to call the doctors'

7     offices?

8          A.  I don't recall anybody telling me

9     to.

10         Q.  So you came up with that on your

11    own?

12         A.  I mean, we call about other things

13    in the medical unit, so -- I mean, I don't

14    know that that's said anywhere, that we call

15    or not call.

16         Q.  Does it say in the policy to call

17    if you don't think the surgery was complete?

18         A.  No.

19         Q.  Does it say under number 2 in that

20    middle section on Plaintiff's Exhibit 7 -- on

21    page two of Plaintiff's Exhibit 7, what does

22    it say if a physician -- can you read that

23    line?

33

1          A.  If a physician letter is presented

2     there is no need to contact the physician

3     unless there is some doubt as to the

4     authenticity of the letter unless the

5     surgeries have been performed in other

6     countries.

7          Q.  So it doesn't say anything about

8     calling if the surgery is complete, right?

9          A.  No.  It just says if we have a

10    doubt of the authenticity.

11         Q.  But you have --

12         A.  Which that says under the exam

13    office part.

14         Q.  So you have no idea where you heard

15    about calling individuals' doctors' offices?

16         A.  No.

17         Q.  Roughly how many applications have

18    you received from people seeking to change the

19    sex designation on their driver's license?

20         A.  I can't really give you a number of

21    how many we've received, by how many we have

22    done is like maybe ninety something.

23         Q.  What do you mean done?

37

1   had the complete surgery or an amended birth

2   certificate.

3          Q.   And you do have the power to

4   approve or deny an application yourself?

5          A.   Yes.

6          Q.   Do you ever have to talk to someone

7   above you in a supervisory role about the

8   application if you approve or deny it?

9          A.   No, I don't have to talk to someone

10   else.

11          Q.   Do you ever share those approvals

12   or denials with anyone else?

13          A.   No.

14          Q.   Do you ever share approvals or

15   denials with the legal department?

16          A.   No.

17          Q.   How often do you call the

18   physician's office when you receive an

19   application?

20          A.   I really don't recall but calling

21   one time.

22          Q.   What about Jerrolynn Spencer?  Do

23   you know of instances where she's called the

38

1    physician's office?

2           A.   I'm sure she has.

3           Q.   For the instance of -- that you

4    recall about calling the physician's office,

5    why did you call?

6           A.   Because the letter did not say they

7    had had the completed surgery.

8           Q.   Who did you talk to at that

9    physician's office?

10          A.   It would have been the nurse that

11   answered the phone or a nurse.

12          Q.   What did you ask the nurse?

13          A.   If the subject had had the

14   completed surgery.

15          Q.   What did the nurse say?

16          A.   They said no in this case.

17          Q.   Before you called the physician's

18   office, did you first contact the applicant

19   for permission?

20          A.   No.

21          Q.   Did you get a warrant?

22          A.   No.

23          Q.   What measures do you take to

39

1    protect the privacy of applicants that are

2    trying to change the sex on their driver's

3    licenses?

4           A.   I just call the doctor's office and

5    what that person -- if they had completed the

6    surgery.  It's, you know, to see if they met

7    with our policy.

8           Q.   And the doctor's offices give out

9    that information?

10          A.   They just said yes or no, you

11   know.  They said no on this case.

12          Q.   Did they have any concerns about

13   giving out private medical information to you?

14          A.   No, because it was a letter that

15   was sent by them.  So I was just asking on the

16   letter.  Most of the time they'll put on there

17   if you have any questions call.

18          Q.   And you know for sure in this

19   instance that the letter came from the

20   office?  Did you know in this instance that

21   the letter came directly from the physician's

22   office to ALEA?

23          A.   I'm not sure if it came from the

40

1    physician's office or from the applicant.

2         Q.  So if it came from the applicant,

3    it didn't come directly from the physician's

4    office, correct?

5         A.  I mean, if the applicant sent it

6    in, no, it didn't come directly from --

7         Q.  Does that applicant know that you

8    might call their physician?

9         A.  No.

10        Q.  Would you say that your medical

11   record is private?

12        A.  The medical record is.

13        Q.  Does that include surgeries on

14   someone's body?  Are surgeries on someone's

15   body a part of the medical record?

16        A.  Yes.

17        Q.  And that would be private, right?

18        A.  Yes.

19        Q.  Did you ever hesitate about calling

20   a physician's office?

21        A.  I mean, I don't like calling the

22   physician's office, but if there's a question

23   about the documentation that was sent in to

41

1    us, then I would call.

2         Q.  But no one told you to call the

3    physician's office about whether or not the

4    surgery was complete or not, right?

