# Exhibit 3

# In The Matter Of:

*Darcy Corbitt, Destiny Clark, and Jane Doe v.*
*Hal Taylor, etc., et al.*

---

*Deena Pregno*
*November 14, 2018*

---

*Baker Realtime Worldwide Court Reporting & Video*
*250 Commerce Street*
*Third Floor, Suite One*
*Montgomery, Alabama  36104*
*www.BakerRealtime.com*

Original File 11-14-18 Deena Pregno.txt
Min-U-Script® with Word Index

1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3               NORTHERN DIVISION

4

5   CIVIL ACTION NO.: 2:18-CV-00091-MHT-GMB

6

7   DARCY CORBITT, DESTINY CLARK, and JANE DOE,

8       Plaintiffs,

9   V.

10  HAL TAYLOR, in his official capacity as

11  Secretary of the Alabama Law Enforcement

12  Agency, et al.

13      Defendants.

14

15          DEPOSITION OF DEENA PREGNO

16               November 14, 2018

17

18          Taken before Elaine Scott, CCR,

19  Commissioner for the State of Alabama at

20  Large, in the Law Offices of the Alabama

21  Attorney General, 501 Washington Avenue,

22  Montgomery, Alabama, on Thursday, November 14,

23  2018, commencing at approximately 9:00 a.m.

2

1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFFS:

4   AMERICAN CIVIL LIBERTIES UNION FOUNDATION

5   Gabriel Arkles

6   125 Broad Street

7   18th Floor

8   New York, New York 10004

9

10  ALABAMA CIVIL LIBERTIES UNION FOUNDATION

11  Brock Boone

12  Randall C. Marshall

13  P.O. Box 6179

14  Montgomery, Alabama 36106

15

16  FOR THE DEFENDANTS:

17  OFFICE OF THE ATTORNEY GENERAL, STATE OF

18  ALABAMA

19  Brad A. Chynoweth

20  501 Washington Avenue

21  Montgomery, Alabama 36130

22

23

3

1        A P P E A R A N C E S (continued)

2

3   ALSO PRESENT:

4   Meredith Barnes

5

6   COURT REPORTER:

7   BAKER REALTIME WORLDWIDE REPORTING & VIDEO

8   Elaine Scott

9   250 Commerce Street

10   Third Floor, Suite One

11   Montgomery, Alabama 36104

12

13

14

15

16

17

18

19

20

21

22

23

26

1  approximate date of when you think this policy

2  was most recently reviewed?

3          A.   Late 2015 or early 2016.

4          Q.   Okay.  Are there any other written

5  or unwritten policies currently in effect

6  regarding sex designations on Alabama driver's

7  licenses?

8          A.   No.

9          Q.   And was this policy, the most

10  recent policy, issued under your authority?

11          A.   Yes.

12          Q.   Did you personally approve this

13  policy before it went into effect?

14          A.   Yes.

15          Q.   I'm now going to show you what's

16  marked as Plaintiff's Exhibit 4.  Can you tell

17  us what this policy is?

18          A.   It's policy order 63, revised date

19  July 1, 2015.

20          Q.   So is this the policy that was in

21  effect most recently before the one that you

22  just reviewed that was D2?

23          A.   Yes.

35

1         A.  I don't know.

2         Q.  Did the policy from 2004 at some

3  point change into the unwritten procedure that

4  you described to me?

5         A.  Yes.

6         Q.  When did that change happen?

7         A.  I don't know.

8         Q.  How did that change happen?

9         A.  I don't know.

10        Q.  Why did that change happen?

11        A.  Which change?

12        Q.  The change from the policy in 2004

13  to the unwritten procedure?

14        A.  I guess to allow more latitude for

15  people requesting.

16        Q.  In what way does the unwritten

17  procedure -- sorry.  I should say in what way

18  did the unwritten procedure provide more

19  latitude than the policy from 2004?

20        A.  Well, I'm not sure what the policy

21  was in 2004.  I'm going off of the 2012

22  policy.

