# Exhibit 27

# In The Matter Of:
*Darcy Corbitt v.*
*Hal Taylor*

*Donald Leach*
*December 21, 2018*

*Tempest Reporting, Inc.*
*175 South Main, Suite 710*
*Salt Lake City, UT 84111*
*(801) 521-5222*

Original File 122118DL.txt
**Min-U-Script® with Word Index**

Page 0

```
                UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF ALABAMA
                     NORTHERN DIVISION



    DARCY CORBITT, et al.,        :

                Plaintiffs,       :  Civil Action No.
                                     2:18-cv-91-MHT-GMB
         -v-                      :

    HAL TAYLOR, in his official   :
    capacity as Secretary of the     Deposition of:
    Alabama Law Enforcement       :  DONALD LEACH
    Agency, et al.,
                                  :
                Defendants.




         Place:       TEMPEST REPORTING, INC.
                      175 South Main Street, #710
                      Salt Lake City, Utah 84111

         Date:        December 21, 2018
                      9:03 a.m.

         Reporter:    Vickie Larsen, CSR/RMR
```

Page 2

```
 1            A P P E A R A N C E S
 2
    For the Plaintiff (present by videoconference):
 3
              Gabriel Arkles
 4            ACLU LGBT & HIV Project/ACLU Foundation
              125 Broad Street, 18th Floor
 5            New York, New York 10004
              212.549.2605
 6            Garkles@aclu.org

 7            Brock Boone
              ACLU OF ALABAMA
 8            P.O. Box 6179
              Montgomery, Alabama 36106
 9            334.265.2754
              Bboone@aclualabama.org
10
    For the Defendants (present by videoconference):
11
              Brad A. Chynoweth
12            ASSISTANT ATTORNEY GENERAL
              CONSTITUTIONAL DEFENSE DIVISION
13            OFFICE OF THE ATTORNEY GENERAL
              STATE OF ALABAMA
14            501 Washington Avenue
              P.O. Box 300152
15            Montgomery, Alabama 36130
              334.242.7997
16            Bchynoweth@ago.state.al.us

17  Also Present: (Present by videoconference):

18            Joshua Block

19

20                   -oOo-
```

Page 3

```
 1
 2                  I N D E X
 3  DONALD LEACH                                  Page
 4  MR. ARKLES                                      5
 5
 6                   -oOo-
 7
 8               E X H I B I T S
 9  No.         Description                       Page
10  Exhibit 38  Expert Report of Donald Leach       5
11  Exhibit 39  Instructions to Change the          5
12              Indicator of Sex on an Idaho
13              Birth Certificate to Reflect
14              Gender Identity
15  Exhibit 40  National Center for                 5
16              Transgender Equality website
17              printout
18  Exhibit 41  Tennessee Rules and                 5
19              Regulations excerpt
20  Exhibit 42  Gender Designation Form             5
21  Exhibit 43  National PREA Resource Center       5
22              Guidance in Cross-Gender and
23              Transgender Pat Searches
24  Exhibit 44  Issues Surrounding Managing         5
25              Lesbian, Gay, Bisexual,
```

Page 4

```
 1              Transgender & Intersex
 2              Offenders in Jails by
 3              Donald L. Leach II, Ph.D.
 4
 5                   -oOo-
```

Page 9

1  Justice Center of Bureau of Prisons on a policy of
2  transgender offender management.
3      Q.   Thank you.
4           And just to be clear, that's something
5  that you reviewed after writing your report and before
6  the deposition today; right?
7      A.   Yes.
8      Q.   Okay.  Thank you.
9           And did you write your report from
10 scratch, or did you build off of something that had
11 already been written?
12     A.   No, I write everything from scratch.
13     Q.   Thanks.
14          And aside from reviewing the documents
15 you mentioned and talking with Brad, is there anything
16 else that you did to prepare for the deposition today?
17     A.   Not that I recall.
18     Q.   Okay.  If you turn to Page 5 in your
19 report, the Case History Disclosure, is this list of
20 your past depositions and trial testimony still up to
21 date?
22     A.   As of today, yes.
23     Q.   Okay.  Thank you.
24          And do you recall which, if any, of these
25 cases you testified at trial in as opposed to just

Page 10

1  being deposed?
2      A.   Rachel Hammers v. Douglas County, that
3  would be Number 5.  Anthony Waller v. Bradley
4  Lovinger, that would be Number 11.  Number 20,
5  multiple initials v. The City of Puyallup.  Number 22,
6  Frank Hyman v. City of Philadelphia.  That's it.
7      Q.   Thank you.
8           And have you ever, aside from this case,
9  prepared an expert report on transgender or intersex
10 issues?
11     A.   No.
12     Q.   And have you ever, aside from in this
13 case, prepared an expert report on driver's licenses
14 before?
15     A.   No.
16     Q.   Thank you.
17          And then I just want to make sure I have
18 your compensation information correct.  So you are
19 being compensated $200 an hour for a research
20 consultation and report creation; right?
21     A.   Yes.
22     Q.   And you received $3,000 for any part of a
23 day involved in a video deposition; right?
24     A.   Yes.
25     Q.   So you're being compensated $3,000 today;

Page 11

1  right?
2      A.   Yes.
3      Q.   Thank you.
4           And -- and then $2,000 for any part of a
5  day spent on trial testimony; is that right?
6      A.   Yes.
7      Q.   And $1,000 a day for travel and on-site
8  consultation; is that right?
9      A.   Yes.
10     Q.   Okay.  Great.  Thank you.
11          So I'm going to go through and I'm going
12 to ask you for your definitions of some words that
13 were used in your report, just to make sure that I
14 understand them.
15          So first could you explain your
16 understanding of the term "sex"?
17     A.   My understanding of the term "sex"?
18     Q.   Yes.
19     A.   Well, that's a very broad understanding.
20 As I try to illustrate in the report, there are
21 multiple components to the term "sex."  There is --
22 there's -- and then when I do presentations, like I'm
23 getting ready to do a presentation for the Los Angeles
24 County Sheriff's Office regarding the management of
25 lesbian, gay, transgender, and intersex persons within

