**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **DARCY CORBITT,** *et al.***,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:18-cv-91-MHT-GMB** |
| | ) | |
| **HAL TAYLOR,** *et al.***,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**DEFENDANTS' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**</u>

Steve Marshall, Attorney General
Brad A. Chynoweth, Assistant Attorney General
Winfield J. Sinclair, Assistant Attorney General

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, AL  36130-0152
334/272-7300
334/353-8440 (fax)
bchynoweth@ago.state.al.us
wsinclair@ago.state.al.us

Counsel for Defendants Hal Taylor,
Charles Ward, Deena Pregno, and Jeannie Eastman

## **Table of Contents**

A. Statement of Facts ..................................................................................................1

    1. The Alabama Law Enforcement Agency and Alabama Driver Licenses .......................1

    2. Policy Order 63: Creation, Implementation, and State Interests .....................3

        a. Defendants' Expert: Donald L. Leach, II .................................................10

        b. Plaintiffs' Expert: Dr. Nicholas Gorton ..................................................13

    3. Plaintiffs ...............................................................................................14

        a. Plaintiff Darcy Corbitt ..........................................................................14

        b. Plaintiff Destiny Clark .........................................................................18

        c. Plaintiff Jane Doe ................................................................................22

B. Argument ...............................................................................................................24

    1. Plaintiffs Corbitt and Clark's Claims Are Barred by the Statute of Limitations ..........24

    2. Defendants' Are Entitled to Summary Judgment on Plaintiffs' Right to Privacy Claim in Count I ......................................................................................28

    3. Defendants Are Entitled to Judgment as a Matter of Law on Plaintiffs' Unwanted Medical Treatment Claim in Count II ..........................................................33

    4. Defendants Are Entitled to Summary Judgment on Plaintiffs' Compelled Speech Claim in Count III ..................................................................................36

    5. Defendants Are Entitled to Summary Judgment on Plaintiffs' Equal Protection Claim in Count IV ..................................................................................41

        a. Policy Order 63 Does Not Intentionally Discriminate Based on an Individual's Transgender Status ............................................................42

i

b.  Even if Policy Order 63 Were a Sex-Based Classification Subject to Intermediate Scrutiny, It Satisfies This Level of Scrutiny....................................44

C. Conclusion....................................................................................................................49

Certificate of Service .......................................................................................................50

Defendants Hal Taylor, Charles Ward, Deena Pregno, and Jeannie Eastman submit this brief in support of their motion for summary judgment.

A.  Statement of Facts

1.  The Alabama Law Enforcement Agency and Alabama Driver Licenses

The Alabama Legislature created the Alabama Law Enforcement Agency ("ALEA") as an agency within the Executive Branch of State government in 2013. *See* Ala. Act. 2013-67 § 1. ALEA is comprised of the Department of Public Safety and the State Bureau of Investigations. *See* Ala. Code § 41-27-1. Defendant Hal Taylor serves as the Secretary of ALEA and is "the appointing authority and executive head of the agency and the appointing authority and department head of the Department of Public Safety and State Bureau of Investigations." Ala. Code § 41-27-2. Defendant Colonel Charles Ward serves as the Director of the Department of Public Safety. *See* Ala. Code 41-27-6. Defendant Deena Pregno serves as the Chief of the Driver License Division of ALEA. (Pregno Depo. at 7, 22). She has served as Chief of the Driver License Division since January 2015 and reports to Colonel Ward as her supervisor. (Pregno Depo.. at 22; Woodruff Depo. at 32). Defendant Jeannie Eastman serves as Supervisor over the Commercial Driver License ("CDL") Division as well as the Medical Unit of ALEA. (Eastman Depo. at 17).

Prior to the creation of ALEA in 2013, the Department of Public Safety was a separate entity and was responsible for issuing driver licenses. (Woodruff Depo. at 12-14). It currently performs this function as a Department within ALEA. (*Id.* at 12; Pregno Depo. at 44). The Alabama Code states that driver licenses issued by the Department of Public Safety "shall bear thereon a distinguishing number assigned to the licensee and a color photograph of the licensee, the name, birthdate, address, and a description of the licensee . . . ." Ala. Code § 32-6-6; *see also* (Pregno Depo. at 11-12). In addition to the statutorily-mandated photograph, name, birthdate, and address,

1

the "description" of the bearer of an Alabama driver license, as implemented by ALEA, consists of the license bearer's height, weight, eye color, hair color, and a designation of the bearer's sex as male or female ("M" or "F"). (Pregno Depo. at 65-66, 88; *see also*, Clark Depo., DX 2; Doe Depo., DX 18).

It is a policy of ALEA to maintain consistency between the information contained on a driver license and that contained on an Alabama birth certificate. (Pregno Depo. at 41-43, 103-04, 111-12, 123-25). Alabama birth certificates are regulated by the Office of Vital Statistics within the State Board of Health. *See* Ala. Code § 22-9A-2. The State Registrar of Vital Statistics is tasked with issuing regulations regarding vital statistics and maintaining custody of records regarding vital statistics. *See* Ala. Code § 22-9A-3. The State Board of Health, as implemented by the State Registrar, "shall by rule determine the items or information to be contained on certificates of birth . . . ." Ala. Code § 22-9A-6(a). By rule Alabama birth certificates include the following identifying information: "date, time, and location of birth; name of child; *sex*; plurality and birth order if not single; mother's information such as name, residence, and date and place of birth; father's information . . . ; attendant's information; and information for legal purposes such as certificate number and date filed." Ala. Admin. Code § 420-7-1-.03(3)(a)(1) (emphasis added). The same regulation orders additional information to be collected for research purposes, but this information does not appear as identifying information on the birth certificate itself. *Id.* § 420-7-1-.03(3)(a)(2). This information includes "demographic information on the parents such as race, ethnicity, and education," etc. *Id.* Neither race nor ethnicity appear on Alabama driver licenses or birth certificates. *See* Ala. Admin. Code § 420-7-1-.03(3)(a)(1); (Clark Depo., DX 2).

2

2.     <u>Policy Order 63: Creation, Implementation, and State Interests</u>

ALEA Policy Order 63 governs when an individual may change the sex designation on an Alabama driver license for situations other than typographical error. (Pregno Depo. at 24-26; Woodruff Depo. at 66). Policy Order 63 was first put in writing and formally issued on September 1, 2012. (Pregno Depo. at 24; *see also* Woodruff Depo., PX 7 at D1). Prior to Policy Order 63, the Department of Public Safety had an unwritten procedure for allowing drivers to change the sex designation on their license. (Pregno Depo. at 27-28; Woodruff Depo. at 48-49). Under the pre-2012 unwritten procedure, the Department of Public Safety would change the sex designation on a driver license if the licensee provided a letter from a physician stating that the physician had performed sex reassignment surgery on the licensee and that the surgery had been completed. (Woodruff Depo. at 49-50). Under the pre-2012 unwritten procedure, the Department of Public Safety required both an amended birth certificate and a physician's letter stating that sex reassignment surgery had been completed, but that, in practice, a physician's letter stating that sex reassignment surgery had been completed was sufficient. (Pregno Depo. at 29-30). Amending an Alabama birth certificate to change the sex designation also requires proof of sex reassignment surgery. *See* Ala. Code § 22-9A-19(d); (Pregno Depo. at 124).

Policy Order 63 was formally issued on September 1, 2012. (Pregno Depo. at 24). The 2012 version of the policy states the following:

> It is the policy of the Director of the Driver License Division that individuals wishing to have their sex changed on their Alabama license due to gender reassignment surgery are required to submit to the Medical Unit an amended birth certificate along with documentation on letterhead from the physician that performed the sexual reassignment surgery stating the surgery has been completed.

(Woodruff Depo., PX 7). Policy Order 63 was created to establish a formal procedure for handling requests to change the sex designation on driver licenses. (Pregno Depo. at 41). Policy Order 63

3

was based on the state statute for amending a birth certificate to change the sex, a process that also requires proof of sex reassignment surgery. (Pregno Depo. at 42, 124); *see also* Ala. Code § 22-9A-19(d). The surgery requirement for amending Alabama birth certificates has been in effect since 1992. *See* Ala. Act 92-607 § 19(d); *see also Id.* § 31 (stating the 1992 amendments would become effective immediately upon approval by the governor). The 2012 version of Policy Order 63 required all medical documentation to be sent to the Medical Unit prior to authorizing a sex designation on a driver license. (Woodruff Depo. at 66).

The version of Policy Order 63 that is currently in effect was revised in late 2015 or early 2016. (Pregno Depo. at 25-26). The current policy states:

> It is the policy of the Chief of the Driver License Division that an individual wishing to have the sex changed on their Alabama driver license due to gender reassignment surgery are required to submit to an Examining office OR the Medical Unit the following:
>
> 1.  An amended state certified birth certificate and/or a letter from the physician that performed the reassignment procedure. The letter must be on the physician's letterhead.

(Woodruff Depo., PX 7 at D2). This current version of Policy Order 63 allows licensees to change the sex designation on their license with either a certified copy of an amended birth certificate documenting the sex designation change or proof from the physician performing the gender reassignment surgery on the physician's letterhead rather than providing both documents. (Pregno Depo. at 29-30). The current policy also authorizes driver license examiners in field offices to change the sex designation on a driver license upon receipt of the correct documentation rather than requiring all such changes to go through the Medical Unit. (Woodruff Depo. at 66-68). Thus, the current policy contains instructions for implementation separately to field examiners and employees of the Medical Unit. (Woodruff Depo., PX 7 at D2).

Prior to depositions, Plaintiffs served an interrogatory asking Defendants to identify "any and all procedures that constitute 'gender reassignment surgery,' 'sexual reassignment surgery,' or 'the reassignment procedure' for purposes of changing the sex designation on an Alabama driver's license." (Eastman Depo., PX 23). After lodging certain objections, Defendants responded as follows:

> Without waiving these objections, defendants state that to change the sex designation on an Alabama driver license, Policy Order 63 requires proof of sexual reassignment surgery that includes an irreversible surgical change of sex characteristics, including genital reassignment.

(*Id.*). The next interrogatory asked Defendants the criteria by which it was determined whether an individual had had sex reassignment surgery, to which Defendants responded by quoting Policy Order 63's language requiring "[a]n amended state certified birth certificate and/or a letter from the physician that performed the reassignment procedure. The letter must be on the physician's letterhead." (*Id.*). The interrogatory response then added that the "process may also involve a member of ALEA's Medical Unit contacting the office of the physician on the letter to confirm the required procedure was performed." (*Id.*).

