**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| DARCY CORBITT, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:18-cv-91-MHT-GMB |
| | ) | |
| HAL TAYLOR, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................. 2

INTRODUCTION .................................................................................................... 3

SUPPLEMENTAL STATEMENT OF FACTS ......................................................... 5

   The Plaintiffs ..................................................................................................... 5

   Driver's Licenses, Birth Certificates, and Passports ......................................... 9

   Transgender People and Science ..................................................................... 13

ARGUMENT ......................................................................................................... 15

   I.   Plaintiffs Brought Their Claims within the Statute of Limitations. ................... 15

      A.    No Plaintiff's Claim Accrued More Than Two Years Before the Filing of the
Complaint .................................................................................................. 16

      B.    Defendants' Continue to Violate the Plaintiffs' Rights. ............................. 19

   II.  Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Right to Privacy Claim.
...................................................................................................................... 21

      A.    Policy Order 63 Forces Plaintiffs to Disclose Their Transgender Identity When They
Show Their Driver's Licenses, Which Violates Their Right to Privacy ............................. 22

      B.    The Ability to Use a Passport in Some Circumstances Does Not Justify Violation of
Plaintiffs' Privacy through Their Driver's Licenses ......................................... 23

      C.    Ms. Corbitt and Ms. Clark Retain a Privacy Interest in Deciding Whether and When
to Disclose Their Transgender Identity ......................................................... 27

      D.    Jane Doe Does Not Share Her Transgender Identity Publicly. ................................. 30

   III.   Defendants Are Not Entitled to Summary Judgment Because They Have Conditioned a
Government Benefit on Plaintiffs Giving up Their Right to Refuse Medical Care ................. 32

   IV.   Defendants Are Not Entitled to Summary Judgment Because Their Policy Compels
Speech ........................................................................................................... 34

   V.  Defendants Are Not Entitled to Summary Judgment Because They Have Discriminated
Against Transgender People Without Adequate Justification. ..................................... 37

      A.    Defendants Have Discriminated Against Plaintiffs Because of Sex. ......................... 37

      B.    Policy Order 63 Cannot Survive Heightened Scrutiny. ................................... 39

      C.    Policy Order 63 Does Not Survive Even Rational Basis Review. ........................... 42

CONCLUSION ...................................................................................................... 46

**INTRODUCTION**

It is undisputed that Defendants require Plaintiffs to submit to sterilizing genital surgery before permitting them to obtain driver's licenses that list their sex as female. It is undisputed that a driver's license with a male sex designation does not accord with how Plaintiffs define themselves and exposes Plaintiffs to humiliation and other serious harm. It is also undisputed that the surgical requirement in Defendants' policy is not consistent with contemporary medical standards for treatment of gender dysphoria or scientific understandings of sex, and is not required for correctional or law enforcement purposes. Defendants argue in their motion for summary judgment that their policy nonetheless does not violate the Plaintiffs' rights under the U.S. Constitution. They are mistaken.

First, Defendants argue that the statute of limitations bars two Plaintiffs' claims. Their argument shows a misunderstanding of the nature of Plaintiffs' claims. The harm Plaintiffs allege arises from not being permitted to change the sex designation on their driver's licenses. It was well within the limitations period when the Plaintiffs were first aware, or should have become aware, that they would not be permitted to do so. Moreover, Defendants' actions continue to this day.

Defendants also argue that they have not violated the Plaintiffs' right to privacy. Here, Defendants not only misapply the law, but also mischaracterize the deposition testimony of Plaintiff Jane Doe. Ms. Doe endeavors to keep her trans identity private. At the very least, it is disputed whether Ms. Doe has made her transgender identity known publicly. But even to the extent some other people know that the Plaintiffs are transgender, they retain a right to privacy protecting them from forced disclosure of their transgender status in circumstances presenting

significant personal risk, such as when they need to show a driver's license in person to a stranger. Defendants argue that Plaintiffs should use passports instead of driver's licenses to avoid the violation of their privacy. No court has accepted that argument; the government may not condition access to a useable driver's license on the forfeiture of a constitutional right.

Competent adults have a fundamental right to refuse medical treatment, particularly if that treatment results in permanent sterilization. While genital gender-affirming surgery is a vital form of treatment for those transgender people who need it, not all transgender people do—and some who do nonetheless cannot obtain it. Defendants argue that because they do not literally bind Plaintiffs to an operating table and wield a scalpel, they do not infringe on the right to refuse medical care. But the government need not go so far to violate due process. The constitution does not permit the Defendants to present Plaintiffs with the choice to go without a valuable form of government identification, sacrifice their safety and dignity by using a form of identification with the wrong sex designation, or give up their bodily integrity and reproductive capacity.

Defendants also argue that their policy does not compel speech because no reasonable person would assume that someone who shows a driver's license endorses the message conveyed on that license. But the opposite is true. Any reasonable person would believe that someone presenting a driver's license was also representing that the information describing them on that license was true.

Finally, Defendants argue that their policy, which applies specifically to transgender people, somehow only incidentally affects transgender people and thus does not discriminate on the basis of sex, and that in any event their policy is justified. But in fact, their policy

deliberately targets transgender people, which is discrimination because of sex, and they have no reason for their policy that satisfies heightened scrutiny, or even rational basis.

## SUPPLEMENTAL STATEMENT OF FACTS

The Plaintiffs

98.     Ms. Corbitt arrived in Alabama from North Dakota in August 2017. Corbitt Dep. 13:7-10, Defs.' Ex. 2.

99.     Ms. Corbitt went to the Lee County Driver License Office in August 2017 to obtain an Alabama driver's license. *Id.* at 41:3-6.

100.    At that visit to the Lee County Driver License Office, the clerk refused to give Ms. Corbitt a driver's license with a female sex designation. *Id.* at 47:1-13.

101.    That day in August 2017 was the first time Ms. Corbitt learned that Alabama would not issue her a license with a corrected sex designation. *Id.* at 46:8-12.

102.    Ms. Clark began trying to change the sex designation on her license in April 2015. Clark Dep. 36:1-37:4, Defs.' Ex. 1.

103.    When Ms. Clark tried to change the sex designation on her license in a local driver's license office, the clerk did not know the policy. She just told Ms. Clark to contact Montgomery. *Id.* at 37:7-15.

104.    Ms. Eastman, in Montgomery, initially told Ms. Clark that the process was as easy as a keystroke. *Id.* at 37:7-22.

105.    Ms. Eastman did not change Ms. Clark's sex designation at that time. Based on Ms. Eastman's statements after reviewing the letter from Ms. Clark's primary care physician,

Ms. Clark believed she would be able to change the sex designation on her license after she underwent surgery, which she was planning to do in the relatively near future. *Id.* at 39:10-19.

106.    After Ms. Clark submitted her surgeon's letter, Ms. Eastman called her surgeon's office on February 3, 2017. Letter from Robert Bolling, M.D. to Whom It May Concern (Jan. 18, 2017) (D169), Pls.' Ex. 39.

107.    Ms. Clark called Ms. Eastman's office when she did not hear back about her application. During that call, she learned that Ms. Eastman had contacted her surgeon's office and would not be changing the sex designation on her license. While Ms. Clark does not recall the exact date of that conversation, the very earliest it could have been was February 3, the same day Ms. Eastman contacted Ms. Clark's surgeon's office. Clark Dep. 41:17-42:7.

108.    The Alabama Law Enforcement Agency (ALEA) has never publicized Policy Order 63 or made it publicly accessible online, except through electronic filing in this lawsuit.

109.    It took Ms. Doe five tries contacting ALEA before she came to learn anything close to the actual policy. Doe Dep. 49:10-13, Defs.' Ex. 3.

110.    Ms. Corbitt believes the sex designation on a driver's license would put her at risk if pulled over by a police officer on a dark country road. Corbitt Dep. 58:1-21. She was deeply frightened when her transgender status was publicly disclosed within the hearing of a state trooper and the trooper began looking at her in a way she could not interpret. *Id.* at 44:8-46:19.

111.    When a police officer noticed the incorrect gender marker on Ms. Clark's license, the officer's demeanor shifted rapidly from friendly to rude. Clark Dep. 33:6-14; 34:3-7.

112.    When a police officer noticed the incorrect gender marker on Ms. Doe's license, the officer disclosed that Ms. Doe was transgender to others, causing Ms. Doe to have leave her job to avoid being discriminatorily fired. Doe Decl., at ¶ 15, Pls.' Ex. 42; Doe Dep. 35:3-18.

113.    Ms. Clark and Ms. Corbitt share that they are transgender at community events where people have come specifically to learn about transgender issues or are transgender themselves. They also disclose that they are transgender on their social media pages. Corbitt Dep. 59:11-21; Clark Dep. 80:1-82:6.

114.    Plaintiffs are more likely to be alone and face-to-face with someone whose reaction to their transgender status they cannot predict when they must show their driver's licenses. *See* Corbitt Dep. 41:11-43:21; Clark Dep. 82:7-20.

115.    In settings like an LGBT event or Facebook page, it is the Plaintiffs' own choice whether and how to disclose they are transgender. When giving a speech or sharing a post on social media, Plaintiffs make the disclosure of their own volition and on their own terms, often providing education about what it means to be transgender and affirming their own womanhood. *See* Corbitt Dep. 58:1-21; 59:11-21; Clark Dep. 80:1-10, 81:12-82:20.

116.    Jane Doe does not identify herself as "trans out in public." Doe Dep. 49:18-21. An early experience of hate violence has shaped her decisions. Doe Decl. ¶ 8, 14.

117.    People at work only know that Ms. Doe is transgender because her driver's license outed her to human resources. Doe Dep.  50:21-51:8.

