# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **DARCY CORBITT**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:18-cv-91-MHT-GMB** |
| | ) | |
| **HAL TAYLOR**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Steve Marshall, Attorney General
Brad A. Chynoweth, Assistant Attorney General
Winfield J. Sinclair, Assistant Attorney General

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, AL  36130-0152
334/272-7300
334/353-8440 (fax)
bchynoweth@ago.state.al.us
wsinclair@ago.state.al.us

Counsel for Defendants Hal Taylor,
Charles Ward, Deena Pregno, and Jeannie Eastman

## Table of Contents

A.  Response to Plaintiffs' Statement of Facts ...........................................................1

B.  Argument ..........................................................................................................4

   1.  Policy Order 63 Does Not Violate Plaintiffs' Right to Privacy....................................4

   2.  Policy Order 63 Does Not Unconstitutionally Compel Plaintiffs to Receive Medical Treatment .................................................................................................7

   3.  Policy Order 63 Does Not Compel Speech....................................................7

   4.  Policy Order 63 Does Not Violate Plaintiffs' Equal Protection Rights........................9

      a.  Policy Order 63 is Subject to Rational Basis Review and Satisfies This Level of Scrutiny ..............................................................................................9

      b.  Policy Order 63 Does Not Unlawfully Discriminate Based on Sex and, Even Assuming Intermediate Scrutiny Applies, Satisfies This Level of Scrutiny .........14

      c.  Transgender Individuals Are Not a Suspect or Quasi Suspect Class Entitled to Heightened Scrutiny................................................................................22

C.  Conclusion ...................................................................................................22

Defendants Hal Taylor, Charles Ward, Deena Pregno and Jeannie Eastman file this response in opposition to Plaintiffs' motion for summary judgment (doc. 50).

A.   Response to Plaintiffs' Statement of Facts

Defendants largely do not dispute Plaintiffs' statement of facts, although Defendants dispute their legal relevance and materiality for the reasons set out in the argument section below. Accordingly, in response to Plaintiffs' Statement of Facts, Defendants reincorporate their Statement of Facts set out in their initial brief. Doc. 54 at 1-24. In addition, Defendants dispute or add clarification to the following specific facts cited in Plaintiffs' brief.

Plaintiffs state that Defendants "permit applicants to change other descriptive characteristics [i.e. aside from sex] listed on driver's licenses, such as height, weight, and hair color, without measurements or medical documentation." Doc. 51 at 4 ¶12. Defendants dispute this statement to the extent it implies Defendants allow individuals to self-certify these descriptive characteristics to be anything whatsoever but require medical documentation only for sex changes on licenses. First, no one can change the name on their driver license without providing a court order. (Doc. 48-5 at 31-32).  Second, Alabama Law Enforcement Agency ("ALEA") driver license examiners are trained not to allow individuals to change the descriptions of other physical characteristics to anything whatsoever based only on the licensee's self-report. (Doc. 48-7 at 131-33). Examiners are trained to allow licensees to make changes to these other physical descriptors only if the change is "something observable that's reasonable." (*Id.* at 132). For instance, Plaintiff Darcy Corbitt testified in her deposition that when she went to obtain an Alabama license in the Opelika field office, the license examiner asked her if her weight had changed and she reported that it had. (Doc. 48-2 at 42). Thus, while Defendants do not require medical documentation or

measurement of all other physical descriptors on a license, they do not allow licensees to self-report any physical description they want.

Plaintiffs cite examples of medical records accepted as sufficient for a sex change under Policy Order 63 despite not containing express references to genital reassignment surgery or "complete" gender reassignment surgery. Doc. 51 at 4-5 ¶¶ 14-18. Despite Plaintiffs' attempt to show Defendants have not consistently applied Policy Order 63, each Plaintiff was informed by an ALEA employee what documentation was required to change the sex designation on a driver license and could not supply the relevant documentation because they had not had sex reassignment surgery. (Doc. 48-14; Doc. 48-2 at 42-46; Doc. 48-1 at 36-45; Doc. 48-4 at 155-56; Doc. 48-3 at 48). Further, Defendants submitted the medical documentation of all third parties who successfully changed the sex designation on their license, and the records speak for themselves as to the consistency of the documentation accepted by Defendants. (Doc. 48-18). Plaintiffs' attempt to portray Defendants' application of Policy Order 63 as inconsistent is both inaccurate and a red herring insofar as it was accurately applied to Plaintiffs.

Plaintiffs cite to a 2016 American Association of Motor Vehicle Administrators Resource Guide as proof that most states do not require documentation of any specific form of medical or surgical treatment to change sex on a license. Doc. 51 at 6 ¶22. However, this same document shows that *nine* states, including Alabama, do have a surgery requirement. (Doc. 52-19 at ECF p. 28).

