**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **DARCY CORBITT,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:18-cv-91-MHT-GMB** |
| | ) | |
| **HAL TAYLOR,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Steve Marshall, Attorney General
Brad A. Chynoweth, Assistant Attorney General
Winfield J. Sinclair, Assistant Attorney General

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, AL  36130-0152
334/272-7300
334/353-8440 (fax)
bchynoweth@ago.state.al.us
wsinclair@ago.state.al.us

Counsel for Defendants Hal Taylor,
Charles Ward, Deena Pregno, and Jeannie Eastman

## Table of Contents

A.  A Note on the Use of the Word "Physiognomy" .................................................................1

B.  Reply to Plaintiffs' Remaining Arguments..........................................................................5

    1.  Plaintiffs Corbitt and Clark's Claims Are Barred by the Statute of Limitations ..........5

    2.  Policy Order 63 Does Not Disclose Confidential Information in Violation of
       Plaintiffs' Due Process Rights ......................................................................................9

    3.  Policy Order 63 Neither Compels Plaintiffs to Receive Medical Treatment Nor
       Conditions Receipt of a Government Benefit on Receiving Such Treatment .............13

    4.  Policy Order 63 Is Government Speech and May Not Be Challenged as Compelled
       Speech .......................................................................................................................13

    5.  Policy Order 63 Is Facially Neutral and Otherwise Satisfies Constitutional Scrutiny
       Under the Equal Protection Clause…………………………………………….. 15

C.  Conclusion ........................................................................................................................18

Defendants Hal Taylor, Charles Ward, Deena Pregno and Jeannie Eastman file this reply to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (doc. 58).

A.  <u>A Note on the Use of the Word "Physiognomy"</u>

Plaintiffs take issue with Defendants' use of the word "physiognomy." They object to Defendants' expert, Donald Leach, using the term to refer to physical sex characteristics, and they further object to the undersigned using the term in briefs submitted to the Court. Doc. 58 at 14-15, 44-45. Plaintiffs state that "[p]hysiognomy refers to determining a person's ethnicity and character based on facial features." Doc. 58 at 14 ¶ 174 (citing Gorton Decl. ¶ 42). They add that "[d]uring the period of eugenics, 'experts' in the United States and Germany claimed that physiognomy proved that people of African descent were less intelligent than people of European descent, and that Jewish people were inherently deceitful." *Id.* at 14-15 ¶ 175. They support this proposition with a citation to a post from a sociology blog and an unpublished paper written by an undergraduate at the State University of New York, New Paltz. *See* Docs. 59-16, 59-17.[1]

As shown below, "physiognomy" has another dictionary meaning that is completely benign, and Plaintiffs are aware that this benign meaning is how Defendants and their expert used the term. Nonetheless, Plaintiffs state that "[t]he repeated use of the term in Defendants' brief is *particularly chilling* in the context of this case, where they defend a policy requiring Plaintiffs to undergo a sterilizing surgical procedure before receiving a driver's license that they can use without risking a variety of negative outcomes, ranging from employment discrimination to

---

[1]   *See*   https://thesocietypages.org/socimages/2015/01/30/helpful-guide-to-human-character/ (containing Plaintiffs' Exhibit 75); https://www.newpaltz.edu/history/bestseminarpapers, https://www.newpaltz.edu/media/department-of-history/chair-intro-2017-2018.pdf (containing Plaintiffs' Exhibit 76).

physical attack." Doc. 58 at 44 (emphasis added). Plaintiffs continue that "the state's position harkens back to an era when the state identified people it deemed undesirable and *subjected them to involuntary sterilization*." *Id.* (emphasis added). Plaintiffs add in a footnote, again citing to an unpublished source obtained at random from the internet—this time a compilation made by undergraduate students at the University of Vermont[2]—that "[t]wo hundred twenty-four people deemed mentally deficient were subjected to involuntary sterilization in Alabama under a 1919 law," and that "[m]ultiple attempts were made to expand the law to authorize sterilization of 'sexual perverts' and 'homosexuals' in the 1930s." Doc. 58 at 44 n.3. While conceding that "what the state does here is thankfully not as direct as past atrocities," Plaintiffs maintain that "ultimately its basis is *just as spurious*, and it causes very real harm to a group with little political power." *Id.* at 44-45 (emphasis added).

