IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DARCY CORBITT, *et al.*, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | CASE NO. 2:18-cv-91-MHT-SMD |
| ) | |
| HAL TAYLOR, *et al.*, ) | |
| ) | |
|     Defendants. ) | |

**DEFENDANTS' RESPONSE TO THE COURT'S BRIEFING ORDER**

Defendants Hal Taylor, Charles Ward, Deena Pregno and Jeannie Eastman file this response to the Court's September 3, 2020 briefing order (doc. 81).

**1.** **Policy Order 63 Does Not Constitute Invidious Sex-Based Discrimination in Violation of Equal Protection Notwithstanding *Bostock*.**

Defendants' equal protection argument consists of two parts. First, Defendants are entitled to judgment as a matter of law on Plaintiffs' equal protection claim because Policy Order 63 does not intentionally discriminate against Plaintiffs on the basis of their transgender status and thus does not constitute invidious sex-based discrimination. *See* doc. 54 at 45-46; doc. 60 at 11-20; doc. 62 at 17-20.[1] Second, even assuming Policy Order 63 is a sex-based classification triggering intermediate scrutiny, Defendants are entitled to judgment as a matter of law because Policy Order 63 satisfies intermediate scrutiny. *See* doc. 54 at 47-51; doc. 60 at 20-24; doc. 62 at 20. *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), is potentially relevant only to Defendants' *first*

---

[1] Citations are to the ECF header page numbers.

argument, *i.e.*, whether Policy Order 63 discriminates against Plaintiffs based on their transgender status or "because of" their sex.[2]

*Bostock* does not affect Defendants' principal argument that Policy Order 63 does not involve a classification on the basis of transgender status or sex that constitutes invidious discrimination under the Equal Protection Clause. *See* doc. 54 at 45-46. *Bostock* does require Defendants to withdraw their reliance on the distinction between discrimination based on transgender *status* and gender non-conforming *conduct* in the context of Title VII claims in *Evans v. Georgia Regional Hospital*, 850 F.3d 1248, 1254-55 (11th Cir. 2017). *See* doc. 60 at 17-18. Defendants' reliance on the Title VII analysis and Judge Pryor's concurrence in *Evans* are hereby withdrawn. Nevertheless, Defendants maintain Policy Order 63 does not "discriminat[e] against a transgender individual because of her gender-nonconformity," *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011), even after *Bostock*. An analysis of *Bostock* reveals why Policy Order 63 is distinguishable from the analysis of sex-based discrimination in the context of employment discrimination in *Bostock* and *Glenn*.

The issue in *Bostock* was whether terminating an employee because she was transgender was discrimination "because of" sex within the meaning of Title VII. 140 S. Ct. at 1737. The Court held that such an act is discrimination "because of" sex in violation of Title VII. *Id.* at 1742. But the Court's statutory interpretation shows that context matters—and it matters in ways that distinguish an employment decision affecting only an individual from the group classification at issue in Policy Order 63.

---

[2] Defendants' second argument that, in the alternative, Policy Order 63 satisfies intermediate scrutiny, is addressed in response to the Court's second and third questions posed in its September 3 order.

2

The Court's plain-meaning analysis of Title VII began with the premise that "sex" refers "only to biological distinctions between male and female." *Id.* at 1739. But the question was not "just what 'sex' meant, but what Title VII says about it." *Id.* The statute "prohibits employers from taking certain actions 'because of' sex," that is sex cannot be the "but for" cause of the employer's action. *Id.* But "Title VII does not concern itself with everything that happens 'because of' sex" but "imposes liability on employers only when they 'fail or refuse to hire,' 'discharge,' 'or otherwise . . . discriminate against' someone because of a statutorily protected characteristic like sex." *Id.* at 1740. Thus, in this context, "'[t]o discriminate against' a person . . . would seem to mean treating that individual *worse* than others who are similarly situated." *Id.* (emphasis added).

