IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DARCY CORBITT, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CASE NO. 2:18-cv-91-MHT-GMB |
| ) | |
| HAL TAYLOR, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**<u>MEMORANDUM OF LAW IN RESPONSE TO ORDER FOR ADDITIONAL BRIEFING</u>**

On February 6, 2018, Plaintiffs brought this action challenging Defendants' policy preventing them from obtaining driver's licenses that correctly designate them as female as violating their rights under the Equal Protection clause, Due Process clause, and Free Speech clause of the Constitution. The parties cross moved for summary judgment on February 8, 2019. At oral argument, the parties agreed to submission of the case on the record. By Order dated July 30, 2019, this Court denied both motions for summary judgment and reserved for judgment "whether to decide the case on the paper record or to hold a trial as to some or all issues." On September 3, 2020, the Court ordered the parties to submit additional briefing on three issues. Doc. No. 81. Pursuant to that Order, Plaintiffs submit that the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), further supports Plaintiffs' Equal Protection claim, a hearing on the subject of the state's justification for its policy is not needed, and that Policy Order 63 is inconsistent with the process for amending sex designation on an Alabama birth certificate.

 **I.** ***Bostock* Reinforces the Conclusion that Policy Order 63, in Denying Access to an Accurate Useable Driver's License to Plaintiffs Because They Are Transgender, Constitutes Sex Discrimination in Violation of the Equal Protection Clause.**

Policy Order 63 facially discriminates on the basis of sex. By purpose, design, and effect, Policy Order 63 denies transgender people—and only transgender people—access to an accurate

driver's license that they may use without sacrificing their safety, health, privacy, and dignity. Policy Order 63 punishes those who identify and live as a sex other than the sex they were assigned at birth unless they undergo sterilizing surgery. It also reinforces the sex stereotype that everyone does or should only identify and live as the sex conventionally associated with their genital anatomy and breast size. The Eleventh Circuit has already held that discrimination against transgender people is sex discrimination, and thus receives heightened scrutiny. *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011).

Defendants have argued that Policy Order 63 does not discriminate based on sex, and so is not subject to intermediate scrutiny. Rather, they argue that Policy Order 63 should be seen as a neutral policy that merely disparately impacts transgender people. In making this argument, they have relied on an out-of-circuit decision that held a policy requiring service members in the U.S. armed services to serve in their "biological sex" did not discriminate on the basis of sex, because it nominally applied to everyone. Defs.' Reply (Doc. No. 62) at 15–18 (citing *Doe 2 v. Shanahan*, 917 F.3d 694, 700 (D.C. Cir. 2019)); *contra Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019). They have also argued that the policy permissibly differentiates based on real sex-based physical differences.

*Bostock* has resolved any doubt on this point in favor of the Plaintiffs. In *Bostock*, the Supreme Court considered whether it was discrimination because of sex under Title VII of the Civil Rights Act of 1964 for an employer to fire a transgender woman when she "wrote a letter to her employer explaining that she planned to 'live and work full-time as a woman.'" *Bostock*, 140 S. Ct. at 1738. Because the employer would have allowed an employee assigned female at birth to live and work full-time as a woman, but fired Aimee Stephens, who was assigned male at birth, for the same conduct, "sex play[ed] an unmistakable and impermissible role" in the decision. *Id.*

2

at 1742–43. Indeed, the Court recognized that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 1741. The Court clarified that where sex motivates a practice, "it is irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it." *Id.* at 1744. While *Bostock* was decided in the context of Title VII, Title VII cases often inform Equal Protection analysis, particularly where the salient question is whether an action is because of sex. *See, e.g.*, *Wilborn v. S. Union State Cmty. Coll.*, 720 F. Supp. 2d 1274, 1308 (M.D. Ala. 2010). Indeed, the Eleventh Circuit relied extensively on Title VII cases in reaching its conclusion in *Glenn*. 663 F.3d at 1316.

In the short time since *Bostock* was decided, five courts have cited it in resolving an Equal Protection claim brought by transgender litigants. Each court ruled in favor of the transgender plaintiffs. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1296 (11th Cir. 2020) (pet. for reh'g en banc pending); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. CV 20-1630 (JEB), 2020 WL 5232076 (D.D.C. Sept. 2, 2020); *Grimm v. Gloucester Cnty. Sch. Bd.*, No. 19-1952, 2020 WL 5034430 (4th Cir. Aug. 26, 2020), *as amended* (Aug. 28, 2020); *Walker v. Azar*, No. 20CV2834FBSMG, 2020 WL 4749859 (E.D.N.Y. Aug. 17, 2020); *Hecox v. Little*, No. 1:20-CV-00184-DCN, 2020 WL 4760138 (D. Idaho Aug. 17, 2020).

