IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DARCY CORBITT, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CASE NO. 2:18-cv-91-MHT-GMB |
| ) | |
| HAL TAYLOR, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO THE COURT'S BRIEFING ORDER**

Plaintiffs submit this additional argument in response to the first two issues in Defendants' Response to the Court's Briefing Order. Plaintiffs rest on their previous briefing on the third question.

**I.     By Any Formulation, Policy Order 63 Treats Transgender People Differently Based on Sex.**

Defendants' various arguments for how Policy Order 63 does not trigger heightened scrutiny are unavailing. A policy that categorizes people based on male or female on their license based on sex on their birth certificate or evidence of genital surgery is patently sex-based. In purpose, design, and effect, the policy treats transgender people worse than cisgender people.

Defendants argue that Policy Order 63 does not trigger heightened scrutiny because it involves a group-based distinction. But group distinctions, like individual distinctions, do trigger heightened scrutiny whenever the government draws those distinctions at least in part based on sex. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979) ("Classifications based upon gender . . . must bear a close and substantial relationship to important governmental objectives."); *United States v. Virginia*, 518 U.S. 515, 547 (1996) (holding rule excluding women, as a group, from admission to Virginia Military Academy unconstitutional); *Frontiero v. Richardson*, 411 U.S. 677,

691 (1973) (finding statutes making it more difficult for women service members than men service members to claim their spouses as dependents unconstitutional).

Defendants also argue that Policy Order 63 does not hurt transgender people. In Equal Protection claims seeking only declaratory and injunctive relief, Plaintiffs need not show injury beyond what is necessary to satisfy Article III standing; while Title VII concerns itself only with an enumerated list of actions, including discrimination, the Equal Protection clause examines classifications. *Compare Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1740 (2020) (assuming for sake of argument that Title VII only prohibits "discrimination")*, with Feeney*, 442 U.S. at 272 ("In assessing an equal protection challenge, a court is called upon only to measure the basic validity of the legislative classification."); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994) (heightened scrutiny applies to "all gender-based classifications").

But here, Plaintiffs have offered overwhelming, undisputed evidence that Policy Order 63 has harmed each of the Plaintiffs and other transgender people in myriad ways. Corbitt Dep. 36:21–23; 37:1–11 (the humiliation Ms. Corbitt experienced when seeking an Alabama driver's license led her to lose sleep and miss work); Corbitt Decl. ¶ 12 (Ms. Corbitt will not be able to stay in Alabama after her graduation if Policy Order 63 stays in effect); Clark Decl. ¶ 9 (Ms. Clark avoids buying alcohol because she fears showing her license); Clark Dep. 33:20–13; 34:1–9 (Ms. Clark fears for her safety while voting); Doe Dep. 78:11–79:4 (Ms. Doe was refused service and told she was going to Hell when she showed her license to a bank teller); Doe Dep. 35:19–23; 36:1–4 (Ms. Doe has been harassed when she showed her license to restaurant staff); U.S. Trans Survey of 2015: Alabama State Report (28% of transgender people surveyed in Alabama had experienced some form of mistreatment when they showed ID with a sex designation that did not match their

2

presentation); Gorton Decl. ¶ 27 (having an identity document with the correct sex designation corresponds with a large reduction in suicide attempts for people with gender dysphoria).

Defendants further argue that the distinction they draw is not based on sex or transgender status, but rather based on surgery. First, it is disingenuous to suggest that a distinction based on surgery is not based on sex when defining the surgery in question as "sex reassignment surgery." Doc. No. 82 at 6. This is surgery performed on some transgender people to alter their physical sex-related characteristics for purposes of relieving their gender dysphoria. Gorton Decl. ¶¶ 36, 43. Because these surgeries cannot be described or explained without reference to sex, any distinction based on them is also a distinction based on sex. *See Bostock*, 140 S. Ct. at 1746.

Second, the distinction Defendants draw is certainly not only about surgery. People who identify with their assigned sex at birth can obtain a driver's license with a sex designation that corresponds to their identity without undergoing any form of surgery, without losing their fertility, and without submitting any sort of medical evidence to the government (even if their genitalia or upper body is not typical for those of their sex). Transgender people cannot, precisely because their assigned sex at birth differs from their gender identity—that is, because they are transgender and thus because of sex. *Id.* at 1741. Even if these are not the sole cause of Defendants' decision to withhold a safe and accurate driver's license from Plaintiffs and other transgender people, that does not make the decision any less because of sex. *Id.*

Finally, Defendants argue that Defendants did not know that Plaintiffs were transgender women when they sought to change the sex on their driver's licenses. In fact, Defendants or their subordinates did have actual knowledge that each Plaintiff was identified as male at birth and now identifies as a woman, and thus that they are transgender women. But even if that knowledge did

somehow escape them, heightened scrutiny would still apply to the sex-based policy Defendants created and implemented.

