IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| DARCY CORBITT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:18cv91-MHT |
| | ) | (WO) |
| HAL TAYLOR, in his | ) | |
| official capacity as | ) | |
| Secretary of the Alabama | ) | |
| Law Enforcement Agency, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

Plaintiffs Darcy Corbitt, Destiny Clark, and Jane
Doe are transgender women living in Alabama who have
sought driver licenses[1] from the Alabama Law Enforcement
Agency (ALEA) reflecting that they are women.  Each has
been unable to obtain a license with a female sex

───────────────

1.  While these documents are called "drivers'
licenses" under State law, see, e.g., Ala. Code § 32-6-6,
ALEA refers to them instead as "driver licenses."  The
terminology used in other States apparently varies.
Because the subject of this opinion is an ALEA policy,
the court employs ALEA's nomenclature.

designation because of the surgery requirements imposed by ALEA's Policy Order 63. Corbitt, Clark, and Doe have named as defendants, in their official capacities, the Secretary of ALEA and other ALEA officials. They claim ALEA's policy is incompatible with the Equal Protection Clause of the Fourteenth Amendment, their fundamental right to privacy, their liberty interest in refusing unwanted medical treatment, and their First Amendment right to be free of compelled speech, and they seek to enjoin the policy's enforcement. The court has jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights).

The parties agreed to resolution of this case on the evidence and briefs they have submitted. *See* July 30, 2019 Hr'g Tr. (doc. no. 74) at 11-13. They agreed that the court could resolve disputed issues of fact and draw reasonable factual inferences and conclusions from the evidence, and that the court's findings and inferences would be binding to the same extent as if made after trial. *See id.; see also Anderson v. City of Bessemer*

*City*, 470 U.S. 564, 573-74 (1985) (findings of fact carry the same weight whether made on the documentary record or at trial). Today the court reaches this resolution.

For the reasons below, the court finds Policy Order 63 unconstitutional. Policy Order 63, as interpreted by ALEA, makes it possible for people to change the sex designation on their driver licenses only by surgically modifying their genitals. By making the content of people's driver licenses depend on the nature of their genitalia, the policy classifies by sex; under Equal Protection Clause doctrine, it is subject to an intermediate form of heightened scrutiny. ALEA has not presented an adequate justification for Policy Order 63. The interests asserted by the State are insufficient to meet the standards of intermediate scrutiny, and the policy is inadequately tailored to advancing those interests.

The resolution of this case follows from longstanding equal-protection jurisprudence. The plaintiffs' claims may be novel, but the standards by which the court

3

evaluates them are not: They are the rules that apply to all sex-based classifications under the Equal Protection Clause.   Finally, because the court finds that Policy Order 63 violates the Equal Protection Clause, it does not reach the alternative constitutional arguments made by Corbitt, Clark, and Doe.


## I.   BACKGROUND

Policy Order 63, first issued in 2012, provides that in general the holders of Alabama driver licenses must surgically modify their genitals before they can change the sex designation on their licenses.[2]   When a person born or previously licensed in Alabama seeks a license with a sex designation that differs from the sex on the

─────────────────

2.   ALEA was not yet constituted when Policy Order 63 was originally issued in 2012; the policy was issued at that time by the Department of Public Safety.   *See* Defs.' Motion for Summary Judgment (doc. no. 54) at 4-6.   The Department of Public Safety became part of ALEA when the latter was created in 2013.   *See id.* at 4.   To avoid unnecessary confusion, this opinion refers to ALEA both in discussing the current operation of the policy and the circumstances surrounding its original entry.

applicant's birth certificate, the text of Policy Order 63 requires that the applicant receive "gender reassignment surgery" and provide a letter from the doctor who performed the "reassignment procedure" on that doctor's letterhead. *See* Pls.' Evidentiary Submission (doc. no. 52-1) at 1. ALEA interprets this to mean that the applicant must undergo what it calls "complete" or "completed" surgery, which it says at least includes surgery to alter the applicant's genitals, although defendants have suggested it may also require chest surgery. *See, e.g.*, Depo. of Jeannie Eastman (doc. no. 48-4) at 64-69; *see also* Defs.' Motion for Summary Judgment (doc. no. 54) at 8 (noting that the surgery required by Policy Order 63 must "includ[e] genital reassignment"). The effect is to make surgical genital modification the only route to a changed sex designation, other than in cases of typographical error.

There are two exceptions to this rule. First, instead of a doctor's letter, applicants are permitted to provide an updated Alabama birth certificate, which

also requires surgery to obtain but may not require genital surgery. *See* Ala. Code § 22-9A-19(d) (requiring that the individual's sex be "changed by surgical procedure"). Alternatively, if the applicants have never lived in the State before and have already updated their sex on an out-of-state license or birth certificate, ALEA will accept the sex on that document regardless of whether the State where the document was updated has a surgery requirement. These caveats aside, the basic function of Policy Order 63 is that it makes the sex designation on Alabamians' driver licenses changeable only by genital surgery. It is this function that plaintiffs challenge.