5         A.  No.

6         Q.  And you have no idea where that

7    idea came from, right?

8         A.  I just -- as far as I know, you

9    know, we've always called about different

10   things, so --

11        Q.  So you call physicians' offices on

12   other issues in the medical unit?

13        A.  Yes.

14        Q.  Can you look back at Exhibit 7,

15   which again is discovery number 1 and number

16   2?  And you've already stated you recognize

17   this document, right?

18        A.  Yes.

19        Q.  How did you first learn about the

20   policies in Plaintiff's Exhibit 7?

21        A.  What do you mean how did I learn?

22        Q.  When did you first hear about

23   policy order 63?

42

1          A.   When I became supervisor over the
2     medical unit, I believe.
3          Q.   So you think day one you learned
4     about it?
5          A.   Well, I can't say it's day one.  I
6     am sure it's when someone had called in
7     questioning it.
8          Q.   Do you remember who you asked a
9     question of since you probably didn't know
10    what to do, right?
11         A.   I can't say for sure.
12         Q.   Has anyone told you why this policy
13    is in place?
14         A.   Well, it's in place to -- so, you
15    know, not just everybody can come in and
16    change the sex on the license.
17         Q.   Does that happen frequently?
18         A.   What?  Somebody coming in wanting
19    the sex changed?  No.  I mean --
20         Q.   Do you suspect that there's people
21    that come in to change the sex and they're
22    fraudulent, they're not actually transgender?
23         A.   I'm sure there could be.

43

1          Q.  Do you know of any instances of

2    that happening?

3          A.  No.

4          Q.  So as far as you know that's never

5    happened?

6          A.  As far as I know.

7          Q.  So then do you know why the policy

8    is in place if it's not really a fear?

9              MR. CHYNOWETH:  Object to the form.

10         Q.  Is that the only reason that the

11   policy is in place?

12         A.  (No response.)

13         Q.  I'll restate.  Is the only reason

14   the policy is in place is to stop people from

15   come in and changing the sex fraudulently?

16         A.  It may not be the only reason, but

17   I'm not sure.

18         Q.  Is that the only reason you know

19   of?

20         A.  I don't know.

21         Q.  You don't know if that's the only

22   reason you know of?

23         A.  I don't know where you're going.

45

1    where to go with this.  Okay.  I didn't start

2    taking all the responsibilities right off when

3    I was supervisor because I had another unit

4    also.  So I'm sure if I got a letter I went to

5    her and asked her about it.

6            Q.  So as best as you can recall Diane

7    might explain what the letter means?

8            A.  That would have been who I would

9    have gone to if I --

10           Q.  Did you ever receive any written

11   guidance outside of what's in the policy?

12           A.  No.

13           Q.  Have you ever given any verbal

14   guidance about the policy?

15           A.  Yes.

16           Q.  What was it?

17           A.  Well, applicants take letters into

18   the driver's license offices, and then they'll

19   call me.  And they'll usually fax the letter

20   over to me so I can read it to guide them if

21   it has the correct information on it to change

22   the sex on the license.

23           Q.  But do you give any verbal guidance

53

1          A.   And then got a letter from another

2    doctor for the same person stating that the --

3    they had a surgical procedure.

4          Q.   What's wrong with that?

5          A.   It did not say they had the

6    complete surgery, which the doctor stated in

7    the other letter that they had, that he had

8    just examined them.

9          Q.   It sounds like you know what

10   complete surgery is, right?

11         A.   Well, the complete surgery would

12   have to be having all your -- the top part,

13   bottom part done surgical to make you a female

14   or a male.

15         Q.   Who told you that?

16         A.   I mean, nobody told me that.

17         Q.   So you came up with that?

18              MR. CHYNOWETH:  Object to the form.

19         A.   Well, I don't see how a person

20   could be a -- I mean -- let me think which

21   way -- I mean, if you -- how can you change

22   your sex if you don't have the top and bottom

23   done?  That's what we mean by completed

54

1   surgery.

2          Q.  But you're not a physician, right?

3          A.  No, I'm not.

4          Q.  So where are you getting this

5   from?  Correct me if I'm wrong.  It sounds

6   like it's coming from you, right?

7          A.  Yes, I said that.

8          Q.  So you think the policy should be a

9   little bit more rigorous and doctors should --

10  it should require that doctors' notes have

11  under penalty of perjury, right?

12         A.  Well, to make sure it that is from

13  a doctor, yes, what is in it is true.

14         Q.  And you think that some physicians

15  are not telling the truth; is that right?