23        Q.  Was the policy in -- I'm sorry.

39

```
 1          Q.  Was anyone involved other than the
 2   legal unit?
 3          A.  I would have to say someone from
 4   the medical unit.
 5          Q.  And would anyone aside from the
 6   legal unit and someone from the medical unit
 7   have been involved?
 8          A.  Probably the driver's license
 9   division chief and at the time director of
10   public safety.
11          Q.  Under whose authority was it
12   issued?
13          A.  The director of public safety and
14   the driver's license division.
15          Q.  Do you know who the director of
16   public safety was at that time?
17          A.  No.
18          Q.  Who was consulted in the process of
19   developing this policy?
20          A.  I can't be completely sure because
21   I was not there, but I would say medical unit
22   personnel and legal.
23          Q.  And were there particular
```

40

1    individuals or positions within the medical

2    unit who would have been consulted?

3           A.   Just those people that handled the

4    request.

5           Q.   Okay.  So the people in the medical

6    unit who responded to individual requests --

7           A.   Correct.

8           Q.   -- to change sex designation --

9           A.   Correct.

10          Q.   -- would have been consulted in the

11   process?

12          A.   Correct.

13          Q.   Do you know if the medical advisory

14   board was involved?

15          A.   I do not know.

16          Q.   Do you have any reason to think

17   that the medical advisory board was involved?

18          A.   I do not.

19          Q.   Who would have had the final say in

20   what the policy was?

21          A.   I would think the director and the

22   legal unit would be collaborative.

23          Q.   Okay.  So ultimately the director

41

1    of public -- of the Department of Public

2    Safety and the legal department would have to

3    come to an agreement?

4          A.   Correct.

5          Q.   Okay.  What problems did the policy

6    seek to address?

7          A.   A formal procedure for handling

8    those requests.

9          Q.   Okay.  So one goal of creating the

10   policy was to have a formal procedure; is that

11   correct?

12         A.   And consistency.

13         Q.   Okay.  So another goal was to

14   create more consistency in how ALEA responded

15   to these requests; is that right?

16         A.   Right.

17         Q.   Were there any other goals in

18   creating this policy?

19         A.   Not to my knowledge.

20         Q.   Were there meetings about

21   developing the policy?

22         A.   I don't know.

23         Q.   Are you aware of any notes or

42

 1    records taken from meetings about the

 2    development of the policy?

 3         A.  No.

 4         Q.  Were any constraints taken into

 5    account in creating the policy?

 6         A.  Can you be more specific?  What do

 7    you mean by constraints?

 8         Q.  When ALEA was developing its

 9    policy, did they consider any limitations on

10    resources or programmatic needs that would

11    limit what they could do with the policy?

12         A.  I'm not sure.  It was -- the policy

13    was established based on the state statute for

14    changing the gender on a birth certificate.

15    That's what it was modeled after.

16         Q.  Okay.  Before settling on modeling

17    the state statute for birth certificates, did

18    ALEA consider any other options for the

19    policy?

20         A.  Not that I'm aware of.

21         Q.  Why not?

22         A.  I don't know.

23         Q.  Why did ALEA choose to model the

43

1   policy after the state birth certificate

2   statute?

3           A.   We wanted to be consistent in how

4   we operated as a state.

5           Q.   And why was consistency with how

6   the state operated for birth certificates

7   important?

8           A.   Because if we were going to require

9   an amended birth certificate, we wanted to

10  make sure we were handling it in the right

11  manner.

12          Q.   What does the right manner mean?

13          A.   We want an amended birth

14  certificate which follows Alabama statutes, so

15  we wanted to be in line with what their

16  requirements were.

17          Q.   Was the understanding of ALEA at

18  the time that it was bound to follow the

19  statute regarding birth certificates?

20          A.   No.

21          Q.   Was it the understanding of ALEA at

22  the time that it would be desirable to follow

23  the statute as far as birth certificates?

44

1          A.  Well, basically -- let me clarify.

2     ALEA is a law enforcement agency.  Although we

3     submit -- we produce a driver's license, it's

4     also an official identity document.  And as

5     law enforcement we want to ensure the

6     information that is on the card is correct,

7     and so we want to make sure the information

8     we're providing to law enforcement officers,

9     correctional agencies, emergency responders,

10    when you question someone -- when a male

11    officer questions a female subject normally

12    they have more than themselves in a room so

13    they can't allege that there's no impropriety

14    going on.  So that's why we wanted to make

15    sure we were in line on the handling of the

16    subject as a law enforcement professional.  If

17    you detain someone or arrest them as far as

18    booking procedures and things like that, it's

19    upon us to let them know the right procedures.