Page 12

1  their system.
2           It's a presentation I've done a number of
3  times.  You and I did it one time -- not -- not the
4  exhaustive one that I do here -- where I talk about
5  the three parts of it, as I did in the report.
6           The first part of it is is it
7  physiognomy?  The actual, I guess what a lot of
8  individuals might refer to as the biological levels of
9  sex, and then you have the gender portion of sex, and
10 then you have the idea of sexual preference.
11          So there really are three components to
12 sex that exist out there that have a tendency to get
13 very jumbled together.  I think that's the point I was
14 trying to make in my report.  They get jumbled
15 together, they get mixed up, and it's important
16 sometimes to come up with definitions.  So which
17 definition are we looking at.
18     Q.   Okay.  Thank you.
19          MR. ARKLES: Let the record reflect that
20 Joshua Block has just joined me here in the room.
21     Q.   And what's the basis for that definition
22 of sex?
23     A.   Sir?
24     Q.   What do you base that definition for sex
25 on?

Page 17

1  realm of how people express themselves with one
2  another and all those particular things.
3          Even my graduate work in geography was
4  based upon people's perception of space, place, and
5  time and how they view themselves acting and
6  interacting within their geographical environment. So
7  -- so it's based upon a lot of those issues, yes.
8          So training is one, education and
9  background is one, observations from the correctional
10 environment is one, and just being a human being and
11 interacting and being an individual who's open to
12 examine a lot of these -- these issues, because, you
13 know, a lot of people aren't open to examining a lot
14 of these issues.
15         As you and I well know, you know, we can
16 create quite a bit of disharmony amongst people when
17 we begin to challenge their perceptions of things,
18 like gender identity, sex, become problematic for
19 them.
20     Q.   It can.
21         And then -- and then could you just also
22 define for me the term "sexual preference."
23     A.   Sexual preference is basically, as I term
24 in my presentations, who it is that turns you on. Who
25 it is that has you elicit that sexual excitement.

Page 18

1  That's sexual preference.
2     Q.   Okay. And could you define
3  "transgender," please.
4     A.   Oh, wow. Now that's getting into a
5  really complex area, because even from the time that
6  you and I first did our presentations back in the
7  early 2000s to now, we see that whole term changing.
8  It's -- it's kind of -- it's morphing as -- as the
9  societal recognition of the issues involved becomes
10 much more prevalent.
11         So to -- for me to give a definition of
12 it, it would be just what I perceive it as being
13 versus what it might be tomorrow. So what I say could
14 be what it was yesterday.
15     Q.   And when you use the term "transgender"
16 in your report, what did you mean by it in that
17 moment?
18     A.   What was the last statement? In that
19 moment?
20     Q.   Yes. What did you mean by transgender as
21 you used it in your report?
22     A.   Typically, transgender is -- is basically
23 what I've learned in my discussions and dealings with
24 individuals like you, individuals that -- that have a
25 -- a different biological physiognomic sex whose

Page 19

1  gender identity felt that was not in line with what
2  they perceive themselves to be. As I say in my
3  presentations, when they look in the mirror, who they
4  see themselves as when they look in the mirror. That
5  becomes an issue where an individual becomes --
6  becomes transgender.
7          So it's a person who -- who sees that,
8  feels that, and then makes the decision that they're
9  going to begin to live as the other gender, which
10 might be separate from their physiognomy.
11     Q.   Thank you.
12         And then I'm going to ask you the same
13 thing for intersex. Can you tell me what that term
14 means as you used it in your report?
15     A.   Intersex is more the medical term that
16 refers to individuals that have ambiguous genitalia,
17 or in the medical profession, disorders of sexual
18 development.
19         The American Intersex Society -- and I
20 think that young lady was with us when we did the
21 presentation out there, the president of it -- but
22 it's individuals whose -- who have some level of --
23 some level of sexual development which doesn't fit
24 into what is the classical idea or what I talk about
25 in my paper, either end of the continuum of what would

Page 20

1  be an individual's perception of fully female or fully
2  male. That becomes intersex.
3          Disorders of sexual development. And
4  it's a range. And it's a range. We're truly causing
5  the question of whether or not any of us are truly
6  fully female or fully male. So we run into
7  definitional issues even when we get to that point.
8      Q.   Right.
9          So you said in your report sex is sort of
10 a continuum between female and male; is that right?
11     A.   Intersex.
12     Q.   Okay. Intersex is people who are a
13 continuum between female and male?
14     A.   Intersex lies on this continuum,
15 intersex -- because there's a range in there. I think
16 most people out in society, if -- when you talk, and I
17 know when I do my presentations in jails and with law
18 enforcement, and even with community groups, most
19 individuals still want to think of intersex strictly
20 as -- as a hermaphrodite, okay, an individual that has
21 both fully functioning sexual organs.
22         But the reality is, it's not like that.
23 That is -- that is so rare that it's an anomaly, that
24 it gets written of that you have two fully
25 functioning. So, you know, that would be the middle

Page 21

1  of that spectrum of fully female to fully male.
2      The truth of it is that people lie more
3  somewhere along that continuum.  And even the American
4  Intersex Society is trying to get away from this whole
5  idea of hermaphroditism.  They want to eliminate that,
6  because it brings up certain pejorative images when
7  people talk about that.
8      And it makes sense to me that they would
9  because, again, it's a range rather than -- rather
10 than a strict concept that people have that may -- may
11 completely be false.
12    Q.    And when you refer to the American
13 Intersex Organization, it's not the Intersex Society
14 of North America that you're talking about, or a
15 different organization?
16    A.    The Intersex Society of North America,
17 yes.
18    Q.    Okay.  Thank you.
19    A.    The president of it did the presentation
20 with you and I.  Do you recall she was there?
21    Q.    I think we might be thinking about
22 different presentations but --
23    A.    Oh, man.
24    Q.    -- that's okay.
25    A.    Well, it just goes to show, I've been