Eastman testified in her deposition in her capacity as a 30(b)(6) representative as to these responses and Policy Order 63's surgery requirement. (Eastman Depo. at 62-64). She testified that for purposes of Policy Order 63 the terms "sex reassignment surgery," "reassignment procedure," and "gender reassignment surgery" were interchangeable. (*Id.* at 62). She testified that, in layman's terms, complete sex reassignment surgery consisted of both "top" and "bottom" surgery. (*Id.* at 68-69). The Medical Unit does not maintain any specific list of procedures that constitute sex reassignment procedures. (*Id.* at 66). Rather, the Medical Unit relies on the documentation from the physician that performed the procedure stating that sex reassignment surgery had been

5

completed. (*Id.* at 67-68). Eastman testified that whenever she or anyone from the Medical Unit had contacted a doctor's office to confirm whether a sex reassignment procedure had been performed, no one at the doctor's office had ever inquired as to what was meant by "sex reassignment procedure" or "sex reassignment surgery." (*Id.* at 151-52). She stated this experience was similar to when she called a doctor's office to follow up about documentation as to other medical conditions, such as when was the last time someone had a seizure. (*Id.* at 152-53). She testified that the individuals she spoke with at doctor's offices indicated they understood the medical condition about which she was inquiring. (*Id.* at 153).

Eastman testified that the best evidence of the documentation the Medical Unit considered sufficient to satisfy Policy Order 63 is contained in the medical documentation for individuals who had requested and been granted a change to the sex designation of their driver licenses, which was produced in connection with this lawsuit. (Eastman Depo. at 152). Eastman and Jerrolynn "JJ" Spencer are the two Medical Unit employees responsible for reviewing medical documentation to ensure it is compliant with Policy Order 63. (*Id.* at 19-20). Spencer testified as to doctor's letters submitted in connection with sex change requests on licenses and why they were or were not considered policy-compliant. (Spencer Depo. at 48, 52-57, 66-68, 73-74). For instance, Spencer testified that a doctor's letter that stated "[s]ex reassignment surgery has been completed on [a given date] and [patient's name redacted] is not of the sex recorded on the original records," was sufficient to meet Policy Order 63's criteria for changing the sex designation on a license. (*Id.* at 48, 52; *Id.*, PX 15). By contrast, a doctor's letter that stated the patient "has had appropriate treatment for gender transition male to female," contains a handwritten note by Spencer indicating she contacted the office to determine whether sex reassignment surgery had been performed. (*Id.* at 66-67; *Id.*, PX 18). Spencer's note states, "[n]o surgery performed per px [telephone

conversation] w/ dr office." (*Id.*). Spencer could not recall if follow-up documentation was provided, but testified that "based on this letter alone," which stated only that "appropriate treatment" had been provided, the request to change the sex designation on the driver license would have been denied. (*Id.* at 66-67). The medical records also document at least one case of an individual who changed the sex designation on a driver license due to reassignment surgery resulting from an intersex condition (Klinefelter's syndrome), rather than the individual being transgender. (D1165).

Prior to depositions, Plaintiffs served an interrogatory asking Defendants to describe "any and all government interests Defendants assert that Policy Order 63 serves, as well as how those government interests are furthered by Policy Order 63." (Eastman Depo., PX 23). After lodging certain objections, Defendants responded as follows:

> Without waiving these objections, and subject to the right to supplement these responses, defendants state that Policy Order 63 serves the State's interests in providing an accurate description of the bearer of an Alabama driver license. An Alabama driver license provides identification for law enforcement and administrative purposes, including, but not limited to, purposes related to arrest, detention, identification of missing persons or crime suspects, and the provision of medical treatment. Policy Order 63 furthers these interests by providing a uniform understanding of what physical characteristics underlie the sex designation on a driver license. Policy Order 63 serves the State's interests in maintaining consistency between the information contained on a driver license and that contained on a birth certificate since obtaining an amended birth certificate to change a sex designation requires proof that the individual's sex has been changed by surgical procedure. *See* Ala. Code § 22-9A-19(d).

*Id.* Chief Pregno testified in her capacity as ALEA's 30(b)(6) representative that this interrogatory response accurately stated the State's interests in Policy Order 63 and how the policy was related to those interests. (Pregno Depo. at 57-58).

7

ALEA, through the above interrogatory and its 30(b)(6) representative, stated one of its interests in Policy Order 63 was to maintain consistency between the information on an Alabama birth certificate and a driver license. (Pregno Depo. at 42-43, 106-07). Chief Pregno testified that the 2012 version of Policy Order 63 "was established based on the state statute for changing the gender on a birth certificate." (*Id.* at 42). The sex designation on an Alabama birth certificate is the "default" for establishing the sex designation on the same individual's driver license. (Woodruff Depo. at 90-92). Amending an Alabama birth certificate requires proof of sex reassignment surgery. (Pregno Depo. at 124). ALEA maintains a similar consistency between the information on licenses and birth certificates in other contexts, such as when an individual's name changes. (*Id.* at 104). Policy Order 63 also serves the State's interests in maintaining a paper trail that documents the reasons why an individual's sex designation might differ between a birth certificate and driver license. (*Id.* at 103); (*see also* Woodruff Depo. at 90-92). Although the federal Real ID Act requires a sex designation to appear on the face of state driver licenses, ALEA controls the information that goes onto an Alabama driver license but does not control the information that goes onto federal identity documents, such as a United States passport. (*Id.* at 51-52, 122). Thus, Policy Order 63 is not intended to maintain consistency between Alabama driver licenses and federal identity documents. (*Id.* at 106).

In addition to the State's interests in consistency with birth certificates, Chief Pregno testified that ALEA is primarily a law enforcement organization, and that an Alabama driver license is an identification document issued for law enforcement purposes. (*Id.* at 55-56, 123). She elaborated in her own words on the State's interests in Policy Order 63 as an identity document:

> As I stated earlier, we are a law enforcement agency, and we are preparing and issuing an identification document. This document is used by law enforcement officers to identify the subject that they're dealing with. It also identifies possible criminal activity or the

> identification of a possible criminal activity. It gives them [i.e. law enforcement officers] a description so they can confirm the person that they—the person in the license is actually the person that they are dealing with. It gives them the information they need to make decisions on how to handle this person for arrest procedures, medical, emergency procedures, booking and retaining procedures, interviewing and questioning procedures, and as well as maintaining the actual physical identifiers of that person.

(*Id.* at 55-56). Policy Order 63 allows ALEA to define and control information about the physical characteristics of subjects law enforcement officers may encounter. (*Id.* at 122). As an example, Chief Pregno testified that a district attorney's office contacted ALEA regarding the identity of a deceased individual the medical examiner had identified as female based on the presence of female genitalia. (*Id.* at 59-60). Although the district attorney had identified the victim as a male based on a criminal database search, ALEA was able to confirm that the same individual was a female at the time of death based on documentation of a sex change contained in information in its driver license records. (*Id.* at 59-61). Policy Order 63 thus serves identification purposes not only for verifying an individual's current identity, but in linking up identities of individuals over time. (*Id.*).

Although ALEA does not necessarily require documentation of changes to other physical characteristics appearing on a license such as height, weight, or eye color, driver license examiners are trained not to allow individuals to change these descriptions to anything they want based only on the licensee's self-report. (Woodruff Depo. at 131-33). Examiners are trained to allow licensees to make changes to these other physical descriptors only if the change is "something observable that's reasonable." (*Id.* at 132). For instance, Plaintiff Darcy Corbitt testified in her deposition that when she went to obtain an Alabama license in the Opelika field office, the license examiner asked her if her weight had changed and she reported that it had. (Corbitt Depo. at 42).

Chief Pregno testified that Policy Order 63 provides information about the definition of "sex" as used on the license to law enforcement officers to allow them to formulate search, seizure,

and booking policies. (Pregno Depo. at 64, 73-86, 120-21). ALEA does not formulate search, seizure, or booking policies for State law enforcement and corrections officers. (*Id.* at 82, 120-21). However, ALEA does provide information to law enforcement and corrections officers by means of the information contained on a driver license so each state agency can formulate its own search, seizure, and booking policies based on this information. (*Id.*). State law requires the bearer of an Alabama driver license to provide it to law enforcement officers or court personnel upon request. (*Id.* at 54; 122-23). Chief Pregno testified that in controlling the information that goes onto a driver license, ALEA, as a law enforcement organization, has in mind the law enforcement officers to whom the bearer of the license is required to display the license. (*Id.* at 123).

a.     Defendants' Expert: Donald L. Leach, II

Defendants disclosed Donald L. Leach, II, as an expert in correctional administration to testify as to the State's interests in Policy Order 63 in a correctional setting. (*See* Leach Depo., PX 38) (expert report). Leach has been a certified instructor of correctional curriculum since 1985 and has assisted in developing policies for jails throughout the country and conducting training for jail administrators. (*Id.* at p. 1). In his expert report, Leach offered the following opinion: "there is a governmental interest in having a standardized definition of sex, such as that established in Policy Order 63, for law enforcement and administrative purposes as expected by a reasonable correctional administrator so there is consistency in the development, and application, of administrative and operational policies and procedures." (*Id.* at p. 13).

In his report, Leach stated that he used a three-fold definition of "sex" for purposes of correctional administration. (Leach Depo., PX 38 at p. 15). Sex can refer to one's physiognomy (physical characteristics), gender identity (how one perceives oneself and which may or may not correspond to an individual's physiognomy), or sexual preference (which sex one is sexually

attracted to). (*Id.*; *see also* Leach Depo. at 11-16). Since the term "sex" can mean different things to different people, for purposes of correctional administration, it is important to have a baseline definition of this term just as it is with the terms "juvenile" and "adult," which are given precise legal meaning by legislatures and courts. (*Id.* at p. 16). Policy Order 63 chooses to define sex in terms of physiognomy. (*Id.* at 15). Since "there are many custodial policies, procedures and practices that are based on the definition of 'sex,'" it is important for jails to develop an internal "data dictionary" including definitions of key terms such as "sex." (*Id.*). The State provides such a baseline by defining "sex" in terms of physiognomy on Alabama driver licenses, and this provides a foundation for corrections administrators to develop search, housing, supervision, and medical care policies that take an inmate's sex into account. (*Id.* at 16-17). Although there are a variety of correctional practices that may be applied to transgender inmates or inmates based on their sex depending on the level of risk an administrator is willing to accept, a foundation for the development of any policy is a clear definition of "sex" to serve as a reference point for staff. (*Id.* at 16).