118.    Until her deposition, Ms. Doe had no idea that her profile picture on Facebook was publicly viewable even though her account settings are friends only. *Id.* 52:21-23, 64:3-5.

119.    Facebook regularly changes privacy settings without notice to users, and many Facebook users do not fully understand what data on their Facebook profile is publicly accessible. Will Oremus, *Facebook Changed 14 Million People's Privacy Settings to "Public" Without Warning*, Slate (June 7, 2018), attached as Pls.' Ex. 60; Brian Barrett, *The Facebook Privacy Setting That Doesn't Do Anything At All*, Wired (March 27, 2018), attached as Pls.' Ex.

61; Alex Hern, *Facebook is Chipping Away at Privacy—and My Profile Has Been Exposed*, The Guardian (June 29, 2016), attached as Pls.' Ex. 62.

120.    Ms. Doe's profile picture sometimes included "banners" with slogans like "Transpeople Won't Be Erased" or "Together Against Antisemitism." Doe Dep. 62:18-21; 77:4-11.

121.    Ms. Doe is not Jewish. Doe Dep. 77:4-11.

122.    During her deposition, at one point Ms. Doe answered "no" when answering a question about whether her driver's license disclosed anything about her transgender status that she did not disclose through Facebook. Doe Dep. 68:7-11.

123.    She clarified later during that same deposition that in fact her license does convey that she is transgender, something that people cannot learn from her Facebook profile. Doe Dep. 75:16-76:11.

124.    Ms. Doe once staffed an outreach table for her employer at a transgender community event. Doe Dep. 58:22-59:12.

125.    No evidence suggests that the organization Ms. Doe was representing at the event has a reputation for employing an exclusively or primarily transgender workforce. 60:21-61:1.

126.    Other people staffing tables at the event were not transgender. Doe Dep. 76:21-23.

127.    Some of the people attending the event as participants were not transgender either. Doe Dep. 77:1-3.

128.    The banner at the event read "TAKE" in large letters. *Id.* at 59:19-60:3.

129.    TAKE stands for Transgender Awareness Knowledge and Empowerment. Doe Dep. 60:4-6.

130.    Ms. Doe began her social transition in her forties. Doe Dep. 9:21-22 (birth date); 28:9-23 (beginning of social transition).

131.    Ms. Doe's friends know that she is transgender because when they first met her, they perceived her to be a man, and now, they know that she is a woman. Doe Dep. 50:5-9.

132.    Ms. Doe cannot afford gender-affirming surgery. Doe Decl. ¶ 20

133.    For Ms. Corbitt, having gender-affirming surgery at this time would not accord with her religious beliefs. Corbitt Decl. ¶ 13-14, Pls.' Ex. 28.

134.    Ms. Clark does not want surgery beyond what she has already had. Clark Dep. 43:1-4.

135.    Ms. Corbitt needs a driver's license for entry into places she must go for work. Passports do not suffice. Corbitt Dep. 37:19-38:2.

136.    Ms. Corbitt keeps her passport in her safety deposit box to prevent theft. Corbitt Dep. 62:3-12.

137.    Ms. Doe has had her use of a passport questioned when she has tried to check into a hotel. Doe Dep. 79:13-18.

138.    Ms. Clark has never gotten a passport. Clark Dep. 71:1-12.

Driver's Licenses, Birth Certificates, and Passports

139.    One intersex person with a gender identity different from her assigned sex at birth was able to obtain a change of sex designation on an Alabama driver's license without submitting proof of surgery. Defs.' Ex. 16, (D1165).

140.    An interest in law enforcement identification was not considered at the time Policy Order 63 was created or revised. Pregno Dep. 45:3-12; 47:4-23, Defs.' Ex. 5.

141.    No federal or Alabama law or policy indicates that the sex designation on a license should be taken into account when deciding where to place transgender people in police lockups, jails, or prisons.

142.    Defendants' expert stated that he would place transgender people based on where they preferred to be placed, not based on the sex designation on their license. Leach Dep. 98:8-15; 110:21-111:8; 112:8-15, Defs.' Ex. 9.

143.    Reproductive capacity has no bearing on identification or ability to drive. *See* Pregno Dep. 67:20-68:1; Eastman Dep. 60:12-16, Defs.' Ex. 4.

144.    State law requires drivers to carry a driver's license. Ala. Code § 32-6-9.

145.    The purpose of a driver's license is to "prove you are who you say you are." Pregno Dep. 53:18-54:1.

146.    One is guilty of a felony if one presents false identification. Ala. Code §§ 17-17-28; 13A-8-194.

147.    Defendants' expert stated that a transgender man could be arrested for possession of a false instrument because of the disparity between a female sex designation on a driver's license and a masculine appearance. Leach Dep. 57:19-58:10.

148.    People commonly use driver's licenses when "travelling by plane, applying for employment, applying for public benefits, filling prescriptions, purchasing alcohol, applying to and attending college, checking into a hotel, renting a car, voting, opening and using a checking account, using a credit or bank card, travelling internationally, and [doing a] number [of] other things that most of us take for granted." Gorton Decl. at ¶ 28, Pls.' Ex. 45.

149.    Passports are valuable documents vulnerable to theft. Katharine Lagrave, *4 Ways People Steal Your Passport*, Conde Nast Traveler (Aug. 15, 2016), attached as Pls.' Ex. 63.

150.    Obtaining a passport book costs $145. Department of State, United States Passport Fees (Feb. 20, 2018), attached as Pls.' Ex. 64.

151.    Ms. Clark has worked in the food and beverage industry for over thirteen years, and she has "never had anyone to present a passport for age verification." Clark Dep. 79:3-15. She remarked that she would be "shock[ed]" if she ever saw a passport used to buy alcohol. *Id.* 79:19.

152.    Currency is fungible. A single bill may change hands hundreds of times before it leaves circulation. Gottfried Leibbrandt, *How fast is that buck? The velocity of money,* Statistics of Payments, Swift Institute, (2012), attached as Pls.' Ex. 65.

153.    In Arkansas, to change the sex designation on one's birth certificate, one must have a court order stating that sex has been changed "by surgical procedure." Ark. Code Ann. § 20-18-307(d).

154.    To change the sex on a driver's license in Arkansas, one needs to indicate whether one prefers F, M, or X to be listed, with no medical documentation required. Email from Gayle Boliou, Supervisor, Driver Services, Department of Finance and Administration (Apr. 7, 2011, 3:38 p.m.), attached as Pls.' Ex. 66; Curtis M. Wong, *Arkansas Has Been Offering a Nonbinary Gender Option on State IDs for Years*, Huffington Post (Oct. 17, 2018), attached as Pls.' Ex. 67.

155.    In the District of Columbia, one needs a signed statement from a medical provider stating that the applicant has "undergone surgical, hormonal or other treatment appropriate for the individual for the purpose of gender transition" to change the sex designation on a birth certificate. District of Columbia Department of Health, Gender Designation Policies, Procedures, and Instructions, attached as Pls.' Ex. 68.

11

156.    To change the sex designation on a D.C. driver's license, one needs to fill out a form stating whether one wants M, F, or X to appear on one's license. District of Columbia Dep't of Motor Vehicles, Procedure for Establishing or Changing Gender Designation on a Driver License of Identification Card (2017), Pls.' Ex. 22.

157.    In Massachusetts, one needs an affidavit from a medical provider stating that the applicant "has completed medical intervention, appropriate for the patient, for the purpose of permanent sex reassignment" to change the sex designation on a birth certificate. Registry of Vital Records and Statistics, Massachusetts Dep't of Pub. Health, Physicians Statement in Support of Amendment of a Birth Certificate Following Medical Intervention for the Purpose of Sex Reassignment (Apr. 1, 2016), attached as Pls.' Ex. 69.

158.    To change the sex designation on a Massachusetts driver's license, one simply needs to submit an attestation of one's gender identity. Registry of Motor Vehicles, Massachusetts Gender Designation Change Form (last visited March 7, 2019), attached as Pls.' Ex. 70.

159.    Birth certificates record information about time and place of birth, race, and parentage not included on driver's licenses. *See* Clark license, Pls.' Ex. 40; Clark birth certificate, Defs.' Ex. 11 (Dep. Defs.' Ex. 1, P10).

160.    Driver's licenses record information about current address and driving restrictions not included on birth certificates. *See* Clark license, Pls.' Ex. 40; Clark birth certificate, Defs.' Ex. 11 (Dep. Defs.' Ex. 1, P10).

161.    The Alabama agencies responsible for maintaining driver's licenses and birth records do not coordinate to share information when the name or sex designation on those

records change, nor do they compare information except when someone presents an Alabama birth certificate to apply for a driver's license. Pregno Dep. 105:7-106:10.

162.    State statute creates a judicial procedure for changing the sex designation on a birth certificate and has created no comparable judicial procedure for changing the sex designation on a driver's license. Ala. Code § 22-9A-19.

163.    Most states do not require surgery to change the sex designation on a license. *See Love v. Johnson*, 146 F. Supp. 3d 848, 857 (E.D. Mich. 2015); National Center for Trans Equality, *How Trans-Friendly is the Driver's License Gender Change Policy in Your State?*, Pls.' Ex. 23; American Association of Motor Vehicle Administrators, Resource Guide on Gender Designation on Driver's Licenses and Identification Cards (Sept. 2016), Pls.' Ex. 56.

164.    Chief Pregno could think of no reason why Alabama's interests might differ from those of other states. Pregno Dep. 118:19-119:1.