Defendants note that Plaintiffs do not dispute their expert Donald Leach's qualifications or his testimony that jail administrators must take sex into account in forming certain policies and that a uniform definition of sex, such as that provided by Policy Order 63, is useful for these purposes. Doc. 51 at 8-9. Rather, Plaintiffs cite Leach's testimony that a jail administrator could

2

use different definitions of "sex" than that in Policy Order 63 and some of his statements regarding sex-based policies given Leach's own, personal level of risk-tolerance. *Id.* at 8-9 ¶¶ 31-32.

Plaintiffs' Amended Complaint contains several allegations that Corbitt was referred to as a "he" or "it" by an ALEA employee in Lee County, Alabama in August 2017 when she went to get an in-state license. Doc. 38 ¶¶ 69-71. Corbitt testified about this exchange at her deposition. (Doc. 48-2 at 41-43). However, Plaintiffs submitted a statement from the examiner who interacted with Corbitt in which the examiner denies misgendering Corbitt and acknowledge the statement "suggests possible dispute over whether and by whom Ms. Corbitt was misgendered in the office." Doc. 51 at 11 n.3. Plaintiffs then state "[a]ny dispute on this point, however, *is not material*." *Id.* (emphasis added). Defendants agree that any dispute over whether the examiner misgendered Corbitt in August 2017 is immaterial to the claims and defenses in this lawsuit.

Defendants object to Plaintiffs' introduction of two news articles regarding the January 2019 murder of a transgender woman in Alabama. Doc. 51 at 20 ¶ 82; (Docs. 52-48; 52-49). Plaintiffs state that police "refused to identify the victim as a woman and did not acknowledge that she was transgender, disrespecting her in death and delaying broader awareness of the incident, in part because of her 'legal documents.'" Doc. 51 at 20 ¶ 82. Plaintiffs did not disclose these news articles in their initial disclosures, and Defendants have had no opportunity to investigate the relevance of the victim's identity documents to the murder investigation. Defendants request that the Court not consider these materials as these articles constitute pure hearsay and cannot be reduced to an admissible form at trial. Plaintiffs have produced no admissible evidence that Policy Order 63 impedes investigators' ability to solve murders involving transgender victims. To the contrary, Chief Pregno testified that ALEA was able to identify a transgender homicide victim at the request of a district attorney. (Doc. 48-5 at 59-61). The victim was identified as a female by

the medical examiner based on the presence of female genitalia due to sex reassignment surgery, and ALEA was able to link the victim's identity to her prior identity with its documentation of her sex change in its driver license records. (*Id.*).

Finally, Plaintiffs cite numerous provisions of Alabama law that "permit or require" a driver license for a variety of activities. Doc. 51 at 23-25 ¶¶ 94-97. However, most, if not all, of the provisions cited also allow individuals to use another form of identification, such as a United States passport, to engage in the given activity. Further, Plaintiffs present no proof that they wish to, for instance, apply for a real estate license or receive accreditation for lead hazard reduction. Doc. 51 at 24 ¶ 94. If any Plaintiff wished to apply for a real estate license or to receive accreditation for lead hazard reduction, she could do so using a United States passport. *See* Ala. Admin Code § 790-X-2-.01(2)(e); *Id.* 822-X-1-.05(d)(4). Plaintiffs currently possess, or have the ability to possess, a passport designating their sex as female. (Doc. 48-2 at 21; Doc. 48-1 at 68, 70; Doc. 48-3 at 32). Plaintiffs testified in their depositions that in nearly all of the situations in which they believed they would be harmed by having to display an Alabama license designating their sex as male, they could use a passport designating their sex as female instead. (Doc. 48-2 at 36-38, 61-64; Doc. 48-1 at 33-34, 72-74; Doc. 48-3 at 35-36, 69-71).

## B.  Argument

### 1.  Policy Order 63 Does Not Violate Plaintiffs' Right to Privacy

Defendants argued in their initial brief that under binding precedent there is no constitutional right to informational privacy in the personal information contained in motor vehicle records. Doc. 54 at 29-30. Defendants further argued that while people viewing Plaintiffs' licenses might infer they are transgender by viewing the sex designation and Plaintiffs' appearance, the licenses do not disclose Plaintiffs' transgender status in the manner required to amount to a

violation of the Due Process Clause, especially given Plaintiffs' ability to limit disclosure by using alternative forms of identification. *Id.* at 30-32.

Plaintiffs rely on persuasive precedent to argue that Policy Order 63 directly discloses their transgender status, and that this information is of a highly personal and sensitive nature. Doc. 51 at 45. However, the question in Count I is whether Policy Order 63 forces Plaintiffs to disclose their transgender status in a manner that amounts to a due process violation under the binding precedent in this circuit.