Defendants make three points in response to Plaintiffs' assertions. First, Defendant's expert Don Leach defined what he meant by the term "physiognomy" in his expert report. *See* Doc. 48-10 at 96 (defining "physiognomy" as the physical or biological component of sex, as distinct from gender identity and sexual preference). Plaintiffs' counsel asked Leach in his deposition what he meant by "physiognomy," to which Leach responded "[t]he physical being, the physical makeup, physical compositions," "[t]he actual structural components that go into—in this case it would go into—into sex." Doc. 48-9 at 13. Leach's definition of "physiognomy" is consistent with the third definition of that term in Merriam-Webster, where it is defined simply as "external aspect." *Physiognomy Definition*, Merriam-Webster.com,

---

[2] *See* http://www.uvm.edu/~lkaelber/eugenics/ (containing the source from which Plaintiffs' Exhibit 77 was obtained).

2

http://merriam-webster.com/dictionary/physiognomy (last visited March 20, 2019).[3] Leach was then directly asked whether he used "physiognomy" in the sense that would link it with any racial pseudoscience, and he *expressly stated* this was not what he meant by the term:

> Q.   So—and so I'd like you to listen to this definition of physiognomy—sorry—physiognomy: A person's facial features and expression, *especially when regarded as indicative of character or ethnic origin*.
>
> *That's not what you mean; right?*
>
> A.  No.
>
> Q.  Okay.

Doc. 48-9 at 13-14 (emphasis added).

Second, nowhere in Plaintiffs' Amended Complaint do Plaintiffs allege that they do not wish to have sex reassignment surgery because it will result in their sterilization. Plaintiffs were asked in their depositions to explain in their own words how Policy Order 63 had harmed them, and no Plaintiffs testified that meeting Policy Order 63's surgery requirement would result in their involuntary sterilization. *See* Doc. 48-2. at 36-38; Doc. 48-1 at 33-34; Doc. 48-3 at 35-36. Furthermore, in Jane Doe's sworn declaration she states that she *wants* surgical treatment for her gender dysphoria but cannot afford it. Doc. 52-42 ¶ 20. At Plaintiff Corbitt's deposition, Defendants played a recording of a video that Corbitt acknowledged she uploaded to her publicly-viewable Facebook page moments after she was informed by an ALEA driver license examiner in August 2017 that she was unable to get an Alabama license designating her sex as female due to

---

[3] Leach's use of "physiognomy" to define one component of sex also tracks the definition of "sex" in Black's Law Dictionary. *See Sex*, Black's Law Dictionary (10th ed. 2014) (defining "sex" as "[t]he sum of the peculiarities of structure and function that distinguish a male from a female organism; gender."). Unlike Black's Law Dictionary, which equates "sex" and "gender," Leach's report distinguishes between the two terms. *See* Doc. 48-10 at 96.

Policy Order 63's surgery requirement, and the court reporter transcribed her statements as follows:

> They [*i.e.* the employees in ALEA's Opelika field office] called Montgomery and they tried to like figure out what to do. Basically I have to have surgery. Well, I can't afford that. In fact, *I told them if I had sixty thousand dollars I would go get it done tomorrow*, so if you want to give me sixty thousand dollars I can be in compliance with this fucking law.

Doc. 48-2 at 79-80, 84 (emphasis added). Nor did any Plaintiff state in their declarations submitted after their depositions in support of their motion for summary judgment that they did not wish to receive sex reassignment surgery because it would result in permanent infertility. Plaintiffs have either expressed a desire to undergo sex reassignment surgery or made no mention of permanent infertility as a basis for their constitutional challenge to Policy Order 63. Thus, not only do Plaintiffs unfairly link the defense of Policy Order 63 to eugenic policies of forced sterilization, their arguments based on forced sterilization are an improper attempt to amend their complaint at summary judgment. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

Third, and finally, Plaintiffs' argument that "the state's position harkens back to an era when the state identified people it deemed undesirable and subjected them to involuntary sterilization" (doc. 58 at 44) is a red herring because Policy Order 63 does not force people to undergo sterilization procedures against their will. In the case cited by Plaintiffs, *In re Opinion of the Justices*, 162 So. 123 (Ala. 1935), the Supreme Court of Alabama considered the constitutionality of a bill that would grant sole discretion to the superintendent of mental institutions to sterilize anyone "lawfully committed" to the institution "with or without the consent of the patient, or his or her relatives." *In re Opinion of the Justices*, 162 So. 2d at 125. By contrast,