The Court further narrowed its interpretation of discrimination "because of" sex by noting Title VII prohibits discrimination against individuals, not groups. *Id.* at 1740-41. "The consequences of the law's focus on individuals rather than groups are anything but academic." *Id.* at 1741. That is, Title VII prohibits adverse employment decisions against an individual employee because of sex even if the employer generally treats men and women equally as a group. *Id.*

From this context, the Court extracted the following rule: "An employer violates Title VII when it intentionally fires an individual employee based in part on sex." *Id.* at 1741. "It doesn't matter if other factors besides the plaintiff's sex contributed to the decision. And it doesn't matter if the employer treated women as a group the same when compared to men as a group." *Id.* Applying this prohibition on sex-based intentional discrimination against individuals to the issue at hand, the Court concluded "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* This is because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* If an employer fires a "transgender person who was identified as a male at birth but who now

3

identifies as a female" but "retains an otherwise identical employee who was identified as female at birth" the "employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* In the specific context of employment discrimination, "homosexuality and transgender status are inextricably bound up with sex." *Id.* at 1742.

Thus, *Bostock* concludes that discrimination based on transgender status is discrimination because of sex based on all of the following context-specific features of Title VII: (a) an employer treats an *individual* employee (b) *worse* than a similarly-situated employee (c) because of (but for) the employee's transgender status. In this context, an employer cannot intentionally discriminate against an employee because of her transgender status without basing its decision in part on the employee's sex, *e.g.* if an employee was born as a man but identifies and dresses as a woman.

But *Bostock* (and *Glenn*) are inapplicable to Policy Order 63 because it concerns a *group classification* that treats men and women, and transgender and non-transgender, alike—and it does not treat transgender individuals *worse* than non-transgender individuals. The equal protection analysis here is guided by the two-step analysis from *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), which differs from the individual employment decisions in *Bostock* and *Glenn. See* doc. 54 at 45-46. Under *Feeney*, a court first looks to whether it involves a gender-based *group classification*. *See Feeney*, 442 U.S. at 274. If the classification is facially neutral, the court next looks to whether "the adverse effect reflects invidious gender-based discrimination." *Id*. Unlike the individual, animus-based employment decisions in *Bostock* and *Glenn*, Policy Order 63 does not invidiously discriminate on the basis of sex even if it disparately impacts transgender individuals.

4

First, Policy Order 63's group-based classification does not single out Plaintiffs for adverse treatment based on their transgender status. Policy Order 63 is facially neutral under the first step of the *Feeney* test. It is a policy for changing the sex designation on an Alabama driver license of general applicability. It applies to men and women. It applies to anyone who wants to change a license regardless of whether the request is because of someone's transgender status. By contrast, *Bostock* expressly stated that its statutory analysis did not apply to considerations of equal treatment between groups. *See Bostock*, 140 S. Ct. at 1747-48. But the equal protection analysis here turns on the rationality of the group *classification* made by Policy Order 63. *See Feeney*, 442 U.S. at 272.

Second, applying the second step of the *Feeney* test demonstrates why *Bostock* is distinguishable. The second step is to show that the facially neutral policy has an "*adverse effect* [that] reflects invidious gender-based discrimination." *Feeney*, 442 U.S. at 274 (emphasis added). To constitute invidious discrimination for equal protection purposes, a plaintiff must show that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its *adverse effects* upon an identifiable group." *Id*. 279 (emphasis added). Policy Order 63 neither treats transgender individuals worse than non-transgender individuals, nor was it adopted because of its adverse effect upon transgender individuals.

Policy Order 63 does not have an "adverse effect" on transgender individuals because it does not prevent transgender individuals from possessing a driver license on the same terms as other citizens, nor does it prevent them from changing the sex designation on their license if they can meet the surgery requirement. While Plaintiffs feel that Policy Order 63 treats them worse because they cannot meet its surgery requirement, Policy Order 63 serves as *an accommodation*, rather than an adverse effect, for transgender individuals who no longer identify with the sex with

5

which they were born. Policy Order 63 does not impose an adverse effect on Plaintiffs like the employers' *termination* of the plaintiffs in *Bostock* and *Glenn*.