Most salient here, the Eleventh Circuit recently ruled that a school district policy prohibiting a transgender boy from using the boys' restroom violated Title IX and the Equal Protection clause. The court found that the plaintiff "properly tee[d] up" the constitutional issue when he explained that "by defining 'boy' and 'girl' based on 'biological sex,' or sex assigned at birth, the School Board divides restrooms based on a characteristic that 'punishes transgender students and favors non-transgender students.'" *Adams*, 968 F.3d at 1296. The court reasoned that,

consistent with *Glenn* and *Bostock,* the policy was subject to heightened scrutiny because it "places a special burden on transgender students because their gender identity does not match their sex assigned at birth." *Id.* The same is true in this case. Policy Order 63 defines sex based on assigned sex at birth and sex-related anatomy, which punishes transgender Alabamans, favors cisgender Alabamans, and places a special burden on transgender people because their gender identity does not match their assigned sex at birth.

Like the Eleventh Circuit in *Adams*, the Fourth Circuit recently ruled that a school district's policy requiring students to use restrooms based on their "biological gender" discriminated against a transgender boy. *Grimm*, No. 19-1952, 2020 WL 5034430, at *21 ("After the Supreme Court's recent decision in *Bostock v. Clayton County*, we have little difficulty holding that a bathroom policy precluding Grimm from using the boys restrooms discriminated against him 'on the basis of sex.'") (internal citation omitted).

Defendants in *Grimm* raised an identical argument to the one Defendants have made here: that the policy applies to everyone, so it does not discriminate because of sex. *Id.* at *15. The Fourth Circuit rejected that argument, mirroring the reasoning in *Bostock* when it noted that preventing the transgender boy from using boy's restrooms required considering sex. *Id.* Just so here—Defendants cannot continue to deny Darcy Corbitt, Destiny Clark, and Jane Doe a female sex designation on their licenses without consideration of sex.

Also of note is *Hecox v. Little,* another case interpreting *Bostock* in the context of an Equal Protection challenge to a rule that classified transgender women as "male." In that case, a state law stated that only females could play on girls' sports teams, and defined female based on various physiological and anatomical characteristics (reproductive anatomy, endogenous hormone levels, and genetic makeup). There, the court found that the law was subject to heightened scrutiny

4

because it treated cisgender athletes differently from transgender athletes: cisgender athletes could participate in sports consistent with their gender identity, while transgender athletes could not. *Hecox*, No. 1:20-CV-00184-DCN, 2020 WL 4760138, at *27. Similarly, here, cisgender people can obtain licenses consistent with their gender identity, while transgender people cannot.

In that case, like in this one, Defendants claimed the law was not subject to heightened scrutiny because it did not expressly use the term "transgender" and differentiated only on the basis of real physiological characteristics. The court noted that avoiding the term "transgender" was not enough to avoid the conclusion that the law was directed at transgender people, and that differentiating based on sex-related characteristics did nothing to show the policy was not sex-based. *Id.* Defendants further argued that transgender women were not barred from participating in sports because they could always do so as men, as Defendants here have argued that they do offer Plaintiffs driver's licenses—simply ones that label them as male. *Id.* at *35. The court rejected that argument "as did the Supreme Court in *Bostock*," noting that it was the equivalent of arguing that gay men and lesbians were not prohibited from marrying under statutes preventing same-sex marriage, because they could always marry people of a different sex. *Id.*

II. **Because the Undisputed Evidence Shows that Defendants' Interest in Law Enforcement Identification Is Invented *Post Hoc,* A Hearing Is Not Needed.**

No hearing is necessary to determine whether the Defendants' interest in law enforcement identification is "hypothesized or invented post hoc in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996). The record is undisputed that the Defendants' only contemporaneous reason for adopting the current policy was wanting consistency with the state birth certificate policy.

The only evidence offered on the reasons for Policy Order 63 was from the Chief Deena Pregno in her 30(b)(6) testimony. Chief Pregno was asked "what considerations went into ALEA's

5

decision to adopt this policy as opposed to some other?" Pregno Dep. 45:5–7. She responded, "what the state requires for amended birth certificates." *Id.* at 8–9. In response to the question, "Were there any other considerations that ALEA took into account at that time?" *Id.* at 10–12. She responded: "Not that I'm aware of." *Id.* at 13–14. While the policy was revised after that time, the only reason offered for that change was to give "more latitude" and "stay consistent with" the state policy. *Id.* at 47:7–8, 48:10.