## II. None of the Evidence that Defendants Point to Indicate that the Interest in Law Enforcement Identification Actually Motivated Its Policy.

Defendants offer various interpretations of the record in an attempt to cast their interest in law enforcement identification as "genuine" and not "hypothesized or invented post hoc in response to litigation." *Virginia*, 518 U.S. at 533. But they point to no evidence from the record indicating that this interest actually motivated the adoption of any iteration of Policy Order 63. Nor could they, as this evidence does not exist.

Defendants continue to misunderstand the meaning of the term "post hoc." Post hoc means "subsequently." *Post Hoc*, Black's Law Dictionary (11th ed. 2019). Whether in administrative law or under heightened scrutiny analysis in Equal Protection law, the rationales offered to justify agency actions must have actually motivated the agency's decision at the time it was made. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) ("[T]he problem is the timing . . . ."). Otherwise, they may not be considered. *See Virginia*, 518 U.S. at 533.

Thus, Defendants' various arguments miss the point. The fact that ALEA is a law enforcement agency sheds no light on what actually motivated its decision to impose a surgical requirement. Nor does the fact the agency has imposed this requirement for some time clarify its original purpose for doing so. The fact that law enforcement agencies have some sex-specific policies for arrest and detention, or sometimes use sex among other characteristics to assist in identifying people, also has no bearing on what the agency actually considered in setting its policy. And it is entirely possible to want to maintain rough consistency with the birth certificate policy

for reasons that have nothing to do with law enforcement identification, which, according to the agency's 30(b)(6) witness, is what happened here.

Again, the record is undisputed that the Defendants' only contemporaneous reason for adopting the current policy was wanting consistency with the state birth certificate policy. The 30(b)(6) witness stated that she had no knowledge of the agency taking law enforcement interests into account when it first formulated its policy. Pregno Dep. 44:20–45:2. She testified that to her knowledge—and thus to the agency's knowledge—the *only* interest at the time was consistency with birth certificates, and nothing else. *Id.* at 45:3–13; Fed. R. Civ. P. 30(b)(6). When asked why that interest mattered, the agency offered nothing more than "we wanted to be in line with what their requirements were" and "[w]e want to be consistent in . . . requiring the same types of documents when we're dealing with the same situation." Pregno Dep. at 43:5–16; 102:16–19. That is not the same as formulating a policy to assist law enforcement officers in identifying crime suspects or missing persons. Indeed, if law enforcement identification were a genuine rationale for creating a policy about transgender access to updated sex designations, the agency may well have arrived at a different conclusion, since Policy Order 63 manifestly undermines the law enforcement interest in accurate identification. *See Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015); *K.L. v. State, Dept. of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431-CI, 2012 WL 2685183, at *7 (Alaska Super. Mar. 12, 2012).

In the absence of any admissible evidence contradicting the 30(b)(6) testimony, it is undisputed that any other interests did not actually motivate the creation or revision of Policy Order 63. As such, they were invented post hoc, and cannot satisfy heightened scrutiny.

5

Should the Court decide to hold a hearing on this or any other issue in this matter, Plaintiffs respectfully request that the hearing be held remotely to mitigate risks of COVID-19 transmission.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court rule in favor of Plaintiffs on all counts. In the event the Court should decide to hold a hearing, Plaintiffs respectfully request that the hearing be held remotely.

Respectfully submitted this the 25th day of September 2020.

s/ Gabriel Arkles
Rose Saxe
Gabriel Arkles
ACLU LGBT & HIV Project / ACLU Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2605
rsaxe@aclu.org
garkles@aclu.org
*Admitted Pro Hac Vice*

Randall C. Marshall
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
rmarshall@aclualabama.org
***Counsel for Plaintiffs Darcy Corbitt, Destiny Clark, and Jane Doe***

## **CERTIFICATE OF SERVICE**

      I certify that on September 25, 2020, I filed the foregoing electronically using the Court's CM/ECF system, which will serve all counsel of record.

                                                     s/ Randall C. Marshall