Though defendants do not contest plaintiffs' standing to bring their equal protection claim, they have suggested at various points that Corbitt, Clark, and Doe are not harmed by Policy Order 63. *See, e.g.*, Defs.' Motion for Summary Judgment (doc. no. 54) at 20. In light of this argument and the court's constitutional obligation to assure itself of its jurisdiction before

6

proceeding, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998), the court pauses to note the impact of Policy Order 63 on the plaintiffs.

The injuries caused by Policy Order 63 are severe. For individuals born in Alabama or previously licensed here whose gender identity differs from the sex they were assigned at birth, the policy requires surgery, which results in permanent infertility in "almost all cases," to be able to obtain a license with a sex designation that matches their gender. *See* Decl. of Dr. Gorton (doc. no. 52-45) at ¶ 43. Even for those who want it, this surgery may be unaffordable, as it is for Doe. *See* Decl. of Jane Doe (doc. no. 56-42) at 20.

The alternative to surgery is to bear a driver license with a sex designation that does not match the plaintiffs' identity or appearance. That too comes with pain and risk. Corbitt feels that carrying a license "that says I am male when I know that is not true" would be "proclaim[ing] a lie." Decl. of Darcy Corbitt (doc. no. 52-28) at 4. This, she says, would run counter to

**7**

her religious beliefs as a "devout and practicing Christian." *Id.* Doe says that carrying an "incorrect ID feels like I am not able to be my true self." Decl. of Jane Doe (doc. no. 56-12) at ¶ 24. For these plaintiffs, being reminded that they were once identified as a different sex is so painful that they redacted their prior names from exhibits they filed with the court. *See* Pls.' Motion for Summary Judgment (doc. no. 51) at 9 n.2.

More concretely, carrying licenses with sex designations that do not match plaintiffs' physical appearance exposes them to a serious risk of violence and hostility whenever they show their licenses. Corbitt, Clark, and Doe present as women. They have traditionally feminine features. *See* Photographs of Corbitt and Clark (docs. no. 1-2 and 1-3). They dress as other women dress. The court lists these attributes not to suggest that they are what make the plaintiffs women, but to explain why bearing licenses that do not designate the plaintiffs as women exposes them to such risk.

8

Whenever plaintiffs show an identification document that calls them male, the reader of the document instantly knows that they are transgender. That, the record makes clear, is dangerous. One-quarter of all transgender people who carry identification documents that do not match their gender have been harassed after showing those documents. *See* Pls.' Evidentiary Submission (doc. no. 52-47) at 8. One in six has been denied services, and more than half have faced harassment or assault from a law enforcement officer who learned they were transgender. *Id.* at 6, 8. One in 50 who presented an incongruous identification document has been physically attacked after doing so. *Id.* at 8. As Clark explained, when she shows her license that reveals her to be transgender, "There's always a risk of violence." *See* Depo. of Destiny Clark (doc. no. 48-1) at 80-82.

This risk is not hypothetical for these plaintiffs. Doe, who works in a dangerous industry, was badly injured and nearly killed by her co-workers because of her transgender status. *See* Decl. of Jane Doe (doc. no.

56-12) at ¶¶ 9-12.  She later lost a job after she showed her male-designated driver license to someone who informed her employer that she is transgender.  *See id.* at ¶ 15; Pls.' Motion for Summary Judgment (doc. no. 51) at 18-19.

The evidence above demonstrates that Policy Order 63 has directly and concretely injured the plaintiffs.  But the Equal Protection analysis below does not turn on the injuries that the policy causes transgender individuals like Corbitt, Clark, and Doe.  As explained below, the court analyzes Policy Order 63 as a sex-based classification not because it harms transgender people, but because it classifies driver license applicants by sex.  The State's justifications for the policy fall short not because of the policy's consequences for transgender Alabamians, but because the government's interests are insubstantial or were formulated *post hoc*, and because the policy is inadequately tailored to advancing them.

## II.  LEGAL STANDARD

Sex-based classifications imposed by a State are subject to an intermediate form of heightened scrutiny under the Equal Protection Clause of the Fourteenth Amendment.  Under Policy Order 63, people in Alabama can change the sex designation on their driver licenses only by changing their genitalia.  *See* Defs.' Motion for Summary Judgment (doc. no. 54) at 8; *see also* Depo. of Jeannie Eastman (doc. no. 48-4) at 64-69, 80-84.  The policy thereby ensures that a person with typically male genitalia receives a license bearing one sex designation and a person with typically female genitalia receives a license bearing another, stamping them publicly with that sex regardless of the sex with which the individuals identify.  The policy thus treats people differently based on the nature of their genitalia, classifying them by sex.  *See* Decl. of Dr. Gorton (doc. no. 52-45) at ¶ 10 (defining "sex" as "the sum of the anatomical, physiological, and biologically functional characteristics of an individual that places them in the

11

categories male, female, or along a spectrum between the two").