16         A.  I think there could be some that

17  don't.

18         Q.  Do you have --

19         A.  Or we could get forged letters.

20         Q.  Couldn't someone forge a letter and

21  still put penalty of perjury on there?

22         A.  It would be notarized and

23  everything.

59

1          A.   No.

2          Q.   Does it matter what that state's

3   policy for changing the sex designation on the

4   birth certificate is?

5          A.   Not as long as we have an amended

6   birth certificate.

7          Q.   So even if another state does not

8   force its citizens to have genital surgery

9   you'll still accept that amended birth

10  certificate; is that right?

11              MR. CHYNOWETH:   Object to the form.

12         A.   Yes.

13         Q.   I'll repeat it in another way

14  also.  If another state does not require

15  surgery, then you'll still accept that birth

16  certificate, right?

17         A.   If it's an amended birth

18  certificate, yes.

19         Q.   Then do you know why Alabama

20  insists that genitals match the license for

21  the driver?

22              MR. CHYNOWETH:   Object to form.

23         A.   I mean, that's our policy.

61

1          Q.  Does it matter what country they

2    were born in?

3          A.  No.

4          Q.  Does it matter what the country's

5    policy for changing the sex designation on the

6    birth certificate is?

7          A.  No.

8          Q.  And under policy order 63 a person

9    may have the sex designation changed on their

10   license with a letter from a physician who

11   performed gender reassignment surgery; is that

12   correct?

13         A.  Yes.

14         Q.  What happens if the physician has

15   retired, died, or otherwise becomes

16   unavailable?

17         A.  I've never had that happen, so --

18         Q.  What would you do if that were to

19   occur?

20         A.  I would probably ask for guidance.

21         Q.  From whom would you ask guidance

22   from?

23         A.  I would probably have to go up my

66

1    because you would have to have the top done.

2         Q.  So are you saying that if you were

3    to have what some -- some are all bottom

4    surgery, but if you don't have top then it

5    doesn't work under the policy, they would be

6    denied?

7         A.  It says complete surgery.  So it

8    has to be irreversible completed surgery.

9         Q.  I still don't know what that means,

10   what complete surgery means.

11              MR. CHYNOWETH:  Object to the form.

12        Q.  You don't have a definition of

13   complete surgery, do you?  Let me retract

14   that.  Do you have a definition of complete

15   surgery?

16        A.  Do I have anything written out that

17   states what complete surgery is; is that what

18   you're asking?  No, I don't.

19        Q.  Yes.  Do you have any verbal

20   guidance as to what complete surgery is?

21        A.  Complete surgery would be having,

22   like I said, top and bottom both done.

23              MR. BOONE:  Okay.  If we could take

67

1    a short break.

2              (Break taken.)

3

4         Q.  Someone could be assigned male at

5    birth but she is a transgender woman and

6    begins taking hormones and develops breasts.

7    She then has bottom surgery.  Would she be

8    able to have the sex changed on her license?

9         A.  If we get a letter from the doctor

10   stating she's had the complete irreversible

11   surgery, yes.

12        Q.  But what if it just states the

13   bottom surgery procedures and not anything

14   about top surgery because it wasn't necessary,

15   would she be approved?

16        A.  No.  Our policy says completed

17   surgery.  So if the doctor would state that it

18   was irreversible surgery, then it would be.

19        Q.  So would top surgery not be

20   necessary for that woman?

21        A.  I mean, I'm not a doctor, so --

22        Q.  But you are --

23        A.  What we require is a letter from

79

1  person physically present in Alabama has an

2  ID?

3          A.  I'm sure that's possible.

4          Q.  Would you agree some people carry

5  ID that is not their own?

6          A.  I'm sure that could happen.

7          Q.  Would you agree that not every

8  person physically present in Alabama was born

9  in Alabama?

10          A.  Yes, I'm sure there's people that

11  weren't born here that's in Alabama.

12          Q.  Would you agree that not every

13  person physically present in Alabama was born

14  in the United States?

15          A.  Yes.

16          Q.  Would you agree that it's possible

17  some transgender people have changed the sex

18  designation on their Alabama driver's license

19  without having surgery?

20          A.  Not without a letter or amended

21  birth certificate.

22          Q.  I'll ask again.  Would you agree

23  that it is possible some transgender people

80

1    have changed the sex designation on their

2    Alabama driver's license without having

3    surgery if, for example, they were born in a

4    state that permitted amendments to the birth

5    certificates without proof of surgery?

6            A.   Yes, if they --

7            Q.   Can you say that again?

8            A.   Yes, if they gave us an amended

9    birth certificate.