20          Q.  So at the time that this policy was

21    created in 2012, did ALEA consider the impact

22    of this policy on arrest and booking

23    procedures?

45

1          A.  I don't -- I'm not sure if they did
2    or not.
3          Q.  So just sticking again just to the
4    time before the creation of this policy, in
5    the course of creating this policy, what
6    considerations went into ALEA's decision to
7    adopt this policy as opposed to some other?
8          A.  What the state requires for amended
9    birth certificates.
10          Q.  Okay.  Were there any other
11    considerations that ALEA took into account at
12    that time?
13          A.  Not that I'm aware of.
14          Q.  Are you aware of any debate that
15    concerned -- that concerned the development of
16    the policy prior to 2012?
17          A.  No.
18          Q.  Were there any conflicting views
19    that had to be resolved at that time?
20          A.  Not to my knowledge.
21          Q.  When the policy was most recently
22    revised in 2016, what was that process?
23          A.  We had it vetted through legal.

46

1    And we changed it to an and/or instead of

2    requiring both documents.

3           Q.   Just to clarify, so in 2012 did it

4    require -- did the policy require both

5    documents?

6           A.   Amended birth certificate along

7    with documentation on letterhead from the

8    physician.

9           Q.   And so then in the 2016 version it

10   says and/or to indicate that either one of

11   those documents is sufficient?

12          A.   Correct.

13          Q.   Okay.  Who was involved in making

14   that decision?

15          A.   It would be me, the legal unit, and

16   the medical unit personnel.

17          Q.   Who in the medical unit was

18   involved?

19          A.   Jeannie Eastman.

20          Q.   Who were the people from the legal

21   unit?

22          A.   I'm not -- I would -- I think

23   Jessica Sanders was involved.

47

1          Q.   And you think there may have been
2     other people who were involved from legal?
3          A.   I don't know who else.
4          Q.   Okay.  And what was your goal in
5     revising policy order 63?
6          A.   Giving them more latitude.
7          Q.   And why was it important to give
8     more latitude?
9          A.   To be more -- you know, give them
10    the ability to get what they want.
11         Q.   And were there any reasons why you
12    wanted to make it easier for people to get
13    what they wanted?
14         A.   To be reasonable.  And as long as
15    they're following procedure.
16         Q.   And was anyone aside from you,
17    Jeannie Eastman, and maybe Jessica Sanders or
18    someone else from the legal unit involved in
19    the most recent revision?
20         A.   No.
21         Q.   Were there any other goals that you
22    had in mind in creating this policy?
23         A.   No.

48

1          Q.  Did you consider other options

2     aside from the current policy before

3     implementing it?

4          A.  No.

5          Q.  Did you consider any other states'

6     procedures for changing the sex designation on

7     a license before revising the policy?

8          A.  No.

9          Q.  Why not?

10          A.  We wanted to stay consistent with

11     Alabama -- the State of Alabama's birth

12     certificate procedure.

13          Q.  Did you consider federal government

14     policy for changing designations on passports

15     when you were creating this policy?

16          A.  No.

17          Q.  Why not?

18          A.  We just didn't.

19          Q.  I'm going to show you a document

20     that is labeled Plaintiff's Exhibit 8.  This

21     is Bates number D338 through -- it's actually

22     D at 337 through D at 380.  And could you --

23     first, could you read the cover email?

55

1    circumstances that you can think of where a

2    legitimate Alabama license could prove that

3    you are who you say you are and a legitimate

4    U.S. passport could not?

5         A.   Correct.

6         Q.   Okay.  And do driver's licenses for

7    other states serve for identification as well?

8         A.   Yes.

9         Q.   Could you please list for me the

10   interest that it is ALEA's position that

11   policy order 63 serves?

12        A.   As I stated earlier, we are a law

13   enforcement agency, and we are preparing and

14   issuing an identification document.  This

15   document is used by law enforcement officers

16   to identify the subject that they're dealing

17   with.  It also identifies possible criminal

18   activity or the identification of a possible

19   criminal activity.  It gives them a

20   description so they can confirm the person

21   that they -- the person in the license is

22   actually the person that they are dealing

23   with.  It gives them the information they need

56

1    to make decisions on how to handle this person

2    for arrest procedures, medical, emergency

3    procedures, booking and retaining procedures,

4    interviewing and questioning procedures, and

5    as well as maintaining the actual physical

6    identifiers of that person.