Page 22

1  trying to get these ideas and concepts out, so we get
2  definitions made all around the country for years now.
3  2007 to now, that's 11 years.
4     Q.    Yes, that's -- it's a while.
5         And you already touched on this, but
6  could you also explain to me so -- so do you see the
7  term "sex" and "gender" as different, and if so, how?
8  What's the difference between those two?
9     A.    Well, it -- how do we want to use the
10 term "sex," first off?  Do we want to use the term
11 "sex" in a very large overarching sense to meet all
12 three parts?
13        So, I mean, my presentation I give starts
14 out, it's all about sex in jails, okay.  Well, first
15 off, what is sex in jails?  If we use sex in jails as
16 that big overarching term, it would then encompass
17 physiognomy, it would encompasses the gender identity,
18 and it would encompass the sexual preference issues.
19        Now, if we want to use sex as -- as the
20 behavior that occurs between two individuals, that
21 might be sexual preference, okay.  But it could also
22 be sexual identity and a gender identity in it.  So,
23 again, it's how do we want to define that.  That's
24 part of the whole issue here.
25     Q.    Okay.  Just a couple more definitions.

Page 23

1        So could you tell me what the term "risk
2  tolerance" means as you used it in your report?
3     A.    I'm sorry, I didn't catch the word.
4     Q.    Risk tolerance.
5     A.    Oh, risk tolerance.  Yeah, risk
6  tolerance.  It's more of a concept that's used in risk
7  management circles and insurance companies and, you
8  know -- okay.  Risk tolerance is how much the
9  individual person, the agency had, or government, or
10 even community.  How much they're willing to tolerate
11 potential risk versus non-risky type of
12 decision-making processes.
13        So risk tolerance is, you know, what
14 you're willing to stake.  Individuals that gamble,
15 they go and they gamble at a casino and they put money
16 on the table, obviously have a high risk tolerance
17 level for the loss of money or else they wouldn't be
18 doing the gambling.
19        Individuals that don't want -- like, I do
20 a lot of presentations in Las Vegas.  Probably, I
21 don't know, half a dozen or more times a year, and I
22 never go to the gambling tables because I always
23 figure I'm going to loose.  So that mean my risk
24 tolerance level for losing my money is pretty low in
25 that case.

Page 24

1        And it works the same way when we're
2  talking about decision-making in -- in how we're going
3  to operate our facilities and our agencies and our
4  governments.  There are certain risk tolerance levels
5  that we have to have.
6        We see this all in this whole debate
7  regarding medical marijuana around the country,
8  recreational marijuana around the country.  There is a
9  level of risk tolerance in all of that that is
10 being -- being expressed by both the public and
11 government.
12       So -- and we -- we just see that in
13 operation.  And we've seen it change in that -- in the
14 last 20 years.
15     Q.    What change have you seen in the last
16 20 years?
17     A.    In medical marijuana?
18     Q.    Oh, I'm sorry.  I thought you were
19 referring to -- I thought you were referring back to
20 corrections.  No, I don't need to hear about medical
21 marijuana, thank you.
22     A.    No, no, let's talk about it in
23 corrections.  It's an interesting issue because --
24 because, you know, in a correctional environment, we
25 have to provide based on, you know, Estelle v. Gamble,

Page 29

1  been arising from the definition of
2  sex -- "whether the one provided in
3  Policy Order Number 63, carry a
4  measure of risk.  How risk adversive,
5  or risk taking, the law enforcement
6  or correctional administrator is
7  grounded in that individual's
8  personal and correctional
9  philosophies, or 'weltanschauung.'
10  The stat" -- there should have been
11  the state -- "of Alabama provides
12  through Policy Order Number 63 a
13  starting point from which the law
14  enforcement or correctional
15  administrator can measure his or her
16  policies or procedures."
17  Q.   Thank you.
18       And is that, in fact, your opinion?
19  A.   Yes.
20  Q.   So would it be fair to say -- to say that
21  different correctional administrators, based on their
22  correctional philosophies, may make different
23  decisions about what "sex" means?
24  A.   Yes.
25  Q.   Would it be fair to say that they make

Page 30

1  different decisions about how to handle a
2  classification of transgender people for those
3  sex-based policies?
4  A.   Yes.  Yes.  I mean, you see that --
5  Q.   And is that -- go ahead.
6  A.   Go ahead.  You know, I'm -- there was a
7  case out of Wyoming that was just spot on.  That point
8  where Dimarco v. Department of Corrections Wyoming, I
9  think it was -- I don't know if you're familiar with
10  that case -- but an individual was housed for about
11  nine months in the Laramie County Jail in Wyoming, and
12  was housed in one method, and that -- in general
13  population, free access, programming, recreations,
14  services.
15       And when she was moved to the Wyoming
16  Department of Corrections, they immediately put her
17  into a lockdown situation for over 400 and some days.
18       She had high levels of restriction on
19  interaction, wasn't allowed to interact with other
20  inmates, wasn't allowed to interact with many staff,
21  was prevented in purchasing certain levels of
22  commissary.
23       I mean, there were a number of things
24  that were wrong.  Now, that's within the same state.
25  And all it was was a bus ride from the county jail to

Page 31

1  the prison system.
2       So, yeah, you see that happening.
3  Q.   And is it possible that there could be
4  acceptable correctional practices that still vary in
5  their definition of the term "sex"?
6  A.   Okay.
7  Q.   And -- sorry.  So if you look back to
8  Page 13, could you read the bolded language there?
9  A.   "In sum, my opinion is there is
10       a governmental interest in having a
11       standardized definition of sex, such
12       as that established in Policy
13       Order 63 for law enforcement and
14       administrative purposes as expected
15       by a reasonable correctional
16       administrator so there is consistency
17       in the development and application of
18       administrative and operational
19       policies and procedures."
20  Q.   And is that, in fact, your opinion?
21  A.   Yes.
22  Q.   So it's my understanding that it's
23  helpful from a correctional perspective to -- for
24  there to be a policy that leads to consistent
25  information about sex on a driver's license.