In his deposition, Leach testified that the information contained on a driver license is "probably one of the . . . foremost pieces of information that's used when booking an individual," and that most jails in the country use the information on an inmate's driver license to identify the inmate during booking (Leach Depo. at 34-35). As an example, Leach recounted a case of an individual with the outward appearance of a man pulled over in Michigan whose driver license designated him as a female. (*Id.* at 36-37). The individual had sex reassignment surgery in this 30s to become a female but in his 60s decided to revert back to male and quit taking hormones. (*Id.*). The individual's license alerted the jail administrator that the man had female genitalia due to the prior surgery but identified as a male. (*Id.* at 38-39). Although the jail administrator decided to

11

classify the inmate with the male population, he made this decision with the information as to the man's physiognomy provided by his license. (*Id.* at 38-40).

Leach testified that a definition of sex in terms of physiognomy, such as that provided by Policy Order 63, was important for Fourth Amendment purposes in a correctional setting because a search should not be more intrusive than necessary. (Leach Depo. at 49-50). For instance, knowing an inmate's sex, defined as physiognomy, allows a correctional administrator to formulate a search policy that takes into account the inmate's sex and the sex of the officer conducting the search and to determine whether cross-gender searches are appropriate. (*Id.* at 49-50, 102). Leach testified that in his opinion it would be overly-intrusive to search an inmate just to find out what kind of genitalia the inmate possessed. (*Id.* at 79). An identity document, such as a driver license, was one way a jail administrator could determine the genitalia of an inmate without conducting an overly-intrusive search. (*Id.* at 85). Leach gave an example of the privacy concerns that can arise by reference to a lawsuit filed by a Florida woman who was misgendered by jail medical staff because she was undergoing hormone replacement therapy for menopause and was consequently housed with the male prison population. (*Id.* at 106-07).[1]

Although there are a variety of acceptable sex-based correctional policies depending on the level of risk a correctional administrator is willing to tolerate, Leach testified that a correctional administrator in Alabama could lower levels of risk by formulating policies based on the sex designation on an Alabama driver license. (Leach Depo. at 53-54, 72-73). This is because it would be reasonable for a correctional administrator to create jail policies based on the way the State defined "sex" on a driver license. (*Id.*). For instance, an administrator that "operationalized decision-making for searches" based on the sex on the inmate's license because the State provided

---

[1] *See De Veloz v. Miami-Date Cnty.*, 2018 WL 6131780, __ F. App'x __ (11th Cir. Nov. 21, 2018).

a definition through its policy for designating sex on licenses acts reasonably and can gain a degree of legal cover for such a policy. (*Id.* at 56-57, 72-73).

      b.     Plaintiffs' Expert: Dr. Nicholas Gorton

Plaintiffs disclosed Dr. Nicholas Gorton as an expert witness in this case. (*See* Gorton Depo., Ex. 2) (expert report). Dr. Gorton is a physician licensed to practice in California. (*Id.* at 2). Although there is no separate certification for the treatment of transgender individuals, Dr. Gorton's primary care practice specializes in the treatment of transgender patients. (*Id.*; Gorton Depo. at 12-14).

Gorton stated in his report that "[t]ransgender people who are diagnosed with Gender Dysphoria may, as part of their prescribed medical treatment plan, change their legal name and their gender marker on official documents such as driving license, passport, birth certificate, and social security card." (Gorton Depo., Ex. 2 at 4). Gorton's report discussed the effects of "misgendering" transgender individuals, which he defined as "when transgender people are addressed either accidentally or intentionally with the wrong pronoun or with the patient's prior name." (*Id.*). Gorton's report stated that misgendering transgender individuals can have negative mental health consequences. (*Id.*). Gorton stated in his report that not all transgender individuals diagnosed with gender dysphoria need sex reassignment for treatment of this condition but that medical treatments may vary for individuals. (*Id.* at 5). Gorton's report concludes that Policy Order 63 "provides no medical or scientific justification" and that the "most clinically appropriate" policy would be to allow transgender individuals to "submit a form where they certify their gender, [and] the genders allowed are three: male, female, and none or non-binary, and their identity document is changed based on the patients [sic] affirmation." (*Id.* at 8). The report states "the next best option

13

is to rely on certification by any of a range of medical or mental health providers who are treating patients with GD [gender dysphoria]." (*Id.*).

Gorton's report stated, and his deposition testimony confirmed, that the only materials he considered in forming his opinion were the complaint in this case, Policy Order 63, and research articles he had published. (Gorton Depo. at 24-26). Gorton did not examine any of the plaintiffs in this suit, examine their medical records, or review their deposition testimony in forming his opinions. (*Id.* at 24-25). Gorton did not know whether any of the plaintiffs in this case had been diagnosed with gender dysphoria. (*Id.* at 33). Gorton admitted that the only basis he had for applying the conclusion of his report that Policy Order 63 "compromises the mental health and physical safety" of transgender individuals to Plaintiffs was that this conclusion applies to "transgender people in general, which I'm assuming they're part of that group since they're the plaintiffs." (*Id.* at 34); (*see also Id.* at 34-35).

Gorton estimated that the percentage of the population that could be diagnosed with gender dysphoria is "probably in the 1 to 500 range – or 1 in 500 range." (Gorton Depo. at 23). Not all transgender individuals have gender dysphoria. (*Id.*). Gorton admitted that for 99% of the population, the sex designation on their identity documents of "M" or "F" was accurate. (*Id.*).

3.   Plaintiffs

   a.   Plaintiff Darcy Corbitt

Plaintiff Darcy Corbitt was born in Louisiana, and her sex at birth was male. (Corbitt Depo. at 8; *Id.*, DX 9). Corbitt grew up in Auburn, Alabama. (*Id.* at 9). Corbitt first obtained an Alabama driver license when she was sixteen in 2008. (*Id.* at 18; *Id.*, DX 9). Corbitt obtained her driver license at this time while still under her name at birth, and the license designated her sex as male. (*Id.* at 18-19, 24-25).

14

Corbitt's current gender identity is female, and she identifies herself as a transgender woman. (Corbitt Depo. at 23). Corbitt testified that she fully identified as a transgender woman and began living as Darcy on her twenty-first birthday, May 11, 2013. (*Id.* at 25, 27). Two months after Corbitt began living as Darcy, she obtained an order from the Lee County Probate Court legally changing her name on July 22, 2013. (*Id.* at 25-26; *Id.*, DX 12). She then went to the driver license office in Lee County to update the name on her license. (*Id.* at 26). She testified that the "clerk at that driver's license office was very – very nice and he congratulated me on my new name." (*Id.* at 26-27). She also updated her name on her car title and with the Social Security Administration. (*Id.* at 27).

Corbitt's Alabama driver license designated her as male both before and after her name change in July 2013. (Corbitt Depo. at 19, 29). She possessed an Alabama driver license until she moved to North Dakota in the fall of 2015, at which time she obtained a North Dakota driver license that designated her sex as male. (*Id.* t 19). In November 2016, Corbitt changed the sex designation on her North Dakota license to female. (*Id.* at 20). In January 2017, Corbitt obtained a United States passport that designates her sex as female. (*Id.* at 21). She currently holds her North Dakota driver license and U.S. passport that designate her as female. (*Id.* at 21-22). Corbitt possessed a passport card and passport book at one time, but currently possesses only a passport book. (*Id.* at 40).

In August 2017, Corbitt moved back to Auburn to pursue graduate studies. (Corbitt Depo. at 13). She went to the driver license office in Lee County to obtain an Alabama license at that time. (*Id.* at 41). The license examiner asked Corbitt if she had ever been licensed in Alabama before, and after she stated she had, she provided the examiner with her social security number. (*Id.* at 42). The license examiner took Corbitt's photograph and asked Corbitt if her weight had

changed, and she responded that it had. (*Id.*). She updated this information and her address, and the examiner handed her a printout of the information that would go on her license and asked Corbitt to verify its accuracy. (*Id.* at 42-43). Corbitt told the examiner that the "M" for sex on the license was not accurate. (*Id.* at 43). The examiner stated she would not update the sex designation because Corbitt was currently in the driver license database as male. (*Id.*). The examiner's supervisor advised the examiner to contact Montgomery to find out what was required to change the sex designation, and the examiner called and spoke to someone in Montgomery. (*Id.* at 43-44). After the telephone call, the examiner advised Corbitt that she "would need to either get an amended birth certificate from the state where I was born or a doctor's note indicating that I had had surgery before the license could be updated." (*Id.* at 46). Corbitt told the examiner she "refused" to surrender her North Dakota license and stated "I will see you in court" before leaving. (*Id.*). In a response to a request for admission, Corbitt admitted that she does not meet the requirements of Policy Order 63 for changing the sex designation on an Alabama license. (Response to Request for Admission 1).

Corbitt was asked to explain in her own words how Policy Order 63, which prevents her from obtaining an Alabama license with a female sex designation, has harmed her. (Corbitt Depo. at 36). Corbitt stated that Policy Order 63 caused her emotional harm based on her embarrassing experience at the Lee County driver license office in August 2017 when she attempted to change her license. (*Id.* at 36-37). She testified that it is impractical to use an out-of-state license and that if she did obtain an Alabama license with her sex designated as male, this would "out" her as transgender to her employers. (*Id.* at 37). She also stated that it was "insulting" to not be allowed to transfer her out-of-state license to keep the same sex designation based on her prior driver license record in Alabama. (*Id.* at 38).

16

Corbitt typically carries her license in her wallet, which is concealed inside a bag. (Corbitt Depo. at 64). She testified that she does not display or waive her driver license about but displays it when she is required. (*Id.* at 64-65). Corbitt could recall two encounters with Alabama law enforcement officers, and on both occasions the officers asked her to present her driver license. (*Id.* at 65-67, 69-70). She presented her license to an Alabama law enforcement officer in 2014 after a traffic stop that resulted in a ticket. (*Id.* at 66-67). On the second occasion, she contacted police to report she was the victim of a crime, and the investigating officer required Corbitt to show her driver license in connection with that report. (*Id.* at 69-70). Corbitt agreed that it was important for the investigating officer to verify her identification and to have accurate information about her to investigate her complaint. (*Id.* at 70).

Corbitt admitted that in a variety of other contexts she could use her passport, which designates her as a female, as a government identification document. (Corbitt Depo. at 61-64). Corbitt admitted that she could use her passport to prove her age for a variety of purposes, such as purchasing alcohol. (*Id.* at 61-62). She admitted she could use it to establish her eligibility to work. (*Id.* at 62-63). She also admitted that she could use her passport or student ID to vote and that she "usually" uses her passport as a photo ID to vote in Alabama. (*Id.* at 63-64).