Transgender People and Science

165.    Sex refers not only to genitalia, but also to internal reproductive organs, hormone levels, secondary sex characteristics like breasts and facial hair, and the gender identity that arises from the central nervous system. Gorton decl. ¶ 10, 11.

166.    Defendants' expert declined to express any opinion as to the most useful definition of sex for correctional purposes, and testified that a policy that reflected gender identity on a driver's license would also satisfy correctional interests. Leach Dep. 32:9-19.

167.    High rates of police misconduct toward transgender people have been reported. Sandy E. James, et. al, The Report of the 2015 U.S. Transgender Survey 14 (2016) ("USTS"), Pls.' Ex. 47.

168.     In 2017 alone, three transgender people were killed by police. *Violence Against the Transgender Community in 2017*, Human Rights Campaign, attached as Pls.' Ex. 71.

169.     Transgender women placed in men's facilities experience high rates of sexual violence. U.S. Dep't of Justice, Bureau of Justice Statistics PREA Data Collection Activities, 2015 2 (June 2015), attached as Pls.' Ex. 72; Valerie Jenness et al, *Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault 3* (2007), attached as Pls.' Ex. 73.

170.     Intersex is "a group of conditions where individuals are born with chromosomal, physiological, or anatomic differences that do not fit the typical definitions of a male or female body." Gorton Decl. ¶ 24.

171.     Transgender is "used to describe individuals whose sex assigned at birth is different than their gender identity." Gorton Decl. ¶ 15.

172.     Most intersex people are not transgender. Some intersex people are transgender— that is, they have a gender identity different from the sex they were assigned at birth. InterACT: Advocates for Intersex Youth, Media Guide Covering the Intersex Community 2, attached as Pls.' Ex. 74 ("[S]ome people can be born with intersex traits and also identify as transgender.").

173.     Defendants use the term "physiognomy" repeatedly in their briefing, as did their expert in his report and testimony. Doc. 54 at 10, 11, 15, 39, 50; Leach report at 15, 18, Pls.' Ex. 26; Leach Dep. 12, 13, 14, 19, 22, 50, 55, 70, 117, 118, 128,  Defs.' Ex. 9.

174.     Physiognomy refers to determining a person's ethnicity and character based on facial features. Gorton Decl. ¶ 42.

175.     During the period of eugenics, "experts" in the United States and Germany claimed that physiognomy proved that people of African descent were less intelligent than

people of European descent, and that Jewish people were inherently deceitful. Gwen Sharp,

*Physiognomy: Face, Bodies, and the "Science" of Human Character,* Sociological Images 6

(Jan. 30, 2015), attached as Pls.' Ex. 75; Marissa Alperin, *Constructing Jewish Bodies in*

*Germany through Physical Culture and Racial Pseudo-Science 4* (2018), attached as Pls.' Ex.

76.

176.    Gender-affirming genital surgery is an important form of healthcare for those

transgender people who need it to treat their gender dysphoria. However, not all transgender

people need genital surgery, and gender-affirming genital surgery for transgender women always

ends fertility. Gorton Decl. ¶ 36, 43.

177.    Defendants continue to prevent Plaintiffs from changing the sex designation on

their driver's licenses, and continue to withhold from Plaintiffs a driver's license that they can

use without compromising their health, integrity, safety, and dignity. *See* Policy Order 63, Pls.'

Ex. 1.

## ARGUMENT

## I.    Plaintiffs Brought Their Claims within the Statute of Limitations.

The Plaintiffs brought this action to challenge Policy Order 63's surgery requirement,

which prevents each of them from obtaining an Alabama license that correctly designates their

sex, thus depriving them of the ability to use this vital piece of identification without sacrificing

their privacy, safety, health, integrity, and dignity. Plaintiffs' claims are timely. Each of their

claims accrued well within the statute of limitations, because each of them learned that

Defendants would not permit them to change the sex designation on their license well within two

years of filing this lawsuit. Moreover, each Plaintiff suffers a continuing violation of her

constitutional rights.

A.  <u>No Plaintiff's Claim Accrued More Than Two Years Before the Filing of the Complaint.</u>

Defendants correctly assert that the applicable statute of limitations for a § 1983 claim is Alabama's general two-year limitations period.  *Shows v. Morgan*, 40 F. Supp. 2d 1345, 1362 (M.D. Ala. 1999) ("All § 1983 actions commenced in Alabama are subject to the two-year limitations period set forth in the general provisions of the 1975 Code of Alabama § 6–2–38."). However, the statute of limitations begins to run only when the plaintiff has a 'complete and present cause of action.'" *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California*, 522 U.S. 192, 195 (1997) (quoting *Rawlings v. Ray*, 312 U.S. 96, 98 (1941)). The statute does not begin to run before "the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Rozar v. Mullis*, 85 F.3d 556, 561–62 (11th Cir. 1996); *see also Neeley v. Walker*, 67 F. Supp. 3d 1319, 1325 (M.D. Ala. 2014).

Defendants wrongly assert that Ms. Corbitt and Ms. Clark's claims are time-barred by the statute of limitations.[1] Ms. Corbitt and Ms. Clark filed suit on February 6, 2018 (Doc. 1). Ms. Corbitt's claim accrued, at the earliest, in August of 2017—only six months before the filing of this lawsuit. Ms. Corbitt arrived in Alabama from North Dakota in the summer of 2017. She went to the Lee County Driver License Office in August of 2017. Corbitt Dep. 41: 3-6. At that visit to the Lee County Driver License Office, the clerk refused to give Ms. Corbitt a driver's license with the correct sex designation. Corbitt Dep. 47:1-13. That was the first time Ms. Corbitt

---

[1] Defendants do not assert that Ms. Doe's claims are time barred.

sought a driver's license with an accurate sex designation, the first time she learned that Alabama would not issue her one, and thus, the first time she learned the facts underlying her claims. Corbitt Dep. 46: 8-12. Ms. Corbitt's claims are not time barred.

Ms. Clark's claims accrued, at the earliest, on February 3, 2017—only twelve months before the filing of this lawsuit. Ms. Clark first began trying to change the sex designation on her license in 2015, but did not receive a definitive response until February 2017. Indeed, in her first interaction with Defendant Jeannie Eastman in around April 2015, Ms. Eastman told Ms. Clark that the process was as easy as a keystroke. When Ms. Eastman did not change the sex designation on Ms. Clark's license, Ms. Clark reasonably believed she would be able to change the sex designation on her license after she underwent gender-affirming surgery, which she was planning to do in the relatively near future. It was only after she had surgery, submitted her paperwork, and learned on or after February 3, 2017 that Ms. Eastman had nonetheless refused to change the sex designation on her license that she had reason to believe she would not be able to obtain an accurate license that she could safely use. Clark Dep. 41:17-42:7. February 3, 2017 would thus be the earliest date of accrual, because that was on or before the date when the facts supporting her cause of action became apparent. *See Rozar*, 85 F.3d at 561–62. Thus, Ms. Clark's claims are not time barred.

Defendants claim that Ms. Corbitt and Ms. Clark should have known about Policy Order 63 long before they actually applied for corrected driver's licenses. But Policy Order 63 was not publicized, advertised, or available online until after this litigation commenced. Even people who work for ALEA do not know about Policy Order 63. For example, when Ms. Clark first tried to change the sex designation on her license, the clerk did not know the policy. She just told Ms.

Clark to contact Montgomery. Clark Dep. 37:7-15. It took Ms. Doe five tries contacting ALEA before she came to learn anything close to the actual policy. Doe Dep. 49:10-13.

Defendants argue that Ms. Corbitt and Ms. Clark should have become aware that they would be prohibited from changing the sex designation on their license when they changed the names on their licenses, before Ms. Corbitt had ever tried to change the sex designation on her license and before either of them had been informed that they would not be permitted to do so. Calculating the accrual of their claims from the date they changed their names is wholly arbitrary. When Ms. Corbitt and Ms. Clark changed their names, they did not receive any information about Policy Order 63 or how it would affect them. The injury of which they complain is not having a traditionally feminine name on a license with a male sex designation. The injury of which they complain is not being permitted to change the sex designation on their license to correspond to their actual sex, female.

In this way, their circumstances differ sharply from those of the plaintiffs in *Brown v. Ga. Bd. Of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003) and *Lovett v. Ray*, 327 F.3d 1181 (11th Cir. 2003). In *Lovett*, the defendants directly notified the plaintiff in 1998 that his parole would not be reconsidered until 2006. *Id.* at 1182. At that moment, he became aware of the facts supporting his cause of action, because he knew—having been specifically told—that Georgia would not reconsider his parole for another eight years, rather than the three he had expected. The situation was much the same in *Brown*. 335 F.3d at 1260.  Unlike the plaintiffs in *Lovett* and *Brown*, Ms. Corbitt and Ms. Clark did not learn of the effects of Policy Order 63 the day they changed their names. Rather, they learned of those effects when they tried and were unable to change the sex designation on their licenses.

Even in circumstances making it much more likely that the plaintiff knows about the underlying policy, the statute of limitations still does not begin to run until the plaintiff learns about the government using that policy to cause injury to the plaintiff. In *Neeley*, the Alabama Legislature passed a law, referred to as Neeley's Law, specifically to keep the plaintiff from ever receiving parole consideration after the governor commuted her death sentence. 67 F.Supp. at 1323. Even with all of the media coverage of the law, and the fact that the law was created specifically to apply to the plaintiff and named after her, it still did not "justify the running of the statute of limitations" until the Board of Pardons specifically informed the plaintiff that the law "would apply… to her." *Id.* at 1326. There is absolutely no indication that Defendants applied their policy to Ms. Corbitt, or that they informed Ms. Corbitt of their policy, at the time when Ms. Corbitt changed her name on her driver's license. Nor did Ms. Clark have any reason to believe that she would not be able to change the sex designation on her license until the defendants informed her of that fact in 2017.