The only binding precedent cited by Plaintiffs regarding the right to informational privacy is *Hester v. City of Milledgeville*, 777 F.2d 1492, 1497 (11th Cir. 1985). Doc. 51 at 44.[1] In *Hester*, firefighters were required to take a polygraph test that involved answering "control questions" of a highly sensitive nature, such as whether they had ever done anything that would have discredited the department or resulted in their dismissal. *Hester*, 777 F.2d at 1496-97. The court held that given the limited nature of the questions and the limited disclosure required, the control questions did not violate the firefighters' due process rights. *Id.* In *James v. City of Douglas*, 941 F.2d 1539 (11th Cir. 1991), the plaintiff alleged that she provided a videotape of herself engaging in sexual activity with someone to police under a promise of confidentiality in connection with a request to investigate threats she had received. *James*, 941 F.2d at 1540-41. Members of the police department who were not involved with the investigation viewed the tape for their own gratification. *Id.* The court held that "a state official may not disclose intimate personal information

---

[1] Plaintiffs also cite the unreported decision of *Burns v. Warden, USP Beaumont*, 482 F. App'x 414, 417 (11th Cir. 2012). However, in that case the court held the inmate stated a claim for First Amendment retaliation but did not consider whether the inmate stated a right to privacy claim. *Burns*, 482 F. App'x at 417. Plaintiffs also cite dicta in *Doe v. Frank*, 951 F.2d 320 (11th Cir. 1992), listing transsexuality as a condition justifying allowing a plaintiff to proceed anonymously. *Doe*, 951 F.2d at 324. This case is irrelevant to the question of whether Plaintiffs' licenses disclose they are transgender under the circumstances required to amount to a due process violation.

obtained under a pledge of confidentiality unless the government demonstrates a legitimate state interest," and that the police officers viewing the video for their own personal gratification was not such an interest. *Id.* at 1543-44. Thus, *James* involved the *direct disclosure* of highly personal information for no legitimate government interest whatsoever.

In *Pryor v. Reno*, 171 F.3d 1281 (11th Cir. 1999), *rev'd on other grounds*, 528 U.S. 1111 (2000), the court distinguished *James* in holding that personal information contained in motor vehicle records was not confidential information giving rise to a constitutional right to privacy. *Pryor*, 171 F.3d at 1288 n.10 (distinguishing *James* because it "acknowledged a constitutional right to privacy only for intimate personal information given to a state official in confidence."); *see also Collier v. Dickinson*, 477 F.3d 1306, 1308 (11th Cir. 2007) (holding state department of motor vehicles did not violate constitutional right to privacy by selling personal information in motor vehicle records to mass marketers).

Here, the sex designation on Plaintiffs' driver licenses is not confidential information on which they can state a claim for a right to informational privacy. Their driver licenses, along with their birth certificates designating their male name and sex are public records, as are the orders from probate judges changing their male birth names to their current female names. All of these records, in a sense, "disclose" their transgender status by documenting their transition from the male gender to female. But though one can infer Plaintiffs are transgender from the personal information contained in these records, they do not disclose intimate personal information given to a state official in confidence. *See James*, 941 F.2d at 1544. Plaintiffs' driver licenses do not state "transgender" on the front. No Defendant or employee of Defendants has received Plaintiffs transgender status in confidence and disclosed it for no legitimate reason. Because there is no expectation of privacy in the personal information contained in these records, *Pryor* and *Collier*

are the more applicable cases. That is, disclosing personal information contained in driving records does not constitute the disclosure of confidential information acknowledged as actionable in *James*, even if an individual could indirectly infer Plaintiffs were transgender through this information.[2]

2.    Policy Order 63 Does Not Unconstitutionally Compel Plaintiffs to Receive Medical Treatment

In response to Plaintiffs' argument in support of their claim that Policy Order 63 unconstitutionally compels them to receive medical treatment, Defendants incorporate their argument as to this claim in their initial brief. Doc. 54 at 33-36. Policy Order 63 simply does not implicate any fundamental right of Plaintiffs. Nor does the surgery requirement for changing the sex designation on a driver license implicate the "unconstitutional conditions" doctrine because Defendants do not *condition* receipt of a driver license on having sex reassignment surgery. *See Lebron v. Sec'y of Fla. Dept. of Children & Families*, 772 F.3d 1352, 1374-75 (11th Cir. 2014) (holding state could not condition receipt of welfare benefits on requirement that individuals submit to suspicionless drug testing in violation of Fourth Amendment rights). Plaintiffs currently possess, or could possess, Alabama driver licenses, even though these licenses designate their sex as male in the absence of proof of sex reassignment surgery. Defendants reserve the right to make additional argument as to this claim in reply.

3.    Policy Order 63 Does Not Compel Speech

In response to Plaintiffs' argument in support of their claim that Policy Order 63 unconstitutionally compels speech, Defendants incorporate their argument as to this claim in their

---

[2] Defendants also maintain that Plaintiffs lack standing to assert their transgender status is confidential for the reasons already set out and reserve the right to restate this argument in a reply brief. Doc. 54 at 32-33.

initial brief. Doc. 54 at 36-41. Since Defendants argue a government-speech rather than compelled-speech paradigm is applicable, the parties are speaking past one another at this point and so Defendants reserve argument on this claim for their reply. However, they raise two points in this opposition brief.