Plaintiffs in this case lawfully possess or could possess Alabama driver licenses, although they cannot not change the sex designation on these licenses without proof of sex reassignment surgery. It is simply hyperbolic to compare Policy Order 63 to a policy granting a state official unfettered discretion to sterilize an individual without the individual's consent. In addition, Plaintiffs do not dispute in any way that the origin of Policy Order 63's surgery requirement was to maintain consistency with the statutory surgery requirement for amending Alabama birth certificates rather than any eugenic ideology based on the pseudoscientific study of "physiognomy." Plaintiffs' characterization of Defendants' position as tantamount to a defense of forced sterilization of those "deemed undesirable" by the State (doc. 58 at 44) is unsupported by the facts and irrelevant to any constitutional claim Plaintiffs have standing to assert.

### B.  Reply to Plaintiffs' Remaining Arguments

1.  Plaintiffs Corbitt and Clark's Claims Are Barred by the Statute of Limitations

Defendants argued that Plaintiffs Corbitt and Clark's claims are barred by the statute of limitations. Doc. 54 at 24-27. They argued Corbitt's claim accrued in July 2013 when she updated her driver license to match her new legal name as a woman, and that Clark's claim accrued in April 2015 when she changed her name on her license and was informed by defendant Jeannie Eastman that she did not meet the requirements to change the sex on her license at that time. (*Id.* at 25). Plaintiffs counter that these accrual times are "wholly arbitrary," and that the injury they complain of "is not having a traditionally feminine name on a license with a male sex designation" but rather "not being permitted to change the sex designation on their license to correspond to their actual sex, female." Doc. 58 at 18.

But Plaintiffs overlook the fact that Corbitt and Clark testified that their legal name changes marked the point at which they fully identified as transgender women and began living publicly as

transgender women. Corbitt testified that she "had started living as Darcy full-time on May 11, 2013." Doc. 48-2 at 25. As part of living full time as Darcy, she thereafter legally changed her name with the probate judge and then changed her new license to match her identity as Darcy, a transgender woman. Policy Order 63 operated in 2013 to result in a driver license that used the sex on her birth certificate, male, as the default, resulting in a license with a sex designation with which Corbitt did not identify. Likewise, Clark testified that she had always considered herself a female, and that it had bothered her ever since she was sixteen that her sex designation on her driver license did not match her gender identity. Doc. 48-1 at 31-32. Thus, Clark's legal change of name, change of name on her driver license, and failed attempt to change the sex on her license in 2015 resulted in the injury as Plaintiffs characterize it in their brief. Doc. 58 at 18. Policy Order 63 operated at these times to inflict the injury of which Corbitt and Clark now complain, namely, a driver license with a  sex designation they could not change to match their gender.

Plaintiffs attempt to reframe the point at which their injuries accrued as the point at which they became fully informed about Policy Order 63's requirements. Doc. 58 at 17. But a claim accrues for purposes of Section 1983 not when a person becomes aware of the precise contents of the policy causing the injury, but when the person knows *or has reason to know* that the person has been injured. *See Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987) ("Thus Section 1983 actions do not accrue until the plaintiff knows or has reason to know that he has been injured."). Here, Corbitt and Clark claim their injury is the inability to eliminate the incongruence between the sex designation on their driver licenses and their gender identity. Doc. 58 at 18. Policy Order 63 operated to make Corbitt and Clark unable to change the sex on their licenses at the time they completed their transition to living publicly as transgender women by changing their licenses to match their legal female names. Their injury occurred at this time even if they were not fully

6

aware of Policy Order 63's requirements because at that time they "could have discovered the factual predicate of [their] claim." *Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1262 (11th Cir. 2003).

The parole cases cited by Defendants in *Brown* and *Lovett v. Ray*, 327 F.3d 1181 (11th Cir. 2003) remain on point because they held the inmates' injury occurred when their parole hearings were set for a date longer than what they claimed was permissible because they should have known at that point that the law had changed to lengthen the time between parole hearings. *See Brown*, 335 F.3d at 1260-62; *Lovett*, 327 F.3d at 1182-83. Plaintiffs seize on the fact that the plaintiffs in those cases were informed by the parole board of the decision to reconsider their parole years later and cite a parole case from this Court, *Neelley v. Walker*, 67 F. Supp. 3d 1319, 1325 (M.D. Ala. 2014). However, the holding of those cases turned on when the decision affecting the plaintiffs was made rather than on whether the plaintiffs were notified of the underlying policy applied to them.