Nor was Policy Order 63 "selected or reaffirmed" "because of" its effect on transgender individuals. *Feeney*, 442 U.S. at 279. Policy Order 63 treats similarly-situated individuals the same. The undisputed facts show that Defendants changed the sex designation for those who provided medical documentation of sex reassignment surgery. Policy Order 63 does not deny Plaintiffs a change in the sex designation on their license "because of" their transgender status. Plaintiffs are treated differently because they cannot meet the surgery requirement. Unlike the animus-based discrimination in *Bostock* and *Glenn* that singled out employees for adverse treatment based on a characteristic necessarily involving sex, the surgery requirement applies equally regardless of sex or transgender status.

Finally, consider the facts that motivated the Court's analysis in *Bostock* in contrast to the facts here. Aimee Stephens presented as a male when she began working for her funeral home employer but began living as a woman after her diagnosis for gender dysphoria. *See Bostock*, 140 S. Ct. at 1738. After she informed her employer of her plan to live and work full-time as a woman, the funeral home fired her, "telling her 'this is not going to work out.'" *Id.*; *see also Glenn*, 663 F.3d at 1321 (holding employer discriminated on the basis of sex where he terminated transgender employee after stating her appearance and dress were "inappropriate," "unsettling," and "unnatural."). The employees in *Bostock* and *Glenn* were treated worse (terminated) on an individual basis because they dressed as women, but were born as men. The employers would not have terminated them if they were born as women and dressed as women. And so terminating the employees on the basis of their transgender status was necessarily related to their sex.

But here, Plaintiffs were denied a change to the sex designation on their driver licenses because they could not provide medical documentation of sex reassignment surgery. If they could have provided it, the sex designation would have been changed as it was for the others who could provide such documentation. *See* doc. 48-16. Unlike the employee in *Bostock* whose transgender status is "inextricably bound up with sex," and hence the employer's reason to terminate her, Defendants did not deny Plaintiffs a change to the sex designation based on their transgender status. The record does not indicate that Defendants inquired or knew about Plaintiffs' status as transgender women. Defendants simply requested medical documentation as they would anyone else requesting a change to the sex designation on their license. Nor did Defendants treat Plaintiffs worse than non-transgender individuals. Under *Feeney*'s equal protection analysis for a policy of general application, rather than the analysis for individual employment decisions *Bostock* and *Glenn*, Policy Order 63 does not invidiously discriminate on the basis of sex or transgender status. Defendants are entitled to judgment as a matter of law on Plaintiffs' equal protection claim without the need to engage in any intermediate scrutiny analysis.

**2.    Defendants' Interest in Law Enforcement Identification Is Not Hypothesized or Invented *Post Hoc* in Response to Litigation.**

Even assuming Defendants must satisfy intermediate scrutiny, the Court does not need to hold a hearing on whether Defendants' interest in law enforcement identification is "hypothesized or invented *post hoc* in response to litigation." Doc. 81 at 2 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). The evidence the Court would hear at such a hearing is already in the record in this case. It indisputably demonstrates Defendants' law enforcement interest in Policy Order 63 through actions prior to or independent of this litigation.