In the absence of any admissible evidence contradicting the 30(b)(6) testimony, it is undisputed that any other interests did not actually motivate the creation or revision of Policy Order 63. As such, they were invented post hoc, and cannot satisfy heightened scrutiny.

### III. Policy Order 63 Is Inconsistent with the Process for Amending Sex Designation on an Alabama Birth Certificate.

Not only did Defendants' purported rationalization for Policy Order 63 come after the fact, it also makes little sense. Policy Order 63 is inconsistent with the state's process for sex designation changes on birth certificates.

Plaintiffs have not been able to identify any judicial interpretation of what the phrase "the sex of an individual born in this state has been changed by surgical procedure" means. Ala. Code § 22-9A-19(d).

Nonetheless, Policy Order 63's process for changing a sex designation on a driver's license does not fully coincide with the process for amending a person's sex designation on an Alabama birth certificate.

In some ways, the statute governing birth certificates may be more onerous because a person amending the sex designation on their birth certificate must 1) change their name and 2) petition a court to issue an order indicating that the individual underwent a surgical procedure to change their sex and that the name was changed. *See id.* Under Policy Order 63, an individual

need not change their name to change their sex designation and need not obtain a court order. There is also obviously no way to change an Alabama birth certificate through submitting an amended birth certificate from some other state, as is possible under Policy Order 63. Eastman 30(b)(6) Dep. 59:13–18.

But in many ways, Policy Order 63 is far more onerous. Ala. Code § 22-9A-19(d) does not state what specific "surgical procedure" is required, and it at least strongly implies that only one procedure is required. It leaves open the possibility that judges will interpret the requirement in a way that does not require permanent sterilization, and that they will accept proof of any form of gender-affirming surgery as sufficient. While this standard would still be burdensome and unconstitutional if used for driver's licenses, because it would still treat transgender people worse than cisgender people, disclose sensitive personal information, compel speech, and condition a government benefit on renouncing the right to refuse medical care, it would be significantly less extreme than what Defendants require under Policy Order 63.

Defendants interpret Policy Order 63 to require what they refer to as "complete" gender reassignment, by which they mean that a transgender person must receive at least two forms of surgery before changing the sex designation on a driver's license: genital reconstruction surgery and surgery on the upper body. Eastman 30(b)(6) Dep. 53:9–54:1; 66:19–22; 67:4–18; Pregno Dep. 85:12–20; Spencer Dep. 61:10–20; 63:13–17. The genital surgery they require always results in permanent sterilization for transgender women, and almost always does for transgender men. Gorton Decl. ¶ 43.

The birth certificate statute also leaves open the ways a person may prove that they have undergone a surgical procedure to a judge. For example, if someone's surgeon has retired or died, presumably they could prove they had undergone surgery through some means other than a letter

7

from the surgeon who performed the procedure—an option foreclosed to them under Policy Order 63. Eastman 30(b)(6) Dep. 61:14–20. Even if it were simply more convenient or less costly to submit evidence from one's primary care physician to the court stating that one has undergone surgery, a judge might accept that proof, and a judge would not necessarily arbitrarily require the physician to have used the word "complete," as Defendants do. *Id.* at 53:9–54:1. And it is vanishingly unlikely that state judges call litigants' physicians without permission to inquire into the details of the medical care they have received, as Defendants do. *Id.* at 37:17–41:10.

While consistency with the state birth certificate policy would not meet the standards as an important government interest, and even a policy that aligned as fully as possible with the statute regarding birth certificates would violate the constitution, these differences demonstrate that Defendants' rationalization does not even hold true: Policy Order 63 is inconsistent with the process for amending the sex designation on a birth certificate in Alabama.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court rule in favor of Plaintiffs on all counts.

Respectfully submitted this the 18th day of September 2020.

                                                                      s/ Gabriel Arkles
Rose Saxe
Gabriel Arkles
ACLU LGBT & HIV Project / ACLU Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2605
rsaxe@aclu.org
garkles@aclu.org
*Admitted Pro Hac Vice*

Randall Marshall
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
rmarshall@aclualabama.org
*Counsel for Plaintiffs Darcy Corbitt, Destiny Clark, and Jane Doe*

## **CERTIFICATE OF SERVICE**

    I certify that on September 18, 2020, I filed the foregoing electronically using the Court's CM/ECF system, which will serve all counsel of record.

s/ Randall Marshall