All state actions that classify people by sex are subject to the same intermediate scrutiny. The State need not favor or disfavor men or women to trigger such scrutiny; the classification itself is the trigger. *Cf. Missouri v. Jenkins*, 515 U.S. 70, 120-21 (1995) (Thomas, J., concurring) (noting that all state-imposed race classifications are subject to strict scrutiny, regardless of whether the classifications cause "feelings of inferiority" or produce "[p]sychological injury or benefit"). At the point of resolving the level of scrutiny that should apply in this case, it therefore does not matter whether the State classifies people by giving them different sex designations on their driver licenses or by sending them to different schools. Intermediate scrutiny applies regardless of what sex-based action the State takes. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 723-24, 724 n.9 (1982).

The sex classification of Policy Order 63 is also one imposed by the State. *See Johnson v. California*, 543 U.S. 499, 505 (2005) (classifications "imposed by government" trigger heightened scrutiny).  Through Policy Order 63, the State sets the criteria by which it channels people into its sex classifications.  The policy obligates ALEA officials to review a license applicant's birth records and medical documentation, decide what they believe the applicant's sex to be, and determine the contents of the individual's license based on that decision.  In so doing, the policy imposes its sex classification, denying the women who are plaintiffs in this case the ability to decide their sex for themselves instead of being told who they are by the State.

If the policy pertained to race or religion instead of sex, it would be apparent that this raised constitutional concerns.  Government agencies collecting demographic data routinely ask people to self-report their race.  *See, e.g.*, 19-3 Miss. Code R. § 11.13.  The alternative, where States publicly designated people's

13

race based on state-determined criteria, would be
troubling: bureaucrats comparing skin tones and tracing
family lineages to decide who is white and who is black.
Laws demanding such inquiries have a long and loathsome
history. *See, e.g.*, *Jones v. Commonwealth*, 80 Va. 538,
544-45 (1885) (reversing a conviction for racial
intermarriage due to insufficient evidence that the
defendant had "one-fourth at least of negro blood in his
veins," an element of the offense). Just as those laws
would today trigger strict scrutiny, *see Loving v.
Virginia*, 388 U.S. 1, 6-8 (1967), so Policy Order 63
triggers intermediate scrutiny, for it publicly
designates people's sex based on state-determined
criteria. As a result, the difficult question here is
not whether intermediate scrutiny applies, but whether
Policy Order 63 survives such scrutiny.[3]

---

    3. The court therefore does not base its decision
on any "special burden" that Policy Order 63 places on
transgender individuals. *Adams v. Sch. Bd. of St. Johns
Cty.*, 968 F.3d 1286, 1296 (11th Cir. 2020), *petition for
reh'g en banc filed*. Its decision is based instead on
the fact that the policy classifies by sex, and it follows

The path the court must take to answer that question is well worn. The Equal Protection Clause "does not make sex a proscribed classification." *United States v. Virginia*, 518 U.S. 515, 533 (1996). But the State must show that its decision to classify based on sex "serves important governmental objectives" and that the particular policy it employs is "substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017). Neither the asserted interest nor the alleged tightness of the policy's tailoring may "rely on overbroad generalizations" about the roles and attributes of men and women. *Id.* at 1689, 1692. Nor may the State's interests be "hypothesized or invented *post hoc* in response to litigation"--they must be the actual goals the policy was intended to advance at the time it was created. *Virginia*, 518 U.S. at 533; *see also Morales-Santana*, 137 S. Ct. at 1696-97. In other words,

---

the traditional Equal Protection principles that apply to all state-imposed sex classifications.

the State must provide an "exceedingly persuasive justification" for the sex-based classification. *Virginia*, 518 U.S. at 531.[4]

### III. DISCUSSION

Defendants name two government interests to justify Policy Order 63. First, they say the policy was created