10           Q.   I'm going to show you some

11   documents.

12                (Plaintiff's Exhibit Number 24 was

13                marked for identification.  A copy

14                is attached.)

15           Q.   This is marked as Plaintiff's

16   Exhibit 24.  The discovery number is 208.

17   Could you please describe this document?

18           A.   It's a letter stating that this

19   doctor had performed reassignment surgery,

20   successfully completed and in is compliance

21   with the World Professional Association for

22   Transgender Health.

23           Q.   Do you recognize this document?

91

1          Q.  And why didn't you approve this?

2          A.  Because the doctor did not perform

3     the surgery.  He just examined.

4          Q.  So once you saw -- tell me when you

5     knew that this wasn't the surgeon from your

6     perspective.

7          A.  I have completed a physical

8     examination of her subsequent to these

9     procedures.

10          Q.  Did you think the letter was

11     fraudulent?

12          A.  I didn't know if it was or not, but

13     it did not meet our policy.  It was not from

14     the surgeon.

15          Q.  Do you see where it says in the

16     third paragraph Destiny Clark has undergone

17     medical and psychological testing, receiving

18     ongoing hormone replacement therapy, and was

19     referred for and received surgical procedures

20     to irreversibly correct her anatomy to match

21     her gender?

22          A.  Yes.

23          Q.  That isn't enough for there to be a

94

1   surgeon?

2         A.   Because this letter states all

3   these procedures have been done, and he just

4   put I performed a surgical procedure.  He did

5   not say he did a complete surgery or a

6   complete irreversible surgery.  It just said a

7   surgical procedure.

8         Q.   What if a wasn't there?

9         A.   It still doesn't say that he did

10  the complete surgery or it was irreversible.

11        Q.   We have previous documents that

12  don't state the word complete and

13  irreversible, correct?

14        A.   Correct.

15        Q.   And they were approved, right?

16        A.   They stated irreversible or

17  complete, I think.  There may have been one

18  that didn't.  I don't remember.

19        Q.   Let's look on this one.  So on

20  Plaintiff's Exhibit 28 does it say the word

21  complete or irreversible on that document?

22        A.   No.

23        Q.   So why --

95

1          A.   This one doesn't.

2          Q.   So why wasn't this document

3    approved, which is Plaintiff's Exhibit 30?

4          A.   Because it says has been living as

5    a transgender female -- having been living as

6    a transgender female has previously been to my

7    practice for evaluation prior to gender

8    transformation surgery.  Then it says I

9    performed a surgical procedure related to

10   gender transformation.

11         Q.   So is one surgical procedure never

12   enough according to ALEA's policy 63?

13         A.   It should be completed surgery.

14         Q.   Although that didn't matter before,

15   right?

16         A.   Well, this doesn't say they did the

17   surgery for gender reassignment surgery.  It

18   just says he performed a surgical procedure

19   related to.

20         Q.   Do you remember your phone call

21   with the doctor's office concerning

22   Plaintiff's Exhibit 30?

23         A.   That's what I've got in my hand.  I

127

1   driver's license -- I mean, your birth

2   certificate.

3          Q.  Do you have to have a birth

4   certificate to get an Alabama driver's

5   license?

6          A.  Yes, I believe so.  I don't work in

7   the exam office.  But, yes, I believe you do

8   have to.

9          Q.  Now, I know from personal

10  experience that a passport can be also

11  considered a primary document like a birth

12  certificate.  Does that sound right to you?

13         A.  Yes.

14         Q.  So you could use a passport in lieu

15  of a birth certificate, correct?

16         A.  I believe so.

17         Q.  What do you know about the medical

18  advisory board?

19         A.  It's a group of doctors that we

20  have on a board that we contact if we need

21  assistance or guidance.

22         Q.  Have you ever contacted any of the

23  doctors?

129

1          Q.   -- regarding any of the

2    applications under policy order 63?

3          A.   No.

4          Q.   You said no, right?

5          A.   Yes.

6          Q.   I just wanted to -- has anyone in

7    the medical unit ever called the medical

8    advisory board to consult about policy order

9    63?

10         A.   No.

11         Q.   Do you know if the medical advisory

12   board was involved with crafting policy order

13   63?

14         A.   I don't believe so.

15         Q.   Do you know why not?

16         A.   They're mostly for driver's

17   license, for the medical standards for

18   driver's licensing.  It's more of the medical

19   of like endo, cardio, things we follow people

20   for that have conditions that might be

21   dangerous when they're driving.

22         Q.   So you wouldn't contact them about

23   any of the different types of operations --