7         Q.   Okay.   I'm going to try to say that

8    back to you to make sure I didn't miss

9    anything.   You let me know whatever it is I'm

10   missing.   So I heard that the government's

11   interest in policy order 63 are to assist

12   officers in identifying the people who they're

13   dealing with, to identify possible criminal

14   activity, to provide information to make

15   decisions for arrests and booking procedures,

16   for interviewing and questioning procedures,

17   for emergency medical procedures, and that the

18   government also has an interest from policy 63

19   in maintaining physical identifiers of license

20   holders.   Is that all accurate?

21        A.   Yes.

22        Q.   And what did I miss?

23        A.   I'm not sure.   Hopefully nothing.

58

1          A.   Correct.

2          Q.   And you would agree with that?

3          A.   Yes.

4          Q.   And -- I'm trying to make sure I

5     have a thorough list.  So would this be the

6     same as the assisting officers in identifying

7     the subjects they're dealing with and

8     maintaining physical identifiers?

9          A.   Yes, sir.

10         Q.   Okay.  It also says that an Alabama

11    driver's license provides identification for

12    law enforcement and administrative purposes,

13    including but not limited to purposes related

14    to arrests, detention, identification of

15    missing persons or crime suspects, and the

16    provision of medical treatment; is that right?

17         A.   Yes.

18         Q.   And you would agree with those

19    interests?

20         A.   Yes.

21         Q.   It says here including but not

22    limited to.  Are there any other law

23    enforcement or administrative purposes you can

59

1    think of that policy order 63 serves?

2         A.   I don't know if it -- I guess it

3    would fall in there, but as far as identity

4    fraud or identity theft as far as tracking

5    someone that comes in and has -- comes in with

6    an identity as say male and then they go

7    through the process and they change their name

8    and then they change their sex and basically

9    have a whole new identity.  It's a way for us

10   to link those identities.  We actually had a

11   call from the district attorney's office a

12   couple of weeks -- a couple of week's ago and

13   they inquired -- as far as the subject's

14   identity, they kept running the subject and

15   said it came back as a Charles, and the

16   subject was Jasmine and was female, and the

17   autopsy report said a fully genital --

18   genitals of a female.  And so they were

19   questioning the processes, how they were

20   getting this information, and if it was

21   correct.  We went back to the original record

22   and the subject did come in as a male, changed

23   their name to a different name, and then not

60

1    too much longer after that, I think it was a

2    year or so, changed their sex.  And so we were

3    able to confirm with the DA's office that this

4    was the person that they had who was

5    previously this name but now died under this

6    name.

7         Q.  When you say that they ran the

8    person, what does that mean?

9         A.  When you say the -- are you

10   referencing the district attorney's office

11   or --

12        Q.  Yes.  When you say the district

13   attorney's office was running this person and

14   the person came back as Charles, what would

15   running the person mean?

16        A.  I can't testify what they did.  I'm

17   assuming they ran them through a criminal

18   database.

19        Q.  I see.  So the criminal database

20   had the person's previous name --

21        A.  Just had them as a -- yes, had them

22   as Charles.

23        Q.  Had the previous name as male sex.

67

1          Q.   How does that policy for what one
2     must do to change the sex designation on a
3     driver's license assist in providing a
4     physical description?
5          A.   It ensures that the physical
6     features of that person are what's displayed
7     on the license.
8          Q.   And what physical features do you
9     mean by that?
10         A.   Well, if they are a male, they'll
11    have male genitalia.  And if they're a female,
12    they'll have female genitalia.
13         Q.   When an officer is seeking to
14    confirm that they are arresting the right
15    person, do they typically look at that
16    person's genitalia?
17         A.   No.  But it will tell them and the
18    booking personnel how they should separate
19    them in the population.
20         Q.   But at the moment of seeking to
21    confirm the person's identity, typically a
22    police officer wouldn't see the person's
23    genitals, right?

68

1          A.   No.

2          Q.   If someone -- if an officer

3    perceived somebody as male because that person

4    had male pattern baldness and a beard and was

5    wearing masculine clothing, would that person

6    having a female sex designation on their

7    license assist the officer in confirming a

8    person's identity?