Page 32

1       Do I have that right?
2  A.   Can you repeat that, please.
3  Q.   Sure.
4       So is it your opinion that for
5  corrections, it's useful for there to be a policy
6  about driver's licenses that provide some consistent
7  information about what they mean by "sex"?
8  A.   Yes.
9  Q.   Okay.  And you're not taking -- you're
10  not expressing an opinion about what the best
11  definition of sex would be for that purpose, are you?
12  A.   No.  Again, that best definition would be
13  based upon the risk tolerance level.
14  Q.   Okay.  So if instead of a current policy,
15  Alabama had a policy that said a driver's license sex
16  designation may be amended to reflect the person's
17  gender identity, would that information be useful to
18  correctional administrators?
19  A.   Yes.
20  Q.   Okay.  And if they had a policy that
21  permitted a change in sex designation when a doctor
22  certified that appropriate clinical treatment had been
23  provided, would that be helpful to correctional
24  administrators?
25  A.   Well, we would have to know what the

Page 33

definition is of "appropriate clinical treatment."
Q. Okay. So -- and if that was left to the discretion of the doctor, would that still be helpful to correctional administrators?
A. Well, I think having a definition is what is helpful to correctional administrators. Having a starting point.
Q. Okay. And so would -- would saying that the person had received appropriate clinical treatment serve as a starting point?
A. It would help if that was what was part of the definition that was being provided.
Q. Okay. Thank you.
And, in your opinion, it would be an acceptable correctional practice to use a definition of sex different than the one provided in Policy Order 63; right?
A. Yes, because it's all based on the discretion of the administrator of the correctional agency, how they're going to base those definitions, where are they going to get that information from, and if they do it off of Policy 63, then they're simply following as a baseline what was provided to them by the state. And it helps them to establish the rationale for their decision-making processes in

Page 34

developing their definitions.
Q. And can you just spell out for me, how is that helpful?
A. You mean how is it helpful to a jail to know what the sex of the individual is?
Q. Well, how is it helpful to a jail to know what sex the -- the person is considered to be for purposes of driver's licenses?
A. Well, again, it provides a starting point for them to develop their policies related to searches of the individual. Cross-gender searches, especially unclothed or strip searches by -- by differing sex individuals, you know, has been found to be intrusive.
So, yeah, having that driver's license tells us a lot about what is the sex of both the employees, in that case, and the sex of the individual that is to be searched, or the arrestee, in that case.
Q. In your experience, do correctional administrators typically take into account the sex designation on a driver's license in deciding how to apply those sex-based policies?
A. Oh, sure, that's probably one of the -- one of the foremost pieces of information that's used when booking an individual. The first time you come in contact with an individual into -- into your jail,

Page 35

you have to have someplace to get the information from. And most jails around the country, if the individual has a driver's license, they will use a driver's license, and most people do have a driver's license.
Q. If somebody came into a jail and didn't have a driver's license, how would that correctional administrator handle that?
A. Well, then that becomes a little bit more tricky for us. We then have to rely on secondary definitions of it. So it might be both the asking of the individual, it might require some sort of a medical examination by a qualified medical provider, it might involve us having a staff member simply begin the strip search processes and then if they -- if they perceive -- because I wouldn't say that they identify -- but if they perceive that the individual is not the same sex that they are, then they might have to stop that process.
Q. Would it be acceptable for a correctional administrator to use a sex designation from a pass point as a starting point rather than a sex designation from a driver's license?
A. If they want to put that in as part of their data point, yes, they could do that. That's a

Page 36

discretionary decision, just like the use of the male versus female. The receipt of the physician's letter is the discretionary decision from the State of Alabama and the driver's license.
I mean, these are discretionary governmental decisions that we have to use in order to develop our baselines.
Q. So if somebody came in and was booked in a jail and you had a driver's license, how would that driver's license influence what happened next?
A. Oh, wow, I can give you a prime example of that if you'd like, okay.
Q. Please.
A. Good friend of mine, an under sheriff with the county in Grand Rapids, Michigan, had -- got a call. In fact, he called me up. I got a call, he had an arrestee was pulled over on the street for a traffic violation, simple traffic violation.
The officer then went up to the vehicle, looked in the vehicle, saw what appeared to be 60s-plus-year-old male, heavy beard. And when asked for the driver's license and insurance, presented a driver's license for a female.
On the driver's license it had -- it had the name of the individual, but it had the sex

Page 37

1   designation as female.
2           The officer then says this isn't your
3   driver's license.  And the arrestee, the pulled over,
4   said that is my driver's license.
5           And apparently what had happened and
6   taken place with this individual was at some point in
7   their -- in his or her late 30s, had gone through a
8   crisis period and had been convinced that some sort of
9   sexual reassignment surgery was the way to go in order
10  to correct some of this phoria they were experiencing.
11          So he then went through the whole
12  process, lived that way for approximately 20 years as
13  a female; had the birth certificate changed, had the
14  driver's license changed, and lived that way.
15          And then when he turned in his 60s he
16  felt as though he'd made a grand mistake and decided,
17  no, that was not the right thing to have happened to
18  him.
19          So he then quit taking the hormones, he
20  began to revert back more appearances of being a male.
21  So of course when he got pulled over he appeared to
22  the arresting officer to be a male.  The driver's
23  license said female.
24          So the arresting officer promptly
25  arrested him for possession of a fraudulent