Corbitt voluntarily and publicly discloses her status as a transgender individual. (Corbitt at 49-60, 72-75). Corbitt maintains a 501(c)(3) nonprofit foundation called the Darcy Jeda Corbitt Foundation "to promote the health and global well-being of transgender individuals through free online education, support, and financial assistance." (*Id.* at 50-51). She maintains a public Facebook page for this foundation and makes publicly-viewable posts relevant to her status as a transgender individual on this page. (*Id.* at 51-53). Through her Facebook page Corbitt solicits donations for her foundation and advocates for the rights of transgender individuals in a forum that

can be viewed publicly. (*Id.* at 53). Corbitt has spoken publicly as an advocate for transgender individuals and stated she did so "professionally," meaning she received compensation for this public activity. (*Id.* at 53-54). She maintains Twitter, Instagram, and YouTube accounts in her name and makes posts related to her status as a transgender individual on these accounts. (*Id.* at 56). Corbitt was featured in a February 7, 2014 Al.com article entitled, "'I've always been Darcy': Transgender Auburn University student to be honored at Montgomery LGBT vigil." (*Id.* at 72; *Id.*, DX 15). Corbitt stated that her transgender status is "not a secret." (*Id.* at 58). Corbitt admitted that she publicly disclosed her transgender status through her social media accounts. (*Id.* at 59). Corbitt admitted that she voluntarily accepts any risk created by disclosing her status as transgender through social media. (*Id.* at 60).

### b.    Plaintiff Destiny Clark

Plaintiff Destiny Clark was born in Alabama, and her sex at birth was male. (Clark Depo. at 8; *Id.*, DX 1). Clark grew up in St. Clair County, Alabama and obtained an Alabama driver license when she turned sixteen. (*Id.* at 9, 16). Clark obtained this license prior to changing her name, and the sex designation on her license at that time was male. (*Id.* at 16-17). Clark moved from St. Clair County to reside in Birmingham from approximately 2004 to 2009, then lived in North Carolina from approximately 2010 to 2011. (*Id.* at 9-10). In 2011, Clark returned to St. Clair County where she has resided continuously until the present. (*Id.* at 11). She has maintained an Alabama driver license designating her sex as male from the time she first obtained one at sixteen until the present. (*Id.* at 16, 26).

Clark identifies herself as a transgender female. (Clark Depo. at 15-16). Clark testified that she first identified herself as a transgender woman when she was twenty-one, but that she kept this identity private until she was approximately twenty-six or twenty-seven. (*Id.* at 20-22). Clark

described her identification as a transgender woman as involving a mental and physical process. (*Id.* at 30-31). She explained that she has always understood herself to be female. (*Id.* at 31). In April 2015, when she was twenty-nine, she legally changed her name to Destiny Clark. (*Id.* 14, 16; *Id.*, DX 3). She testified that her physical transition to female involved hormone therapy and was complete when she received breast augmentation in March 2016. (*Id.* at 22-24, 27-31, 40). Clark testified that she possessed an Alabama driver license designating her as male throughout this time and that it had bothered her ever since she first received her license at sixteen. (*Id.* at 32).

Clark testified that she tried three times without success to change the sex designation on her driver license. (Clark Depo. at 36). She tried the first time shortly after she completed her legal name change in April 2015. (*Id.* at 36-37). Although Clark's recollection was hazy, she recalled that she had a telephone conversation with Eastman at this time and that it resulted in the denial of her request to change the sex on her license. (*Id.* at 37, 39-40). After her breast augmentation procedure in March 2016, Clark attempted a second time to change the sex on her license. (*Id.* at 39-40). Clark submitted a letter from her physician dated January 15, 2016, and marked as received in the Medical Unit on March 25, 2016. (Clark Depo. at 44; Eastman Depo. at 154, DX 27). The letter from the physician states:

> I have knowledge of Ms. Clark's medical condition and have performed a thorough physical examination of her.
>
> Based on my thorough physical examination of Ms. Clark. I confirm that she has met the requirements of the Alabama Department of Public Safety's policy for changing the gender designation on her driver's license from male to female.

(Eastman Depo. DX 27 [D283]). Eastman testified that this letter was insufficient to satisfy Policy Order 63 because it stated only that the doctor performed a "thorough physical examination" but did not state that the doctor had performed surgery on Clark. (Eastman Depo. at 155-56). Clark

sent a second letter from the same doctor to Eastman dated March 31, 2016 that purported to state Clark had received certain surgical procedures. (*Id.* DX 27 [284]). The letter was marked as received in the Medical Unit the same day. (*Id.*). The letter contains a handwritten note from Eastman stating "must present ltr from Dr. that performed surgery or amended birth certificate. 3/31/16 JTE." (*Id.*). Eastman testified that this letter did not satisfy Policy Order 63 because it was not from the physician that performed the surgery. (*Id.* at 90-92, 156-57).

Clark attempted a third time to change the sex on her license in 2017 and this time sent a letter dated January 18, 2017, from the doctor that performed her breast augmentation surgery. (Clark Depo. at 41, 45; Eastman Depo. DX 27 [D285]). The letter states "I performed a surgical procedure related to gender transformation on March 2, 2016," which Clark confirmed was her breast augmentation surgery. (Clark Depo. at 41; Eastman Depo. DX 27 [D285]). This letter contains another handwritten note that states "Per px [telephone call] w/Dr. office, Dr. did not perform complete gender reassignment surgery. Must have ltr stating complete surgery has been performed or amended birth cert. 2/3/17 JTE." (Eastman Depo. DX 27 [D285]). Eastman testified that she called the physician's office because the letter did not comply with Policy Order 63 since it stated only that "a surgical procedure" was done. (Eastman Depo. at 156). Therefore, she called the doctor's office to confirm whether complete gender reassignment surgery had been performed, and the doctor's office advised her that it had not. (*Id.* at 93-94, 96, 156). No one at the doctor's office asked her what she meant by "gender reassignment surgery." (*Id.*). In a response to a request for admission, Clark admitted that she does not meet the requirements of Policy Order 63 for changing the sex designation on an Alabama license. (Response to Request for Admission 2; Supplemental Response to Interrogatory 16).

20

Clark was asked to explain in her own words how her inability to change the sex on her license had harmed her. (Clark Depo. at 33). Clark testified that she tried not to show her license, that it had caused a police officer to treat her differently during a traffic stop, that she tries to avoid drinking socially because she has to show her license, and that when she recently showed her license to vote the poll worker treated her rudely. (*Id.* at 33-34). Clark carries her license in her pocketbook in her purse. (Clark Depo. at 65). She does not display her license publicly and limits the disclosure of her driver license. (*Id.*).

Clark does not currently possess a United States passport and was unaware that the other two plaintiffs in this suit currently possess passports designating their sex as female. (Clark at 66). However, Clark has all of the required documents to obtain a passport and testified that she could afford both a passport book and a passport card. (*Id.* 68, 70). She stated she would like to obtain a passport with her sex designated as female on it. (*Id.* at 72). Clark acknowledged that if she possessed a passport designating her sex as female she could prove her age to purchase alcohol with it. (*Id.* at 73-74). She agreed that in many situations she had a choice about what government identification she could display. (*Id.* at 75).

Clark is open about her transgender status and describes herself as a "trans activist." (Clark Depo. at 56). Clark makes publicly-viewable posts on her Facebook page in connection with her work as a trans activist for the purpose of publicizing these activities. (*Id.* at 56-59). Clark is a member of two organizations involved in transgender and LGBTQ activism. (*Id.* at 59). She is President of Central Alabama Pride and a queen for the Magic City Sisters of Perpetual Indulgence. (*Id.*). Clark's photograph and a description of her activities as President of Central Alabama Pride can be publicly viewed on that organization's website. (*Id.* at 60-61; *Id.*, DX 6). Clark agreed that her work with Central Alabama Pride involved her publicly disclosing her transgender status and

21

that she is "open" about being transgender. (*Id.* at 60-61). Clark acknowledged that she voluntarily accepts the risks involved in publicly disclosing her transgender status. (*Id.* at 64).

  c.  Plaintiff Jane Doe

  Plaintiff Jane Doe was granted leave by the Court to proceed anonymously in this suit. (Doe Depo. at 8-9; *Id.*, DX 16 [Doc. 41]). Jane Doe's sex at birth was male. (*Id.* at 9). Jane Doe is a transgender female. (*Id.*). Doe obtained an Alabama driver license when she was sixteen that designated her sex as male. (*Id.* at 17-18). She understood herself to be a transgender woman around the age of nineteen. (*Id.* at 20-21). Doe received medical treatment related to her transgender status. (*Id.* at 23, 25-26). Doe began publicly living as a woman in May 2017. (*Id.* at 27-28).

  After a time living out of state, Doe has possessed an Alabama driver license designating her sex as male continuously since 2005. (Doe Depo. at 30-31). Doe possesses a United States passport that designates her sex as female. (*Id.* at 32). In order to change her sex designation on her passport, Doe submitted a letter from her doctor stating only that she was "undergoing clinical treatment for intended gender transition to the new gender" with a box marked 'X' for "female." (*Id.* at 33-34; *Id.* DX 20). Doe attempted to use this same letter to change the sex on her Alabama driver license but was told this was insufficient. (*Id.* at 42-44). Although she apparently received less than clear explanations about what was required to change the sex on her license, she was finally told in April 2017 that she needed to have medical documentation of "the full surgery" to change the sex on her license. (*Id.* at 48). Doe made no further attempts to change the sex on her license, and in response to requests for admission she admitted she does not meet the requirements of Policy Order 63 for changing the sex designation on an Alabama license. (Response to Request for Admission 3).

Does was asked to explain in her own words how being unable to change the sex on her license harmed her. (Doe Depo. at 35). Doe stated that she was required to show her license to a police officer investigating a traffic accident she was involved in and that the officer realized the female name on the license and sex designation were "incongruent." (*Id.* at 35). She also stated that showing her license was a problem when ordering drinks in public and that she had had problems trying to use her passport as a form of identification at hotels. (*Id.* at 35-36).

Doe keeps her driver license in her wallet and places a credit card in front of it to hide it from view. (Doe Depo. at 69). Doe was not sure whether she could use a passport to prove her age to purchase alcohol but admitted that, if this were an acceptable form of identification, she would prefer to use it for that purpose because her name and sex designation match on that document. (*Id.* at 69-70). Doe acknowledged she could use her passport to establish her eligibility to work. (*Id.* at 70). She was not aware she could use her passport as a form of identification to vote, but stated that she would prefer to use it as a form of photo ID going forward. (*Id.* at 70-71). Doe has had contact with Alabama law enforcement officers on at least four occasions and on each occasion she was required to show her driver license. (*Id.* at 71-72). She had also been involved in two motor vehicle accidents and was required to display her license to law enforcement officers on those occasions. (*Id.* at 73).