B.  Defendants' Continue to Violate the Plaintiffs' Rights.

Even if the Court were to find that Ms. Clark's or Ms. Corbitt's claims somehow accrued prior to February 6, 2016, the surgery requirement of Policy Order 63 constitutes a continuing violation. When plaintiffs suffer a continuing violation of their rights, their claims are not barred under the statute of limitations. *See Lee v. Eleventh Judicial Circuit of Fla.*, 699 F. App'x 897, 898 (11th Cir. 2017); *Ctr. For Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006). This "Circuit distinguishes between the present consequence of a one time violation, which does not extend the limitations period, and the continuation of that violation into the present, which does." *City of Hialeah v. Rojas*, 311 F.3d 1096, 1101 (11th Cir.2002) (quotations omitted).

It has long been a principle of civil rights claims that unconstitutional laws cannot be insulated from challenge by the statute of limitations. *See Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). "The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." *Robinson v. United States*, 327 F. App'x 816, 818 (11th Cir. 2007). For example, an ordinance offensive to the First Amendment cannot be "insulated from challenge by a statutory limitations period." *Nat'l Advertising Co. v. City of Raleigh*, 947 F.2d 1158, 1168 (4th Cir. 1991). When a "violation occurs as a result of a continuing policy, itself illegal, then the statute does not foreclose an action aimed at the company's enforcement of the policy within the limitations period." *Perez v. Laredo Junior College*, 706 F.2d 731, 733–734 (5th Cir. 1983).

 "The critical distinction in the continuing violation analysis ... is whether the plaintiffs complain of the present consequence of a one-time violation, which does not extend the limitations period, or the continuation of that violation into the present, which does." *Knight v. Columbus, Ga.*, 19 F.3d 579, 580–81 (11th Cir.1994) (internal marks omitted); *see also Omanwa v. Catoosa County.*, 711 F. App'x 959, 962 (11th Cir. 2017). For example, a false arrest is not a continuing violation because it is a discrete wrong that happens on a particular day and then ends, rather than something that continues to occur over time. *See Parrish v. City of Opp, Ala.*, 898 F. Supp. 839, 843 n.2 (M.D. Ala. 1995). In *Lovett* and *Brown*, the violation was a "one time act with continued consequences," *Lovett*, 327 F.3d at 1183, because on a particular date the parole board set another specific date for a parole hearing. *Brown*, 335 F.3d at 1261.

When injury is caused not by a one-time act but by ongoing actions, the claim is not time barred. The Eleventh Circuit found that the continuing violation doctrine applied where a prisoner alleged facts permitting an inference that unconstitutional conditions, including

exposure to scabies and lack of treatment for a hernia, continued until a time within the limitations period. *Robinson*, 327 F. App'x at 818. Similarly, in *Eldridge v. Bouchard*, plaintiffs could bring a § 1983 lawsuit challenging a law they learned about well before the relevant limitations period because the law continued to result in their underpayment each pay period. 620 F. Supp. 678, 682 (W.D. Va. 1985).

In the instant case, the ongoing enforcement of Policy Order 63 constitutes a continuing violation. Unlike in a false arrest case, this was not a one-time act. It is blanket policy that not only prevented the Plaintiffs from obtaining an accurate, useable license on a single occasion in the past, but continues to prevent them from obtaining one today and every day in the future until Policy Order 63 no longer contains a surgery requirement. *See Perez*, 706 F.2d at 733 (limitations period had not begun to run even though plaintiff had made a specific request for more compensation, gotten denied, appealed the denial, and received a final determination on a particular date, because he continued to receive less compensation than he was entitled to). The two-year limitations period should not start to run until the "end of a continuing violation." *Dews v. Town of Sunnyvale, Tex.*, 109 F. Supp. 2d 526, 563 (N.D. Tex. 2000).

At each moment of every day, Defendants prevent Plaintiffs from changing the sex designation on their driver's licenses, and thus cause the constant violation of their rights to privacy, due process, free speech, and equal protection of the law. Because ALEA has not yet removed the surgery provision from Policy Order 63, the clock has not yet begun to run on the two-year statute of limitations for Plaintiffs.

## II.   Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Right to Privacy Claim.

Defendants argue that Policy Order 63 does not violate Plaintiffs' right to privacy. First, Defendants state that a sex designation is "not the sort of confidential information protected by

the Fourteenth Amendment." Doc. 54 at 28. Second, Defendants state that Plaintiffs only have to

reveal their license to law enforcement officers and court personnel, and they can use a passport

for other things. *Id.* Third, Defendants state that Plaintiffs disclose their transgender status on

social media and in public. *Id.* They are mistaken in each of their arguments.

A.  Policy Order 63 Forces Plaintiffs to Disclose Their Transgender Identity When They Show
    Their Driver's Licenses, Which Violates Their Right to Privacy.

Plaintiffs and Defendants agree that there is a "constitutionally protected 'zone of

privacy'" which includes an "individual interest in avoiding disclosure of personal matters."

*Whalen v. Roe*, 429 U.S. 589, 598-99 (1977); Doc. 51, page 44; Doc. 54, page 28. However,

Defendants disregard the core of informational privacy—protecting information about sexual,

medical, and mental health. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2323

(2016), *as revised* (June 27, 2016) (sexual, medical); *United States v. Kravetz*, 706 F.3d 47, 63

(1st Cir. 2013) (medical, mental health); *United States v. Brice*, 649 F.3d 793, 796 (D.C. Cir.

2011) (medical, mental health); *Aid for Women v. Foulston*, 441 F.3d 1101, 1124 (10th Cir.

2006) (sexual, medical); *Livsey v. Salt Lake Cty.*, 275 F.3d 952, 956 (10th Cir. 2001) (sexual,

medical); *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998) (sexual); *United States v.*

*Westinghouse Elec. Corp.*, 638 F.2d 570, 580 (3d Cir. 1980) (medical); *Hirschfeld v. Stone*, 193

F.R.D. 175, 183 (S.D.N.Y. 2000) (sexual, medical).

Defendants rely on *Collier*, a case that does not involve disclosure of transgender status

or any other sort of intimate personal information. In *Collier*, the state of Florida, in violation of

the Driver Privacy Protection Act ("DPPA"), released information in the form of mailing lists to

mass marketers. *Collier v. Dickinson*, 477 F.3d 1306, 1308 (11th Cir. 2007). An Eleventh Circuit

panel said that the district court did not err in finding no constitutional violation, based on a

footnote from *Pryor v. Reno*, 171 F.3d 1281, 1288 n. 10 (11th Cir.1999), *rev'd on other grounds*,

528 U.S. 1111 (2000). In *Pryor*, the court held that the DPPA was a valid exercise of congressional power under the commerce clause, but noted in dicta that it was not a valid exercise of congressional enforcement powers under the Fourteenth Amendment. *Id.* The court stated that a constitutional right to privacy did exist for "*intimate personal information,*" but not generally for motor vehicle records (records pertaining to "a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card"). *Id.* at 1288 n. 10, 1283 n.2.

The instant case is not about the DPPA or about the disclosure of mailing lists for mass marketing; it is about *intimate personal information*. The only similarity is that the three cases involve driver's licenses in some way. But here, the transgender Plaintiffs risk violence, harassment, and discrimination every time they have to reveal that they are transgender through showing their driver's licenses, in person, to a stranger, which is a concern not present in *Collier* or *Pryor*. Defendants do not deny that Plaintiffs' licenses let strangers know that they are transgender, which is exactly the sort of intimate information that is most confidential according to the federal courts. (Doc. 54, 30); *see e.g. Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 334 (D.P.R. 2018); *Love*, 146 F. Supp. 3d at 855; *Darnell v. Lloyd*, 395 F. Supp. 1210, 1214 (D. Conn. 1975).

B.  The Ability to Use a Passport in Some Circumstances Does Not Justify Violation of Plaintiffs' Privacy through Their Driver's Licenses

Defendants try to wave away the intimate nature of the disclosure and the danger it causes by declaring that "Alabama law requires Plaintiffs to display their driver license only in limited circumstances." In other words, Defendants' actions only result in legally-compelled disclosure of intimate information about Plaintiffs in circumstances that endanger them on

occasion, rather than all the time, and thus, in Defendants' estimation, the disclosure does not

matter. Defendants cite no case law for this curious philosophy.

In fact, Defendants disregard all cases specific to the issue at hand. The personal safety

and bodily integrity of transgender people becomes threatened when the government forces

information about transgender status to be disclosed. *See Doe v. Frank*, 951 F.2d 320, 324 (11th

Cir. 1992) (noting that there is "social stigma attached to being transgender"); *Whitaker ex rel.*

*Whitaker* 858 F.3d 1034,1051 (7th Cir. 2017); *In re E.P.L.*, 891 N.Y.S.2d 619, 621 (N.Y. Sup.

Ct. 2009). One's transgender status is a matter that can be "highly sensitive and [of a] personal

nature," disclosure of which creates "real danger of physical harm." *Frank*, 951 F.2d at 324.

Plaintiffs already experience this risk. Ms. Doe has been denied services by a bank teller who

told her she was going to hell after she saw Ms. Doe's license. Doe Dep. 78:11-79:4. Ms. Doe

has been harassed at restaurants and bars. Doe Dep. 35:19-23; 36:1-4; Doe Decl., at ¶ 17.