First, Plaintiffs spend the bulk of their argument on this point on the factual message/ideological message distinction. Doc. 51 at 51-54. But the dispositive issue is not the content of the message but *who* is doing the speaking. Defendants argue it is the State who speaks under the three factors set out in *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2248-49 (2015). Since a "government entity has the right to speak for itself," it "is entitled to say what it wishes" and "to select the views that it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009). While Defendants maintain that "sex" on a driver license as defined by Policy Order 63 is not the same type of ideological message as "Live Free or Die," it is certainly a message that the State selects and wishes to convey to law enforcement officers for identification purposes. The information contained on a driver license would be of little value if the State did not convey some distinct meaning it wished to convey regardless of the individual meanings the bearers of the licenses might wish to convey.

This leads to Defendants' second point. If Plaintiffs are correct that the sex designation as defined by Policy Order 63 on a driver license is compelled speech, then this sex designation is a content-based speech restriction that must satisfy *strict scrutiny. See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). If that is so, then the speech restriction is permissible only if it is the least restrictive means to achieving a compelling government interest. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). But if that is true for a state's choice of how to define "sex" for purposes of identification on a driver license, then it would also be true for all other

information such as the licensee's name, date of birth, height, weight, hair color, and eye color. Under Plaintiffs' theory, if any individual citizen disagreed with the "message" conveyed by this information, the State would have to satisfy strict scrutiny to continue using the personal information. There are any number of citizens who might regard this personal information as forcing them to convey a message about themselves with which they disagree. Since the State would be unlikely to satisfy strict scrutiny with respect to any one piece of identifying information, Plaintiffs' theory of compelled speech would require the State to discontinue the use not only of driver licenses but any other identity document. Or, it could continue to do so, but only if each citizen were allowed to define the meaning of the terms on his or her document or select which items would appear based on his or her personal ideology. In sum, if Plaintiffs prevail on their compelled speech claim, it would have the odd result of compelling *the State* to express *their* message on documents traditionally created and controlled by the government as a medium of speech for the government. The Supreme Court could not have intended this result in *Wooley v. Maynard*, 430 U.S. 705 (1977). Therefore, Defendants are entitled to summary judgment on Plaintiffs' compelled speech claim.

4.   Policy Order 63 Does Not Violate Plaintiffs' Equal Protection Rights

   a.   Policy Order 63 is Subject to Rational Basis Review and Satisfies This Level of Scrutiny

Defendants argued in their initial brief that Policy Order 63 does not discriminate based solely on sex or transgender status and thus does not trigger the intermediate scrutiny applied to sex-based classifications. Doc. 54 at 42-43. Policy Order 63 provides a criterion for changing the sex on a driver license (other than to correct a typographical error) that applies equally to transgender and non-transgender individuals. A transgender individual whose gender does not match the sex initially assigned on his or her birth certificate must provide an amended birth

9

certificate or proof of sex reassignment surgery. A non-transgender individual who wishes to change his or her sex—whether due to an intersex condition such as Klinefelter's syndrome, a bad-faith attempt to manipulate a government identity document, or for any other reason—must meet the exact same criterion by providing an amended birth certificate or proof of surgery. Transgender individuals may otherwise enjoy the privilege of possessing an Alabama driver license and operating a motor vehicle on the same terms as non-transgender individuals.

However, Plaintiffs argue as follows:

> Policy Order 63 facially discriminates based on sex and transgender status. It establishes the only process for individuals to change the sex designation on their driver's licenses. The policy explicitly concerns sex, and prevents *only* transgender people from obtaining an accurate and safe driver's license without undergoing surgery and producing documentation of surgery to the government. Defendants treat transgender people differently than similarly-situated cisgender people.

Doc. 51 at 26 (footnote omitted). They elsewhere argue that Policy Order 63 "classifies people based on their transgender status for purposes of sex designations on licenses," and that the policy "specifically targets transgender people based on their nonconformity to sex stereotypes, and identification with a sex other than their sex assigned at birth," and that transgender individuals "are the only group that cannot get a license that reflects the sex with which they identify." *Id.* at 27. But this is not so for the reasons stated above: similarly-situated transgender individuals or non-transgender individuals with intersex conditions (*see* Doc. 48-18 at D1165) may change their sex designation if they meet Policy Order 63's criterion whereas those who cannot may not change their sex designation. The records produced by Defendants provide numerous examples of transgender individuals or individuals with intersex conditions who have successfully changed the sex designation on their license by satisfying Policy Order 63. (*See* Doc. 48-18). Thus, Policy Order 63 falls under the "general rule that legislation is presumed to be valid and will be sustained

if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. at 440 (1985).