The court in the *Neelley* case cited by Plaintiffs actually changed course and held the plaintiff's claim was barred by the statute of limitations. *See Neelley v. Walker*, 173 F. Supp. 3d 1257, 1265-70 (M.D. Ala. 2016), *rev'd by Neelley v. Walker*, 677 F. App'x 532 (11th Cir. 2017). Although the Eleventh Circuit reversed, the court's unpublished opinion makes clear that the proper inquiry is when the decision that inflicts the alleged injury is made rather than when the plaintiff understands the policy resulting in the injury. *See Neelley*, 677 F. App'x at 535. The court noted the district court "relied on *Chardon v. Fernandez*, 454 U.S. 6 . . . (1981) (per curiam), for the proposition that when ascertaining the relevant injury, courts must focus on the moment of the adoption of the unconstitutional act itself rather than the moment at which the claimant experiences its effects." *Neelley*, 677 F. App'x at 535 (internal quotation and citation omitted). Although there

7

was a passage of time between the enactment of the statute challenged by Neelley and the parole board informing her she was ineligible for parole, the court held her claim accrued when the parole board denied Neelley's parole pursuant to the statute because the parole board possessed independent decisionmaking authority to deny parole. *Id.* That is, the statute did not inflict Neelley's injury automatically by operation of law but required an independent decision by the parole board. *Id.*

In this case, unlike a parole board "charged with the responsibility of determining who is eligible for parole," *Neelley*, 677 F. App'x at 535 (internal quotation and citation omitted), Policy Order 63 made Corbitt and Clark unable to change the sex designation on their licenses by operation of law when they changed the names on their licenses to match their legal names when they updated their identity documents to live publicly as transgender women in 2013 and 2015, respectively. ALEA did not make a new or independent determination to apply Policy Order 63 to Corbitt in August 2017 when she first became aware of the surgery requirement, but rather it had been applied when she received her first license as a transgender woman in 2013. In Clark's case, the undisputed facts show that Policy Order 63 was actually expressly applied by Jeannie Eastman in 2015, although its surgery requirement had been in effect to prevent Clark from changing the sex on her license before that. Because the "decision had been made" *Neelley*, F. App'x at 535 (quoting *Chardon*, 454 U.S. at 8), by operation of law when Corbitt and Clark updated their licenses to change their names in 2013 and 2015, Corbitt and Clark's later express awareness of Policy Order 63's requirements is irrelevant to when their claims accrued.

Because the parole cases of *Brown* and *Lovett* thus remain on point notwithstanding Plaintiffs' citation of *Neelley*, the analysis of the "continuing violations" doctrine and "separate and distinct" injury rule from those cases is also applicable. *See Brown*, 335 F.3d at 1261-62;

*Lovett*, 327 F.3d at 1183. As previously argued, Corbitt and Clark do not experience continuous violations of Policy Order 63 but rather its present consequences of a one time violation, and Corbitt's August 2017 denial of a change to her sex designation was not a separate and distinct injury from the 2013 injury. *See* Doc. 54 at 26-27. For these reasons, Corbitt and Clark's claims are barred by the statute of limitations.

2.   Policy Order 63 Does Not Disclose Confidential Information in Violation of Plaintiffs' Due Process Rights

The dispute on Count I really boils down to this: does Policy Order 63 *disclose* Plaintiffs' transgender status in the manner required to amount to a due process violation? Plaintiffs do not dispute that personal information contained in driving records is not the sort of confidential information protected by the Due Process Clause. *See* Doc. 58 at 22-23; *see also Collier v. Dickinson*, 477 F.3d 1306, 1308 (11th Cir. 2007); *Pryor v. Reno*, 171 F.3d 1281, 1288 n.10 (11th Cir. 1999). Defendants do not dispute that an individual's transgender status can constitute the sort of intimate personal information protected by due process. But Defendants maintain that Policy Order 63 does not disclose Plaintiffs' transgender status because their licenses disclose only their "sex" as defined by Policy Order 63. Under *Collier* and *Pryor*, this information is no more confidential than the other information disclosed on a license such as date of birth, height, weight, hair color, and eye color.