First, the Alabama State agency responsible for identification information on driver licenses has always been a law enforcement agency. This responsibility first lay with the

7

Department of Public Safety ("DPS") and, later, with the Alabama Law Enforcement Agency ("ALEA") after its creation in 2013. *See* Ala. Code § 32-6-6 (delegating the duty to determine identification information to be included on a driver license to DPS); Ala. Code § 41-27-1 (creating ALEA "to coordinate public safety in this state" and placing DPS and the State Bureau of Investigations under its jurisdiction); Doc. 48-7 [Woodruff Deposition] at 12-14; Doc 48-5 [Chief Pregno Deposition] at 55 ("As I stated earlier [at 44], we are a law enforcement agency, and we are preparing and issuing an identification document."). The Director of DPS, Defendant Colonel Charles Ward, is appointed by the Secretary of ALEA and is required by statute to "have an extensive law enforcement background and, by virtue of office, is a state law enforcement officer . . . ." Ala. Code § 41-27-6(a)(1). Alabama does not have a Department of Motor Vehicles ("DMV"). Driver licenses, insofar as they are used as a means of identifying Alabama citizens, have *always* been under the authority of a state law enforcement agency. Defendants' law enforcement interest in providing a uniform physical description (or criterion for changing a physical description) on driver licenses pre-dates this litigation by virtue of this institutional history.

Second, the testimony and records submitted show that Defendants have actually enforced and applied the surgery requirement for changing the sex designation on driver licenses since before Policy Order 63 was even put in writing in 2012. Prior to Policy Order 63's formal creation in 2012, DPS had an unwritten procedure for changing the sex designation on a license if the licensee provided a letter from a physician stating that the physician had performed sex reassignment surgery on the licensee and the surgery had been completed. Doc. 48-7 at 48-50. There are documents in the record reflecting DPS changed the sex designation on a license upon receiving medical documentation of sex reassignment surgery dating as far back as 2008. *See, e.g.*,

doc. 48-18 at Bates Nos. D1245-48; *see also id.* at D1208, 1212-16, 1218-19, 1222, 1228, 1238-39, 1139-44, 1179, 1181-82, 1184, 1186-87, 1190, 1196 (containing additional records of sex changes from 2008 through 2012). And, of course, the records contain numerous examples of additional sex designation changes since Policy Order 63 was put into writing in 2012. *See id.* Plaintiffs may quibble whether DPS and ALEA employees maintained complete uniformity over the years on whether a given doctor's note was sufficient to meet the surgery requirement. But there is no dispute that Defendants in fact required medical documentation of sex reassignment surgery before changing the sex designation on a driver license with documentation reaching back to 2008. Defendants' documented history of enforcing and applying Policy Order 63 over the years, and prior to this litigation, demonstrates their stated law enforcement interests are *not* "hypothesized or invented *post hoc* in response to litigation." Defendants' enforcement history shows an institutional concern for uniform physical descriptions on driver licenses rather than a merely pretextual after-the-fact justification, as would be the case for an historically unenforced policy.

Third, Defendants' law enforcement interests are justified by facts that occurred prior to or independently of this litigation. Defendants have stated Policy Order 63 serves the State's interest in "provid[ing] identification for law enforcement and administrative purposes, including, but not limited to, purposes related to arrest, detention, identification of missing persons or crime suspects, and the provision of medical treatment." Doc. 48-17 at 6. Defendants submitted a report from an expert in correctional administration, Don Leach, on October 31, 2018. Doc. 48-9, PX38. In the report, Leach stated his opinion that there is a governmental interest in having a standardized definition of "sex" so that correctional administrators can form appropriate search, housing, supervision, and medical care policies that take an inmate's sex into account. *Id.* at pp. 13-17. On