---

4. To dispose of a threshold matter: In defendants' motion for summary judgment, they argued that the claims of plaintiffs Corbitt and Clark are barred by the applicable statute of limitations. *See* Defs.' Motion for Summary Judgment (doc. no. 54) at 24-27. The court is not persuaded, at least as to Corbitt, because she moved to Alabama and first sought a female-designated license from ALEA in August 2017--only six months before filing suit. *See* Pls.' Response to Motion for Summary Judgment (doc. no. 58) at 16. Corbitt neither knew nor had reason to know that she had been injured by Policy Order 63 until she requested a female-designated license and was denied; indeed, she had not been injured by the policy until that point. *See Rozar v. Mullis*, 85 F.3d 556, 561-62 (11th Cir. 1996); *Foudy v. Indian River Cty. Sheriff's Office*, 845 F.3d 1117, 1122-23 (11th Cir. 2017) (holding that the injury-discovery rule for claim accrual still applies to equal protection claims). Nor did she have a "complete and present cause of action" until then. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). In any event, defendants do not challenge Doe's capacity to bring the same injunctive claims raised by Corbitt and Clark.

to ensure consistency with the State's existing requirements for amending a birth certificate. Second, they say that Policy Order 63 "serves the State's interests in providing an accurate description of the bearer of an Alabama driver license" to make it easier for law enforcement officers to identify people when determining appropriate post-arrest search and placement procedures. *See* Defs.' Motion for Summary Judgment (doc. no. 54) at 10. To determine whether the State has met its burden under the Equal Protection Clause, the court must assess whether these interests are "important," whether Policy Order 63 is "substantially related" to advancing them, and whether they were the actual interests considered when Policy Order 63 was adopted.

A. **Consistency with Birth Certificate Amendments**

According to defendants, "Policy Order 63 was originally created based on the statutory process for amending a birth certificate." *Id.* at 46. They say the policy thus "serves the important government interests

**17**

in maintaining consistency between the sex designation on an Alabama birth certificate and an Alabama driver license." *Id.* Under state law, an Alabama birth certificate may be amended to change the sex designation with a court order indicating that the "sex of an individual born in this state has been changed by surgical procedure and that the name of the individual has been changed." Ala. Code § 22-9A-19(d).

Defendants have done little to elucidate why their alleged interest in uniformity between birth certificate and driver license amendment standards is important. They have noted, without further explanation, that it "is related [to] the State's important government interest in using identity documents to provide physical descriptions of individuals and, with respect to ALEA's control over driver licenses, providing a uniform understanding of 'sex' on a driver license for law enforcement." Defs.' Response to Pls.' Motion for Summary Judgment (doc. no. 60) at 19. And they have argued, as appears to be true, that this interest is

18

neither *post hoc* nor reliant on "overbroad
generalizations" about men and women. *Id.* at 20.

In the context of sex-based classifications, the
"burden of justification is demanding and it rests
entirely on the State." *Virginia*, 518 U.S. at 533.
Defendants' failure to articulate the importance of their
alleged interest in conformity with birth certificate
protocols falls short of meeting that burden. But to the
extent that defendants have defined this interest, the
court does not see how it can meet the requirements of
intermediate scrutiny.

For one, defendants' argument rests on the premise
that an alignment of procedures should generate an
alignment of documents--that is, that having uniform
processes for amending licenses and birth certificates
is likely in practice to produce uniformity between
individuals' licenses and birth certificates. As a
logical matter, this premise is dubious. Many people may
seek to amend their driver licenses without bothering to
amend their birth certificates, regardless of the

requirements for each.  Showing one's license is a common occurrence; the times when a person needs to present a birth certificate are few and far between.  Accordingly, the risks of bearing a sex-designated document that does not match a person's gender are much greater when the document is a driver license than when it is a birth certificate.  A person with limited time or resources might reasonably decide to change one but not the other.

Underscoring the faultiness of their premise, defendants have presented no evidence to support it. Defendants could, for instance, have compared their driver license records with the State's birth certificate records to determine how often people who have changed the sex designation on their licenses through the procedure of Policy Order 63 also have changed the sex designation on their birth certificates.  They have not done so, leaving the court in the dark as to whether the baseline presumption underlying the State's asserted interest in uniform procedures is ever actually borne out.  In the context of intermediate scrutiny, where the

State bears the burden of justification, this evidentiary hole is fatal.  *See Virginia*, 518 U.S. at 533.

Even if the court accepted defendants' shaky premise, their asserted interest would remain inadequate.  Since the earliest days of the Supreme Court's sex-classification jurisprudence, the Court has insisted that "administrative ease and convenience" is not a sufficiently important justification for a state policy based on sex.  *See Craig v. Boren*, 429 U.S. 190, 198 (1976); *see also Tuan Anh Nguyen v. I.N.S*, 533 U.S. 53, 88 (2001) (O'Connor, J., dissenting) ("We have repeatedly rejected efforts to justify sex-based classifications on the ground of administrative convenience.").  And on the record presented here, the court finds that the State's interest in conformity with the rules for birth certificates provides only the convenience of avoiding the need to gather some additional documentation of sex changes on infrequent occasions.