9          A.   I don't know if it would assist,

10   but if they were to be arrested it would

11   definitely need to be known.

12         Q.   So it might assist with the

13   procedures after the arrest, but it wouldn't

14   necessarily assist with confirming the

15   identity at the time of the arrest?

16         A.   The photo would.

17         Q.   The photo would, but the female sex

18   designation might not?

19         A.   It should if it's -- could you ask

20   the question one more time?

21         Q.   So if there were a transgender man

22   who has not gotten a male sex designation on

23   his license but has transitioned from female

69

1    to male and that he wears masculine clothing

2    and has masculine physical characteristics,

3    such as male pattern baldness and a beard and

4    is typically perceived by others as male, then

5    would it help an officer to confirm that

6    person's identity that his sex designation on

7    his license would still be female?

8         A.   It may not help in that situation,

9    but that is still the physical characteristics

10   of that person.

11        Q.   In fact, wouldn't a female sex

12   designation on the ID of somebody who the

13   officer perceived as male raise suspicion in

14   the officer that the person might not be who

15   he thought he was?

16        A.   That's speculation.  It's possible.

17        Q.   Do Alabama law enforcement officers

18   receive training on policy order 63?

19        A.   No.

20        Q.   Do Alabama law enforcement officers

21   receive training on interacting with

22   transgender members of the public?

23        A.   I would have to speak to someone in

71

1   Q. Do you have reason to think that

2 Alabama's interest in law enforcement officers

3 being able to identify people they're

4 interacting with is different from the

5 interests in those other states?

6   A. I'm not -- I don't know what other

7 states require.

8   Q. Do you have any reason to think

9 that Alabama has different needs than other

10 states do in identifying people?

11   A. No.

12   Q. And Alabama doesn't consistently

13 measure or require medical documentation of

14 height before listing that attribute on a

15 license, correct?

16   A. Correct.

17   Q. And it doesn't consistently measure

18 or require medical documentation of weight

19 before listing that attribute, right?

20   A. Correct.

21   Q. Does Alabama law require

22 individuals to update the photos on their

23 license when their appearance changes?

79

```
 1   municipal arresting officers.
 2        Q.  Okay.  And do the arrest -- I'm
 3   sorry.  Do the search procedures vary based on
 4   whether it's a state, county, or city law
 5   enforcement officer?
 6        A.  Yes.  It varies from agency to
 7   agency.
 8        Q.  And could you name -- which
 9   agency's search procedures or practices are
10   you able to testify about today?
11        A.  None.
12        Q.  How do you know that policy order
13   63 is, in fact, serving search procedures?
14        A.  Well, it just -- it does.
15        Q.  Explain to me how it does.
16        A.  I mean, it tells you physically
17   what -- who that person is and how that
18   officer should handle them, if they have
19   procedures in place to handle female subjects
20   differently than male.  It also identifies
21   that person for different detention
22   facilities.  When they are booked into a
23   facility as an officer you want to know that
```

80

```
1    the information that you're giving to them is

2    correct.

3            Q.  Is it your understanding that when

4    agencies have policies that differ for

5    searches based on whether the arrestee is

6    female or male those policies refer

7    exclusively to the person's genitals?

8            A.  Yes.

9            Q.  And what is the basis for that

10   knowledge?

11           A.  For the officer?

12           Q.  How do you know that all of these

13   different policies when they refer to female

14   or male are referring to genitals?

15           A.  I'm going off the information that

16   we use based on the identifiers on the

17   license.

18           Q.  And I'm trying to figure out why

19   it's important that the identifier on the

20   license relates to genitals.  So how do you

21   know that people's genitals are what matter

22   for purposes of search procedures?

23           A.  I'm not sure I understand your
```

85

1    that genitals are the most useful piece of

2    information about sex for purposes of

3    detention?

4         A.   It is for our purposes for the

5    driver's license.  I need you to define

6    genitals to make sure my definition matches

7    yours.

8         Q.   So you testified that one interest

9    the policy order 63 serves is to provide

10   information to detention agencies, right?

11        A.   Correct.

12        Q.   What information is it that you

13   intend to provide through policy order 63?

14        A.   The physical characteristics of

15   their sex.

16        Q.   And which physical characteristics

17   do you mean?

18        A.   If they're a male, they have a

19   penis.  And if they're a female, they have a

20   vagina.