Page 38

1   instrument, okay.  Now it's a felony.  It went from a
2   traffic stop to a felony possession of a fraudulent
3   instrument.
4           He gets brought to the jail.  That's
5   where I get called by the administrator, the under
6   sheriff up there, a friend of mine.  He's like, what
7   should we do here?
8           And that's how it impacts jails.  Because
9   the questions that he wanted was, who does the
10  searching now, okay.  Who -- who do I house him with
11  now?  How do I proceed?  Or do I -- do I take the --
12  the very risk adversive practice where I put them into
13  a situation where they have no contact with anybody
14  else in the jail, no contact with other inmates.
15          I mean, very -- you know, what I consider
16  to be kind of a very punitive-type of environment.  So
17  we talked about it.
18          So, yeah, those issues about the driver's
19  license have a huge impact on who's going to do the
20  searches at booking, who's going to do the strip
21  search, where we going to house, you know, what type
22  of services are we going to provide, what type of
23  programming are we going to allow access to.
24          So, you know, a lot more decisions than
25  just simply what's on the driver's license.

Page 39

1       Q.   What did you advise that person to do
2   with that person in Grand Rapids?
3       A.   Well, again, he had definitions.  He had
4   definitions for how they would do it.  And what he was
5   wondering was, okay, how do I modify my definitions?
6           And that's what we talked about was,
7   okay, how do we modify definitions?  How do we go
8   about doing this?  Because all the old definitions
9   that he had didn't seem to work in this situation,
10  so -- but he needed a starting point.
11          So at least we had a starting point for
12  where to take the housing and supervision and
13  services.  So my -- my recommendations to him was, all
14  right, you have an individual there.  Who do you feel
15  most comfortable with having search you?
16          All right.  The appearance -- by all
17  outward appearances, we have a male.  The genitalia
18  has been reconstructed based upon sexual reassignment
19  surgery.  The breast implants had been removed.
20          Okay, so who's going to do the strip
21  searching of the individual?  And, again, who do you
22  feel most comfortable?  And in this particular case,
23  the gentleman had no problem with a male officer.
24          So then it became an issue of where do we
25  house in our jail?  And when I asked him -- I asked

Page 40

1   him very simple question, was how often do -- do --
2   does one inmate look at the sexual genitalia of
3   another inmate?
4           And the situation I used was, we have a
5   lot of vets that are coming back from Iraq, from
6   Afghanistan, from Syria, and I reflect back to my own
7   experience in the Marine Corps during the Vietnam War
8   where these Bouncing Bettys were used a lot by the
9   North Vietnamese.
10          These were small mines that would pop up
11  about waist level, and when they went off, they
12  didn't -- they didn't necessarily kill you, but they
13  did blow your genitalia off.  That was not an uncommon
14  situation.
15          So what I asked him was if you had a vet
16  that came in and he'd had his genitalia blown off in
17  an IED explosion, where would you house that veteran
18  in your jail?  Now all -- he just simply lacks --
19  lacks a penis and a scrotum, okay.  Where would you
20  house him in the jail?
21          And that was where we started.  That
22  became the baseline for the discussion about housing
23  supervision, the provision of services to the
24  individual.
25      Q.   And do you know what happened to that

Page 53

1  all sex-based classification decisions; is that right?
2      A.   Discretionary decisions, yeah.  For the
3  administrator of that particular agency, yes.  Keeping
4  in mind their risk tolerance for things like Fourth
5  Amendment violations or EEOC issues.  I mean, there's
6  a range of other issues that go into that risk
7  tolerance decision-making process, but it's all
8  discretionary.
9      Q.   So would you say a correctional
10 administrator would have to have a high degree of risk
11 tolerance to simply go off of what was on the driver's
12 license?
13     A.   No.  I would think that they would
14 probably have a lower degree of risk tolerance and be
15 more risk adversive to just simply go off of the
16 driver's license.
17     Q.   And why is that?
18     A.   Well, because that provides them with a
19 lot of good legal cover that way.  I mean, if they're
20 using the definition and the definition is
21 established, in this case by the State of Alabama for
22 what is male or female, and they're using that on the
23 driver's license, then they get some liability
24 coverage in their policies that say, well, look, we're
25 getting our information about whether or not this

Page 54

1  individual is a male or female based upon what the
2  state tells us that they're male or female, which is
3  what they recognize on the driver's license.  So they
4  get some cover that way.
5      Q.   And would that be true regardless what
6  state a driver's license is from?
7      A.   Well, I think that, yeah, that's -- I
8  mean, if that's their data point, that's where they
9  get the information for it, yeah, it would be true
10 everywhere.
11     Q.   Okay.  But as you mentioned earlier, if
12 they wanted to take into account all of the aspects of
13 physicality, gender identity, and gender expression,
14 and sexual preference, they're probably not going to
15 be able to do that based on just the sex designation
16 on a driver's license; is that right?
17     A.   I would say that that's true, because
18 that's -- that's just one data point in that decision
19 process.  That's one discretionary data point that
20 they're using as part of making those decisions.
21     Q.   Okay.  So would a reasonable correctional
22 officer expect that two people with the same external
23 genitals and the same gender identity might have a
24 different sex designation on their license?
25     A.   I don't think you would expect that at

Page 55

1  all, no.  You're talking about an officer?
2      Q.   Yes.
3      A.   You used the term "officer."
4      Q.   Yes.
5      A.   Yeah, line level staff.
6           No.  I think the line level staff are
7  going to expect that gender identity, physiognomy, and
8  the driver's license are all going to be reflective of
9  one another.
10     Q.   So in Alabama -- I'd like you just to
11 assume for a moment that what I'm telling you is true.
12          So in Alabama, it is possible to change
13 the sex designation on one's license based on either
14 evidence of sex reassignment surgery or that one has
15 amended their birth certificate.
16          The amendment of the birth certificate
17 can be a birth certificate from any jurisdiction, and
18 some jurisdictions permit changes to birth
19 certificates without sex reassignment surgery.
20          So because of that, it is possible that
21 two people who identify as male but who have female
22 typical external genitals, one who was born in, say,
23 Idaho would have male on his Alabama license, and one
24 who is born in Alabama might be female on his license.
25          Does that make sense so far?