Doe's friends know that she is transgender and she is open as a transgender woman at her current job. (Doe Depo. at 50-51). Doe maintains a Facebook page in her name. (*Id.* at 52). Doe acknowledged in her deposition that she had posted multiple Facebook profile pictures that associated her picture with a message supporting transgender causes and that these posts could be seen by the public. (*Id.* at 53-63). Doe acknowledged that she posted these messages with her profile picture because she was a transgender individual, she wished to raise awareness of

23

transgender issues, and that a person viewing her Facebook page could accordingly publicly identify her as transgender. (*Id.* at 54-55, 57, 62). One of Doe's posts was in connection with a "tabling" event for a local transgender activist group. (*Id.* at 58-59). Doe participated in the tabling event in a public park in a city where a banner was displayed designating the group as a transgender advocacy group. (*Id.* at 59-60). Doe admitted that members of the public could see her at the event and could associate her with the transgender message displayed on the banner. (*Id.* at 59-60, 65-66). Does stated that her Alabama driver license discloses her transgender status but then conceded that her driver license does not disclose anything about her transgender status that she does not voluntarily disclose on Facebook. (*Id.* at 68).

## B.  Argument

1.    Plaintiffs Corbitt and Clark's Claims Are Barred by the Statute of Limitations

Plaintiff Corbitt and Clark knew or should have known that Policy Order 63's surgery requirement prevented her from changing the sex on her Alabama license outside the two-year statute of limitations period for a claim brought pursuant to 42 U.S.C. § 1983 in Alabama. Corbitt began living full time as Darcy in 2013. She obtained a legal change of name and obtained an Alabama driver license in her female name in 2013 that designated her sex as male. Clark had been living publicly as a transgender woman when she obtained a legal change of name in April 2015. Shortly after Clark's legal change of name in April 2015, she attempted to also change the sex designation on her Alabama driver license and Eastman denied her request. Thus, Policy Order 63 prevented Corbitt and Clark from changing the sex designation on their Alabama licenses in 2013 and 2015, respectively. Their claims are time-barred.

"All constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been

brought." *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008). In Alabama, the applicable statute of limitations for a § 1983 claim is the two-year limitation set out in § 6-2-8(*l*) of the Alabama Code. *See Jones v. Prueit & Mauldin*, 876 F.2d 1480, 1483 (11th Cir. 1989) (*en banc*). For purposes of a § 1983 claim, "the statute of limitations begins to run from the date 'the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003) (quoting *Rozar v. Mullis*, 85 F.3d 556, 561-62 (11th Cir. 1996)). "Thus Section 1983 actions do not accrue until the plaintiff knows *or has reason to know* that he has been injured." *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987) (emphasis added).

Here, it should have apparent to Corbitt and Clark that the facts supporting a cause of action existed when they updated their Alabama licenses to include their female names after their legal change of name. Corbitt updated her Alabama driver license to match her legal name as a woman shortly after her name change in July 2013. (Corbitt Depo. at 25-27; *Id.*, DX 12). But her driver license continued to designate her sex as male at that time. (*Id.* at 19, 29). Clark changed her legal name to match her female identity in April 2015, and attempted to change not only the name but also the sex on her driver license at that time. (Clark Depo. at 14, 16; *Id.*, DX 3; *Id.* at 36-37). Clark testified that Eastman informed her she did not meet the requirements to change the sex on her license and did not allow the change in 2015. (*Id.* at 37, 39-40). Policy Order 63's surgery requirement for changing the sex designation on a driver license was in effect at that time. (Pregno Depo. at 24-26; Woodruff Depo. PX 7). Since Corbitt and Clark filed suit on February 6, 2018 (doc. 1), any cause of action that accrued prior to February 6, 2016, is time-barred. But Corbitt and Clark knew or should have known that Policy Order 63 prevented them from changing the sex on

25

their licenses after they had changed the names on their licenses to their legal female names in 2013 and 2015. Thus, they are due to be dismissed from this suit.

The statute of limitations analysis in the parole reconsideration cases of *Brown* and *Lovett v. Ray*, 327 F.3d 1181 (11th Cir. 2003), are on point both as to when Corbitt and Clark's cause of action accrued and whether the "continuing violations" doctrine applies to toll their claims. In *Lovett*, a parole board notified an inmate in 1998 that his parole would not be reconsidered until 2006. *Lovett*, 327 F.3d at 1182. The court held that the inmate knew *or should have known* at that time that Georgia law had been changed to reduce the frequency of parole consideration and that his suit filed in 2001 was past the two-year statute of limitations. *Id.* at 1182-83. In *Brown*, the parole board informed the inmate in 1995 that his parole would be reconsidered in 2000, but the inmate waited until 2002 to file suit claiming a three-year period for parole reconsideration applied. *Brown*, 335 F.3d at 1260. As in *Lovett*, the court held the inmate should have known in 1995 that Georgia had changed its law that year to delay parole reconsideration for up to eight years rather than three. *Id.* at 1261-62. Since it was "the decision in 1995 that forms a potential basis" for the inmate's claim, "[i]t was also at this point that [the inmate] *could have discovered the factual predicate of his claim*." *Id.* (emphasis added).

Both *Lovett* and *Brown* declined to apply the "continuing violations" doctrine to toll the running of the inmates' claims. *Brown*, 335 F.3d at 1261-62; *Lovett*, 327 F.3d at 1183. "The critical distinction in the continuing violation analysis . . . is whether the plaintiff[] complain[s] of the present consequence of a one time violation, which does not extend the limitations period, or the continuation of that violation into the present, which does." *Lovett*, 327 F.3d at 1182 (quoting *Knight v. Columbus*, 19 F.3d 579, 580-81 (11th Cir. 1994)). In both cases, the parole boards' decision not to reconsider the inmates' parole until a later date was a one-time violation, and the

26

statute of limitations ran from the date on which the parole reconsideration policy was applied rather than for the entire period in which the inmates' reconsideration was delayed. *Brown*, 335 F.3d at 1261; *Lovett*, 327 F.3d at 1183. The inmate in *Brown* made the additional argument that, though he was informed in 1995 that his parole would be reconsidered again in 2000, he suffered a "separate and distinct" injury when his parole was denied in 2001 and his reconsideration was reset to 2007. *Brown*, 335 F.3d at 1261. The court rejected this argument as well, holding that it should have been apparent to the inmate in 1995 that Georgia no longer reconsidered parole every two years and that each time a parole reconsideration hearing was set in the future did not constitute a distinct and separate injury. *Id.* at 1261-62.

In this case, as in *Lovett* and *Brown*, neither the continuing violation nor separate and distinct injury arguments save Corbitt and Clark's claims from the statute of limitations argument. In each case, the alleged injury was the issuance of an Alabama driver license in Corbitt and Clark's legal female names with a male sex designation. *See Brown*, 335 F.3d at 1261-62 ("It was . . . at this point that [Corbitt and Clark] could have discovered the factual predicate of [their] claim."). Though they continue to feel the effects of this act, they do not suffer a continuing violation every time they present or renew their Alabama licenses. Corbitt may argue she surrendered her 2013-issued Alabama license when she obtained a North Dakota license, and suffered a separate and distinct injury when she returned to Auburn and was denied an Alabama license with a female sex designation in August 2017. But this argument fares no better than that of the inmate in *Brown*, because the factual basis of Corbitt's claim should have been apparent in 2013, and she did not suffer a separate and distinct injury in 2017 any more than the inmate in *Brown* when he received a new date for parole reconsideration. Accordingly, all claims brought by Corbitt and Clark should be dismissed as barred by the statute of limitations.

27

2.     Defendants' Are Entitled to Summary Judgment on Plaintiffs' Right to Privacy Claim in Count I

Plaintiffs allege in Count I that Policy Order 63 "force[s] Ms. Clark and Ms. Doe to disclose highly personal information—that they are transgender—to each person who sees their driver license," and that Policy Order 63 "condition[s] Ms. Corbitt's receipt of an Alabama driver license on being forced to make such disclosures." Doc. 38 ¶ 108. Plaintiffs state that the alleged disclosure of their transgender identities from the male sex designation on their driver licenses violates their right to informational privacy under the Substantive Due Process Clause of the Fourteenth Amendment. *Id.* ¶¶104-10. However, a sex designation, like the other personal information contained on an Alabama driver license, is not the sort of confidential information protected by the Fourteenth Amendment. Nor do Plaintiffs' licenses "disclose" that they are transgender to the public. Alabama law requires Plaintiffs to display their licenses only under limited circumstances, *i.e.* to law enforcement officers, and Plaintiffs retain the discretion to limit the disclosure of their licenses by using passports for other identification purposes. Finally, Plaintiffs publicly disclose their transgender identity through various social media and public activism and thus cannot claim that Policy Order 63 results in the nonconsensual disclosure of confidential information.

Although the contours of the right are vague, the Supreme Court has recognized a constitutional right to privacy in "the individual interest in avoiding disclosure of personal matters," and an "interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599 (1977). Plaintiffs apparently invoke the former right in this case. The Supreme Court again recognized an individual privacy interest in avoiding the disclosure of intimate matters in *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 457-59 (1977), and most recently in *National Aeronautics and Space Administration v. Nelson*, 562 U.S. 134 (2011). In *Nelson*, the court followed *Whalen* in assuming that a constitutional right to informational privacy exists but

concluded the government's interest was sufficient to justify asking employees sensitive questions during background investigations. *See Nelson*, 562 U.S. at 147-56. The Eleventh Circuit has recognized such a right but limited its applicability to cases where a state official disclosed intimate personal information obtained under a pledge of confidentiality unless there was a legitimate state interest in the disclosure sufficient to outweigh the individual's privacy interest. *See James v. City of Douglas*, 941 F.2d 1539, 1543-44 (11th Cir. 1991).