Even if the disclosure did only happen to law enforcement officers, that would still be too

much. When a police officer noticed the incorrect gender maker on Ms. Doe's license, he

disclosed that she was transgender to others, causing Ms. Doe to have to leave her job. Doe

Decl., at ¶ 15; Doe Dep. 35:3-18. When a police officer noticed the incorrect gender marker on

Ms. Clark's license, the officer's demeanor shifted rapidly from friendly to rude. Clark Dep.

33:6-14; 34:3-7. Ms. Corbitt was deeply frightened when her transgender status was publicly

disclosed within the hearing of a state trooper and the trooper began looking at her in a way she

could not interpret. Corbitt Dep. at 44:8-46:19. These fears are justified given an unfortunate

record of police misconduct against transgender people. *See* USTS at 14; *Violence Against the*

*Transgender Community in 2017*, Human Rights Campaign, attached as Pls.' Ex. 71.

Courts have consistently concluded that denying transgender individuals the ability to change their sex on a driver's license or birth certificate infringes on their right to privacy. *See Love*, 146 F. Supp. 3d 848 at 856 ("[B]y requiring Plaintiffs to disclose their transgender status, the Policy directly implicates their fundamental right of privacy"); *K.L. v. State, Dep't of Admin., Div. of Motor Vehicles No. 3AN–11–05431 CI*, 2012 WL 2685183, *6 (Alaska Super. Ct. Mar. 12, 2012) ("[O]ne's transgender[] status is private, sensitive personal information"); *see also Arroyo Gonzalez*, 305 F. Supp. 3d at 333 ("forced disclosure of plaintiffs' transgender status violates their constitutional right to decisional privacy."). Courts find that these policies require individuals to use identification with a gender marker that conflicts with their lived sex, forcing them to reveal their transgender status to complete strangers, causing embarrassment and risk of bodily harm. *Love*, 146 F. Supp. 3d at 853; *see K.L.*, 2012 WL 2685183 at *7; *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1140 (D. Idaho 2018); *Arroyo Gonzalez*, 305 F. Supp. 3d at 333.

Defendants also suggest that transgender individuals in Alabama should start using passports as much as possible to avoid the unwanted disclosure of their transgender status. But Plaintiffs should not have to do so. Alabama may not condition access to a government benefit like a driver's license on giving up the right to privacy. *Lebron v. Sec'y, Fla. Dep't of Child & Fam.*, 710 F.3d 1202, 1217 (11th Cir. 2013). As more fully set forth in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, a driver's license functions as a valuable government benefit. Doc. 51, 23-25.

Moreover, as Defendants point out, the Plaintiffs can be—and have been—compelled to display their licenses to judges, peace officers, and state troopers under state law. Ala. Code § 32-6-9. They can also be compelled to show a license to other people if involved in a traffic accident. Ala. Code § 32-10-2. But that is only the tip of the iceberg. This Court recently held

25

that a state-issued photo ID is "a virtual necessity for most Americans[.]" *Doe 1 v. Marshall*, No. 2:15-CV-606-WKW, 2019 WL 539055, at *7 (M.D. Ala. Feb. 11, 2019) (citing *Wooley v. Maynard*, 430 U.S. 705, 715 (1977)) (internal citations omitted). Ms. Corbitt cannot obtain entry to spaces she must go for work with a passport. Corbitt Dep. 37:19-38:2. The sex designation on a driver's license could put a transgender Alabamian at risk if  pulled over by a police officer "on a dark country road," (Corbitt Dep. 58:1-21) "travelling by plane, applying for employment, applying for public benefits, filling prescriptions, purchasing alcohol, applying to and attending college, checking into a hotel, renting a car, voting, opening and using a checking account, using a credit or bank card, travelling internationally, [or doing any] number [of] other things that most of us take for granted." Gorton Decl., at ¶ 28.

Passports are valuable documents vulnerable to theft in a way that licenses are not. Katharine Lagrave, 4 Ways People Steal Your Passport, Conde Nast Traveler (Aug. 15, 2016), attached as Pls.' Ex. 63. Ms. Clark testified that she has worked in the food and beverage industry for over thirteen years and has "never had anyone to present a passport for age verification." Clark Dep. 79:3-15. She remarked that she would be "shock[ed]" if she ever saw a passport used to buy alcohol. *Id.* 79:19. In *Doe1*, the state also argued that "Plaintiffs could use a passport," to which this Court responded that "a passport is a poor substitute for a state-issued ID. Passports are cumbersome and highly sought-after on the black market. They also cost money. A passport book is $145, and a passport card is $65." *Doe 1*, No. 2:15-CV-606-WKW at *8. Indeed, Ms. Corbitt keeps her passport in her safety deposit box to prevent theft; Ms. Doe has had her use of a passport questioned when she has tried to check into a hotel; and Ms. Clark has never gotten a passport. Corbitt Dep 62:3-12; Doe Dep 79:13-18; Clark Dep. 71:1-12.

Having a passport does not protect Plaintiffs from the government forcing "them to disclose their transgender status in violation of their constitutional right to informational privacy. Such forced disclosure of a transgender person's most private information is not justified by any legitimate government interest." *Arroyo Gonzalez*, 305 F. Supp. 3d at 333. Plaintiffs may not be forced to go without a driver's license to avoid violation of their constitutional rights.

C.  Ms. Corbitt and Ms. Clark Retain a Privacy Interest in Deciding Whether and When to Disclose Their Transgender Identity.

Defendants argue that Ms. Corbitt and Ms. Clark lose all constitutional protection of their privacy with regard to their transgender status because they have disclosed that they are transgender to other people in some contexts. But the Constitution does not permit the government to violate the right to privacy of private parties just because they have not kept their intimate personal information completely secret. *See Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (citing *Katz v. United States*, 389 U.S. 347, 351-52 (1967)) (A "person does not surrender all Fourth Amendment protection by venturing into the public sphere. To the contrary, 'what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.'"); *Ann-Margret v. High Soc. Magazine, Inc.*, 498 F. Supp. 401, 404 (S.D.N.Y. 1980) (a public figure "does not, simply by virtue of his or her notoriety, lose all rights to privacy[.]").

Telling one group of people something personal is not the same as being forced to tell the public at large. The Fifth Circuit recognized a substantial privacy interest in financial records including assets and sources of income. *See Plante v. Gonzalez*, 575 F.2d 1119, 1135 (5th Cir. 1978).[2] That was true even though some people inevitably would already have access to that

---

[2] *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (decisions of Fifth Circuit from before Circuit split continue to be binding in Eleventh Circuit).

information—at a minimum, the IRS, financial institutions and employers, and probably also close family members, co-workers, business associates, lawyers, and accountants.

Sharing one's intimate personal information in a public context does not waive one's constitutional right to privacy. This Court ruled that a teacher did not lose her constitutional right to privacy because she answered "questions about her sexual relations before the Covington County Board of Education." *Drake v. Covington Cty. Bd. of Educ.*, 371 F. Supp. 974, 980 (M.D. Ala. 1974). The teacher had been fired for alleged immorality because she had gotten pregnant while unmarried. This Court found that the cancellation of her teaching contract violated the teacher's "constitutional right of privacy." *Id.* at 979. In reference to the teacher discussing her sexual relations publicly, the concurrence states, "While it is true that an individual may lose his tortious right of privacy by openly and publicly discussing a particular matter, courts indulge in every reasonable presumption against the waiver of constitutional rights." *Id.* at 980. "A waiver of constitutional rights in any context must, at the very least, be clear." *Fuentes v. Shevin*, 407 U.S. 67, 95 (1972); *see also Sedersten v. Taylor*, No. 09-3031-CV-S-GAF, 2009 WL 4802567, at *3 (W.D. Mo. Dec. 9, 2009) (finding that a person does not waive his or her constitutional rights by posting a comment online).

Defendants propose that Ms. Corbitt and Ms. Clark accept the risk of harm, death, and humiliation when showing their driver's licenses to strangers in bars, at airports, on dark country roads, at hotels, at car rental locations, at job locations, at pharmacies, at government offices, at colleges, at polling places, at banks, at any place where a credit or bank card might be used, at any location where there might be any interaction with court personnel, and at any location where there might be any interaction with law enforcement officials because they have shared that they are transgender through social media and at transgender or LGBTQ events. Making

28

tailored disclosures to a limited, friendly audience in person or to those who specifically search for one's name online is not the same as being forced to reveal one's transgender status in person to potentially hostile strangers. The latter is what Policy Order 63 forces on the Plaintiffs.

Plaintiffs did not waive their right to privacy when they chose to share personal information with a select group of people who chose to attend a transgender or LGBT-specific event, or to people who sought out their social media pages. *See* Corbitt Dep. 59:11-21; Clark Dep. 80:1-82:6; *Fuentes*, 407 U.S. 67 at 95. Like the teacher in *Drake*, Ms. Clark and Ms. Corbitt have made disclosures to a public audience—arguably a much friendlier and narrower audience than a public school board hearing; like the teacher in *Drake*, they have not lost their right to privacy. In the same way, one does not lose one's right to privacy in not having police conduct an unwarranted search of one's home because of having church meetings on Friday nights in one's living room. *See Carpenter*, 138 S. Ct. at 2217.

When Plaintiffs have to show their driver's licenses, they are more likely to be face-to-face with someone whose reaction to this information is unpredictable, in a situation where they do not have friends or allies nearby. *See* Corbitt Dep. 41:11-43:21; Clark Dep. 82:7-20. Dealing with hate messages sent through social media or offensive reactions from an audience member when surrounded with other transgender people does not carry nearly the same level of immediate material threat. Also, crucially, in settings like an LGBT event or Facebook page, it is the Plaintiffs' own choice whether and how to disclose their private information. *See* Corbitt Dep. 58:1-21; 59:11-21; Clark Dep. 80:1-10, 81:12-82:20.