Nevertheless, Plaintiffs argue that even if Policy Order 63 is subject only to rational basis review, it cannot satisfy even this level of constitutional scrutiny because it is arbitrary and based on animus. Doc. 51 at 33-43. Plaintiffs' argument fails to properly apply rational basis review to Policy Order 63. Rational basis review is "a paradigm of judicial restraint" and does not provide "a license for courts to judge the wisdom, fairness, or logic of legislative choices." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993). The question before a court applying rational basis review is whether the government's policy is rationally related to a legitimate state interest. *See Heller v. Doe*, 509 U.S. 312, 320 (1993). Under this standard, a government policy "is accorded a strong presumption of validity" and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 319-20; *see also Beach Commc'ns*, 508 U.S. at 315 (stating "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated" the state actor). This is true "even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale seems tenuous." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

The Supreme Court, in its most recent application of rational basis review, stated the following:

> Given the standard of review, it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny. On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a "bare ... desire to harm a politically unpopular group." *Department of Agriculture v. Moreno*, 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). In one case, we invalidated a local zoning ordinance that required a special permit for group homes for the intellectually disabled, but not for other facilities such as fraternity houses or hospitals. We did so on the ground that the

11

> city's stated concerns about (among other things) "legal responsibility" and "crowded conditions" rested on "an irrational prejudice" against the intellectually disabled. *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 448–450, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (internal quotation marks omitted). And in another case, this Court overturned a state constitutional amendment that denied gays and lesbians access to the protection of antidiscrimination laws. The amendment, we held, was "divorced from any factual context from which we could discern a relationship to legitimate state interests," and "its sheer breadth [was] so discontinuous with the reasons offered for it" that the initiative seemed "inexplicable by anything but animus." *Romer v. Evans,* 517 U.S. 620, 632, 635, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

*Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018). Plaintiffs attempt to fit Policy Order 63 into the extremely rare instance of a policy that lacks any conceivable rationale other than a bare desire to harm a politically unpopular group. *See* Doc. 51 at 33-43.

Policy Order 63 serves the legitimate government interest in maintaining consistency between the sex designation on an Alabama birth certificate and an Alabama driver license. It is rationally related to this interest because changing the sex on either document requires proof of sex reassignment surgery. Policy Order 63 serves the legitimate government interest of providing information related to physical identification primarily for law enforcement purposes. It is rationally related to this interest by providing a clear definition of "sex" in terms of physical sex characteristics of statewide applicability to allow law enforcement officers to form appropriate arrest, booking, and search procedures, as well as procedures for the provision of medical treatment.

Defendants have presented undisputed evidence that Alabama requires proof of sex reassignment surgery to amend a birth certificate to change a sex designation, and that this statutory requirement regarding birth certificates has been in effect since 1992. *See* Ala. Code § 22-9A-19(d); Ala. Act 92-607 §§ 19(d), 31; *see also* Doc. 48-18 at D1162, D1199, D1225 (containing

12

court orders approving sex changes to birth certificate and making finding petitioner had submitted proof of sex reassignment surgery). Defendants have presented undisputed evidence that, not only does Policy Order 63 bear a conceivable rational relationship to maintaining consistency with changing the sex on a birth certificate, but that the *actual origin* of Policy Order 63's surgery requirement was the statutory surgery requirement for changing birth certificates. (*See* Doc. 48-5 at 42, 124). Since birth certificates and driver licenses are both important identity documents, it is rational for the State to require the physical identifier of "sex" to mean the same thing on each document and to have the same criterion for changing the sex designation on each document.

Plaintiffs counter that this rationale is arbitrary because Defendants accept out-of-state amended birth certificates to satisfy Policy Order 63's requirements even if the jurisdiction allows a change to the sex designation on a birth certificate without proof of surgery. Doc. 51 at 36-37. But Defendants are required to extend full faith and credit to the nonjudicial records, such as birth certificates, of other states provided they are properly certified. *See* 28 U.S.C. § 1739; Ala. Code § 12-21-71; *Harrison v. State*, 560 So. 2d 1124, 1126-27 (Ala. Crim. App. 1989) (recognizing that Ala. Code § 12-21-71 adopted the federal statute regarding full faith and credit for nonjudicial records); *Pittman v. Pittman*, 19 So. 2d 723, 723-24 (Ala. 1944). Further, it would be administratively burdensome for ALEA employees to research each jurisdiction's sex-change policy every time they received an out-of-state amended birth certificate and to accept only those amended birth certificates from jurisdictions with a surgery requirement. Thus, Defendants' acceptance of other jurisdictions' amended birth certificates is rationally related to legitimate government interests and does not undermine their interest in maintaining consistency with Alabama birth certificates.

13

Policy Order 63 is rationally related to the State's interest in providing information related to physical identification to law enforcement officers by means of a driver license. Defendants have already set out the basis in the record as to why Policy Order 63 supports this interest in arguing the policy satisfies intermediate scrutiny, and they hereby reincorporate this argument. *See* Doc. 54 at 46-48. Clearly, if Policy Order 63 satisfies intermediate scrutiny, it satisfies the much less exacting standard of rational basis review. In response, Plaintiffs selectively quote responses from Chief Pregno's deposition and testimony from Defendants' expert Don Leach in which he stated other definitions of sex could be used for correctional purposes. *See* Doc. 51 at 40-41. Chief Pregno sufficiently articulated the State's interest in providing information to State law enforcement officers through a uniform definition of "sex" on driver licenses to allow agencies to develop appropriate arrest, booking, and search procedures. (Doc. 48-5 at 55-56, 65, 82, 120-21). Leach's concession that other definitions of "sex" could be used is irrelevant to his expert testimony that Alabama's choice to provide a uniform definition of sex by means of a driver license provides valuable information on which corrections administrators can create appropriate corrections policies. (Doc. 48-9, PX 38 at 16-17; *Id.* at 49-50, 102, 34-35, 85). The question is not whether Defendants could have made other policy choices, but whether the policy choice they did make is rationally related to a legitimate government purpose. *See Beach Commc'ns*, 508 U.S. at 313 ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."). Policy Order 63 unquestionably satisfies this standard.