Plaintiffs argue that Policy Order 63 discloses their transgender status because on certain occasions individuals viewing their licenses, in conjunction with their feminine appearance and manner of dress, have inferred that they are transgender. Doc. 58 at 24. But if Policy Order 63 "discloses" Plaintiffs' transgender status only in this inferential manner, then it does so in the same sense in which it also might "disclose" an individual's thyroid condition based on the weight listed on a license or "disclose" a genetic condition causing premature aging (Progeria) based on the date

9

of birth combined with the individual's older appearance. The question is whether this inferential "disclosure" of confidential information from the non-confidential personal information contained on a driver license combined with other information observed about the licensee is a "disclosure" of that confidential information in the legal sense required to amount to a due process violation.

Whether Policy Order 63 results in a "disclosure" of confidential information in the legal sense must be answered by reference to binding precedent, and under this standard it clearly does not result in the sort of disclosure required for a due process violation. *See National Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 147-56 (2011); *James v. City of Douglas*, 941 F.2d 1539, 1543-44 (11th Cir. 1991); *Hester v. City of Milledgeville*, 777 F.2d 1492, 1496-97 (11th Cir. 1985). In *Nelson*, certain NASA employees were required to complete a questionnaire that asked them such intimate questions as whether they had ever received any treatment or counseling for illegal drug use. *Nelson*, 562 U.S. at 152. In *James*, a police detective received a videotape of the plaintiff engaging in sexual activity in connection with her claim that someone was attempting to extort her, and other officers viewed the tape for their own gratification rather than for any investigatory purpose. *James*, 941 F.2d at 1540-41. In *Hester*, the plaintiff firefighters were required to submit to polygraph examinations as a condition of continued employment and to answer certain control questions such as whether they had ever done something that would have resulted in their dismissal or would have discredited the department. *Hester*, 777 F.2d at 1496-97. In each of these cases, the policy or actions of the government officials resulted in the *direct* disclosure of the confidential information through questions asked as a condition of public employment or through the unauthorized viewing of an intimate act. None of these cases involved an indirect or inferential disclosure of confidential information from non-confidential information and thus support

10

Defendants' position that Policy Order 63 discloses only the non-confidential information considered in *Collier* and *Pryor*.

Furthermore, only in *James* did the court hold that the disclosure of the confidential information amounted to a due process violation. *See James*, 941 F.2d at 1543-44. While all of the above cases involved direct disclosures of confidential information, the court in *James* stated that whether the disclosure of confidential information violates due process requires an inquiry into "whether there is a legitimate state interest in disclosure that outweighs the threat to the plaintiff's privacy interest." *Id.* at 1544. Clearly, the officers viewing the videotape of a possible victim of extortion for personal gratification was not a legitimate state interest that outweighed the plaintiff's privacy interest. *Id.*

Here, not only does Policy Order 63 not directly disclose Plaintiffs' transgender status, but the indirect or inferential disclosure of their transgender status through the disclosure of the non-confidential sex designation on their license involves a legitimate state interest that outweighs the threat to Plaintiffs' privacy interests. *See James*, 941 F.2d at 1544. Policy Order 63 serves the State's interests in using driver licenses as a form of identification primarily for law enforcement purposes. As Defendants have argued, Alabama law compels licensees to disclose their driver license, rather than another form of identification, only under limited circumstances related to law enforcement and the operation of a motor vehicle. Doc. 54 at 30-31. These are unquestionably legitimate state interests that outweigh any indirect, inferential disclosure of Plaintiffs' transgender status. Plaintiffs possess or could possess passports designating their sex as female for all other identification purposes.

Plaintiffs counter that Defendants cannot appeal to the availability of passports to mitigate the unconstitutionality of the forced disclosure of their transgender status created by Policy Order

11

63. Doc. 58 at 25-27. If Plaintiffs were correct that displaying their Alabama licenses violated their due process rights, then it would indeed be irrelevant to argue they could reduce the extent to which their constitutional rights were violated by using passports. But this is not the point of Defendants' argument regarding passports. Defendants' argument is that Alabama law limits the circumstances in which Plaintiffs are required to display an Alabama license rather than another form of identification to those related to operating a motor vehicle or dealing with law enforcement or court personnel. The legally-required display of an Alabama license is thus limited to situations involving a legitimate state interest that outweighs the threat to Plaintiffs' privacy interests. *See James*, 941 F.2d at 1544.[4] For other situations, Plaintiffs retain the discretion to choose which form of identification to display, such as a passport.