9

November 21, 2018, *after* Defendants served Leach's report, the Eleventh Circuit issued an opinion in which it held a Florida county jail was deliberately indifferent in misgendering a female inmate during intake and placing her in a male detention facility. *See DeVeloz v. Miami-Dade Cty.*, 756 F. App'x 869, 877 (11th Cir. 2018). *DeVeloz* occurred independently of this litigation and reinforces Leach's opinion on the importance of providing a uniform definition of "sex" on a driver license on which a corrections officer may rely at booking. Also independent of this litigation, Chief Pregno testified about a situation in which a district attorney contacted ALEA for help identifying a deceased individual that a medical examiner had identified as female based on the presence of female genitalia. Doc. 48-5 at 59-60. Although the district attorney had identified the victim as a male based on a criminal database search, ALEA was able to confirm that the same individual was a female at the time of death based on documentation of a sex change contained in information in ALEA's driver license records. *Id.* at 59-61. Finally, Plaintiffs all testified in their depositions that they had been required to display their driver licenses to Alabama law enforcement officers in connection with a traffic stop, traffic accident, or to report a crime. Doc. 48-2 at 66-70; Doc. 48-1 at 33-34; Doc. 48-3 at 71-72. *DeVeloz*, Chief Pregno's example of identifying the homicide victim, and Plaintiffs' prior displays of their licenses to law enforcement officers all exemplify Defendants' law enforcement interests in Policy Order 63, and these facts occurred prior to or independently of this litigation.

Fourth, if Defendants' interest in consistency with the process of amending birth certificates is not "hypothesized or invented *post hoc* in response to litigation," then neither is their interest in law enforcement identification. But Defendants' interest in maintaining consistency with the process for amending birth certificates is not post hoc because Policy Order 63 was based on the statutory surgery requirement for amending sex on birth certificates when it was created

years before this litigation. *See* doc. 48-5 at 42. Therefore, the necessarily related law enforcement interest is also not post hoc. While these interests are conceptually distinct, Defendants' interest in law enforcement identification are inseparable from maintaining consistency with the process for amending birth certificates. The sex designation on an Alabama birth certificate is the "default" for establishing the sex designation on the same individual's driver license. Doc. 48-7 at 90-92; *see also* doc. 48-5 at 104 (testimony of Chief Pregno that if someone changes their name on their birth certificate, they are also required to change their name on their license). If the physical descriptions on a birth certificate provide the default descriptions on a driver license, and a driver license is used by law enforcement officers to identify subjects, then consistency between changes in the physical characteristics on the two documents is related to Defendants' interest in law enforcement identification. Since Defendants' interest in consistency are neither hypothesized nor post hoc, then neither is their interest in law enforcement identification.

For these reasons, the evidence in the record demonstrates that, even assuming intermediate scrutiny applies, Defendants' asserted interest in law enforcement identification is not "hypothesized or invented *post hoc* in response to litigation." Therefore, the Court should not hold a hearing on the issue as it would merely hear evidence already in the record establishing this fact.

**3.   Policy Order 63 Is Consistent with the Process for Amending the Sex Designation on an Alabama Birth Certificate.**

Policy Order 63 is consistent with the process for amending the sex designation on an Alabama birth certificate because there is no specific list of procedures that satisfy the surgery requirement under Alabama Code § 22-9A-19(d) and judges approve amended birth certificates based upon documentation of sex reassignment surgery, similarly to Policy Order 63.

Alabama birth certificates may be amended to change the sex designation as follows:

> Upon receipt of a certified copy of an order of a court of competent jurisdiction indicating that the sex of an individual born in this state has been changed by surgical procedure and that the name of the individual has been changed, the certificate of birth of the individual shall be amended as prescribed by rules to reflect the changes.

Ala. Code § 22-9A-19(d). Defendants have been unable to locate any case law or Attorney General Opinions construing what specific procedures satisfy the requirement that "the sex . . . has been changed by surgical procedure." *Id.* However, the Alabama Department of Public Health, Division of Vital Statistics, has promulgated administrative regulations that provide some details on amending birth certificates. *See* Ala. Admin. Code § 420-7-1-.16.