As ALEA's Federal Rule of Civil Procedure 30(b)(6) witness Deena Pregno, chief of the agency's driver

license division, explained in her deposition when asked why this conformity was important, "if the birth document doesn't match [the driver license], we need to either find a document that links the change or find out why there is a discrepancy." Depo. of Deena Pregno (doc. no. 48-5) at 103. Pregno could think of no problem that might flow from an inconsistency between the driver license and birth certificate procedures other than the extra documentation that would be required when "tracking changes to that person's identifying information." *Id.* at 103, 109-10.

Nor has the State provided anything beyond Pregno's testimony to explain why such an inconsistency would be problematic for the State. Instead, they have doubled down on her explanation, arguing that Policy Order 63 "serves the State's interests in maintaining a paper trail that documents the reasons why an individual's sex designation might differ between a birth certificate and driver license." Defs.' Motion for Summary Judgment

(doc. no. 54) at 11.[5]  Moreover, this need to maintain a paper trail apparently crops up only when a person applies for a license; Pregno could think of no other time when a person's license and birth certificate would need to be compared.  *See* Depo. of Deena Pregno (doc. no. 48-5) at 105-06.

Under the Supreme Court's precedents, avoiding the occasional burden of finding some additional documentation to track a change in a person's identification materials is not an adequate basis for sex-based state policy.  While a government may appropriately choose to advance an important interest by means that promote effective and efficient administration, *see Nguyen*, 533 U.S. at 69, ALEA's asserted desire to avoid paperwork cannot suffice as the interest itself.

---

5.  Indeed, the State's apparent expectation that individuals' licenses and birth certificates will differ even with Policy Order 63 in place suggests that it recognizes the unlikelihood that maintaining uniform procedures will lead people to change both documents.

Indeed, the interest ALEA claims in uniformity between the driver license and birth certificate amendment standards seems designed to make an end-run around the State's burden to show an "exceedingly persuasive justification" for sex-based differential treatment. *Virginia*, 518 U.S. at 532-33. But state interests, like the sexes, are not fungible. *See id.* at 533. The State may have good reasons for using the appearance of a child's genitalia to determine the sex on his or her birth certificate: For one thing, as gender identity "cannot be ascertained immediately after birth," Amended Complaint (doc. no. 38) at ¶ 34, the State might be hard-pressed to come up with a viable alternative approach. For another, the State has serious interests in gathering and maintaining certain population data via birth certificates, including information about sex. *See* Ala. Admin. Code § 420-7-1-.03(3)(a) (describing the information collected for birth certificates and requiring that sex be collected). But ALEA has never argued that such interests apply to driver licenses, nor

is there any evidence that it considered such interests when creating Policy Order 63.

By contrast to birth certificates, neither state law nor regulation requires ALEA to include sex designations on driver licenses; it is a creature of ALEA policy. The Code of Alabama mandates that driver licenses must contain a license number, "color photograph ... name, birthdate, address, and a description of the licensee," as well as the licensee's signature. Ala. Code § 32-6-6. The Alabama Administrative Code does not require sex to be designated either. ALEA cannot export the interests underlying one presumably lawful sex classification to prop up its sex-based policy simply by citing the inconvenience of disuniformity between the two, especially when the inconvenience is as minimal as the record demonstrates it to be in this case.

Finally, even if the State had a sufficiently important interest in avoiding the need to document discrepancies between a person's birth certificate and license, Policy Order 63 would still fail as inadequately

tailored to advancing that interest. Although state action need not "be capable of achieving its ultimate objective in every instance" under the intermediate version of heightened scrutiny that applies to sex-based classifications, *see Nguyen*, 533 U.S. at 70, the State must still show a "direct, substantial relationship between objective and means," *Miss. Univ. for Women*, 458 U.S. at 725-26.

Defendants here do not show a substantial relationship--or much relationship at all--between the operation of Policy Order 63 and the State's desire for consistency with the birth certificate amendment process. Although Policy Order 63 and the birth certificate amendment statute both require some type of surgery, the record shows this facial likeness to be thin ice over deep water.

"The parties agree that there are no specified procedures that satisfy the surgery requirement" of the birth certificate amendment statute. Defs.' Reply in Response to Order for Add'l Briefing (doc. no. 84) at 5.

Indeed, defendants have provided no evidence whatsoever of how this surgery requirement is applied. Though they fault as "purely speculative" plaintiffs' concern that Policy Order 63 may require different surgeries than birth certificate amendments, *see id.*, it is defendants' burden under intermediate scrutiny to establish that their interest in uniformity between these policies is actually borne out, not plaintiffs' to establish the opposite.