21        Q.   And do you know of any reason why

22   detention agencies would be more interested in

23   whether someone has a penis or a vagina than

86

1    any other sort of information related to sex?

2         A.   I don't know if they would be more

3    interested, but I would say if they're putting

4    them into a holding cell that they would want

5    to know that information is accurate.

6         Q.   So is it your understanding that

7    detention agencies will place people into a

8    holding cell based on whether they have a

9    penis or a vagina?

10        A.   No.  I'm saying I provide that

11   information so they can make that decision on

12   whether or not they want to put that

13   individual in a different holding cell.

14        Q.   Is there any reason that you know

15   why it is more helpful to provide information

16   about whether somebody has a penis or a vagina

17   rather than any other type of information

18   about their sex?

19        A.   That's who they are physically.

20   It's -- I mean, if that's who they are, then

21   that's their physical characteristic, that

22   they have those physical attributes.

23        Q.   Do you know if any Alabama agencies

101

1    provision of emergency medical care was an

2    interest that policy order 63 serves, right?

3        A.  Yes.

4        Q.  And can you tell me how policy

5    order 63 serves that interest?

6        A.  Emergency personnel, you know, when

7    you provide them the driver's license they see

8    whether they're dealing with a male or a

9    female.

10        Q.  And how does that assist them with

11    providing medical care?

12        A.  It gives them the information that

13    they know who they're dealing with.

14        Q.  Under what circumstances would

15    emergency medical personnel rely on the sex on

16    a driver's license rather than physical

17    examination?

18        A.  I'm not sure that they would.  It's

19    just -- you know, it's a basic identifier for

20    those personnel that are responding.

21        Q.  In what circumstances would the

22    health care that the person would receive vary

23    based on the sex designation on their license?

102

1          A.   That would be up to the emergency
2     personnel, the responders.
3          Q.   Are you aware of any circumstances
4     where the sex designation on the license would
5     change the medical treatment that someone
6     might receive?
7          A.   No.
8          Q.   You mentioned earlier that it was
9     important to have policy order 63 be
10    consistent with the state policy for birth
11    certificates; is that right?
12         A.   Yes.
13         Q.   Could you remind me of why having
14    that consistency is important to the
15    government?
16         A.   We want to be consistent in
17    providing -- with requiring the same types of
18    documents when we're dealing with the same
19    type of situation.
20         Q.   Is consistency with Social Security
21    records also important?
22         A.   I'm not sure what information is in
23    Social Security records.

107

1    requirements for Alabama birth certificates,

2    right?

3         A.   Yes.   Maybe I -- did I answer

4    that -- I may have missed -- did I answer

5    incorrectly?   Yes, we are consistent with the

6    State of Alabama's requirements to change the

7    sex designation with our policy.

8         Q.   Okay.   And why is it more important

9    to ALEA to match the requirements for birth

10   certificates than for say U.S. passports?

11        A.   Well, we want to maintain

12   consistency, but we want what is displayed on

13   the document to be true.

14        Q.   So is it ALEA's position that the

15   information on U.S. passports is less likely

16   to be true than the information on birth

17   certificates?

18        A.   I don't know.

19        Q.   Could documentation from a doctor

20   stating that someone had had clinical, but not

21   necessarily surgical, treatment to change

22   their sex provide a paper trail for purposes

23   of driver's licenses?

115

1          Q.   Okay.  And do you personally

2   believe that somebody who was assigned male at

3   birth and who identifies as female and who has

4   had sex reassignment surgery is a woman?

5               MR. CHYNOWETH:  Object to form.

6          A.   Repeat the question, please.

7          Q.   Do you personally believe that

8   somebody who was assigned male at birth, who

9   identifies as female, and who has had sex

10  reassignment surgery is a woman?

11              MR. CHYNOWETH:  Object to the form.

12         A.   Genetically they're a male.

13  Physically they're a female.

14         Q.   Okay.  And personally do you

15  believe that somebody who was assigned male at

16  birth and who identifies as female and who has

17  not had sex reassignment surgery is a woman?

18              MR. CHYNOWETH:  Object to the form.

19         A.   They are physically a male.

20         Q.   So you don't believe that somebody

21  is a woman in that circumstance?

22         A.   Correct.

23         Q.   And why is that?