Page 56

1      A.   Yeah, because their definition -- again,
2  here's where -- here's where that discretionary
3  decision comes in in that whole process, is that part
4  of their -- their definition for that driver's license
5  designation says we will accept what another state
6  says, all right.
7           Now -- and that's their discretionary
8  decision.  They could very well write into that
9  definition, we're not going to accept what another
10 state says.  You have to meet our criteria.
11          So, yeah, you might have a birth
12 certificate from Idaho that you had amended there and
13 they don't require it; but in our state, your birth
14 certificate, in order to be amended like that, we have
15 that requirement.  They could very easily make that as
16 a designation.
17     Q.   Okay.  And so, again, assuming that what
18 I told you is true and they haven't made that
19 designation, they are accepting certificates from
20 other states, would that affect how useful this policy
21 would be for -- as a baseline for correctional
22 administrators?
23     A.   Yes.  Because if you came in and you had
24 "male" on your driver's license, and that basically
25 operationalized decision-making for searches by other

Page 57

 1  males, then that's how you would be searched, and that
 2  would give cover.
 3       And if the individual came in and they
 4  had "female" on their driver's license and that
 5  operationalized decisions that led to being searched
 6  by a female, again, that would give cover.
 7       So in that we would say that there was
 8  not a Fourth Amendment violation, because in each case
 9  the information that we used to drive our
10  decision-making process for the intrusiveness of the
11  search was based upon the information that was on the
12  driver's license, which is recognized by the State of
13  Alabama.
14    Q.   Okay.  So whatever the policy is in
15  Alabama, going by the license in Alabama would provide
16  some legal cover for correctional administrators; is
17  that right?
18    A.   Yes, it helps.
19    Q.   And earlier you talked to me about a
20  person who had transitioned to female and then
21  transitioned back to male who was -- who was stopped
22  in Grand Rapids.
23       Would it be possible that a transgender
24  man, somebody who was assigned female at birth and who
25  had not had genital reconstruction surgery and who had

Page 58

 1  a beard, would also be stopped under those same
 2  circumstances and accused of not having a valid ID?
 3    A.   Well, it depends on how the driver's
 4  license was issued.
 5    Q.   If the driver's license were issued such
 6  that it said female but the person appeared typically
 7  male with clothes on, is it possible that the same
 8  thing could have happened that happened to the person
 9  you told me about in Michigan?
10    A.   I would imagine so, yes.
11    Q.   And do you -- you mentioned in your
12  report that it's also important to identify staff sex
13  for purposes of searches and supervision; is that
14  right?
15    A.   Yes.
16    Q.   Is there a typical way that correctional
17  administrators go about identifying the sex of staff
18  members?
19    A.   Oh, my.  Now you're really getting
20  tricky.  Geez, you're running into all sorts of EEOC
21  issues.  So I got a story for you, how's that?
22    Q.   Great.  Great.
23    A.   All right.  I like my stories for you.
24       All right.  Good friend of mine, the
25  under sheriff in Charleston County, South Carolina;

Page 59

 1  large jail, 2,600 beds.  Sitting in his office one
 2  day, they're doing hiring, okay, for new employees.
 3  The -- and I've got -- I did an interview with him
 4  like this, a distance interview, and I use it in my
 5  presentations.
 6       And he describes how he's sitting in his
 7  office and these three members of the hiring board
 8  come to his office; one is a captain, she's an African
 9  American female; one is a sergeant, and he's an
10  African American male; and then the other is just a
11  male officer.
12       And they come in the room and they say,
13  Chief, we got a problem.
14       So, okay, What's the problem?
15       Said, Well, we -- we had a candidate come
16  before the board, and we all looked at the folder.
17  The folder and the information all looked really good,
18  and we said, Send young lady in, because the name on
19  the folder, the sex in the folder, all indicated that
20  this was a female applying for a correctional officer
21  job, all right.
22       They bring the individual in, sits down
23  at the table, and they look up and they say, Oh, there
24  must be some mistake.  We're expecting -- just as a
25  name I'll toss out -- they're expecting Marsha.

Page 60

 1       And he says, No, my name's Matthew, I
 2  used to be Marsha, from underneath a heavy beard.
 3       And they say, Well, what do you want us
 4  to do, chief?
 5       And he said, Well, was the individual a
 6  good candidate?
 7       They said, Well, yeah, yeah, good
 8  candidate.
 9       Well, how was the interview?
10       Well, the interview was fine, yeah, good
11  candidate.
12       So he says -- he turned to the African
13  American captain, female, and he says, you know, in
14  Charleston ten years ago, 20 years ago, we'd have
15  looked at you and we'd have said, a female officer
16  working in the jail?  In a male housing unit?  In
17  command?  We can't do that.  We can't have that.
18       And he turned to the African American
19  sergeant and he said, 40 years ago in Charleston,
20  South Carolina, we'd have looked at you and said, an
21  African American man working in the jail?  We can't
22  have that.  We can't do that.
23       He said, now, if we'd have lived and had
24  those policies and kept those policies, neither one of
25  you would be here or in your positions.  So what do