Regardless of the precise contours of Plaintiffs' right to informational privacy, it is clear that their claims fail under the circumstances of this case. The Eleventh Circuit has squarely held that the disclosure of personal information contained in a driver license database is not the disclosure of the type of confidential information protected by the United States Constitution. *See Collier v. Dickinson*, 477 F.3d 1306, 1308 (11th Cir. 2007); *Pryor v. Reno*, 171 F.3d 1281, 1288 n.10 (11th Cir. 1999), *rev'd on other grounds*, 528 U.S. 1111 (2000). In *Collier*, the court held that the Florida Department of Highway Safety and Motor Vehicles ("DHSMV") did not violate the plaintiffs' constitutional right to privacy by *selling* their personal information provided to the DHSMV to obtain their driver licenses to mass marketers. *Collier*, 477 F.3d at 1307-08. The court relied on its decision in *Pryor v. Reno* for this conclusion. *Id.* In *Pryor*, the court held that personal information contained in motor vehicle records was not confidential information giving rise to a constitutional right to privacy. *Pryor*, 171 F.3d at 1288 n.10. The court in *Pryor* stated that *James* "acknowledged a constitutional right to privacy only for *intimate personal information given to a state official in confidence*." *Id.* The personal information contained on the face of Plaintiffs' driver licenses are matters of public record and are insufficient under *Collier* and *Pryor* to give rise to a constitutional right to informational privacy. *Cf. Snavely v. City of Huntsville*, 785 So. 2d 1162,

1168 (Ala. Crim. App. 2000) (holding that copies of criminal defendant's driving history maintained by Department of Public Safety were public records).

While an individual viewing Plaintiffs' licenses might infer that they are transgender from the photograph and sex designation, Policy Order 63 does not directly disclose Plaintiffs' transgender status from the face of the license. Further, any disclosure of Plaintiffs' transgender status is limited because Alabama law requires Plaintiffs to display their driver license only in limited circumstances.

The Alabama Code governs the contents of a driver license and when it, *rather than another form of government identification*, must be possessed or displayed. Alabama law provides that "[e]very licensee shall have his or her license in his or her immediate possession at all times when driving a motor vehicle and shall display the same, upon demand of a *judge of any court, a peace officer, or a state trooper*." Ala. Code § 32-6-9 (emphasis added). In *Sly v. State*, 387 So. 2d 913 (Ala. Crim. App. 1980), the Alabama Court of Criminal Appeals upheld a defendant's conviction for refusing a state trooper's request to see a driver's license because the trooper had a statutory right to request the license and the driver had a duty to display it. *Sly*, 387 So. 2d at 915-16. *See also Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."); *Id.* at 187 ("The principles of *Terry* permit a State to *require* a suspect to disclose his name in the course of a *Terry* stop.") (emphasis added). Chief Pregno testified that in controlling the information that goes onto a driver license, ALEA, as a law enforcement organization, has in mind the law enforcement officers to whom the bearer of the license is required to display the license. (Pregno Depo. at 123). Thus, the state requires every citizen to possess a

form of state identification that proves the citizen is authorized to operate a motor vehicle and that accurately identifies the citizen to judicial officials and law enforcement officers.

There is *no* requirement in Alabama law that Plaintiffs use an Alabama driver license, rather than a United States passport or passport card, when applying for a job, purchasing alcohol, voting, or otherwise providing proof of identity, age, or eligibility to work. Corbitt and Jane Doe currently possess passports designating their sex as female, and Clark testified that she could obtain a passport that designated her as female as well. A passport designating Plaintiffs' sex as female can be used to establish identity and proof of age for a wide variety of transactions. Alabama Alcoholic Beverage Control Board regulations provide that proof of age to legally purchase alcohol can be established not only with a driver's license of any state, but a military identification, passport, or government agency identification bearing a photograph and date of birth. *See* Ala. Admin. Code § 20-x-6-.09(1)(d). A passport or student identification card also serves as a valid photo identification for purposes of voting in Alabama. Ala. Code § 17-9-30(3), (5). Corbitt testified that she "usually" uses her passport as a photo ID to vote in Alabama. (Corbitt Depo. at 6-64). Doe was not aware she could use her passport to vote, but testified she would prefer to use her passport for voting going forward. (Doe Depo. at 70-71).

In sum, all Plaintiffs admitted they could use a passport designating their sex as female for a variety of everyday purposes and thus minimize the display of their Alabama license. Crucially, each Plaintiff admitted she had been required to display her Alabama driver license to a law enforcement officer in connection with a traffic stop, traffic accident, or to report a crime. Consistent with Alabama law, Plaintiffs are compelled to display their driver licenses only under limited circumstances and to a limited audience, *i.e.* law enforcement officials and court personnel. Given the state's interests in accurately identifying individuals for law enforcement purposes, any

potential disclosure of Plaintiffs' transgender status is outweighed by the government's legitimate interests, even assuming Plaintiffs had a right to informational privacy in the sex appearing on their license. *See James*, 941 F.2d at 1544 ("The inquiry is whether there is a legitimate state interest in disclosure that outweighs the threat to the plaintiff's privacy interest.").

Finally, Plaintiffs allege in Count I that Policy Order 63 injures them by forcing them disclose their private, confidential status as transgender and thus increase their risk of bodily harm. Doc. 38 ¶ 108. But even if Plaintiffs stated a claim for a violation of their due process rights, which they do not, they lack standing to assert their licenses force the disclosure of their transgender status because they publicly disclose this information by means of social media and through public advocacy. Thus, Plaintiffs cannot satisfy the "injury in fact" requirement for standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-48 (2016).

Plaintiff Corbitt maintains Facebook, Twitter, Instagram, and YouTube accounts in her name and makes posts related to her transgender status on these accounts. (Corbitt Depo. at 51-53, 56). She maintains a nonprofit foundation in her name that engages in public advocacy for transgender rights, and she makes Facebook posts that associate her picture and transgender status with her organization. (*Id.* at 51-53). She was featured in an Al.com article entitled, "'I've always been Darcy': Transgender Auburn University student to be honored at Montgomery LGBT vigil." (*Id.* at 72; *Id.*, DX 15). She stated her transgender status is "not a secret." (*Id.* at 58). She admitted that she publicly disclosed her status as transgender through her social media accounts, and that she voluntarily accepts any risk created by disclosing this status through social media. (*Id.* at 59-60).

Plaintiff Clark is a self-described "trans activist." (Clark Depo. at 56). Clark also makes publicly-viewable posts on her Facebook page in connection with her work as a trans activist. (*Id.*

at 56-59). Clark is President of Central Alabama Pride, and a photograph of her in connection with this position appears on the organization's website along with a description of her activities. (*Id.* at 59-61; *Id.*, DX 6). Clark acknowledged that she is "open" about being transgender and that she voluntarily accepts the risks involved in publicly disclosing her transgender status. (*Id.* at 64).

Finally, Plaintiff Jane Doe also maintains a Facebook page in her name that she has used to post publicly-viewable messages in which she associates her photo with a message supporting transgender causes. (Doe Depo. at 52-63). Doe's friends know she is transgender and she is open as a transgender woman at her current job. (*Id.* at 50-51). Doe participated at a tabling event for a local transgender activist group in a public park where a banner was displayed designating the group as a transgender advocacy group. (*Id.* at 59-60). Doe admitted that members of the public could see her at the event and could associate her with the transgender message displayed on the banner. (*Id.* at 59-60, 65-66). Doe conceded that her driver license does not disclose anything about her transgender status that she does not voluntarily disclose on Facebook. (*Id.* at 68). Thus, even if Plaintiffs' driver licenses could conceivably disclose their transgender status, they lack standing to assert their licenses disclose information that they have kept private or confidential. For all of these reasons, Defendants are entitled to judgment as a matter of law on Count I.

3.  **Defendants Are Entitled to Judgment as a Matter of Law on Plaintiffs' Unwanted Medical Treatment Claim in Count II**

Plaintiffs allege in Count II that Policy Order 63 violates their substantive due process rights to refuse unwanted medical treatment by "forc[ing] transgender people who live in Alabama either to undergo certain kinds of gender-confirming surgery to secure a correct driver license or endanger their health and safety with an incorrect driver license." Doc. 38 ¶ 114. However, ALEA has not "forced" Plaintiffs to receive medical treatment they do not want or even conditioned receipt of a driver license on their receiving such treatment. Plaintiffs currently possess, or have

the ability to possess, an Alabama driver license. Policy Order 63 merely prevents them from changing the sex on their licenses without proof of surgery. This policy is rationally related to the State's interest in maintaining consistency with changing the sex on birth certificates and providing a clear definition of "sex" as it appears on licenses for identification and law enforcement purposes.

The Supreme Court has assumed that the Due Process Clause of the Fourteenth Amendment "would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition." *Cruzan by Cruzan v. Dir., Mo. Dept. of Health*, 497 U.S. 261, 279 (1990). The Court later revisited *Cruzan* and framed its holding as follows: "We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). But the Court in *Glucksberg* cautioned against expanding the rights included under substantive due process:

> But we ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.

*Glucksberg*, 521 U.S. at 720 (internal quotations and citations omitted).

In order to prevent this judicial usurpation of the democratic process, the Supreme Court has created a two-step analysis that constrains what rights a court may recognize as fundamental. "First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720-21 (internal quotation and

citations omitted).   "Second, we have required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest.'"  *Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). As an example of the second step, the Court in *Glucksberg* held the lower court erred in formulating the right in question as "the right to die" rather than the more specific question before the Court, *viz.*, whether "the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so." *Id.* at 723. The Court found under the first step in the analysis that such a right was not fundamental because it was not deeply rooted in this Nation's history and traditions. *Id.* at 723-28. The Court then concluded that since Washington's prohibition on physician-assisted suicide did not burden a fundamental substantive due process right, it need satisfy only rational basis review, a burden that was "unquestionably met." *Id.* at 728.

Here, Plaintiffs appear to assert a fundamental right to a driver license with a sex designation of the gender with which they identify without having a surgical change of sex characteristics that include genital reassignment. No such right is "deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720-21 (internal quotation and citations omitted). Thus, Policy Order 63's surgery requirement is subject only to rational basis review. *Id.* at 728. Policy Order 63's surgery requirement is rationally related to the State's interests in maintaining consistency between sex changes on a birth certificate and on a driver license, and in providing a clear definition of "sex" as it appears on a driver license for identification and law enforcement purposes.

More fundamentally, however, Policy Order 63 does not force or compel Plaintiffs to receive medical treatment they do not want within the framework of *Cruzan*. The question in that

case was whether the hospital could continue to physically maintain artificial feeding and hydration equipment for a patient in a persistent vegetative state against her parent and coguardians' wishes. *Cruzan*, 497 U.S. at 265. Courts have declined to apply the right recognized in *Cruzan* even in cases where the government *physically forces* an individual in custody to receive medical treatment the individual does not want. *See, e.g., In re Soliman*, 134 F. Supp. 2d 1238, 1254-58 (N.D. Ala. 2001) (holding the force-feeding of a detainee on a hunger strike did not violate detainee's constitutional right to refuse unwanted medical treatment). In this case, ALEA has not physically forced Plaintiffs to receive sex reassignment surgery. It has not even conditioned receipt of a driver license on the receipt of such surgery. Thus, Plaintiffs cannot demonstrate the element of forcible compulsion required to state a claim for a violation of their right to refuse unwanted medical treatment.