The Constitution does not permit the government to force the Plaintiffs to disclose their transgender status in circumstances where they would never have otherwise done so just because they do not keep this information completely secret.

D.  <u>Jane Doe Does Not Share Her Transgender Identity Publicly.</u>

While even if she had deliberately disclosed her transgender identity to the public she still would not have waived her privacy rights, Ms. Doe tries to avoid letting other people know that she is transgender. Unlike Ms. Clark and Ms. Corbitt, and in part because of her experience of hate violence, Ms. Doe chooses to keep her trans identity as private as possible. Doe Decl. ¶ 8, 14. The Defendants wildly mischaracterize Ms. Doe's testimony. The deposition transcript makes clear that Ms. Doe endeavors to keep her trans identity private, and that when she has not succeeded in doing so, it has usually been her driver's license that has caused her identity to become exposed. At most, these facts are disputed and do not warrant summary judgment for Defendants.

First, Jane Doe states that she does not identify herself as "trans out in public, however, I have been identified as a transperson." Defendants mischaracterize Ms. Doe's testimony in their brief, stating "Doe's friends know she is transgender and she is open as a transgender woman at her current job." Doc. 54, 33. Ms. Doe is a middle-aged woman who only recently socially transitioned. Her friends know that she is trans because when they first met her, they perceived her to be a man, and now, they know that she is a woman. Doe Dep. 50:5-9. The only way her friends would not know she is trans is if all her friends had abandoned her when she transitioned, and she had to make entirely new friends. Thankfully, that did not come to pass.

People at work only know that Ms. Doe is transgender because of her driver's license. Ms. Doe explains, "when I had to go through HR and my driver's license was incongruent with—the gender marker and name was off. So working with insurance trying to figure out how they were going to file the insurance it came out obviously that I was trans—a trans individual." *Id.* 50:21-51:8. Thankfully, this employer did not discriminate against her. But involuntary

disclosure of trans identity through her driver's license is not the same as publicly broadcasting her trans identity because she wishes to do so.

As for Ms. Doe's Facebook page, Ms. Doe had no idea that her profile picture was publicly viewable even though her account was otherwise set to friends only. "They shouldn't be able to see anything I post. I don't post public." Doe Dep. 52:21-23. "Again, I didn't know the public would have that readily available to my posts." Doe Dep. 64:3-5.  Many Facebook users do not fully understand what data on their Facebook profile is publicly accessible. Will Oremus, Facebook Changed 14 Million People's Privacy Settings to "Public" Without Warning, Slate (June 7, 2018), attached as Pls.' Ex. 60; Brian Barrett, The Facebook Privacy Setting That Doesn't Do Anything At All, Wired (March 27, 2018), attached as Pls.' Ex. 61; Alex Hern, Facebook is Chipping Away at Privacy—and My Profile Has Been Exposed, The Guardian (June 29, 2016), attached as Pls.' Ex. 62. No evidence suggests that Ms. Doe had any knowledge that her profile picture could be viewed by the public.

But regardless, the only way in which her picture alluded to transgender identity was through including slogans as "banners," such as "Transpeople Won't Be Erased." Doe Dep. 62:18-21. That is not the same as disclosing one's transgender identity. In fact, Ms. Doe also had a "banner" on her profile picture that states, "Together Against Antisemitism," although Ms. Doe is not Jewish. Doe Dep. 77:4-11. When someone tweets "#BlackLivesMatter," that statement alone does not disclose the race of the tweeter—people of all races have tweeted that message. If someone updates a Facebook status saying, "End HIV Stigma," someone reading that Facebook page still would not know whether the poster was living with HIV. And if the poster were in fact living with HIV, they would still have a constitutional right to privacy preventing the government from disclosing that information to others without sufficient justification. While Ms.

Doe at one point misspoke when answering a question about whether her driver's license disclosed anything about her transgender status that she did not disclose through Facebook, she clarified later during that same deposition that her license does convey that she is transgender, something that people cannot learn from her Facebook profile. Doe Dep. 75:16-76:11. Defendants' brief includes the misstatement and omits the clarification.

Grasping at straws, Defendants also claim that Ms. Doe publicly revealed that she is a transgender woman by staffing an outreach table for her employer at a transgender community event. Other people staffing tables at the event were not transgender. Doe Dep. 76:21-23. Many of the people attending the event were not transgender. Doe Dep. 77:1-3. The banner at the event read "TAKE." *Id.* at 59:19-60:3. One would have to approach close enough to read the smaller print to find out that TAKE stands for Transgender Awareness Knowledge and Empowerment. *Id.* at 60:4-6. There is no reason to assume that anyone would know that Ms. Doe was transgender simply because her work brought her to that location.

Defendants' arguments imply that to retain any right to privacy with regard to her transgender status, Ms. Doe would have to shun the transgender community completely, and avoid endorsing any message acknowledging the humanity of transgender people. The constitution contains no such requirement. The "constitutional right to privacy does not [force plaintiffs] to keep secret matters that are of an intimate or personal nature." *Drake*, 371 F. Supp. at 981 n.4.

III. **Defendants Are Not Entitled to Summary Judgment Because They Have Conditioned a Government Benefit on Plaintiffs Giving up Their Right to Refuse Medical Care**

Policy Order 63 also infringes on Plaintiffs' fundamental right to refuse medical care. Defendants attempt to reformulate the right at stake and argue that it is not fundamental. But the right is not to obtain "a driver license with a sex designation of the gender with which they

identify without having a surgical change of sex characteristics that include genital reassignment." Doc. 54 at 35. Rather, the right is that of a competent adult to refuse sterilizing surgery. *See* Gorton Decl. ¶ 43. This right is fundamental. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990); *Skinner v. Oklahoma*, 316 U.S. 535, 541-42 (1942).

Defendants also assert that they do not condition a driver's license on receipt of such surgery. It is true that Ms. Clark and Ms. Doe currently have Alabama driver's licenses, and that Ms. Corbitt could obtain one were she willing to attest to a painful lie, give up her accurate and safely useable out-of-state license, and sacrifice her dignity. What none of the Plaintiffs have, and what none of them can get while Policy Order 63 stands, is an Alabama driver's license that accurately states their sex, or that they can use without putting themselves in danger of harassment, discrimination, and violence and contradicting their fundamental sense of self. They could only obtain that benefit, a benefit available to Alabama drivers who are not transgender without condition, if they underwent surgery that would permanently end their reproductive capacity, that may not be in their medical best interests, that they may not be able to afford (Ms. Doe cannot), that they may not want (Ms. Clark does not), and that may not accord with their understanding of what God wants for them at this time (for Ms. Corbitt, it does not). Doe Decl. ¶ 20; Clark Dep. 43:1-4; Corbitt Decl. ¶ 13-14.

Defendants note that some courts have found force feeding of detainees acceptable. Courts have also, however, found that detainees have diminished rights as compared to people who are not in detention, like Plaintiffs. *See e.g. Turner v. Safley*, 482 U.S. 78, 89 (1987).

But it is notable that even in those situations where people are both incarcerated and not competent to make their own decisions, they still cannot be subjected to treatment against their

will unless procedural safeguards are in place, the government proves that treatment is medically appropriate, and the government proves that no less restrictive means are available to accomplish government objectives. *See e.g., Sell v. United States*, 539 U.S. 166, 180-81 (2003) (holding that the government may only forcibly medicate someone who is not otherwise competent to stand trial for a crime if important governmental interests are at stake; the involuntary treatment will significantly further those interests; and involuntary treatment is necessary to further those interests and in the person's best medical interest); *United States v. Diaz*, 630 F.3d 1314, 1331 (11th Cir. 2011) (holding government bears burden of proof by clear and convincing evidence to impose treatment on someone under *Sell*); *Washington v. Harper*, 494 U.S. 210, 221 (1990) (requiring individualized showing that prisoner has a serious mental illness, is dangerous to self or others because of that serious mental illness, and that involuntary medication would be in the applicant's medical interests). In the case cited by Defendants, the court found involuntary treatment necessary to preserve the life of the detainee. *In re Soliman*, 134 F. Supp. 2d 1238, 1257 (N.D. Ala. 2001). Defendants have made no showing here that treatment with genital surgery is necessary to preserve the lives of Plaintiffs, or even that it would be medically appropriate.

That Defendants have not literally physically forced sterilizing surgery on Plaintiffs against their will is no answer. "'[W]hat the state may not do directly it may not do indirectly.'" *Lebron.*, 710 F.3d at 1217, quoting *Bailey v. Alabama*, 219 U.S. 219, 244 (1911).

## IV. Defendants Are Not Entitled to Summary Judgment Because Their Policy Compels Speech

Defendants argue that they are entitled to summary judgment because the sex designations on licenses constitute government speech, and Plaintiffs only need to show their licenses to others in limited circumstances. They are mistaken.

34

It is true that the sex designation on a driver's license is government speech. But that is the beginning, not the end, of the analysis. While the government is entitled to speak on its own behalf, it may not compel anyone to endorse, carry, or associate themselves with a message with which they disagree. In *Walker*, the plaintiff was trying to make the state government issue a new sort of specialty license plate that conveyed the plaintiff's message, not objecting to a message the government forced the plaintiff to carry. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2252–53 (2015). As the Supreme Court explained in that case, "Our determination that Texas's specialty license plate designs are government speech does not mean that the designs do not also implicate the free speech rights of private persons . . . [W]e have recognized that the First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees." *Id.*

Defendants contend that "Plaintiffs sex designations on their licenses do not express the ideological message that they are somehow not 'real' women, but rather communicates information to law enforcement officers about their physical description." Doc. 54 at 39-40. But a male sex designation does express the message that Plaintiffs are not "real" women. It is difficult to imagine any more direct way to express that ideology, or to compel individuals to endorse it. Even if the sex designation were merely "information," as Defendants assert, that would not save it from constitutional infirmity. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797–98 (1988) ("These cases cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech").