b.   Policy Order 63 Does Not Unlawfully Discriminate Based on Sex and, Even Assuming Intermediate Scrutiny Applies, Satisfies This Level of Scrutiny

Defendants argued in their initial brief that "while intermediate scrutiny must do more than rely on stereotypical generalizations, [equal protection analysis based on sex] may also take into account 'biological differences' between the sexes, such as the indisputable fact that for most

14

people external genitalia at birth typically conform with a person's gender identity." Doc. 54 at 45. That is, the Supreme Court has recognized that sex is an immutable characteristic and that the government does not violate the Equal Protection Clause when it bases distinctions on real biological differences between men and women. *See Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 64, 73 (2001); *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth."). Thus, even if Policy Order 63 involves a sex-based classification, it does not constitute invidious sex-based discrimination because it simply classifies driver license holders as male or female for identification purposes based on their physical sex characteristics, including genitalia, whether those assigned at birth or acquired through surgical means.

Plaintiffs rely on the Eleventh Circuit's holding that "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011). Doc. 51 at 26. However, the Eleventh Circuit has subsequently drawn a distinction between status-based and conduct-based protections. *See Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1254-55 (11th Cir. 2017). In *Evans*, the court held in the context of a Title VII claim that the plaintiff's status as a lesbian could not serve as the basis for a sex discrimination claim because her status as a lesbian was not based on gender non-conformity under *Glenn*. *Evans*, 850 F.3d at 1254-57. In a concurrence, Judge William Pryor revisited earlier precedent and clarified that "*Price Waterhouse* and *Glenn* concerned claims that an employee's *behavior*, not status alone, deviated from a gender stereotype held by an employer." *Evans*, 350 F.3d at 1259 (Pryor, J., concurring). The concurrence noted that the employee in *Glenn* "was born a biological male" but was fired after beginning to transition to a woman and appearing at work dressed as a woman, which her employer said was

"unsettling," "unnatural," and "not appropriate." *Id.* at 1260 (quoting *Glenn*, 663 F.3d at 1314, 1320-21). It was thus the employee in *Glenn*'s *behavior* that triggered heightened scrutiny, not her status as a biological male beginning a transition to the female gender. The concurrence clarified that the "doctrine of gender nonconformity is, and always has been, behavior based" and that it "is not and cannot be an independent vehicle for relief because the only status-based classes that provide relief are those enumerated within Title VII." *Id.*

Here, Policy Order 63 is based on a person's status, not their behavior, and therefore no Equal Protection violation exists since *Nguyen* and *Frontiero* acknowledge that basing a distinction on biological or physical differences between men and women is permissible, especially where, as here, the distinction is simply the definition of the terms "male" and "female" themselves based on reference to physical characteristics. *See also United States v. Virginia*, 518 U.S. 515, 533 (1996) (stating that "[p]hysical differences between men and women, however, are enduring."). If, for instance, Defendants refused to grant driver licenses to individuals born as biological males but who dressed or presented as women, this would constitute sex-based discrimination based on gender nonconforming behavior under *Glenn*. However, Policy Order 63 does not impose any disability or restraint on Plaintiffs due to gender nonconforming behavior. It simply sets the sex on a driver license based on the sex assigned on a birth certificate unless an individual can provide proof of sex reassignment surgery. The policy requires a change in the physical "status" from male to female by surgical means but is not based on any requirement that individuals behave in a way that corresponds with their sex at birth. Policy Order 63 simply provides a definition of "sex" and is thus distinguishable from *Glenn* and permissible under *Nguyen* and *Frontiero*.