Finally, Plaintiffs respond to Defendants' argument that they lack standing to assert any right to confidentiality regarding their transgender status by framing it as an issue of waiver, citing *Drake v. Covington County Board of Education*, 371 F. Supp. 974 (M.D. Ala. 1974). Doc. 58 at 28. Defendants will not rehash the facts establishing Plaintiffs have not kept their transgender status confidential but here distinguish *Drake*. In *Drake* the majority of a three-judge panel found the plaintiff had not waived her privacy rights in challenging her termination for "immorality"

---

[4] Plaintiffs argue that "[e]ven if the disclosure did only happen to law enforcement officers, that would still be too much." Doc. 58 at 24. Plaintiffs give the example of an officer disclosing Jane Doe's transgender status to co-workers after seeing her license during an investigation of a traffic accident. But Jane Doe's initial display of her license to the officer for the purpose of investigating the accident was related to the legitimate government purpose of accurately identifying subjects involved in traffic accidents. Policy Order 63 is related to accurate physical identification of license holders, and the officer's voluntary choice to exceed this legitimate scope is no more justified than the officers' choice in *James* to view the videotape for their own gratification. But police misconduct in individual cases does not prevent the State from requiring individuals to identify themselves through documents whose contents are controlled by the State. If the fear of misuse of confidential information were to prevent any disclosure of this information to law enforcement, then law enforcement could not investigate sex crimes, for instance, by compelling disclosure of sensitive information.

12

because her employer had discovered she was pregnant outside of wedlock by receiving an unauthorized disclosure from her doctor. *Drake*, 371 F. Supp. at 978; *see also Id.* at 981 ("While there is some dispute over the facts, it would appear that the question of Miss Drake's pregnancy came to the Board's attention because her private physician breached his confidential relationship and reported her condition to the Board.") (Johnson, C.J., concurring). The dissenting judge would have held that the teacher's sexual relationship was not confidential because "it was publicly discussed in Florala." *Id.* (Varner, J., dissenting).

Whether viewed as an issue of standing or waiver, *Drake* establishes that a plaintiff may assert a claim for the disclosure of private or confidential information only if the plaintiff has in fact treated that information in a confidential manner. None of the Plaintiffs, including Jane Doe, have done so in this case. Plaintiffs have disclosed their transgender status through social media and through public participation in transgender activist events. This is nothing like the school board members learning of the teacher's pregnancy through the unauthorized disclosure from a physician in *Drake*. Summary judgment is due to be granted in Defendants' favor on Count I.

3.  Policy Order 63 Neither Compels Plaintiffs to Receive Medical Treatment Nor Conditions
    Receipt of a Government Benefit on Receiving Such Treatment

    Defendants reincorporate their arguments from Section A, *supra*, as to Count II.

4.  Policy Order 63 Is Government Speech and May Not Be Challenged as Compelled Speech

    Defendants have argued that the sex designation on an Alabama driver license, as defined by Policy Order 63, is government speech and is thus not susceptible to a First Amendment compelled-speech challenge. Doc. 54 at 40-41 (analyzing three elements of government speech under *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015)). Plaintiffs cite in opposition a recent decision of this Court holding that information on a driver license

compels speech in *Doe v. Marshall*, No. 2:15-cv-606-WKW, 2019 WL 539055, at \*6-8, __ F. Supp. 3d __ (M.D. Ala. Feb. 11, 2019). Defendants respectfully disagree with the holding in *Doe*.

*Doe* held that a policy of placing the words "CRIMINAL SEX OFFENDER" on registered sex offenders' driver licenses was compelled speech under the First Amendment and failed to satisfy strict scrutiny. *Doe*, 2019 WL 539055, at \*6-8. The court held that the State had a compelling interest in requiring sex offenders to possess a driver license or identification card bearing "a designation that enables law enforcement officers to identify the licensee as a sex offender," Ala. Code § 15-20A-18(b), but that the words chosen required the plaintiffs to express a message about themselves with which they disagreed. *Id.* The court in *Doe agreed* that the sex offender designation "is indeed government speech," but held that "the fact that a license is government speech does not mean it is immune from the compelled speech analysis." *Id.* at 7 (citing *Wooley v. Maynard*, 430 U.S. 705 (1977)). Defendants respectfully disagree that if speech on a driver license is government speech under the analysis set out in *Walker*, then it is not immune from compelled speech analysis.