Two subsections of this administrative regulation are applicable to changes to the sex designation on a birth certificate. The first section concerns amendments to birth certificates other than for the correction of minor errors within one year of the date of the event. *See* § 420-7-1-.16(6). For such amendments, "documentary evidence must be presented" and "[a]ll documents presented must contain sufficient information to clearly indicate that they pertain to the registrant on the birth certificate for which the correction has been requested." *Id.* Examples of acceptable documents include "[c]ourt orders clearly establishing the facts to be amended" and "[m]edical records." *Id.* § 420-7-1-.16(6)(a)(1.)(i.), (j.). Such records must be a "duly certified copy or excerpt thereof from the original custodian of the record." *Id.* 420-7-1-.16(6)(a)(3.). Although less applicable, the regulation contains another section for amendments to "other items on the birth certificate," which must include "adequate documentary evidence to support the amendment," including an "order from an Alabama circuit court." *Id.* 420-7-1-.16(6)(f)(3.). Thus, the Alabama Code and relevant administrative regulations authorize a change to the sex designation on a birth certificate with a court order supported by adequate medical documentation, with no specific definition of sex reassignment surgery provided.

The record contains samples of court orders approving amendments to the sex designation on Alabama birth certificates. *See* doc. 48-18 at Bates Nos. D1148, 1162, 1199, 1225, 1241-42.[3] These court orders demonstrate that the petitions were supported by medical documentation with no specific procedures mentioned, similar to the medical documentation deemed sufficient for a change in a driver license under Policy Order 63. For instance, one order makes a specific finding based on "evidence submitted" that "the Petitioner has undergone a surgical procedure to irreversibly change her sex, male to female, in order to reflect her true gender; and that her sex was so changed thereby." *Id.* at Bates No. 1225. None of these court orders makes a specific finding regarding which procedures were performed, but only that the verified petitions and record evidence before the court satisfies the surgery requirement of § 22-9A-19(d). Based on the petitioners' documentation of sex reassignment surgery, the courts issued orders to the respondent Alabama Department of Public Health, Division of Vital Statistics, to issue an amended birth certificate changing the sex designation.

Thus, the plain language of § 22-9A-19(d) requires a petitioner requesting a change to the sex designation on a birth certificate to supply proof "that the sex of an individual born in this state has been changed by *surgical procedure*." *Id.* (emphasis added). Supporting administrative regulations require proof of this surgical procedure by medical documentation. *See* § 420-7-1-.16(6)(a.), (f.). Policy Order 63 tracks this statutory requirement for birth certificates by requiring either an amended birth certificate or proof of "gender reassignment surgery." Doc. 48-7, PX7 at D2. For purposes of implementing Policy Order 63, the terms "sex reassignment surgery,"

---

[3] In addition to these court orders, the record contains numerous examples of amended birth certificates that reference circuit court or probate court cases approving sex designation changes in the "FACTS AMENDED" section. *See* doc. 48-18 at Bates Nos. D1147, 1159, 1167, 1175, 1189.

"reassignment procedure," and "gender reassignment surgery" are interchangeable. Doc. 48-4 at 62. Because changes to both documents require medical documentation of sex reassignment surgery, Policy Order 63 is in fact consistent with the process for amending the sex designation on an Alabama birth certificate.

>Respectfully submitted,
>
>Steve Marshall,
>  *Attorney General*
>
>*s/* Brad A. Chynoweth
>Brad A. Chynoweth (ASB-0030-S63K)
>  *Assistant Chief Deputy Attorney General*
>Winfield J. Sinclair (ASB-1750-S81W)
>  *Assistant Attorney General*
>
>Office of the Attorney General
>501 Washington Avenue
>Montgomery, Alabama 36130-0152
>Telephone: (334) 242-7300
>Fax: (334) 353-8400
>Brad.Chynoweth@AlabamaAG.gov
>Winfield.Sinclair@AlabamaAG.gov
>
>***Counsel for Defendants Hal Taylor, Charles Ward, Deena Pregno, and Jeannie Eastman***

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Randall C. Marshall
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
rmarshall@aclualabama.org

Rose Saxe
Gabriel Arkles
Leslie Cooper
ACLU LGBT & HIV Project/ACLU Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2605
rsaxe@aclu.org
garkles@aclu.org
*Admitted Pro Hac Vice*

/s Brad A. Chynoweth
Counsel for Defendants