The evidence in the record shows that there is no one sex-reassignment surgery and that different surgeries are appropriate for different people. *See* Decl. of Dr. Gorton (doc. no. 52-45) at ¶ 36. Some of the plaintiffs have even received sex-reassignment surgery. Clark's application for a female-designated license was rejected notwithstanding her doctor's letter indicating that she had received "gender transformation surgery"--namely, surgery to modify her chest. *See* Pls.' Sealed Evidence (doc. no. 56-10) at 2; *see also* Depo. of Destiny Clark (doc. no. 48-1) at 41. Defendants present no evidence

that Clark's surgery would not meet the birth certificate statute's requirement that a person's sex be "changed by surgical procedure."  Ala. Code § 22-9A-19(d).

Nor are defendants consistent about what surgery or surgeries Policy Order 63 requires.  As they explain, ALEA "does not maintain any specific list of procedures" that satisfy the policy.  *See* Defs.' Motion for Summary Judgment (doc. no. 54) at 8.  In practice, whether defendants will approve a change of sex designation appears to turn on the particular phrasing of the doctor's letter provided, or even an ALEA staff member's impressionistic sense of the letter's sufficiency.

Clark's application, for instance, was rejected in spite of her surgery because the doctor did not say he had performed "complete gender reassignment surgery." *See* Pls.' Sealed Evidence (doc. no. 56-10) at 2.  Another transgender individual applying for a license whose doctor's note said the applicant had "undergone a surgical procedure performed by me ... to irreversibly correct an anatomical male appearance" was similarly

rejected because the letter did not say the procedure was a "complete" surgery.  *See* Pls.' Sealed Evidence (doc. no. 56-6) at 2.  But another applicant was approved whose doctor's letter said that "[s]ex reassignment surgery has been successfully completed ... and surgery is permanent and irreversible."  *See* Pls.' Sealed Evidence (doc. no. 56-3) at 2.  Yet another applicant was approved whose letter merely said she had "undergone Gender Confirmation Surgery for the purpose of sex/gender reassignment from male to female" and that the surgery was "irreversible," though it did not say she received "complete" surgery. *See* Pls.' Sealed Evidence (doc. no. 56-1) at 2.  Another was approved with a letter saying the applicant received "sexual reassignment surgery," with no indication that the surgery was either "complete" or "irreversible," and no specific mention of what surgery was performed.  *See* Defs.' Sealed Evidence (doc. no. 49-4) at 55.

In canvassing the spread of doctors' letters in cases where applicants have or have not been approved, the court is convinced, and so finds, that there is no rhyme

29

or reason at all.  Defendants have said that they interpret a letter's use of the term "complete"--a requirement that appears nowhere in the text of Policy Order 63--to mean that the individual received both genital and chest surgery, *see* Depo. of Jeannie Eastman (doc. no. 48-4) at 53, and they say that in any case an application will be approved if the doctor's letter uses the term "complete."  But in practice they neither approve only applications that use the word "complete," nor only applications that otherwise indicate that both genital and chest surgeries were performed.

This is therefore not a case where a sex-based policy merely fails to "achiev[e] its ultimate objective in every instance."  *See Nguyen*, 533 U.S. at 70.  Policy Order 63 governs the process for people who seek to change the sex designation on their licenses.  ALEA says the policy's goal is to align the steps that this subset of license applicants must take with what those individuals would have to do to amend the sex designation on an Alabama birth certificate.  In that context, on the

record presented here, the court finds that Policy Order 63 does not hit any more often than it misses.

In sum, defendants assert that the important government interest underlying Policy Order 63 is in the occasional reduction of paperwork they achieve by maintaining uniformity between, on the one hand, a policy which they interpret to require either a combination of genital and chest surgeries or a doctor's note that specifically says the surgery is "complete"--and which they sometimes apply to require neither--and on the other, a state law for which they do not know what surgeries are required. The former policy additionally allows people to get an accurate in-state license if they have accurate out-of-state identification and have never been licensed in Alabama before. The latter law includes an additional name-change prerequisite and requires a court order.

That is not a "direct, substantial relationship between objective and means." *Miss. Univ. for Women*, 458 U.S. at 725-26. Even if defendants' purported interest

in uniformity between Policy Order 63 and Alabama Code § 22-9A-19(d) were important enough to meet the standards of intermediate scrutiny, the haphazard and paper-deep overlap that ALEA has shown between the two still would not sustain its policy.[6]

## B. Law Enforcement Identification

The court therefore turns to defendants' alternative asserted interest in facilitating identification by law enforcement.  It fares no better.

Defendants claim that "Policy Order 63 serves the important government interest of providing information

─────────────────

6. Of course, the State always has the option of removing sex designations from Alabama driver licenses, which presumably would raise no constitutional concern. As noted above, while State law requires that license-holders' names, photographs, birthdates, and addresses appear on their driver licenses, it does not require sex to be designated.  Similarly, many states once included race designations on driver licenses, a practice today employed only in North Carolina and optional there.  *See* Cassius Adair, *Licensing Citizenship*, 71 Am. Q. 569, 587 (2019).  The court has not further considered this potential remedy because it was not requested by the plaintiffs.

related to physical identification to law enforcement
officers." *See* Defs.' Motion for Summary Judgment (doc.
no. 54) at 49.  They say this is important because a
driver license "provides information to law enforcement
officers ... so that each state agency can formulate its
own search, seizure, and booking policies based on this
information." *Id.* at 49-50.