Page 97

1  say that in our changing world, this evolving sense of
2  decency that we have in our society, some of our
3  practices have to change, but we need definitional --
4  definitions on which to base how we make those
5  changes. That's critical.
6      So one other thing. Gender of staff.
7  Gender of staff. Are we talking about what the staff
8  identify as or are we talking about what the staff has
9  as plumbing?
10  Q.   Right.
11  A.   You see how definitions come in.
12  Q.   So it sounds like you don't think that --
13  that restrictions on cross-gender pat searches are
14  appropriate; is that right?
15  A.   No. Not blanket like this, no. This is
16  a blanket policy, no. Blanket policies like that, no.
17  Q.   Okay.
18  A.   I've had my discussions with Andy Moss on
19  this. I know Andy. You know Andy.
20  Q.   Is Andy one of the authors of this -- of
21  this guidance you think?
22  A.   It's by The Moss Group.
23  Q.   Yeah.
24  A.   That's her company. I like Andy.
25  Q.   So -- so if you don't think that, in

Page 98

1  general, cross-gender pat searches should be
2  prohibited, then it isn't necessarily required to
3  figure out how to classify somebody for purposes of
4  sex before doing a pat search; is that right?
5  A.   Well, you have to have an idea of who to
6  have them search, right? So you have to have some --
7  you have to have some basis.
8  Q.   Well, but I thought you said that for pat
9  searches it would be okay to have men search women or
10  to have women search men?
11  A.   Oh, yeah.
12  Q.   Am I wrong?
13  A.   In my jail it would be. And, in fact --
14  in fact, we instituted cross-gender supervision in --
15  I was thinking it was, like, '89, '90, maybe.
16      Prior to that, in the state of Kentucky,
17  female officers -- they were called matrons, you
18  couldn't even call them officers, they were called
19  matrons -- they only dealt with the female inmates and
20  the male officers only dealt with the male inmates.
21      Which was okay except that there was one
22  captain, one lieutenant, one sergeant position. So if
23  you were a female officer and you came -- a female
24  matron at that time -- you came to work, your
25  opportunities for advancement within the organization

Page 99

1  were significantly limited.
2      There was one sergeant, one lieutenant.
3  But if you were a male officer, we had, God, 25
4  sergeant positions, and a dozen lieutenant positions.
5      So from an employee/employer perspective,
6  we were really discriminating against our female staff
7  in the way we managed them in that way. So we
8  integrate them.
9      Now, when we did that, all the male staff
10  claimed that the female officers were going to get
11  raped and assaulted, they couldn't control the male
12  housing units, the jail was going to go into a riot,
13  it was going to burn down, people were going to get
14  out, the community was going to be killed,
15  thermonuclear weapons are going to go off. I mean,
16  that's what you hear, okay. I mean, you get this
17  slippery slope argument.
18      In reality, we found that one of the best
19  performing officers we had in the jail was a
20  62-year-old female that the inmates called mom. She
21  could get them to do anything. She didn't have any
22  fights, okay. So that was good.
23      But the male staff, they all resented it.
24  And I think some of it was now it opened up those
25  positions to the female officers, okay. Yeah, now

Page 100

1  they got a little more competition, all right. That
2  was one issue.
3      The next thing we found after doing that
4  was when -- when altercations were happening, they
5  were sending all the male officers to the
6  altercations, all right.
7      And so now we had use of force issues for
8  an officer showing he had more use of forces than this
9  other officer over here, so it looked like he was
10  being a thug in the jail. When in reality, it was how
11  we're operationalizing their uses of force policy. We
12  were only sending the males.
13      So we became an equal opportunity
14  ass-kicking jail. Meaning if you were a female
15  officer, you got to go in on that fight too.
16  Everybody went in.
17      And you know what we found? When we
18  started sending only women in or we started sending
19  women in with the men, fights went down. Inmates
20  chilled out when they came in, because they didn't
21  want to fight the women.
22      Now, is that true across the board? No.
23  We did have some fights with women. But basically,
24  across the board, we did not have that. So, again,
25  it's how we operationalize some of these things.

Page 109

 1  a high risk tolerance.
 2          Our intake unit, you know, in most jails
 3  around the country, females get a very short amount of
 4  resource placed toward their housing, supervision,
 5  service provision.
 6          There was a 2002 report that came out
 7  from the National Institute of Corrections that talked
 8  about the -- the lack of good classification housing
 9  and supervision policies for female offenders in the
10  country, because nobody puts money toward them.
11          So, for example, you have a place like
12  Memphis, Shelby County, Tennessee, 33 -- 3,600-bed
13  jails, and they have very strict prohibitions in the
14  state of Tennessee on separating males from females,
15  sight and sound.
16          Now, why do we have a site and sound
17  separation once they cross that threshold of the jail?
18  They can sit together in the back seat of the cruiser,
19  but once they cross the threshold of the jail, we have
20  to have them separated.
21          That's because we all know if they can
22  even hear each other, they're going to become sexually
23  titillated by it, they're going to get some sort of
24  gratification out of it.  Okay, that's why we have to
25  do this sight and sound separation.

Page 110

 1          So you can't have them being booked in
 2  the same area.  You can't have them being housed in
 3  the same area.  Here's how it worked out in Memphis:
 4  The males had a beautiful sitting area, they had
 5  televisions to watch that they could, you know, pass
 6  the time with.  They had telephones that they can call
 7  and get bonded out of custody with.  Those were all
 8  available to them.
 9          You went to the female side, they were
10  given a large utility closet, no television, no
11  telephone.  When they wanted to make a call, they had
12  to get an officer to get them out, to walk them up the
13  hall so the males couldn't see them, so that they
14  could make a phone call so they could get bonded out
15  of custody.
16          Now -- okay.  Now we got a Fifth
17  Amendment right to bond, right?  Okay.  But it seemed
18  to be being hindered a little bit by these practices
19  of sight and sound separations.  That's the way it
20  gets worked out.
21          Now, in our jail, we ran an intake unit,
22  we ran a passive seating area where males and females
23  all sat together.  We ran an intake housing unit,
24  there was a co-ed housing unit, the males and females.
25  Males go on the lower level, females on the upper