For all of these reasons, Defendants are entitled to summary judgment on Count II.

4.    **Defendants Are Entitled to Summary Judgment on Plaintiffs' Compelled Speech Claim in Count III**

Plaintiffs allege in Count III that the male sex designations on their driver licenses force them to "convey[] the state's ideological message that gender is determined solely by the appearance of external genitals at the time of birth unless modified through certain surgical procedures, a message with which Ms. Clark and Ms. Doe vehemently disagree." Doc. 38 ¶ 125. But Policy Order 63's criterion for changing the sex designation on a driver license neither conveys an ideological message nor compels Plaintiffs to express such a message. Plaintiffs retain a large degree of control over whether to display their license, and they are required to display it only in limited to circumstances to law enforcement officers or court personnel. Furthermore, the personal information contained on an Alabama driver license is government speech not protected by the

First Amendment because it is the means by which ALEA communicates to state law enforcement officers for law enforcement purposes.

The United States Supreme Court recognized that citizens have the right to be free from being compelled to express an ideological message with which they disagree in *Wooley v. Maynard*, 430 U.S. 705 (1977). In *Wooley*, the plaintiff challenged the requirement of the State of New Hampshire that his license tag display the state's motto, "Live Free or Die." *Wooley*, 430 U.S. at 713. The manner in which the Court framed the constitutional issue is significant:

> We are thus faced with the question of whether the State may constitutionally require an individual to participate in the dissemination of an ideological message *by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public*. We hold that the State may not do so.

*Id.* (emphasis added). The Court found that the New Hampshire statute "in effect requires that appellees use their private property as a 'mobile billboard' for the State's ideological message or suffer a penalty." *Id.* at 715. The Court found the state could achieve its purpose of identifying vehicles without the use of the motto and that the motto conveyed a distinct ideological message. *Id.* at 716.

In contrast to the requirement in *Wooley* that citizens use private property to broadcast the state's ideological message to the public generally, the Seventh Circuit recently rejected a compelled speech claim brought by a Satanist who challenged the printing of "In God We Trust" on United States currency. *See Mayle v. United States*, 891 F.3d 680, 683 (7th Cir. 2018). The court dispensed with this claim as follows:

> Inscribing the motto on currency, Mayle argues next, violates the Free Speech Clause because the national motto conveys a religious message, which he is being forced to convey: that he "trusts" in a deity. But Mayle is not in any meaningful way affirming the motto by using currency. See *Wooley v. Maynard*, 430 U.S. 705, 717 n.15,

> 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). *He is not wearing a sign or driving a car displaying a slogan*. See *id.* at 717, 97 S.Ct. 1428. As the district court noted, *most people do not brandish currency in public—they keep it in a wallet or otherwise out of sight until the moment of exchange*. And the recipient of cash in a commercial transaction could not reasonably think that the payer is proselytizing. If the recipient thought about it at all, *she would understand that the government designed the currency and is responsible for all of its content, including the motto. She would not regard the motto as Mayle's own speech.*

*Mayle*, 891 F.3d at 686 (emphasis added). The Eighth Circuit recently endorsed *Mayle*'s analysis in rejecting a similar compelled speech claim. *See New Doe Child #1 v. United States*, 901 F.3d 1015, 1024-25 (8th Cir. 2018) (holding that "the use or possession of U.S. money does not require a person to express, adopt, or risk association with any particular viewpoint" because "[t]he nature of currency is such that any expression thereon is distinctively the Government's own."). *Mayle*'s analysis regarding carrying currency is more analogous to carrying a state driver license as an identification document than displaying the state's motto on a private vehicle as in *Wooley*.

First, Alabama law does not require individuals to display their Alabama driver license to the general public. As noted above with respect to Plaintiffs' informational privacy claim, Alabama law requires license holders to display their Alabama driver license only under limited circumstances. Alabama law provides that "[e]very licensee shall have his or her license in his or her immediate possession at all times when driving a motor vehicle and shall display the same, upon demand of a *judge of any court, a peace officer, or a state trooper*." Ala. Code § 32-6-9 (emphasis added); *see also Sly*, 387 So. 2d at 915-16 (upholding conviction of motorist for refusing to display license to state trooper upon request). Law enforcement officers may request that a citizen provide a license for identification in the ordinary course of business and may *require* a citizen to present a license for identification if the officer has reasonable suspicion to believe the citizen is engaging in criminal activity. *See Hiibel*, 542 U.S. at 185-87. Plaintiffs all testified that

they carried their licenses concealed and typically displayed them only when required. *See Mayle*, 891 F.3d at 686 (stating "most people do not brandish currency in public—they keep it in a wallet or otherwise out of sight until the moment of exchange."). They testified that they do or could use a passport that designated them as female for identification purposes in a variety of contexts, such as purchasing alcohol, establishing eligibility to work, and voting. All three plaintiffs testified they had had contact with Alabama law enforcement officers in a variety of circumstances, and that the officers required them to display their driver licenses in each case.

Second, as in *Mayle* and unlike in *Wooley*, the sex designation on an Alabama driver license does not convey any ideological message by the State. *Compare Mayle*, 891 F.3d at 686 ("And the recipient of cash in a commercial transaction could not reasonably think that the payer is proselytizing. If the recipient thought about it at all, she would understand that the government designed the currency and is responsible for all of its content, including the motto. She would not regard the motto as Mayle's own speech."), *with Wooley*, 430 U.S. at 715 (holding the mandated use of "Live Free or Die" slogan on license plates "in effect requires that appellees use their private property as a 'mobile billboard' for the State's ideological message or suffer a penalty."). Unlike the expression of rugged individualism conveyed by "Live Free or Die" in *Wooley*, the sex designation on an Alabama license is simply a physical description of the bearer of the licensee, just like the other physical descriptors of height, weight, date of birth, eye color, and hair color. Policy Order 63 defines "sex" on a license in terms of physiognomy by requiring sex reassignment surgery to change the physical sex characteristics to male and female, including genitalia. ALEA is a law enforcement organization, and its intent in choosing this definition of "sex" is to provide information to the law enforcement officers to whom citizens must display their licenses for identification and law enforcement purposes. (Pregno Depo. at 123). Plaintiffs' sex designations

39

on their licenses do not express the ideological message that they are somehow not "real" women, but rather communicate information to law enforcement officers about their physical description.

The State thus does not compel speech through the information contained on its driver licenses. Rather, an Alabama driver license, and the information displayed on it, is "government speech" not constrained by the First Amendment. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015); *Pleasant Grove v. City of Summum*, 555 U.S. 460 (2009). Whether speech is government speech not subject to the First Amendment depends on (1) whether the medium of speech has historically been used by the state to communicate; (2) whether the speech is closely identified in the public mind with the state; and (3) whether the state maintains direct control over the message. *Walker*, 135 S. Ct. at 2248-49. Here, all three factors clearly support Defendants' claim that personal information on the face of a driver license, including the sex designation, is government speech.

First, the historical use of a driver license is unquestionably for state purposes, *viz.*, to ensure the motorist is legally authorized to drive and for identification purposes. Second, the personal information on a driver license is closely identified in the public mind with the state because, as were the Texas license plates in *Walker*, licenses "are, essentially, government IDs." *Walker*, 135 S. Ct. at 2249. "And issuers of ID 'typically do not permit' the placement on their IDs of 'message[s] with which they do not wish to be associated.'" *Id.* (quoting *Summum*, 555 U.S. at 471). Thus, a reasonable observer understands the term "sex" on a license to convey some message by the government. Third, the State, through ALEA, maintains direct control over the information on a driver license. Alabama law requires ALEA to issue a driver license that contains a color photograph of the licensee, the name, birthdate, address, and a "description" of the licensee. *See* Ala. Code § 32-6-6-. ALEA has exercised its control over the contents of a license by requiring

the "description" to include the license bearer's height, weight, eye color, hair color, and sex designation. (Pregno Depo. at 65-66). Chief Pregno testified that law enforcement officers are the "audience" to whom ALEA is communicating in determining the information that goes on a driver license. (*Id.* at 123).

In sum, the sex designation on Plaintiffs' driver licenses do not compel speech because they are not required to publicly display any ideological message with which they disagree by means of their license. The personal information on a driver license is government speech controlled by the government, to communicate with the government and is not subject to Plaintiffs' First Amendment challenge. *See Walker*, 135 S. Ct. at 2245 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."). Accordingly, Defendants are entitled to summary judgment on Count III.

5.   **Defendants Are Entitled to Summary Judgment on Plaintiffs' Equal Protection Claim in Count IV**

Plaintiffs allege in Count IV that "Policy Order 63 and Defendants' practices are directed solely at transgender people and discriminate against them on the basis of sex, as well as on the basis of transgender status." Doc. 38 ¶130. Plaintiffs allege that Policy Order 63 fails to satisfy intermediate scrutiny under the Equal Protection Clause. *Id.* ¶¶132-134. However, Policy Order 63 does not discriminate on the basis of an individual's transgender status as Plaintiffs allege. Transgender individuals who meet Policy Order 63's requirements may change the sex designation on their license, and the policy thus treats similarly-situated individuals similarly. Even if it were subject to intermediate scrutiny, Policy Order 63 satisfies this level of review on the undisputed facts of this case.

a.    Policy Order 63 Does Not Intentionally Discriminate Based on an Individual's Transgender Status

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons *similarly situated* should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (emphasis added). "When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). In *Feeney*, the Court considered whether a veteran's preference hiring statute, which unquestionably disproportionately favored men over women, violated equal protection. The court provided the following analysis:

> When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionably adverse, a twofold inquiry is thus appropriate. The first question is whether the statutory classification is indeed neutral in the sense that it is not gender-based. If the classification itself, covert of overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination. In this second inquiry, impact provides an important starting point, but purposeful discrimination is the condition that offends the Constitution.

*Id.* at 274. In order to show a discriminatory purpose, a plaintiff must show that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 279. Thus, the veterans' preference statute at issue in that case did not have to satisfy intermediate scrutiny, as would a sex-based classification, because it lacked the requisite discriminatory intent. *Id.* at 281.