Indeed, Defendants appear to concede that the sex designation on a license is speech with which the Plaintiffs disagree, but contest whether Plaintiffs are compelled to associate with the

message. Defendants argue that under most circumstances, Plaintiffs do not need to show a driver's license. But the government is not permitted to compel individuals to speak at all; it is no defense to say that the government only compels the Plaintiffs to speak sometimes or to some audiences. One could as easily have argued that the plaintiff in *Wooley,* who objected to bearing the message "Live Free or Die" on his license plate, could opt not to drive or to leave his car in a garage. *Wooley*, 430 U.S. at 713. And even if Plaintiffs were never *required* to show their driver's licenses, the government may not condition receipt of a benefit on giving a constitutional right. As described more fully above, that Ms. Corbitt and Ms. Doe have passports and Ms. Clark is eligible to obtain one is beside the point.

Defendants also argue that a reasonable person would not associate Plaintiffs with the message about their sex contained on their driver's licenses. But that is simply not so. A reasonable person would assume that, when showing a driver's license, the license holder represents that the information on the license is an accurate description. At the least, Plaintiffs have produced sufficient evidence to permit a reasonable factfinder to so find.

While Defendants assert that the facts of this case more closely resemble *Mayle* than *Wooley*, the opposite is true. In *Wooley,* the Court found that drivers had the right to avoid becoming a courier for the message "Live Free or Die" through bearing it on a license plate. In *Mayle,* the court found that a reasonable person would not associate someone with the message "In God We Trust" when using U.S. currency. Currency is wholly fungible by design and function; a single bill may change hands hundreds of times before it leaves circulation. Gottfried Leibbrandt, *How fast is that buck? The velocity of money,* Statistics of Payments, Swift Institute, (2012), attached as Pls'. Ex. 65. Its primary purpose is not expressive, and it makes no statement specific to any individual holder of currency. It may well be that "the recipient of cash in a commercial

transaction could not reasonably think that the payer is proselytizing." *Mayle v. United States*, 891 F.3d 680, 686 (7th Cir. 2018), *cert. denied*, No. 18-583, 2019 WL 113170 (U.S. Jan. 7, 2019). By contrast, unlike a dollar bill that hundreds or thousands of people use, each driver's license is unique to each individual, and the viewer of a driver's license would have every reason to believe that the presenter of the license represents the contents to be true. One is guilty of a felony if one presents false identification. Ala. Code §§ 17-17-28; 13A-8-194. Defendants' expert stated that a transgender man could be arrested for possession of a false instrument because of the disparity between a female sex designation and a masculine appearance. Leach Dep. 57:19-58:10.

A driver's license is a non-fungible document one must carry at all times while driving. Ala. Code § 32-6-9(a). Its primary purpose is expressive. Indeed, its purpose is to convey a message identifying and describing the individual who carries it—in Chief Pregno's words, to "prove you are who you say you are." Pregno Dep. 53:18-54:1. That 99% of people who carry Alabama licenses agree with its message about their gender does not negate the right of transgender people "to refuse to foster…an idea they find morally objectionable." *Wooley*, 430 U.S. at 715. Here, Alabama literally "compel[s] its citizens to carry" a license with a message that offends the Plaintiffs' beliefs—indeed, their very sense of self. *See N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1566 (11th Cir. 1990).

## V. Defendants Are Not Entitled to Summary Judgment Because They Have Discriminated Against Transgender People Without Adequate Justification.

Policy Order 63 facially discriminates on the basis of sex. It serves no important government interest, nor is it even rationally related to a legitimate government interest.

### A. Defendants Have Discriminated Against Plaintiffs Because of Sex.

Defendants argue that Policy Order 63 does not discriminate on the basis of sex or transgender status and merely has a disparate impact on transgender people. But a reasonable

fact-finder could conclude that when Defendants created and enforced a policy that prevents transgender people from changing their sex designation without undergoing genital surgery, they were acting on the basis of sex and transgender status.

Defendants downplay the intent behind the policy by asserting that it only disproportionately impacts transgender people. In fact, it only applies to transgender people. It is true that the record shows that one intersex person was able to obtain a change of sex designation on a driver's license. Defs.' Ex. 16, (D1165). Most intersex people are not transgender—that is, they identify with the sex they were assigned at birth. Some intersex people are transgender— that is, they identify with a sex other than the one they were assigned at birth. Interestingly, though, Defendants' brief suggests that they view intersex and transgender as mutually exclusive groups. Doc. 54 at 43 ("But it does not *solely* affect transgender individuals but also, for example, those with intersex conditions."). To the extent they do not see any intersex people as transgender, that may explain why the record shows that Defendants approved a change of sex designation for an intersex applicant without proof that the applicant had undergone surgery. Defs.' Ex. 16, (D1165).  Rather than disprove discrimination against transgender people, that fact tends to show deliberate targeting of transgender people.

People who are not transgender in Alabama can get a driver's license that accurately reflects their gender and that they can use without contradicting their fundamental sense of self and exposing themselves to risk of violence. They can do this regardless of whether they have ever had any sort of surgery. They can do this without permanently losing their fertility. *See* Gorton Decl. ¶ 43. They can even do this if they do not have genital anatomy typical for their gender, as sometimes happens for those who are born with intersex conditions, undergo

treatment for cancer or certain other conditions, or experience traumatic injury to the genital area. *See* Gorton Decl. ¶ 51.

By design, Defendants' policy subjects *only transgender people* to a requirement that they undergo genital surgery (or amend the sex designation on a birth certificate, which typically also requires surgery) and share proof of that surgery with the government before they can obtain a driver's license that accurately reflects their sex and that they can use safely. No reasonable factfinder would conclude that Defendants did not intend Policy Order 63 to function in exactly that way, *because of* Defendants' views about sex and transgender people.

B. Policy Order 63 Cannot Survive Heightened Scrutiny.

Defendants claim that their policy survives heightened scrutiny. They are mistaken. Defendants quote portions of the opinions in *United States v. Virginia*, 518 U.S. 515 (1996), and *Nguyen v. INS*, 533 U.S. 53 (2001), out of context to defend their policy. The portion of *United States v. Virginia* quoted by Defendants does acknowledge differences between men and women, but goes on only to state that those differences can justify affirmative action programs for women. *Virginia*, 518 U.S. at 533. Defendants have produced no evidence to suggest they discriminate against transgender people to create affirmative action programs, nor would any such evidence be credible on these facts.

In *Nguyen v. I.N.S.,* the Court accepted different statutory treatment of a U.S. citizen parent who gives birth to a child compared to a U.S. citizen parent who does not give birth for purposes of determining whether a child receives U.S. citizenship. In that case, the Court held that proof of the parent-child relationship was an important government interest, and that it made sense not to require the same proof from parents who literally give birth to their children— making parentage obvious—as from parents who contribute genetic material but do not give

birth. *Nguyen*, 533 U.S. at 62. The context here could hardly be more different. Whether one can or has given birth simply has no relevance to identification or ability to drive.

Defendants offer two government interests to justify their policy. First, they offer the interest of maintaining consistency with the state birth certificate policy. But they provide no explanation at all of why that interest is important.

Many states do not have a consistent policy for changing sex designation on driver's licenses and birth certificates. For example, in Arkansas, to change the sex designation on one's birth certificate, one must show a court order stating that sex has been changed "by surgical procedure." Ark. Code Ann. § 20-18-307(d). But to change the sex designation on one's driver's license, one simply needs to indicate whether one prefers F, M, or X to be listed, with no medical documentation required. Email from Gayle Boliou, Supervisor, Driver Services, Department of Finance and Administration, re Forms Request (Apr. 7, 2011), attached as Pls.' Ex. 66; Curtis M. Wong, Arkansas Has Been Offering a Nonbinary Gender Option on State IDs for Years, Huffington Post (Oct. 17, 2018), attached as Pls.' Ex. 67.

In the District of Columbia, one needs a signed statement from a medical provider stating that the applicant has "undergone surgical, hormonal or other treatment appropriate for the individual for the purpose of gender transition" to change the sex designation on a birth certificate. District of Columbia Department of Health, Gender Designation Policies, Procedures, and Instructions, attached as Pls.' Ex. 68.  But to change the sex designation on a D.C. driver's license, one simply needs to fill out a form stating whether one wants M, F, or X to appear on one's license. District of Columbia Dep't of Motor Vehicles, Procedure for Establishing or Changing Gender Designation on a Driver License of Identification Card (2017), Pls.' Ex. 22.

Similarly, in Massachusetts, one needs an affidavit from a medical provider stating that the applicant "has completed medical intervention, appropriate for the patient, for the purpose of permanent sex reassignment" to change the sex designation on a birth certificate. Registry of Vital Records and Statistics, Massachusetts Dep't of Pub. Health, Physicians Statement in Support of Amendment of a Birth Certificate Following Medical Intervention for the Purpose of Sex Reassignment (Apr. 1, 2016), attached as Pls.' Ex. 69. But to change the sex designation on a driver's license, one simply needs to submit an attestation of one's gender identity. Registry of Motor Vehicles, Massachusetts Gender Designation Change Form, attached as Pls.' Ex. 70.