Setting aside the status/conduct distinction, the persuasive authorities cited by Plaintiffs are not only distinguishable but actually provide indirect support for Policy Order 63. *See* Doc. 51 at 31). The cases Plaintiffs cite from other jurisdictions in which courts invalidated policies preventing transgender individuals from changing the sex on their identity documents are telling, because all of those cases except one involved policies in which transgender individuals were *completely barred* from changing their sex designation. *See Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 330 (D.P.R. 2018) ("Pursuant to its Birth Certificate Policy, Puerto Rico categorically requires that birth certificates reflect the sex assigned at birth and prohibits transgender persons from correcting the gender marker in their birth certificates so that these accurately reflect the persons' sex, as determined by their gender identity."); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1135 (D. Idaho 2018) ("[T]he Court finds [the] policy of *categorically and automatically* denying applications submitted by transgender individuals to change the sex listed on their birth certificates is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment.") (emphasis added); *K.L. v. State, Dept. of Admin. Div. of Motor Vehicles*, No. 3AN-11-05431-CI, 2012 WL 2685183, at *8 (Alaska Super. Mar. 12, 2012) ("[T]he Court concludes that the absence of *any procedure* allowing licensees to change the sex designation on their license impermissibly interferes with K.L's right to privacy.") (emphasis added); *but see Love v. Johnson*, 146 F. Supp. 3d 848, 856-57 (E.D. Mich. 2015) (holding Michigan's policy changing sex designation based only on birth certificate was unconstitutional because it completely barred sex change for plaintiffs from states that did not allow sex changes on birth certificates and required surgery to change birth certificate for in-state plaintiffs). *Love* is distinguishable in that the court held the policy burdened a fundamental right to privacy and so failed to satisfy *strict scrutiny*.

17

*Love*, 146 F. Supp. 3d at 856-57.[3] *Love* did not address whether Michigan's policy discriminated based on sex.

Plaintiffs would have a stronger case for invidious sex discrimination if Alabama provided no means to change the sex designation on a driver license since. That is, a policy that uses sex initially assigned on a birth certificate for government identification documents and prevents any subsequent change would categorically prohibit transgender individuals from changing their sex designation to conform to their gender. Such a policy would arguably assume that individuals' gender-based behavior must always conform to the sex assigned on their birth certificate and would discriminate "against a transgender individual because of her gender-nonconformity." *Glenn*, 663 F.3d at 1317. But Policy Order 63 is not such a policy because it provides a criterion for changing the sex on driver licenses from that assigned on a birth certificate either by amending the birth certificate (through proof of surgery) or providing direct documentation of surgery. Although Plaintiffs disagree with the surgery criterion chosen by Defendants, they cannot rely on the cases cited above to support the application of heightened scrutiny because all of those except *Love* involved policies that allowed *no* opportunity for a transgender individual to change the sex on an identity document.

Finally, even assuming Policy Order 63 must satisfy intermediate scrutiny, Plaintiffs apply an erroneous intermediate scrutiny analysis more akin to a strict scrutiny analysis that focuses almost entirely on the narrowness of the tailoring to the State's justifications. Doc. 51 at 30-33. To satisfy intermediate scrutiny for a sex-based classification, the government must show the classification is substantially related to an important government interest. *See United States v.*

---

[3] For the reasons already argued as to Count I, Policy Order 63 does not burden a fundamental right to privacy under Eleventh Circuit precedent. Therefore, the strict scrutiny analysis in *Love* is inapplicable.

18

*Virginia*, 518 U.S. 515, 533 (1996). However, rather than focusing on the narrowness of the tailoring to the government's interest, the Supreme Court has identified two criteria for whether a policy satisfies intermediate scrutiny: (1) "[t]he justification must be genuine, not hypothesized or invented *post hoc* in response to litigation"; and (2) "it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* Policy Order 63 satisfies both criteria on the undisputed facts of this case.

First, the justification for Policy Order 63 based on consistency with Alabama birth certificates and the provision of a physical description of individuals for law enforcement purposes is not *post hoc*. Plaintiffs do not dispute that Policy Order 63's actual origin traces back to the surgery requirement for changing sex on a birth certificate. Doc. 51 at 31-32. Rather, Plaintiffs argue that maintaining consistency between the criterion for changing sex on a birth certificate and a driver license is not an important government interest. Doc. 51 at 31. Plaintiffs argue that Defendants' 30(b)(6) deponent could not adequately articulate the importance of maintaining this consistency and that the consistency between birth certificates and driver licenses creates inconsistency between these State identification documents and federal identification documents, such as passports. Doc. 51 at 31-32. But Chief Pregno testified that ALEA controls the information that goes onto a driver license but does not control the information that goes onto federal identity documents, such as passports. (Doc. 48-5 at 122). Maintaining a uniform criterion for changing sex on birth certificates and driver licenses is related the State's important government interest in using identity documents to provide physical descriptions of individuals and, with respect to ALEA's control over driver licenses, providing a uniform understanding of "sex" on a driver license for law enforcement. (*See* Doc. 48-5 at 55-56).

Although Plaintiffs dispute the importance of this governmental interest, they do not create a genuine dispute of material fact about the State's actual justification for Policy Order 63. The State's position is thus unlike the employer in *Glenn* who could not satisfy intermediate scrutiny by providing other conceivable reasons for terminating the employee since he had indisputably terminated the employee because he found her gender-nonconforming behavior "inappropriate," "unsettling," and "unnatural." *Glenn*, 663 F.3d at 1320-21. The interests articulated by the State in Policy Order 63, *i.e.*, consistency between State-created identity documents and identification for law enforcement purposes, are not *post hoc* in response to litigation but the actual interests that motivated the policy under the undisputed facts of the case.