If the sex designation on a driver license satisfies the elements for government speech under *Walker*, then the speech on a driver license cannot be attributed to the licensee but rather to the government. But if the speech is not attributed to the licensee, then the licensee may not bring *any* First Amendment challenge to the speech, whether it is based on compelled speech, viewpoint discrimination, or any other claim. *See Walker*, 135 S. Ct. at 2245 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says . . . Thus, government statements . . . do not normally trigger the First Amendment rules designed to protect the marketplace of ideas."). The Supreme Court has held that, if speech is government speech, a compelled speech challenge under the First Amendment is simply inapplicable. *See Johanns v.*

14

*Livestock Mktg. Ass'n*, 544 U.S. 550, 553, 556-57, 567 (2005); *see also Delano Farms Co. v. Cal. Table Grape Comm'n*, 586 F.3d 1219, 1220 (9th Cir. 2009) (concluding that because an advertising scheme "is the government's own speech" it "is thereby exempt from a First Amendment compelled speech challenge" under *Johanns*).

The question turns on who is doing the speaking. If Defendants are correct that the State of Alabama speaks, primarily to its law enforcement officers, through the personal identifying information contained on driver licenses, then Plaintiffs' compelled speech claim fails as a matter of law with no need for further analysis. If Plaintiffs were to prevail, then it would be they who compelled the government to speak, a result at odds with *Walker*. *See Walker*, 135 S. Ct. at 2253 ("But here, compelled private speech is not at issue. And just as Texas cannot require SCV to convey the State's ideological message, SCV cannot force Texas to include a Confederate battle flag on its specialty license plates."). Defendants respectfully disagree with the analysis in *Doe* and move for summary judgment in their favor on Plaintiffs' compelled speech claim.

5.   Policy Order 63 Is Facially Neutral and Otherwise Satisfies Constitutional Scrutiny Under the Equal Protection Clause

Defendants submit additional authority in support of their equal protection argument that was released the date they filed their opposition brief, March 8, 2019, and which did not come to their attention in time to raise in that brief. *See Doe 2 v. Shanahan*, No. 18-5257, 2019 WL 1086495, __ F.3d __ (D.C. Cir. Mar. 8, 2019).[5] The Court of Appeals for the District of Columbia released an unpublished judgment vacating a preliminary injunction against the "Mattis Plan,"

---

[5] Defendants cite this case for the first time in their reply because it did not come to their attention in time to include it in their opposition brief filed the same day the decision was released. Accordingly, if Plaintiffs wish to file a sur-reply to address the applicability of *Shanahan* to the case, Defendants do not oppose any motion for leave to file a sur-reply on the relevance of *Shanahan.*

which, among other things, excludes all of those diagnosed with gender dysphoria from military service and requires all servicemembers to serve in their biological sex. *See Doe 2 v. Shanahan*, No. 18-5257, 2019 WL 102309, at *1, __ F. App'x __ (D.C. Cir. Jan. 4, 2019). The January 4, 2019 judgment noted that opinions would be filed at a later date. *See Shanahan,* 2019 WL 102309, at n.*. The court filed its opinions on March 8, 2019.

Defendants have argued that Policy Order 63 is facially neutral with respect to transgender individuals because it provides a criterion for changing the sex that is applicable to transgender and non-transgender individuals on the same basis and thus does not trigger heightened scrutiny. *See* Doc. 54 at 42-43; Doc. 60 at 9-14. Plaintiffs argue that Policy Order 63 is not facially neutral because it applies only to transgender people. Doc. 58 at 37-38. In an opinion concurring in the judgment, Senior Circuit Judge Williams addressed, and rejected, an identical equal protection argument asserted by transgender opponents of the Mattis Plan. *Shanahan*, 2019 WL 1086495, at *32-34. Judge Williams concluded that the ban on service for people diagnosed with gender dysphoria and the requirement that all servicemembers serve in their biological sex were facially neutral because they applied to transgender and non-transgender people:

> Plaintiffs, of course, object to the requirement that all must serve in their biological sex. That is central to their claim. See Oral Arg. Tr. 19:12–16 (arguing that the Mattis policy "requires anyone who serves to do so in their biological sex," but that "not living in a person's biological sex is the defining characteristic of what it means to be transgender"). *But the requirement is nevertheless facially neutral; "all" means "all." Transgender or non-transgender; gender dysphoria or non-gender dysphoria; "all" service members must serve "in their biological sex." Mattis Memo* 3, J.A. 265. This can't be facially discriminatory as to transgender persons; military officials need not know an individual's transgender status in order to enforce the policy— knowledge of physical characteristics unrelated to gender preference is both necessary and sufficient. Cf. *Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 897 (D.C. Cir. 1998)

(observing that an employer can't discriminate on the basis of a disability without an actual "awareness of the disability itself").