In particular, ALEA argues it is important to use a
person's genitalia to determine the identification on
that person's license to assist with "the creation of
appropriate policies and procedures in a correctional
context for inmate searches, hosing, supervision, and
medical care." *Id.* at 50.[7]  Policy Order 63 allegedly
serves this purpose by "providing an accurate description

_____

7.  The record demonstrates, and the court finds,
that this asserted State interest is in using genital
status in particular to determine the sex designations
on driver licenses.  It is therefore different from the
State's interest discussed above in "providing a uniform
understanding of 'sex' on a driver license," Defs.'
Response to Pls.' Motion for Summary Judgment (doc. no.
60) at 19, which the courts finds to be an interest in
providing some uniform definition of sex, regardless of
what that definition is.

of the bearer of an Alabama license." *See* Defs.' Motion for Summary Judgment (doc. no. 54) at 10. As defendants' expert Donald Leach explained during his deposition, the sex designation on a driver license is among the "foremost pieces of information that's used when booking an individual." *See* Defs.' Evidence (doc. no. 48-9) at 34. Driver license sex designations, along with conversations with the arrestee and even medical examinations when necessary, are part of how officers decide whether a male or female officer should conduct body searches during the booking process. *See id.* at 34-36.

Ensuring that law enforcement officers apply appropriate booking procedures is important. But the court need not reach the question whether Policy Order 63 is adequately tailored to advancing that interest. To justify a sex-based policy, the State's interest must not only be important; it must also not be "hypothesized or invented *post hoc* in response to litigation." *Virginia*, 518 U.S. at 533. Defendants bear the burden under

intermediate scrutiny of establishing that the interests they assert were the actual goals ALEA considered when it first created Policy Order 63.  But the evidence in the record does not indicate that defendants' asserted interest in facilitating proper booking procedures played any part in ALEA's calculus when it developed Policy Order 63.  Instead, the record shows, and the court finds, that conformity with the State's birth certificate amendment procedures was the only interest ALEA considered when creating the policy.

Pregno discussed this issue at length in her Rule 30(b)(6) deposition testimony on behalf of ALEA.  She testified that the State was focused on conformity with the birth certificate statute when it developed Policy Order 63.  As she explained, "the policy was established based on the state statute for changing the gender on a birth certificate," because "[w]e wanted to be consistent in how we operated as a state."  Depo. of Deena Pregno (doc. no. 48-5) at 42-43.  She was later asked directly: "[I]n the course of creating this policy, what

considerations went into ALEA's decision to adopt this policy as opposed to some other?" *Id.* at 45. She answered: "What the state requires for amended birth certificates." *Id.* Plaintiffs' counsel then asked: "Were there any other considerations that ALEA took into account at that time?" *Id.* She answered: "Not that I'm aware of." *Id.* When asked whether ALEA considered the effects of the policy on arrest and booking procedures, she answered "I don't -- I'm not sure if they did or not." *Id.* at 44-45. Considered as a whole, Pregno's testimony left the court with little doubt that ALEA was interested in uniformity with the State's birth certificate amendment statute when it developed Policy Order 63, not in helping officers decide on proper arrest and booking procedures.[8]

---

8. Pregno also testified that when ALEA revised the policy to allow applicants to provide either a doctor's letter or an amended birth certificate instead of requiring both, its only goal was to give "more latitude" to applicants, not to help law enforcement officers make decisions about booking search procedures. *Id.* at 46-47.

Under Federal Rule of Civil Procedure 30(b)(6), the court must understand Pregno's testimony on behalf of ALEA as the testimony of ALEA itself. *See* 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2103 (3d ed. 2020). Defendants have had ample opportunity since her testimony to provide evidence that the circumstances of Policy Order 63's adoption were different than she described, subject to the general principle that "a party whose testimony 'evolves' risks its credibility." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 34-35 (2d Cir. 2015). They have not done so; instead, defendants have confirmed that Pregno's testimony was accurate. As ALEA submitted in response to the court's request for supplemental briefing on this particular issue, "the contemporaneous reason for adopting Policy Order 63 was consistency with [the] birth certificate policy." Defs.' Reply in Response to Order for Add'l Briefing (doc. no. 84) at 4 (capitalization adjusted). That concession, supported as it is by

Pregno's Rule 30(b)(6) testimony, is an insurmountable obstacle to defendants' position.