Page 111

 1  level.  They came down, they commingled in the common
 2  areas.
 3          We ran a work release housing unit with
 4  the males housed on one side and the female on the
 5  other side, and in between we had vending machines,
 6  and we had a pool table, ping pong table, a seating
 7  area, and they commingled freely.  The males didn't go
 8  on their side, they didn't go on the male side.
 9          I mean, you know, okay.  Did we ever have
10  any problems in there?  No.  No, because we were
11  proactive.  As soon as we started seeing a behavior of
12  an inmate inappropriate, we dealt with that behavior
13  right then.  That's how you have to do it.
14          But that's my risk tolerance.  When I
15  talk about doing this, the jails around the country,
16  they throw hands up.  They're like, oh, my God, you
17  can't do that.  They'll be having sex all over the
18  place.
19          You know, what I find personally is that
20  most people can control their sexual urges when
21  they're in jail, and that short period of time that
22  they're in, that they don't feel a need to have sex
23  with every female that walks in the door, nor do the
24  females feel that they have to have sex with every
25  male that walks in the door, and it work both ways.

Page 112

 1          And if you give people the opportunity to
 2  -- to demonstrate adult rational behavior, you reward
 3  them for that, and you sanction them when you don't.
 4  You'll get that from them.
 5          But, again, that's my -- that's -- my
 6  risk tolerance level's really high.  Some people say
 7  we got to punish.
 8      Q.   And when people ask you about your
 9  recommendations for how transgender people should be
10  housed, what would you tell them?
11      A.   Now, again, you're talking to Don Leach,
12  what would I recommend.  I would ask an individual
13  where do you feel most comfortable being housed.  Can
14  you live in a male housing unit?  Yes.  Okay, we'll
15  put you in there.
16          If you have any problems while you're in
17  there, you let us know.  If there's any issues come
18  up, you let us know.  If something happens while
19  you're in there, you let us know.  You inform them
20  that they have to help participate in their
21  incarceration.
22          So we'll put you where you feel most
23  comfortable, but if a problem develops, you have to
24  tell us.  But you know what, I would tell that to
25  anybody.  I would tell that to anybody that goes in a

Page 145

1 So, again, that's all that changing
2 landscape.
3 Q. All right. Thank you.
4 And you're not claiming to have any
5 medical expertise; right?
6 A. I have my EMT certification, but that's
7 about it. That was through the Lexington Fire
8 Department back when I was working at the jail, yes, I
9 had that. But other than that, no.
10 Q. Okay. And do you have any degrees in
11 biology?
12 A. No. I was a liberal arts major.
13 Q. So was I.
14 And have you ever worked in the motor
15 vehicle department before?
16 A. No.
17 Q. And do you have expertise in driver's
18 licenses, specifically?
19 A. No.
20 Q. Okay. And have you ever been
21 disqualified as an expert before?
22 A. Not to my knowledge.
23 Q. Okay. And since you have experience
24 making arrests, I'd like to ask just a couple of
25 questions following up on that.

Page 146

1 So at the point where you make an arrest,
2 how do you identify -- do you identify the sex of the
3 person who you're arresting?
4 A. I did. Had it write it on -- had to
5 write it on the citation.
6 Q. And so how did you decide what to write
7 on the citation for sex?
8 A. I used his driver's license.
9 Q. Okay. Did you -- as far as you recall,
10 did you ever arrest somebody who you thought might be
11 transgender or intersex?
12 A. Not that I can recall, no.
13 Q. Have you ever arrested somebody who
14 didn't have a driver's license?
15 A. Not a juvenile? Not a juvenile.
16 Assuming it's not a juvenile. I've arrested
17 juveniles, they didn't have driver's licenses.
18 Q. With juveniles who did not have driver's
19 licenses, how did you determine what sex to write
20 down?
21 A. Physical appearance. And we would talk
22 to them, of course. You know, we're talking about a
23 long time ago. That would have been back in the --
24 that was in the '80s.
25 Q. Okay.

Page 147

1 A. Long time ago.
2 Q. When you talked to them, did they -- did
3 you ask questions about their sex?
4 A. No, I don't -- I don't recall -- I don't
5 recall really talking about their sex to them too
6 much. It just -- it just was more obvious. Again,
7 we're talking about back in the '80s.
8 Q. Okay. Could you tell me, are there
9 unique concerns in a correctional environment that
10 aren't necessarily relevant in the community?
11 A. Are there unique concerns in the
12 correctional environment that are not relevant in the
13 community?
14 Q. Yes.
15 A. Well, I -- yeah, I mean, we have the
16 Fourth Amendment issues. I mean, intrusiveness of the
17 search, okay, where we have a policy that's going to
18 require a pretty intrusive search, a strip search, you
19 don't see many strip searches in the community. That
20 would probably be one.
21 You know, housing. You know, having to
22 make a decision about what apartment you can live in
23 the -- in the community. I don't know that any
24 governmental agency makes a decision on what apartment
25 you can be housed in based upon your sex or gender

Page 148

1 identity or other issues, I'm not aware of it. So, I
2 mean, that might be another one.
3 Other than that, yeah, I don't -- that's
4 about it off the top of my head.
5 MR. ARKLES: All right. So I'm going to
6 take another very short break. I think we're probably
7 wrapping up here, and so unless -- of course Brad will
8 also have an opportunity to ask you questions.
9 Why don't we just take one last
10 five-minute break.
11 (There was a break taken.)
12 MR. ARKLES: We can go back on the
13 record, and I have no further questions at this time.
14 MR. CHYNOWETH: No questions from the
15 defendants.
16 MR. ARKLES: All right. Then I think
17 we're done.
18 Vickie, is there anything that you need
19 from us?
20 THE REPORTER: Do you both want a copy of
21 the transcript?
22 MR. ARKLES: Yes, please.
23 MR. CHYNOWETH: Yes.
24 THE REPORTER: Do you want the doctor to
25 read and sign? Or do you have read and sign?