While Policy Order 63 undoubtedly disproportionally applies to transgender individuals who wish to change the driver license on their sex, it lacks discriminatory intent because it treats similarly-situated individuals similarly, the classic requirement of equal protection. First, no policy

of ALEA prevents transgender individuals from obtaining a driver license so long as the individual meets all the same requirements of a non-transgender individual. With regard to the sex designation on a driver license, the sex on a birth certificate is the "default" sex for what is used on a driver license. This default results in a disparate impact on transgender individuals, whose gender identity does not match the sex assigned on their birth certificate. But it does not *solely* affect transgender individuals but also, for example, those with intersex conditions. The records contain an example of at least one individual who obtained a sex change on a driver license due to an intersex condition, Klinefelter's syndrome. (D1165). Second, for transgender individuals, Alabama law provides a means to change the sex on both birth certificates and driver licenses by providing proof of sex reassignment surgery. Transgender individuals who meet Policy Order 63's requirements may change their sex on their driver licenses, whereas those who do not cannot. The records are replete with transgender individuals who have met this requirement and obtained a change to the sex designation on their license.

Policy Order 63 simply provides a clear criterion for when an individual changes "sex" for purposes of physical identification for law enforcement. Policy Order 63 does not "discriminat[e] against a transgender individual because of her gender-nonconformity." *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011). In fact, Policy Order 63 provides an accommodation to allow transgender individuals to change the sex designation on their license. Plaintiffs cannot complain that because Policy Order 63 does not provide the accommodation of their choice that it invidiously discriminates against them based on their transgender status. Because Policy Order 63 lacks discriminatory intent against transgender individuals, Defendants are entitled to summary judgment on Plaintiffs' equal protection claim.

43

b.     Even if Policy Order 63 Were a Sex-Based Classification Subject to Intermediate Scrutiny, It Satisfies This Level of Scrutiny

In *Glenn*, the Eleventh Circuit held that "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." *Glenn*, 663 F.3d at 1317. Accordingly, the court held that the employer had to satisfy intermediate scrutiny, *i.e.*, the employer bore the burden of showing his action was "substantially related to a sufficiently important governmental interest." *Id.* at 1320. The employer in *Glenn* failed to make such a showing because his motive in terminating the employee was based purely on discriminatory animus. *Id.* at 1321. The employer told the transgender woman employee that her appearance and dress were "inappropriate," "unsettling," and "unnatural." *Id.* Under these circumstances, the court easily concluded that the employer's *post hoc* justification for the termination failed to satisfy intermediate scrutiny. *Id.* at 1321.

Plaintiffs assume that Policy Order 63 is a sex-based classification because it requires conformity between genitalia, whether those at birth or acquired through surgical means, and the sex designation on a driver license. Plaintiffs maintain that this classification discriminates against them because their gender does not conform to the genitals they were assigned at birth and they have not had sex reassignment surgery. Therefore, their male sex designations on their licenses constitute sex discrimination against them based on their gender non-conforming behavior.

Although Defendants dispute this characterization of Plaintiffs' claim to discrimination for the reasons set out above, even assuming intermediate scrutiny applies, Policy Order 63 satisfies this level of scrutiny. In order to satisfy intermediate scrutiny, defendants bear the burden of showing that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. *See United States v. Virginia*, 518 U.S. 515, 533 (1996). "The justification must be genuine, not

44

hypothesized or invented *post hoc* in response to litigation." *Id.* "And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.*

Although intermediate scrutiny is not satisfied by reliance on sex-based stereotypes and generalizations, the Supreme Court has also acknowledged that "[p]hysical differences between men and women, however, are enduring: [T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both." *Id.* (internal quotation and citation omitted). The court also acknowledged the "[i]nherent differences' between men and women." *Id.* The Supreme Court has elsewhere stated that "gender specific terms can mark a permissible distinction," and that "[t]he equal protection question is whether the distinction is lawful. *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 64 (2001). "Here, the use of gender specific terms takes into account a *biological difference* between the parents." *Id.* (emphasis added). The court in *Nguyen* concluded:

> To fail to acknowledge even our most basic biological differences—such as the fact that a mother must be present at birth but the father need not be—risks making the guarantee of equal protection superficial, and so disserving it. Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real. The distinction embodied in the statutory scheme here at issue is not marked by misconception and prejudice, nor does it show disrespect for either class. The difference between men and women in relation to the birth process is a real one, and the principle of equal protection does not forbid Congress to address the problem at hand in a manner specific to each gender.

*Id.* at 73. Thus, while intermediate scrutiny must do more than rely on stereotypical generalizations, it may also take into account "biological differences" between the sexes, such as the indisputable fact that for most people external genitalia at birth typically conform with a person's gender identity.

Policy Order 63 serves the important government interests in maintaining consistency between the sex designation on an Alabama birth certificate and an Alabama driver license. Policy Order 63 is substantially related to this interest because changing the sex on either document requires proof of gender reassignment surgery. Policy Order 63 serves the important government interest of providing information related to physical identification to law enforcement officers. Policy Order 63 is substantially related to this interest by providing a clear definition of "sex" in terms of physical sex characteristics of statewide applicability to allow law enforcement officers to form appropriate arrest, booking, and search procedures, as well as procedures for the provision of medical treatment.

Defendants presented undisputed evidence of these important government interests and the manner in which Policy Order 63 is substantially related to those interests. Alabama by statute requires proof of sex reassignment to amend a birth certificate. *See* Ala. Code § 22-9A-19(d); (Pregno Depo. at 124). This statutory requirement has been in effect since 1992. *See* Ala. Act 92-607 §§ 19(d), 31. Policy Order 63 was originally created based on the statutory process for amending a birth certificate. (Pregno Depo. at 42, 124). Policy Order 63 maintains consistency with birth certificates by changing the sex on a license upon the receipt of an amended birth certificate, which requires proof of sex reassignment surgery, or upon direct receipt of medical documentation of reassignment surgery. (Woodruff Depo., PX 7).

With respect to identification for law enforcement purpose, Chief Pregno testified that ALEA is a law enforcement organization, and that one purpose of a driver license is as an identification document for law enforcement purposes. (Pregno Depo. at 55-56). Although ALEA does not formulate search, seizure, or booking policies for State law enforcement and corrections officers, it provides information to law enforcement officers by means of the information contained

on a driver license so that each state agency can formulate its own search, seizure, and booking policies based on this information. (*Id.* at 82, 120-21). Policy Order 63 is substantially related to this important purpose because it provides a definition of "sex" in terms of physical sex characteristics that allow law enforcement officers to form appropriate search, seizure, and booking policies. (*Id.* at 65, 73-86, 120-21). Plaintiffs' own expert conceded that for *99%* of the population, the sex designation on their identity documents of "M" or "F" was accurate. (Gorton Depo. at 23). *See Carcano v. McCrory*, 203 F. Supp. 3d 615, 644 (M.D.N.C. 2016) (stating that on plaintiffs' own estimate less than 1% of the population was transgendered, and thus a policy based on sex on a birth certificate was substantially related to important government interests because sex on a birth certificate based on external genitalia was accurate for 99% of the population).

Defendants' expert witness, Don Leach, provided testimony about the substantial relationship between Policy Order 63's definition of "sex" in terms of physiognomy and the creation of appropriate policies and procedures in a correctional context for inmate searches, housing, supervision, and medical care. (Leach Depo., PX 38 at 16-17). Because there are many situations in which corrections officers must take an inmate's sex into account, it is important for jails to have "data dictionaries" that define key terms such as "sex" consistently to jail staff. (*Id.* at 15). ALEA provides a baseline definition of "sex" for correctional purposes on a statewide basis through Policy Order 63. (*Id.* at 16-17). Knowledge of an inmate's sex, including genitalia, is important for Fourth Amendment purposes in a correctional setting because a search should not be more intrusive than necessary, and corrections officers must develop appropriate procedures for cross-gender searches. (*Id.* at 49-50, 102). Corrections officers can determine an inmate's

physical sex, including genitalia, by means of a driver license shortly upon booking. (*Id.* at 34-35, 85).

Far from Leach's testimony being *post hoc* or based on stereotypes about gender, the relevance of his concerns about the State's interests in Policy Order 63 are supported by a decision of the Eleventh Circuit released after he issued his expert report in this case. (Leach Depo. at 106-07). *See De Veloz v. Miami-Date Cnty.*, 2018 WL 6131780, __ F. App'x __ (11th Cir. Nov. 21, 2018). In that case, a woman taking hormone replacement therapy due to menopause was misgendered by jail medical staff and mistakenly housed with the male jail population. *De Veloz*, 2018 WL 6131780, at *2-5. The court reversed the grant of qualified immunity to the staff that misclassified the plaintiff and held that they were deliberately indifferent. *Id.* at *7. The court noted that "no party disputes that placing a female in the general population of a male detention facility created an extreme condition and posed an unreasonable risk of serious harm to the female's future health or safety." *Id.* "It is abundantly clear to us that housing a *biological female* alongside 40 male inmates poses an outrageous risk that she will be harassed, assaulted, raped, or even murdered." *Id.* (emphasis added). Thus, *De Veloz* makes clear the importance of providing accurate information regarding an individual's sex for purposes of jail administration.

In sum, Policy Order 63 has neither the purpose nor effect of invidiously discriminating against transgender individuals. From its inception, it was intended to maintain consistency with birth certificates and accurately describe a license bearer's physical sex characteristics to law enforcement and corrections officers for law enforcement purposes. Defendants stated interests, and the relation Policy Order 63 bears to these interests, are not based on stereotypes regarding sex and gender but on the concrete realities involved in the identification of individuals for law enforcement purposes.

C.  <u>Conclusion</u>

For the reasons stated above, Defendants are entitled to summary judgment as to all claims.


Respectfully submitted this 8th day of February, 2019.


Steve Marshall,
 *Attorney General*

<u>s/</u> Brad A. Chynoweth
Brad A. Chynoweth (ASB-0030-S63K)
Winfield J. Sinclair (ASB-1750-S81W)
 *Assistant Attorneys General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8440
bchynoweth@ago.state.al.us
wsinclair@ago.state.al.us

***Counsel for Defendants Hal Taylor, Charles Ward, Deena Pregno, and Jeannie Eastman***

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notification of such filing to the following:

Brock Boone
Randall C. Marshall
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
bboone@aclualabama.org
rmarshall@aclualabama.org

Rose Saxe
Gabriel Arkles
ACLU LGBT & HIV Project/ACLU
Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2605
rsaxe@aclu.org
garkles@aclu.org
*Admitted Pro Hac Vice*

/s Brad A. Chynoweth
Counsel for Defendants