Neither during depositions nor now in briefing have Defendants offered the slightest rationale for why consistency between these two standards matters to the government. No evidence suggests that Alabama has unique interests in maintaining consistency between birth certificate and driver's license standards. Chief Pregno could think of no reason why Alabama's needs might differ from those of other states. Pregno Dep. 118:19-119:1.

The importance of this interest is also belied by the state's own law and policy. Birth certificates and driver's licenses inevitably have numerous inconsistencies. For example, birth certificates record information about parentage and place of birth not included on driver's licenses. Driver's licenses record information about current address and driving restrictions not included on birth certificates. It is possible for people to amend the name on their birth certificate but not the name on their driver's license or vice versa. Pregno Dep. 105:14-18. It is possible for people to amend the sex designation on their birth certificate but not the sex designation on their driver's license or vice versa. Pregno Dep. 105:19-23. State statute creates a judicial procedure for changing the sex designation on a birth certificate and has created no comparable judicial procedure for changing the sex designation on a driver's license. Ala. Code § 22-9A-19. If

41

consistency between birth certificates and driver's licenses were truly an important government interest, Alabama has done a poor job serving it.

Second, Defendants assert an interest in law enforcement identification. However, it is undisputed that this interest is post hoc. According to the 30(b)(6) testimony of Chief Pregno, who issued the most recent version of the policy, law enforcement identification was not considered at the time the policy was created or revised. Pregno Dep. 45:3-12; 47:4-23.

Defendants claim that their expert's testimony about this interest is not post hoc because of an Eleventh Circuit decision issued late in 2018. Defendants misunderstand the meaning of post hoc. What is relevant for constitutional purposes is why the government actually created Policy Order 63 at the time it created it, not what happens later. *Virginia*, 518 U.S. at 533; *Glenn v. Brumby*, 663 F.3d 1312, 1321 (11th Cir. 2011).

Even if somehow consideration of law enforcement identification were appropriate under heightened scrutiny, Policy Order 63 does not substantially further that interest. Policy Order 63 makes law enforcement identification of individuals more difficult, because it prevents them from having access to the most up-to-date and salient information about a person's sex. *K.L.*, 2012 WL 2685183, at *7; *F.V.*, 286 F. Supp. 3d at 1142; *Arroyo Gonzalez*, 305 F. Supp. 3d at 333. Moreover, most states in the country achieve their interests in law enforcement identification without resort to a surgical requirement for changing the sex designation on a license. *Love*, 146 F. Supp. 3d at 857 (noting "[a]t least 25 of the states and the District of Columbia do not require a transgender person to undergo surgery to change the gender on his or her driver's license or state ID card"). Alabama's interests in law enforcement identification of license holders are no different than the rest of the country. Pregno Dep. 118:19-119:1.

C. Policy Order 63 Does Not Survive Even Rational Basis Review.

Policy Order 63 is subject to heightened scrutiny. Even if it were not, though, it would still violate the Equal Protection Clause for the reasons more fully set out in the Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment. Doc. 51, 33-43. The policy does not further an interest in identification.

It is true, as Defendants point out, that most people are not transgender. But that does not give ALEA a rational basis for requiring that transgender people undergo surgery before correcting the sex designation on their license. Defendants cite *Carcaño v. McCrory*, 203 F. Supp. 3d 615 (M.D.N.C. 2016). In that case, a district court granted transgender Plaintiffs a preliminary injunction preventing a law from going into effect that would have prevented anyone from using restrooms designated for a sex other than the one listed on their birth certificate, finding that the law was likely to violate Title IX. *Id.* at 622. However, the court noted in dicta that the law was not likely to violate the Equal Protection Clause because it applied to everyone and worked fine for the vast majority of people, because the vast majority of people are not transgender. *Id.* This reasoning is faulty, non-binding, and distinguishable. Plaintiffs challenge Policy Order 63's requirement that transgender people must undergo surgery before correcting the information on their driver's licenses. This requirement applies exclusively to transgender people, so it is irrelevant how many non-transgender people there are as compared to transgender people. Meanwhile, Defendants make no attempt to distinguish the cases that address the actual issue in this case, nor could they. *F.V.*, 286 F. Supp. 3d at 1140; *Arroyo Gonzalez*, 305 F. Supp. 3d at 333; *Love*, 146 F. Supp. 3d at 853; *K.L.*, 2012 WL 2685183 at *7. The well-reasoned opinions in these cases establish that surgery policies for driver's licenses or birth certificates do not serve the state's interest in identification.

Defendants use the term "physiognomy" throughout their briefing, as did their expert in his report and testimony. The use of this term demonstrates Defendants' and Defendants' expert's profound misunderstanding of the relevant facts and science. Physiognomy is a pseudoscience. It refers to determining a person's ethnicity and character based on facial features. Gorton Decl. ¶ 42. During the period of eugenics, "experts" in the United States and Germany claimed that physiognomy proved that people of African descent were less intelligent than people of European descent, and that Jewish people were inherently deceitful. Gwen Sharp, *Physiognomy: Face, Bodies, and the "Science" of Human Character,* Sociological Images 6 (Jan. 30, 2015), attached as Pls.' Ex. 75; Marissa Alperin, *Constructing Jewish Bodies in Germany through Physical Culture and Racial Pseudo-Science 4* (2018), attached as Pls.' Ex. 76.

The repeated use of the term in Defendants' brief is particularly chilling in the context of this case, where they defend a policy requiring Plaintiffs to undergo a sterilizing surgical procedure before receiving a driver's license that they can use without risking a variety of negative outcomes, ranging from employment discrimination to physical attack. *See* USTS at 89-90 (describing mistreatment transgender people experience when presenting identification inconsistent with their gender presentation); *c.f. In re Opinion of the Justices*, 230 Ala. 543, 547 (1935) (advising that an Alabama bill providing for expanded sterilization of people deemed mentally unfit would violate state and federal due process protections). In both ways, the state's position harkens back to an era when the state identified people it deemed undesirable and subjected them to involuntary sterilization.[3] While what the state does here is thankfully not

---

[3] Two hundred twenty-four people deemed mentally deficient were subjected to involuntary sterilization in Alabama under a 1919 law.  Lutz Kaelber, *Eugenics: Compulsory Sterilization in 50 States: Alabama* (2012), attached as Pls.' Ex. 77. Multiple attempts were made to expand the

nearly as direct as past atrocities, ultimately its basis is just as spurious, and it causes very real harm to a group with little political power.

Even if Defendants had used the terms anatomy and physiology, their understanding of sex would remain oversimplified at best. Sex is not restricted to genitalia, but also includes internal reproductive organs, hormone levels, secondary sex characteristics like breasts and facial hair, and the gender identity that arises from the central nervous system. Defendants' expert, a former correctional administrator, does not have the qualifications to counter Plaintiffs' expert, a medical doctor with extensive clinical and research expertise in transgender health, on these points.

It is true that Defendants' expert testified that it is helpful for correctional agencies to have information about some aspect of sex on a driver's license. But he never testified that it was any more useful to have information about genital anatomy than gender identity, or that surgical status mattered more than gender identity. To the contrary, he explicitly declined to express any opinion as to the most useful definition of sex for correctional purposes, and testified that a policy that reflected gender identity on a driver's license would also satisfy correctional interests. Leach Dep. 32:9-19.

The fact that jails sometimes misclassify women, putting them in danger, undermines rather than supports Defendants' argument. In *De Veloz v. Miami-Dade Cty.*, a woman who is not transgender was placed in a male facility because jail staff wrongly assumed she was a transgender woman. No. 17-13059, 2018 WL 6131780, at *4 (11th Cir. Nov. 21, 2018). If anything, this case shows that jail staff do not consider the sex designation on driver's licenses in

---

law to authorize sterilization of "sexual perverts" and "homosexuals" in the 1930s. *Id.* Involuntary sterilization occurred in Alabama as recently as 1973. *Id.*

making classifications; in *De Veloz,* jail staff made the placement solely because the woman in question took estrogen, not because of the sex designation on her license. *Id.* And in fact, the risks that the woman in that case experienced are shared by transgender women placed in men's facilities against their will. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 830 (1994) (transgender woman beaten and raped within weeks of placement in the general population of a maximum security men's prison); *Giraldo v. Dep't of Corr. & Rehab*., 85 Cal. Rptr. 3d 371, 375 (Cal. Ct. App. 2008) (transgender woman raped repeatedly in men's prison); *Shaw v. D.C.*, 944 F. Supp. 2d 43, 52 (D.D.C. 2013) (transgender woman "intimately and inappropriately touched" by male staff in male facility).

No federal or Alabama law or policy indicates that the sex designation on a license should be taken into account when deciding where to place transgender people in police lockups, jails, or prisons. Defendants' own expert stated that he would place transgender people based on where they preferred to be placed, not based on the sex designation on their license. Leach Dep. 98:8-15; 110:21-111:8; 112:8-15. Policy Order 63 does not improve jail safety in any way. Nor is it rationally related to any other legitimate state interest.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motion for summary judgment on all counts.

Respectfully submitted this 8th day of March 2019.

s/ Brock Boone
Brock Boone
Randall C. Marshall
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
bboone@aclualabama.org
rmarshall@aclualabama.org

Gabriel Arkles
Rose Saxe
ACLU LGBT & HIV Project / ACLU Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2605
rsaxe@aclu.org
garkles@aclu.org
*Admitted Pro Hac Vice*
**Counsel for Plaintiffs Darcy Corbitt, Destiny Clark, and Jane Doe**

## **CERTIFICATE OF SERVICE**

I certify that on March 8, 2019, I filed the foregoing electronically using the Court's CM/ECF system, which will serve all counsel of record.

s/ Brock Boone