Second, Policy Order 63 does not rely on "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 533. In *Frontiero*, the Supreme Court stated that "what differentiates sex from such non-suspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society." *Frontiero*, 411 U.S. at 686. As an example, the Court noted its prior decision in *Reed v. Reed*, 404 U.S. 71 (1971), in which it invalidated an Idaho statute that created a preference for men to be appointed administrators of estates over women. *Id.* at 682-83. The Court rejected the Idaho Supreme Court's rationale that the legislature could legitimately assume "in general men are better qualified to act as an administrator than are women," and held that "by ignoring the individual qualifications of particular applicants, the challenged statute provided dissimilar treatment for men and women who are similarly situated." *Id.* (internal quotation and citation omitted).

Here, Policy Order 63 does not rely on the sort of stereotypical sex-based generalizations intermediate scrutiny is intended to eliminate. Rather, it relies on the indisputable fact of physical

and biological differences between the male and female sex—differences that the Supreme Court has stated governments may take into account without invidiously discriminating based on sex. *See Virginia*, 518 U.S. at 533 ("Physical differences between men and women, however, are enduring."); *Nguyen*, 533 U.S. at 64 ("Here, the use of gender specific terms takes into account a biological difference between the parents."); *Frontiero*, 411 U.S. at 686. The policy uses the sex on a birth certificate, which is based on external genitalia at birth, as the default in setting the sex on a driver license—a policy that Plaintiffs' expert admitted was accurate for 99% of the population. (Doc. 48-8 at 23). For the 0.3% of the population that is transgender and for whom their gender does not align with their sex at birth, Policy Order 63 provides a means to change their sex designation on a driver license through proof of sex reassignment surgery. (*See* Doc. 52-46) (containing Plaintiffs' exhibit estimating 0.3% of adults are transgender).

Policy Order 63 defines "sex" in a way that correlates "male" and "female" with physical characteristics, including genitalia. It does so for purposes of providing a physical description for identification and law enforcement purposes and does not involve the kind of stereotypes and generalizations that intermediate scrutiny must screen out. On the contrary, Plaintiffs do not dispute the testimony presented by the State that law enforcement and corrections officials must take sex differences into account for a variety of purposes related to search, seizure, and booking. *See Veloz v. Miami-Dade Cnty.*, No. 17-13059, 2018 WL 6131780, at *7, __ F. App'x __ (11th Cir. Nov. 21, 2018) ("It is abundantly clear to us that housing a biological female alongside 40 male inmates poses an outrageous risk that she will be harassed, assaulted, raped, or even murdered.").

Plaintiffs' intermediate scrutiny argument focuses primarily on whether Defendants could achieve their important government objectives by adopting a different criterion for permitting sex

changes on driver licenses. Doc. 51 at 31-33. But "[n]one of [the Supreme Court's] gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70. Rather, the inquiry is whether the State's justifications are *post hoc* in response to litigation and based on overbroad generalizations about the abilities of males and females. The justifications provided for Policy Order 63 are neither and it thus satisfies intermediate scrutiny, assuming this level of scrutiny applies.

<blockquote>

c.    <u>Transgender Individuals Are Not a Suspect or Quasi Suspect Class Entitled to Heightened Scrutiny</u>

</blockquote>

Plaintiffs argue that independently of *Glenn*'s holding that intermediate scrutiny applies to transgender individuals based on gender-nonconforming behavior, transgender individuals constitute a suspect class for equal protection purposes. Doc. 51 at 27-30. But the Eleventh Circuit has already resolved the question of the level of scrutiny that applies to transgender individuals based on gender-nonconforming behavior. *See Glenn*, 663 F.3d at 1315-20. Plaintiffs' claims in this case are based on the fact that their sex-based-on-genitalia and gender do not align, and that Policy Order 63 accordingly invidiously discriminates against them. If this claim is cognizable under the Equal Protection Clause, it can be based only on sex discrimination due to gender nonconformity. This claim fails for the reasons set out above. Defendants are accordingly due to be granted summary judgment on Plaintiffs' equal protection claim.

C.  <u>Conclusion</u>

For the reasons stated above, Plaintiffs' motion for summary judgment should be denied and Defendants' motion for summary judgment should be granted.

22

Respectfully submitted,

Steve Marshall,
  *Attorney General*

<u>*s/* Brad A. Chynoweth</u>
Brad A. Chynoweth (ASB-0030-S63K)
Winfield J. Sinclair (ASB-1750-S81W)
  *Assistant Attorneys General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8440
bchynoweth@ago.state.al.us
wsinclair@ago.state.al.us

***Counsel for Defendants Hal Taylor, Charles
Ward, Deena Pregno, and Jeannie Eastman***

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2019, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notification of such filing to the following:


Brock Boone
Randall C. Marshall
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
bboone@aclualabama.org
rmarshall@aclualabama.org

Rose Saxe
Gabriel Arkles
ACLU LGBT & HIV Project/ACLU
Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2605
rsaxe@aclu.org
garkles@aclu.org
*Admitted Pro Hac Vice*


/s Brad A. Chynoweth
Counsel for Defendants