To be sure, plaintiffs (wrongly) maintain that the biological-based sex standards operate as a complete ban on transgender persons. *Panel Judgment* *2 (This is "clear error."). But the effect of these standards on transgender persons (*Op.* —— n.* (Wilkins, J., concurring)) is no different from that of a regulation barring headgear (and thus yarmulkes) on Orthodox Jews. See *Goldman*, 475 U.S. at 514, 106 S.Ct. 1310 (Brennan, J., dissenting) ("It sets up an almost absolute bar to the fulfillment of a religious duty."). Even if both policies require "suppressi[on] [of] the characteristic that defines [a person's] identity," Appellees' Br. 21—be it "transgender identity," *id.*, or "religious ... identity," *Goldman*, 475 U.S. at 517, 106 S.Ct. 1310 (Brennan, J., dissenting)—the magnitude of the impact does nothing to transform a facially neutral policy into a facially discriminatory one, see *id.* at 510, 106 S.Ct. 1310 (majority opinion) (describing the headgear policy as "reasonabl[e]" and "evenhanded[ ]" "even though [its] effect is to restrict ... [expression] required by [ ] religious beliefs"); *id.* at 513, 106 S.Ct. 1310 (Stevens, J., concurring) (agreeing that the headgear policy is "neutral, completely objective").

*Shanahan*, 2019 1086495, at *33 (emphasis added).

Applying Judge Williams' concurring opinion, Policy Order 63 provides a criterion for changing the sex on a driver license that applies to *all*, transgender and non-transgender alike. The policy applies to those with intersex conditions as well as non-transgender individuals who wish to change the sex on their license to change their identity so they could, for example, engage in identity fraud. Judge Williams' analysis, like that of Judge William Pryor's concurrence in *Evans v. Georgia Regional Hospital*, 850 F.3d 1248, 1259 (11th Cir. 2017) (Pryor, J., concurring), concludes that a policy that disparately impacts transgender individuals based on their *status* as transgender does not constitute invidious discrimination . Thus, Policy Order 63 does not constitute sex-based discrimination based on gender non-conforming *behavior* requiring intermediate scrutiny as in *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), but rather provides a facially neutral criterion for changing the sex designation on a license that disparately impacts transgender

17

individuals based on their status. Since the policy is facially neutral, no form of heightened scrutiny applies, and Policy Order 63 easily satisfies rational basis review for the reasons already argued. Doc. 60 at 10-14.

Defendants reincorporate their previous arguments as to Plaintiffs' equal protection claim, namely, that even if intermediate scrutiny applies, Policy Order 63 satisfies this level of scrutiny and that transgender individuals do not constitute a suspect class warranting heightened scrutiny outside of the behavior-based analysis in *Glenn*. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' equal protection claim.

C.  Conclusion

For the reasons stated above, Plaintiffs' motion for summary judgment should be denied and Defendants' motion for summary judgment should be granted.

Respectfully submitted,

Steve Marshall,
 *Attorney General*

*s*/ Brad A. Chynoweth
Brad A. Chynoweth (ASB-0030-S63K)
Winfield J. Sinclair (ASB-1750-S81W)
 *Assistant Attorneys General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8440
bchynoweth@ago.state.al.us
wsinclair@ago.state.al.us

***Counsel for Defendants Hal Taylor, Charles Ward, Deena Pregno, and Jeannie Eastman***

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2019, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notification of such filing to the following:

Brock Boone
Randall C. Marshall
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
bboone@aclualabama.org
rmarshall@aclualabama.org

Rose Saxe
Gabriel Arkles
ACLU LGBT & HIV Project/ACLU
Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2605
rsaxe@aclu.org
garkles@aclu.org
*Admitted Pro Hac Vice*

/s Brad A. Chynoweth
Counsel for Defendants