Defendants say, however, that "the contemporaneous reason for adopting Policy Order 63--consistency with birth certificates--does not show the law enforcement interest is hypothesized or *post hoc*." *Id.* at 5. They say this is so because "the physical descriptions on a birth certificate provide the default descriptions on a driver license, and a driver license is used by law enforcement officers to identify subjects." Defs.' Response to the Court's Order (doc. no. 82) at 11. Thus, "[s]ince Defendants' interest in consistency are [sic] neither hypothesized nor *post hoc*, then neither is their interest in law enforcement identification." *Id.* (italics added).

This line of argument flirts with incoherence. More problematically, the record is devoid of evidence supporting it. Defendants have not shown that officers use birth certificates to decide any part of the booking procedures. They do not clarify why it would matter, at

the moment of booking, whether the sex designations on arrestees' licenses match the designations on their birth certificates. *Cf.* Depo. of Deena Pregno (doc. no. 48-5) at 105-06 (indicating that Pregno is unaware of any time when driver licenses and birth certificates are compared other than when a person applies for a driver license). Nor do they otherwise explain why an interest in conformity with birth certificate amendments is the same as an interest in ensuring appropriate post-arrest booking procedures. And nothing they say contradicts either Pregno's Rule 30(b)(6) testimony or the concession in their briefing that consistency with birth certificates was all ALEA considered when it developed Policy Order 63.

Defendants have also hinted that their purported interest in law enforcement identification may relate to traffic stops and arrests. *See* Defs.' Motion for Summary Judgment (doc. no. 54) at 49 (including "arrest" on a list of procedures that Policy Order 63 helps officers formulate); Defs.' Response to the Court's Order (doc.

no. 82) at 10 (noting that plaintiffs have had to display their licenses during traffic stops).  Pregno clarified that defendants' concern would be about avoiding the risk of mistaken identity during such encounters.  *See* Depo. of Deena Pregno (doc. no. 48-5) at 62-63.

Again, defendants have presented no evidence showing how a license with a sex designation that differs from the license-holder's appearance could help officers confirm that the license matches the driver.  Indeed, the record suggests that licenses denoting the license-holder's genital status are wholly unhelpful for this purpose, as Pregno acknowledged that officers don't typically check a person's genitals when stopping or arresting them.  *See id.* at 67-68.  Furthermore, this interest suffers from the same infirmity as the ostensible interest in facilitating the booking process: Nothing indicates that ALEA considered it when creating Policy Order 63.

In the final measure then, the State's interest in consistency with birth certificate amendment procedures

is one of marginal administrative convenience that cannot support a sex-based policy, and Policy Order 63 in practice does little to advance it.  The interest in facilitating the determination of appropriate search procedures and housing placements during the post-arrest booking process was not one that ALEA considered when it created Policy Order 63, so the policy cannot survive intermediate scrutiny on that basis.  These are the interests the State asserts, and neither provides the justification that the Constitution requires for sex-based laws.  *See Virginia*, 518 U.S. at 531.  Under the tenets of equal protection law, that is the end of the road.


## IV. CONCLUSION

Nearly 50 years ago, the Supreme Court recognized that the Equal Protection Clause demands special skepticism of state actions that impose sex-based classifications.  *See Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (plurality opinion).  The Court soon

settled on the standard of scrutiny that this court applies today, instructing that "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig*, 429 U.S. at 197. Neither "benign justifications" nor an absence of discriminatory intent prevents a sex-based law from being subject to this scrutiny. *Virginia*, 518 U.S. at 535-36. All laws and state policies that "differentiate on the basis of gender" receive this heightened standard of review. *Morales-Santana*, 137 S. Ct. at 1689.

Many pass such scrutiny. As the Court has explained, "[j]ust as neutral terms can mask discrimination that is unlawful, gender specific terms can mark a permissible distinction. The equal protection question is whether the distinction is lawful." *Nguyen*, 533 U.S. at 64. The fact that a State acts based on sex does not invalidate its action, but it does require that the State justify the decision by proving that its reasons were important and its methods well-picked. Here, ALEA has failed to

**42**

show that the interests it actually considered at the time it created Policy Order 63 were substantial enough to justify the sex-based distinction that the policy draws.  The State has not risen to meet the obligation that the Equal Protection Clause imposes.  Alabama therefore may no longer make people's genitalia determine the contents of their driver licenses.  Policy Order 63 is unconstitutional.

The court will enter an appropriate order and judgment enjoining the enforcement of Policy Order 63.  On application by plaintiffs Corbitt, Clark, and Doe, ALEA must issue them driver licenses reflecting that they are women.

DONE, this the 15th day of January, 2021.

      /s/ Myron H. Thompson
    UNITED STATES DISTRICT JUDGE