## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

February 17, 2021

For rules and forms visit
www.ca11.uscourts.gov

Noel Steven Barnes
Alabama Law Enforcement Agency
Legal Division
201 S UNION ST
PO BOX 304115
MONTGOMERY, AL 36130

Brad A. Chynoweth
Alabama Attorney General's Office
501 WASHINGTON AVE
PO BOX 300152
MONTGOMERY, AL 36130

James W. Davis
Alabama Attorney General's Office
501 WASHINGTON AVE
PO BOX 300152
MONTGOMERY, AL 36130

Misty Shawn Fairbanks Messick
Alabama Attorney General's Office
501 WASHINGTON AVE
PO BOX 300152
MONTGOMERY, AL 36130

Winfield J. Sinclair
Alabama Attorney General's Office
501 WASHINGTON AVE
PO BOX 300152
MONTGOMERY, AL 36130

Appeal Number:  21-10486-F
Case Style:  Darcy Corbitt, et al v. Hal Taylor, et al
District Court Docket No:  2:18-cv-00091-MHT-SMD

**This Court requires all counsel to file documents electronically using the Electronic Case Files
("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to
use the ECF system by registering for an account at www.pacer.gov. Information and training
materials related to electronic filing, are available at www.ca11.uscourts.gov.**

The referenced case has been docketed in this court. Please use the appellate docket number noted above when making inquiries.

Attorneys who wish to participate in this appeal must be admitted to the bar of this Court, admitted for this particular proceeding pursuant to 11th Cir. R. 46-3, or admitted pro hac vice pursuant to 11th Cir. R. 46-4. In addition, all attorneys (except court-appointed counsel) who wish to participate in this appeal must file an Appearance of Counsel form within 14 days. The Application for Admission to the Bar and Appearance of Counsel Form are available at www.ca11.uscourts.gov. The clerk generally may not process filings from an attorney until that attorney files an appearance form. See 11th Cir. R. 46-6(b).

11th Cir. R. 33-1(a) requires appellant to file a Civil Appeal Statement in most civil appeals. You must file a completed Civil Appeal Statement, with service on all other parties, within 14 days from the date of this letter. Civil Appeal Statement forms are available on the Internet at www.ca11.uscourts.gov, and as provided by 11th Cir. R. 33-1(a).

Every motion, petition, brief, answer, response and reply filed must contain a Certificate of Interested Persons and Corporate Disclosure Statement (CIP). Appellants/Petitioners must file a CIP within 14 days after the date the case or appeal is docketed in this court; Appellees/Respondents/Intervenors/Other Parties must file a CIP within 28 days after the case or appeal is docketed in this court, regardless of whether appellants/petitioners have filed a CIP. See FRAP 26.1 and 11th Cir. R. 26.1-1.

On the same day a party or amicus curiae first files its paper or e-filed CIP, that filer must also complete the court's web-based CIP at the Web-Based CIP link on the court's website. Pro se filers (except attorneys appearing in particular cases as pro se parties) are **not required or authorized** to complete the web-based CIP.

Pursuant to Eleventh Circuit Rule 42-1(b) you are hereby notified that upon expiration of (14) days from this date, this appeal will be dismissed by the clerk without further notice unless the default(s) noted below have been corrected:

Pay to the DISTRICT COURT clerk the docketing and filing fees, with notice to this office, **or** request leave to proceed in forma pauperis on appeal in the district court. See Fed.R. App.P. 24(a). If the district court denies such leave, appellant may file in this court a Motion to Proceed in forma pauperis in this court with a financial affidavit.

File a Transcript Information Form, as required by Fed.R.App.P. 10(b)(1); a Transcript Information Form is available from the district court clerk. Appellant is required to file and serve copies of the form in accordance with the instructions included on the form. UNLESS A TRANSCRIPT IS ORDERED, APPELLANT'S BRIEF MUST BE SERVED AND FILED WITHIN 40 DAYS FROM FEBRUARY 12, 2021. See 11th Cir. R. 12-1 and 31-1.


Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Dionne S. Young, F
Phone #: (404) 335-6224

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Darcy Corbitt, Destiny Clark, and, Jane Doe, | ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. |
| v. | ) ) | 2:18-cv-91-MHT-SMD |
| Hal Taylor, in his official capacity as Secretary of the Alabama Law Enforcement Agency; Col. Charles Ward, in his official capacity as Director of the Department of Public Safety; Chief Deena Pregno, in her official capacity as Chief of the Driver License Division; and, Jeannie Eastman, in her official capacity as Driver License Supervisor in the Driver License Division, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## NOTICE OF APPEAL

Defendants—Hal Taylor, in his official capacity as Secretary of the Alabama Law Enforcement Agency, Col. Charles Ward, in his official capacity as Director of the Department of Public Safety, Chief Deena Pregno, in her official capacity as Chief of the Driver License Division,[1] and Jeannie Eastman, in her official capacity as Driver License Supervisor in the Driver License Division—hereby give notice of their appeal to the United States Court of Appeals for the Eleventh Circuit from this Court's Opinion (doc. 101) and Judgment (doc. 102) entered on January 15, 2021, as well as from all earlier rulings, opinions, and orders adverse to them in this case.

---

[1] Chief Pregno has since retired, but no one has yet assumed her title at ALEA, and so this official capacity suit has continued in her name. *See* Fed. R. Civ. P. 25(d); Fed. R. App. P. 43(c).

Respectfully submitted,

Steve Marshall
  *Attorney General*

s/ Brad A. Chynoweth
Brad A. Chynoweth (ASB-0030-S63K)
  *Assistant Chief Deputy Attorney General*
James W. Davis (ASB-4063-I58J)
Winfield J. Sinclair (ASB-1750-S81W)
Misty S. Fairbanks Messick (ASB-1813-T71F)
  *Assistant Attorneys General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Facsimile:  (334) 353-8440
Brad.Chynoweth@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Winfield.Sinclair@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov

**Counsel for the Defendants**

2

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 12, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel for Plaintiffs: Gabriel Arkles (garkles@transgenderlegal.org); Randall Marshall (rmarshall@aclualabama.org); Rose Saxe (rsaxe@aclu.org); Kaitlin Welborn (kwelborn@aclualabama.org); and LaTisha Gotell Faulks (tgfaulks@aclualabama.org).

s/  Brad A. Chynoweth
Counsel for the Defendants

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
DARCY CORBITT, et al.,        )
                              )
      Plaintiffs,             )
                              )        CIVIL ACTION NO.
      v.                      )         2:18cv91-MHT
                              )            (WO)
HAL TAYLOR, in his            )
official capacity as          )
Secretary of the Alabama      )
Law Enforcement Agency,       )
et al.,                       )
                              )
      Defendants.             )
```

OPINION

Plaintiffs Darcy Corbitt, Destiny Clark, and Jane
Doe are transgender women living in Alabama who have
sought driver licenses[1] from the Alabama Law Enforcement
Agency (ALEA) reflecting that they are women.  Each has
been unable to obtain a license with a female sex

_____

1.  While these documents are called "drivers'
licenses" under State law, *see, e.g.*, Ala. Code § 32-6-6,
ALEA refers to them instead as "driver licenses."  The
terminology used in other States apparently varies.
Because the subject of this opinion is an ALEA policy,
the court employs ALEA's nomenclature.

designation because of the surgery requirements imposed
by ALEA's Policy Order 63.  Corbitt, Clark, and Doe have
named as defendants, in their official capacities, the
Secretary of ALEA and other ALEA officials.  They claim
ALEA's policy is incompatible with the Equal Protection
Clause of the Fourteenth Amendment, their fundamental
right to privacy, their liberty interest in refusing
unwanted medical treatment, and their First Amendment
right to be free of compelled speech, and they seek to
enjoin the policy's enforcement.  The court has
jurisdiction under 28 U.S.C. § 1331 (federal question)
and § 1343 (civil rights).

The parties agreed to resolution of this case on the
evidence and briefs they have submitted.  *See* July 30,
2019 Hr'g Tr. (doc. no. 74) at 11-13.  They agreed that
the court could resolve disputed issues of fact and draw
reasonable factual inferences and conclusions from the
evidence, and that the court's findings and inferences
would be binding to the same extent as if made after
trial.  *See id.; see also Anderson v. City of Bessemer*

2

*City*, 470 U.S. 564, 573-74 (1985) (findings of fact carry the same weight whether made on the documentary record or at trial).  Today the court reaches this resolution.

For the reasons below, the court finds Policy Order 63 unconstitutional.  Policy Order 63, as interpreted by ALEA, makes it possible for people to change the sex designation on their driver licenses only by surgically modifying their genitals.  By making the content of people's driver licenses depend on the nature of their genitalia, the policy classifies by sex; under Equal Protection Clause doctrine, it is subject to an intermediate form of heightened scrutiny.  ALEA has not presented an adequate justification for Policy Order 63.  The interests asserted by the State are insufficient to meet the standards of intermediate scrutiny, and the policy is inadequately tailored to advancing those interests.

The resolution of this case follows from longstanding equal-protection jurisprudence.  The plaintiffs' claims may be novel, but the standards by which the court

3

evaluates them are not: They are the rules that apply to all sex-based classifications under the Equal Protection Clause. Finally, because the court finds that Policy Order 63 violates the Equal Protection Clause, it does not reach the alternative constitutional arguments made by Corbitt, Clark, and Doe.


## I. BACKGROUND

Policy Order 63, first issued in 2012, provides that in general the holders of Alabama driver licenses must surgically modify their genitals before they can change the sex designation on their licenses.[2] When a person born or previously licensed in Alabama seeks a license with a sex designation that differs from the sex on the

---

2. ALEA was not yet constituted when Policy Order 63 was originally issued in 2012; the policy was issued at that time by the Department of Public Safety. *See* Defs.' Motion for Summary Judgment (doc. no. 54) at 4-6. The Department of Public Safety became part of ALEA when the latter was created in 2013. *See id.* at 4. To avoid unnecessary confusion, this opinion refers to ALEA both in discussing the current operation of the policy and the circumstances surrounding its original entry.

applicant's birth certificate, the text of Policy Order 63 requires that the applicant receive "gender reassignment surgery" and provide a letter from the doctor who performed the "reassignment procedure" on that doctor's letterhead. *See* Pls.' Evidentiary Submission (doc. no. 52-1) at 1. ALEA interprets this to mean that the applicant must undergo what it calls "complete" or "completed" surgery, which it says at least includes surgery to alter the applicant's genitals, although defendants have suggested it may also require chest surgery. *See, e.g.*, Depo. of Jeannie Eastman (doc. no. 48-4) at 64-69; *see also* Defs.' Motion for Summary Judgment (doc. no. 54) at 8 (noting that the surgery required by Policy Order 63 must "includ[e] genital reassignment"). The effect is to make surgical genital modification the only route to a changed sex designation, other than in cases of typographical error.

There are two exceptions to this rule. First, instead of a doctor's letter, applicants are permitted to provide an updated Alabama birth certificate, which

also requires surgery to obtain but may not require genital surgery. *See* Ala. Code § 22-9A-19(d) (requiring that the individual's sex be "changed by surgical procedure"). Alternatively, if the applicants have never lived in the State before and have already updated their sex on an out-of-state license or birth certificate, ALEA will accept the sex on that document regardless of whether the State where the document was updated has a surgery requirement. These caveats aside, the basic function of Policy Order 63 is that it makes the sex designation on Alabamians' driver licenses changeable only by genital surgery. It is this function that plaintiffs challenge.

Though defendants do not contest plaintiffs' standing to bring their equal protection claim, they have suggested at various points that Corbitt, Clark, and Doe are not harmed by Policy Order 63. *See, e.g.*, Defs.' Motion for Summary Judgment (doc. no. 54) at 20. In light of this argument and the court's constitutional obligation to assure itself of its jurisdiction before

6

proceeding, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998), the court pauses to note the impact of Policy Order 63 on the plaintiffs.

The injuries caused by Policy Order 63 are severe. For individuals born in Alabama or previously licensed here whose gender identity differs from the sex they were assigned at birth, the policy requires surgery, which results in permanent infertility in "almost all cases," to be able to obtain a license with a sex designation that matches their gender. *See* Decl. of Dr. Gorton (doc. no. 52-45) at ¶ 43. Even for those who want it, this surgery may be unaffordable, as it is for Doe. *See* Decl. of Jane Doe (doc. no. 56-42) at 20.

The alternative to surgery is to bear a driver license with a sex designation that does not match the plaintiffs' identity or appearance. That too comes with pain and risk. Corbitt feels that carrying a license "that says I am male when I know that is not true" would be "proclaim[ing] a lie." Decl. of Darcy Corbitt (doc. no. 52-28) at 4. This, she says, would run counter to

7

her religious beliefs as a "devout and practicing Christian." *Id.* Doe says that carrying an "incorrect ID feels like I am not able to be my true self." Decl. of Jane Doe (doc. no. 56-12) at ¶ 24. For these plaintiffs, being reminded that they were once identified as a different sex is so painful that they redacted their prior names from exhibits they filed with the court. *See* Pls.' Motion for Summary Judgment (doc. no. 51) at 9 n.2.

More concretely, carrying licenses with sex designations that do not match plaintiffs' physical appearance exposes them to a serious risk of violence and hostility whenever they show their licenses. Corbitt, Clark, and Doe present as women. They have traditionally feminine features. *See* Photographs of Corbitt and Clark (docs. no. 1-2 and 1-3). They dress as other women dress. The court lists these attributes not to suggest that they are what make the plaintiffs women, but to explain why bearing licenses that do not designate the plaintiffs as women exposes them to such risk.

8

Whenever plaintiffs show an identification document that calls them male, the reader of the document instantly knows that they are transgender. That, the record makes clear, is dangerous. One-quarter of all transgender people who carry identification documents that do not match their gender have been harassed after showing those documents. *See* Pls.' Evidentiary Submission (doc. no. 52-47) at 8. One in six has been denied services, and more than half have faced harassment or assault from a law enforcement officer who learned they were transgender. *Id.* at 6, 8. One in 50 who presented an incongruous identification document has been physically attacked after doing so. *Id.* at 8. As Clark explained, when she shows her license that reveals her to be transgender, "There's always a risk of violence." *See* Depo. of Destiny Clark (doc. no. 48-1) at 80-82.

This risk is not hypothetical for these plaintiffs. Doe, who works in a dangerous industry, was badly injured and nearly killed by her co-workers because of her transgender status. *See* Decl. of Jane Doe (doc. no.

9

56-12) at ¶¶ 9-12. She later lost a job after she showed her male-designated driver license to someone who informed her employer that she is transgender. *See id.* at ¶ 15; Pls.' Motion for Summary Judgment (doc. no. 51) at 18-19.

The evidence above demonstrates that Policy Order 63 has directly and concretely injured the plaintiffs. But the Equal Protection analysis below does not turn on the injuries that the policy causes transgender individuals like Corbitt, Clark, and Doe. As explained below, the court analyzes Policy Order 63 as a sex-based classification not because it harms transgender people, but because it classifies driver license applicants by sex. The State's justifications for the policy fall short not because of the policy's consequences for transgender Alabamians, but because the government's interests are insubstantial or were formulated *post hoc*, and because the policy is inadequately tailored to advancing them.

## II.  LEGAL STANDARD

Sex-based  classifications  imposed  by  a  State  are
subject  to  an  intermediate  form  of  heightened  scrutiny
under  the  Equal  Protection  Clause  of  the  Fourteenth
Amendment.   Under  Policy  Order  63,  people  in  Alabama  can
change  the  sex  designation  on  their  driver  licenses  only
by  changing  their  genitalia.   *See*  Defs.'  Motion  for
Summary  Judgment  (doc.  no.  54)  at  8;  *see  also*  Depo.  of
Jeannie  Eastman  (doc.  no.  48-4)  at  64-69,  80-84.   The
policy  thereby  ensures  that  a  person  with  typically  male
genitalia  receives  a  license  bearing  one  sex  designation
and  a  person  with  typically  female  genitalia  receives  a
license  bearing  another,  stamping  them  publicly  with  that
sex  regardless  of  the  sex  with  which  the  individuals
identify.   The  policy  thus  treats  people  differently
based  on  the  nature  of  their  genitalia,  classifying  them
by  sex.   *See*  Decl.  of  Dr.  Gorton  (doc.  no.  52-45)  at  ¶  10
(defining  "sex"  as  "the  sum  of  the  anatomical,
physiological,  and  biologically  functional
characteristics  of  an  individual  that  places  them  in  the

11

categories male, female, or along a spectrum between the two").

All state actions that classify people by sex are subject to the same intermediate scrutiny. The State need not favor or disfavor men or women to trigger such scrutiny; the classification itself is the trigger. *Cf. Missouri v. Jenkins*, 515 U.S. 70, 120-21 (1995) (Thomas, J., concurring) (noting that all state-imposed race classifications are subject to strict scrutiny, regardless of whether the classifications cause "feelings of inferiority" or produce "[p]sychological injury or benefit"). At the point of resolving the level of scrutiny that should apply in this case, it therefore does not matter whether the State classifies people by giving them different sex designations on their driver licenses or by sending them to different schools. Intermediate scrutiny applies regardless of what sex-based action the State takes. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 723-24, 724 n.9 (1982).

The sex classification of Policy Order 63 is also one imposed by the State. *See Johnson v. California*, 543 U.S. 499, 505 (2005) (classifications "imposed by government" trigger heightened scrutiny). Through Policy Order 63, the State sets the criteria by which it channels people into its sex classifications. The policy obligates ALEA officials to review a license applicant's birth records and medical documentation, decide what they believe the applicant's sex to be, and determine the contents of the individual's license based on that decision. In so doing, the policy imposes its sex classification, denying the women who are plaintiffs in this case the ability to decide their sex for themselves instead of being told who they are by the State.

If the policy pertained to race or religion instead of sex, it would be apparent that this raised constitutional concerns. Government agencies collecting demographic data routinely ask people to self-report their race. *See, e.g.*, 19-3 Miss. Code R. § 11.13. The alternative, where States publicly designated people's

13

race based on state-determined criteria, would be troubling: bureaucrats comparing skin tones and tracing family lineages to decide who is white and who is black. Laws demanding such inquiries have a long and loathsome history. *See, e.g.*, *Jones v. Commonwealth*, 80 Va. 538, 544-45 (1885) (reversing a conviction for racial intermarriage due to insufficient evidence that the defendant had "one-fourth at least of negro blood in his veins," an element of the offense). Just as those laws would today trigger strict scrutiny, *see Loving v. Virginia*, 388 U.S. 1, 6-8 (1967), so Policy Order 63 triggers intermediate scrutiny, for it publicly designates people's sex based on state-determined criteria. As a result, the difficult question here is not whether intermediate scrutiny applies, but whether Policy Order 63 survives such scrutiny.[3]

---

3. The court therefore does not base its decision on any "special burden" that Policy Order 63 places on transgender individuals. *Adams v. Sch. Bd. of St. Johns Cty.*, 968 F.3d 1286, 1296 (11th Cir. 2020), *petition for reh'g en banc filed*. Its decision is based instead on the fact that the policy classifies by sex, and it follows

The path the court must take to answer that question is well worn.  The Equal Protection Clause "does not make sex a proscribed classification."  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  But the State must show that its decision to classify based on sex "serves important governmental objectives" and that the particular policy it employs is "substantially related to the achievement of those objectives."  *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017).  Neither the asserted interest nor the alleged tightness of the policy's tailoring may "rely on overbroad generalizations" about the roles and attributes of men and women.  *Id.* at 1689, 1692.  Nor may the State's interests be "hypothesized or invented *post hoc* in response to litigation"--they must be the actual goals the policy was intended to advance at the time it was created.  *Virginia*, 518 U.S. at 533; *see also Morales-Santana*, 137 S. Ct. at 1696-97.  In other words,

_____

the traditional Equal Protection principles that apply to all state-imposed sex classifications.

the State must provide an "exceedingly persuasive

justification" for the sex-based classification.

*Virginia*, 518 U.S. at 531.[4]


### III. DISCUSSION

Defendants name two government interests to justify

Policy Order 63.  First, they say the policy was created

———————————————————

4.  To dispose of a threshold matter: In defendants'
motion for summary judgment, they argued that the claims
of plaintiffs Corbitt and Clark are barred by the
applicable statute of limitations.  *See* Defs.' Motion for
Summary Judgment (doc. no. 54) at 24-27.  The court is
not persuaded, at least as to Corbitt, because she moved
to Alabama and first sought a female-designated license
from ALEA in August 2017--only six months before filing
suit.  *See* Pls.' Response to Motion for Summary Judgment
(doc. no. 58) at 16.  Corbitt neither knew nor had reason
to know that she had been injured by Policy Order 63
until she requested a female-designated license and was
denied; indeed, she had not been injured by the policy
until that point.  *See Rozar v. Mullis*, 85 F.3d 556, 561-
62 (11th Cir. 1996); *Foudy v. Indian River Cty. Sheriff's
Office*, 845 F.3d 1117, 1122-23 (11th Cir. 2017) (holding
that the injury-discovery rule for claim accrual still
applies to equal protection claims).  Nor did she have a
"complete and present cause of action" until then.
*Wallace v. Kato*, 549 U.S. 384, 388 (2007).  In any event,
defendants do not challenge Doe's capacity to bring the
same injunctive claims raised by Corbitt and Clark.

to ensure consistency with the State's existing
requirements for amending a birth certificate.  Second,
they say that Policy Order 63 "serves the State's
interests in providing an accurate description of the
bearer of an Alabama driver license" to make it easier
for law enforcement officers to identify people when
determining appropriate post-arrest search and placement
procedures.  *See* Defs.' Motion for Summary Judgment (doc.
no. 54) at 10.  To determine whether the State has met
its burden under the Equal Protection Clause, the court
must assess whether these interests are "important,"
whether Policy Order 63 is "substantially related" to
advancing them, and whether they were the actual
interests considered when Policy Order 63 was adopted.


   A.  Consistency with Birth Certificate Amendments

   According to defendants, "Policy Order 63 was
originally created based on the statutory process for
amending a birth certificate."  *Id.* at 46.  They say the
policy thus "serves the important government interests

in maintaining consistency between the sex designation
on an Alabama birth certificate and an Alabama driver
license." *Id.* Under state law, an Alabama birth
certificate may be amended to change the sex designation
with a court order indicating that the "sex of an
individual born in this state has been changed by
surgical procedure and that the name of the individual
has been changed." Ala. Code § 22-9A-19(d).

Defendants have done little to elucidate why their
alleged interest in uniformity between birth certificate
and driver license amendment standards is important.
They have noted, without further explanation, that it "is
related [to] the State's important government interest
in using identity documents to provide physical
descriptions of individuals and, with respect to ALEA's
control over driver licenses, providing a uniform
understanding of 'sex' on a driver license for law
enforcement." Defs.' Response to Pls.' Motion for
Summary Judgment (doc. no. 60) at 19. And they have
argued, as appears to be true, that this interest is

neither *post hoc* nor reliant on "overbroad
generalizations" about men and women. *Id.* at 20.

In the context of sex-based classifications, the
"burden of justification is demanding and it rests
entirely on the State." *Virginia*, 518 U.S. at 533.
Defendants' failure to articulate the importance of their
alleged interest in conformity with birth certificate
protocols falls short of meeting that burden. But to the
extent that defendants have defined this interest, the
court does not see how it can meet the requirements of
intermediate scrutiny.

For one, defendants' argument rests on the premise
that an alignment of procedures should generate an
alignment of documents--that is, that having uniform
processes for amending licenses and birth certificates
is likely in practice to produce uniformity between
individuals' licenses and birth certificates. As a
logical matter, this premise is dubious. Many people may
seek to amend their driver licenses without bothering to
amend their birth certificates, regardless of the

requirements for each.  Showing one's license is a common
occurrence; the times when a person needs to present a
birth certificate are few and far between.  Accordingly,
the risks of bearing a sex-designated document that does
not match a person's gender are much greater when the
document is a driver license than when it is a birth
certificate.  A person with limited time or resources
might reasonably decide to change one but not the other.

Underscoring the faultiness of their premise,
defendants have presented no evidence to support it.
Defendants could, for instance, have compared their
driver license records with the State's birth certificate
records to determine how often people who have changed
the sex designation on their licenses through the
procedure of Policy Order 63 also have changed the sex
designation on their birth certificates.  They have not
done so, leaving the court in the dark as to whether the
baseline presumption underlying the State's asserted
interest in uniform procedures is ever actually borne
out.  In the context of intermediate scrutiny, where the

20

State bears the burden of justification, this evidentiary hole is fatal.  *See Virginia*, 518 U.S. at 533.

Even if the court accepted defendants' shaky premise, their asserted interest would remain inadequate.  Since the earliest days of the Supreme Court's sex-classification jurisprudence, the Court has insisted that "administrative ease and convenience" is not a sufficiently important justification for a state policy based on sex.  *See Craig v. Boren*, 429 U.S. 190, 198 (1976); *see also Tuan Anh Nguyen v. I.N.S*, 533 U.S. 53, 88 (2001) (O'Connor, J., dissenting) ("We have repeatedly rejected efforts to justify sex-based classifications on the ground of administrative convenience.").  And on the record presented here, the court finds that the State's interest in conformity with the rules for birth certificates provides only the convenience of avoiding the need to gather some additional documentation of sex changes on infrequent occasions.

As ALEA's Federal Rule of Civil Procedure 30(b)(6) witness Deena Pregno, chief of the agency's driver

21

license division, **explained in her deposition when asked why this conformity was important**, "if the birth document doesn't match [the driver license], we need to either find a document that links the change or find out why there is a discrepancy." Depo. of Deena Pregno (doc. no. 48-5) at 103. Pregno could think of no problem that might flow from an inconsistency between the driver license and birth certificate procedures other than the extra documentation that would be required when "tracking changes to that person's identifying information." *Id.* at 103, 109-10.

Nor has the State provided anything beyond Pregno's testimony to explain why such an inconsistency would be problematic for the State. Instead, they have doubled down on her explanation, arguing that Policy Order 63 "serves the State's interests in maintaining a paper trail that documents the reasons why an individual's sex designation might differ between a birth certificate and driver license." Defs.' Motion for Summary Judgment

(doc. no. 54) at 11.[5]  Moreover, this need to maintain a
paper trail apparently crops up only when a person
applies for a license; Pregno could think of no other
time when a person's license and birth certificate would
need to be compared.  *See* Depo. of Deena Pregno (doc. no.
48-5) at 105-06.

Under the Supreme Court's precedents, avoiding the
occasional burden of finding some additional
documentation to track a change in a person's
identification materials is not an adequate basis for
sex-based state policy.  While a government may
appropriately choose to advance an important interest by
means that promote effective and efficient
administration, *see Nguyen*, 533 U.S. at 69, ALEA's
asserted desire to avoid paperwork cannot suffice as the
interest itself.

_____

5.  Indeed, the State's apparent expectation that
individuals' licenses and birth certificates will differ
even with Policy Order 63 in place suggests that it
recognizes the unlikelihood that maintaining uniform
procedures will lead people to change both documents.

Indeed, the interest ALEA claims in uniformity between the driver license and birth certificate amendment standards seems designed to make an end-run around the State's burden to show an "exceedingly persuasive justification" for sex-based differential treatment. *Virginia*, 518 U.S. at 532-33. But state interests, like the sexes, are not fungible. *See id.* at 533. The State may have good reasons for using the appearance of a child's genitalia to determine the sex on his or her birth certificate: For one thing, as gender identity "cannot be ascertained immediately after birth," Amended Complaint (doc. no. 38) at ¶ 34, the State might be hard-pressed to come up with a viable alternative approach. For another, the State has serious interests in gathering and maintaining certain population data via birth certificates, including information about sex. *See* Ala. Admin. Code § 420-7-1-.03(3)(a) (describing the information collected for birth certificates and requiring that sex be collected). But ALEA has never argued that such interests apply to driver licenses, nor

24

is there any evidence that it considered such interests
when creating Policy Order 63.

By contrast to birth certificates, neither state law
nor regulation requires ALEA to include sex designations
on driver licenses; it is a creature of ALEA policy.  The
Code of Alabama mandates that driver licenses must
contain a license number, "color photograph ... name,
birthdate, address, and a description of the licensee,"
as well as the licensee's signature.  Ala. Code § 32-6-6.
The Alabama Administrative Code does not require sex to
be designated either.  ALEA cannot export the interests
underlying one presumably lawful sex classification to
prop up its sex-based policy simply by citing the
inconvenience of disuniformity between the two,
especially when the inconvenience is as minimal as the
record demonstrates it to be in this case.

Finally, even if the State had a sufficiently
important interest in avoiding the need to document
discrepancies between a person's birth certificate and
license, Policy Order 63 would still fail as inadequately

tailored to advancing that interest. Although state action need not "be capable of achieving its ultimate objective in every instance" under the intermediate version of heightened scrutiny that applies to sex-based classifications, *see Nguyen*, 533 U.S. at 70, the State must still show a "direct, substantial relationship between objective and means," *Miss. Univ. for Women*, 458 U.S. at 725-26.

Defendants here do not show a substantial relationship--or much relationship at all--between the operation of Policy Order 63 and the State's desire for consistency with the birth certificate amendment process. Although Policy Order 63 and the birth certificate amendment statute both require some type of surgery, the record shows this facial likeness to be thin ice over deep water.

"The parties agree that there are no specified procedures that satisfy the surgery requirement" of the birth certificate amendment statute. Defs.' Reply in Response to Order for Add'l Briefing (doc. no. 84) at 5.

Indeed, defendants have provided no evidence whatsoever of how this surgery requirement is applied.  Though they fault as "purely speculative" plaintiffs' concern that Policy Order 63 may require different surgeries than birth certificate amendments, *see id.*, it is defendants' burden under intermediate scrutiny to establish that their interest in uniformity between these policies is actually borne out, not plaintiffs' to establish the opposite.

The evidence in the record shows that there is no one sex-reassignment surgery and that different surgeries are appropriate for different people.  *See* Decl. of Dr. Gorton (doc. no. 52-45) at ¶ 36.  Some of the plaintiffs have even received sex-reassignment surgery.  Clark's application for a female-designated license was rejected notwithstanding her doctor's letter indicating that she had received "gender transformation surgery"--namely, surgery to modify her chest.  *See* Pls.' Sealed Evidence (doc. no. 56-10) at 2; *see also* Depo. of Destiny Clark (doc. no. 48-1) at 41.  Defendants present no evidence

27

that Clark's surgery would not meet the birth certificate statute's requirement that a person's sex be "changed by surgical procedure." Ala. Code § 22-9A-19(d).

Nor are defendants consistent about what surgery or surgeries Policy Order 63 requires. As they explain, ALEA "does not maintain any specific list of procedures" that satisfy the policy. *See* Defs.' Motion for Summary Judgment (doc. no. 54) at 8. In practice, whether defendants will approve a change of sex designation appears to turn on the particular phrasing of the doctor's letter provided, or even an ALEA staff member's impressionistic sense of the letter's sufficiency.

Clark's application, for instance, was rejected in spite of her surgery because the doctor did not say he had performed "complete gender reassignment surgery." *See* Pls.' Sealed Evidence (doc. no. 56-10) at 2. Another transgender individual applying for a license whose doctor's note said the applicant had "undergone a surgical procedure performed by me ... to irreversibly correct an anatomical male appearance" was similarly

28

rejected because the letter did not say the procedure was a "complete" surgery. *See* Pls.' Sealed Evidence (doc. no. 56-6) at 2. But another applicant was approved whose doctor's letter said that "[s]ex reassignment surgery has been successfully completed ... and surgery is permanent and irreversible." *See* Pls.' Sealed Evidence (doc. no. 56-3) at 2. Yet another applicant was approved whose letter merely said she had "undergone Gender Confirmation Surgery for the purpose of sex/gender reassignment from male to female" and that the surgery was "irreversible," though it did not say she received "complete" surgery. *See* Pls.' Sealed Evidence (doc. no. 56-1) at 2. Another was approved with a letter saying the applicant received "sexual reassignment surgery," with no indication that the surgery was either "complete" or "irreversible," and no specific mention of what surgery was performed. *See* Defs.' Sealed Evidence (doc. no. 49-4) at 55.

In canvassing the spread of doctors' letters in cases where applicants have or have not been approved, the court is convinced, and so finds, that there is no rhyme

29

or reason at all. Defendants have said that they interpret a letter's use of the term "complete"--a requirement that appears nowhere in the text of Policy Order 63--to mean that the individual received both genital and chest surgery, *see* Depo. of Jeannie Eastman (doc. no. 48-4) at 53, and they say that in any case an application will be approved if the doctor's letter uses the term "complete." But in practice they neither approve only applications that use the word "complete," nor only applications that otherwise indicate that both genital and chest surgeries were performed.

This is therefore not a case where a sex-based policy merely fails to "achiev[e] its ultimate objective in every instance." *See Nguyen*, 533 U.S. at 70. Policy Order 63 governs the process for people who seek to change the sex designation on their licenses. ALEA says the policy's goal is to align the steps that this subset of license applicants must take with what those individuals would have to do to amend the sex designation on an Alabama birth certificate. In that context, on the

record presented here, the court finds that Policy Order 63 does not hit any more often than it misses.

In sum, defendants assert that the important government interest underlying Policy Order 63 is in the occasional reduction of paperwork they achieve by maintaining uniformity between, on the one hand, a policy which they interpret to require either a combination of genital and chest surgeries or a doctor's note that specifically says the surgery is "complete"--and which they sometimes apply to require neither--and on the other, a state law for which they do not know what surgeries are required. The former policy additionally allows people to get an accurate in-state license if they have accurate out-of-state identification and have never been licensed in Alabama before. The latter law includes an additional name-change prerequisite and requires a court order.

That is not a "direct, substantial relationship between objective and means." *Miss. Univ. for Women*, 458 U.S. at 725-26. Even if defendants' purported interest

31

in uniformity between Policy Order 63 and Alabama Code § 22-9A-19(d) were important enough to meet the standards of intermediate scrutiny, the haphazard and paper-deep overlap that ALEA has shown between the two still would not sustain its policy.[6]

### B.   Law Enforcement Identification

The court therefore turns to defendants' alternative asserted interest in facilitating identification by law enforcement.  It fares no better.

Defendants claim that "Policy Order 63 serves the important government interest of providing information

---

6.  Of course, the State always has the option of removing sex designations from Alabama driver licenses, which presumably would raise no constitutional concern.  As noted above, while State law requires that license-holders' names, photographs, birthdates, and addresses appear on their driver licenses, it does not require sex to be designated.  Similarly, many states once included race designations on driver licenses, a practice today employed only in North Carolina and optional there.  *See* Cassius Adair, *Licensing Citizenship*, 71 Am. Q. 569, 587 (2019).  The court has not further considered this potential remedy because it was not requested by the plaintiffs.

related to physical identification to law enforcement officers." *See* Defs.' Motion for Summary Judgment (doc. no. 54) at 49.   They say this is important because a driver license "provides information to law enforcement officers ... so that each state agency can formulate its own search, seizure, and booking policies based on this information." *Id.* at 49-50.

In particular, ALEA argues it is important to use a person's genitalia to determine the identification on that person's license to assist with "the creation of appropriate policies and procedures in a correctional context for inmate searches, hosing, supervision, and medical care." *Id.* at 50.[7]   Policy Order 63 allegedly serves this purpose by "providing an accurate description

_____

7.   The record demonstrates, and the court finds, that this asserted State interest is in using genital status in particular to determine the sex designations on driver licenses.   It is therefore different from the State's interest discussed above in "providing a uniform understanding of 'sex' on a driver license," Defs.' Response to Pls.' Motion for Summary Judgment (doc. no. 60) at 19, which the courts finds to be an interest in providing some uniform definition of sex, regardless of what that definition is.

of the bearer of an Alabama license." *See* Defs.' Motion for Summary Judgment (doc. no. 54) at 10. As defendants' expert Donald Leach explained during his deposition, the sex designation on a driver license is among the "foremost pieces of information that's used when booking an individual." *See* Defs.' Evidence (doc. no. 48-9) at 34. Driver license sex designations, along with conversations with the arrestee and even medical examinations when necessary, are part of how officers decide whether a male or female officer should conduct body searches during the booking process. *See id.* at 34-36.

Ensuring that law enforcement officers apply appropriate booking procedures is important. But the court need not reach the question whether Policy Order 63 is adequately tailored to advancing that interest. To justify a sex-based policy, the State's interest must not only be important; it must also not be "hypothesized or invented *post hoc* in response to litigation." *Virginia*, 518 U.S. at 533. Defendants bear the burden under

intermediate scrutiny of establishing that the interests they assert were the actual goals ALEA considered when it first created Policy Order 63.  But the evidence in the record does not indicate that defendants' asserted interest in facilitating proper booking procedures played any part in ALEA's calculus when it developed Policy Order 63.  Instead, the record shows, and the court finds, that conformity with the State's birth certificate amendment procedures was the only interest ALEA considered when creating the policy.

Pregno discussed this issue at length in her Rule 30(b)(6) deposition testimony on behalf of ALEA.  She testified that the State was focused on conformity with the birth certificate statute when it developed Policy Order 63.  As she explained, "the policy was established based on the state statute for changing the gender on a birth certificate," because "[w]e wanted to be consistent in how we operated as a state."  Depo. of Deena Pregno (doc. no. 48-5) at 42-43.  She was later asked directly: "[I]n the course of creating this policy, what

considerations went into ALEA's decision to adopt this policy as opposed to some other?" *Id.* at 45.   She answered: "What the state requires for amended birth certificates." *Id.*   Plaintiffs' counsel then asked: "Were there any other considerations that ALEA took into account at that time?" *Id.*   She answered: "Not that I'm aware of." *Id.*   When asked whether ALEA considered the effects of the policy on arrest and booking procedures, she answered "I don't -- I'm not sure if they did or not." *Id.* at 44-45.   Considered as a whole, Pregno's testimony left the court with little doubt that ALEA was interested in uniformity with the State's birth certificate amendment statute when it developed Policy Order 63, not in helping officers decide on proper arrest and booking procedures.[8]

---

8.   Pregno also testified that when ALEA revised the policy to allow applicants to provide either a doctor's letter or an amended birth certificate instead of requiring both, its only goal was to give "more latitude" to applicants, not to help law enforcement officers make decisions about booking search procedures. *Id.* at 46-47.

Under Federal Rule of Civil Procedure 30(b)(6), the court must understand Pregno's testimony on behalf of ALEA as the testimony of ALEA itself. *See* 8A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2103 (3d ed. 2020). Defendants have had ample opportunity since her testimony to provide evidence that the circumstances of Policy Order 63's adoption were different than she described, subject to the general principle that "a party whose testimony 'evolves' risks its credibility." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 34-35 (2d Cir. 2015). They have not done so; instead, defendants have confirmed that Pregno's testimony was accurate. As ALEA submitted in response to the court's request for supplemental briefing on this particular issue, "the contemporaneous reason for adopting Policy Order 63 was consistency with [the] birth certificate policy." Defs.' Reply in Response to Order for Add'l Briefing (doc. no. 84) at 4 (capitalization adjusted). That concession, supported as it is by

37

Pregno's Rule 30(b)(6) testimony, is an insurmountable
obstacle to defendants' position.

Defendants say, however, that "the contemporaneous
reason for adopting Policy Order 63--consistency with
birth certificates--does not show the law enforcement
interest is hypothesized or *post hoc*." *Id.* at 5. They
say this is so because "the physical descriptions on a
birth certificate provide the default descriptions on a
driver license, and a driver license is used by law
enforcement officers to identify subjects." Defs.'
Response to the Court's Order (doc. no. 82) at 11. Thus,
"[s]ince Defendants' interest in consistency are [sic]
neither hypothesized nor *post hoc*, then neither is their
interest in law enforcement identification."
*Id.* (italics added).

This line of argument flirts with incoherence. More
problematically, the record is devoid of evidence
supporting it. Defendants have not shown that officers
use birth certificates to decide any part of the booking
procedures. They do not clarify why it would matter, at

38

the moment of booking, whether the sex designations on arrestees' licenses match the designations on their birth certificates. *Cf.* Depo. of Deena Pregno (doc. no. 48-5) at 105-06 (indicating that Pregno is unaware of any time when driver licenses and birth certificates are compared other than when a person applies for a driver license). Nor do they otherwise explain why an interest in conformity with birth certificate amendments is the same as an interest in ensuring appropriate post-arrest booking procedures. And nothing they say contradicts either Pregno's Rule 30(b)(6) testimony or the concession in their briefing that consistency with birth certificates was all ALEA considered when it developed Policy Order 63.

Defendants have also hinted that their purported interest in law enforcement identification may relate to traffic stops and arrests. *See* Defs.' Motion for Summary Judgment (doc. no. 54) at 49 (including "arrest" on a list of procedures that Policy Order 63 helps officers formulate); Defs.' Response to the Court's Order (doc.

no. 82) at 10 (noting that plaintiffs have had to display their licenses during traffic stops).   Pregno clarified that defendants' concern would be about avoiding the risk of mistaken identity during such encounters.   *See* Depo. of Deena Pregno (doc. no. 48-5) at 62-63.

Again, defendants have presented no evidence showing how a license with a sex designation that differs from the license-holder's appearance could help officers confirm that the license matches the driver.   Indeed, the record suggests that licenses denoting the license-holder's genital status are wholly unhelpful for this purpose, as Pregno acknowledged that officers don't typically check a person's genitals when stopping or arresting them.   *See id.* at 67-68.   Furthermore, this interest suffers from the same infirmity as the ostensible interest in facilitating the booking process: Nothing indicates that ALEA considered it when creating Policy Order 63.

In the final measure then, the State's interest in consistency with birth certificate amendment procedures

40

is one of marginal administrative convenience that cannot support a sex-based policy, and Policy Order 63 in practice does little to advance it. The interest in facilitating the determination of appropriate search procedures and housing placements during the post-arrest booking process was not one that ALEA considered when it created Policy Order 63, so the policy cannot survive intermediate scrutiny on that basis. These are the interests the State asserts, and neither provides the justification that the Constitution requires for sex-based laws. *See Virginia*, 518 U.S. at 531. Under the tenets of equal protection law, that is the end of the road.

## IV. CONCLUSION

Nearly 50 years ago, the Supreme Court recognized that the Equal Protection Clause demands special skepticism of state actions that impose sex-based classifications. *See Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (plurality opinion). The Court soon

41

settled on the standard of scrutiny that this court applies today, instructing that "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig*, 429 U.S. at 197. Neither "benign justifications" nor an absence of discriminatory intent prevents a sex-based law from being subject to this scrutiny. *Virginia*, 518 U.S. at 535-36. All laws and state policies that "differentiate on the basis of gender" receive this heightened standard of review. *Morales-Santana*, 137 S. Ct. at 1689.

Many pass such scrutiny. As the Court has explained, "[j]ust as neutral terms can mask discrimination that is unlawful, gender specific terms can mark a permissible distinction. The equal protection question is whether the distinction is lawful." *Nguyen*, 533 U.S. at 64. The fact that a State acts based on sex does not invalidate its action, but it does require that the State justify the decision by proving that its reasons were important and its methods well-picked. Here, ALEA has failed to

show that the interests it actually considered at the time it created Policy Order 63 were substantial enough to justify the sex-based distinction that the policy draws.  The State has not risen to meet the obligation that the Equal Protection Clause imposes.  Alabama therefore may no longer make people's genitalia determine the contents of their driver licenses.  Policy Order 63 is unconstitutional.

The court will enter an appropriate order and judgment enjoining the enforcement of Policy Order 63.  On application by plaintiffs Corbitt, Clark, and Doe, ALEA must issue them driver licenses reflecting that they are women.

DONE, this the 15th day of January, 2021.

   /s/ Myron H. Thompson   
UNITED STATES DISTRICT JUDGE

43

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| DARCY CORBITT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:18cv91-MHT |
| | ) | (WO) |
| HAL TAYLOR, in his | ) | |
| official capacity as | ) | |
| Secretary of the Alabama | ) | |
| Law Enforcement Agency, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

JUDGMENT

In accordance with the opinion entered this date, it
is the ORDER, JUDGMENT, and DECREE of the court as
follows:

(1) Judgment is entered in favor of plaintiffs Darcy
Corbitt, Destiny Clark, and Jane Doe, and against
defendants Hal Taylor, Charles Ward, Deena Pregno, and
Jeannie Eastman.

(2) It is DECLARED that the policy of the Alabama
Law Enforcement Agency entitled "Subject: Changing Sex

on a Driver License Due to Gender Reassignment," also known as Policy Order 63, as it has been applied to plaintiffs Corbitt, Clark, and Doe, is unconstitutional.

(3) Defendants Taylor, Ward, Pregno, and Eastman are ENJOINED and RESTRAINED from failing to issue to plaintiffs Corbitt, Clark, and Doe new driver licenses with female sex designations, upon application for such licenses by them.

It is further ORDERED that costs are taxed against defendants Taylor, Ward, Pregno, and Eastman, for which execution may issue.

The clerk of the court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

This case is closed.

DONE, this the 15th day of January, 2021.

                    ___/s/ Myron H. Thompson___
                    UNITED STATES DISTRICT JUDGE

2

A copy of this checklist is available at the website for the U.S. Court of Appeals for the Eleventh Circuit www.ca11.uscourts.gov

Effective on December 1, 2013, the fee to file an appeal is $505.00

## CIVIL APPEALS JURISDICTION CHECKLIST

1. **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   (a) **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C. § 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1368 (11th Cir. 1983) (citing *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(b); *Perez-Priego v. Alachua County Clerk of Court*, 148 F.3d 1272 (11th Cir. 1998). However, under 28 U.S.C. § 636(c)(3), the Courts of Appeals have jurisdiction over an appeal from a final judgment entered by a magistrate judge, but only if the parties consented to the magistrate's jurisdiction. *McNab v. J & J Marine, Inc.*, 240 F.3d 1326, 1327-28 (11th Cir. 2001).

   (b) **In cases involving multiple parties or multiple claims**, a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). *Williams v. Bishop*, 732 F.2d 885, 885-86 (11th Cir. 1984). A judgment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 201, 108 S.Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 837 (11th Cir. 1998).

   (c) **Appeals pursuant to 28 U.S.C. § 1292(a):** Under this section, appeals are permitted from the following types of orders:
      i. Orders granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions; However, interlocutory appeals from orders denying temporary restraining orders are not permitted. *McDougald v. Jenson*, 786 F.2d 1465, 1472-73 (11th Cir. 1986);
      ii. Orders appointing receivers or refusing to wind up receiverships; and
      iii. Orders determining the rights and liabilities of parties in admiralty cases.

   (d) **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5:** The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

   (e) **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93

L.Ed. 1528 (1949); *Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc.*, 890 F.2d 371, 376 (11th Cir. 1989); *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

2.   **Time for Filing:** The timely filing of a notice of appeal is mandatory and jurisdictional. *Rinaldo v. Corbett*, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

(a)   **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the order or judgment appealed from is entered.  However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry.  **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.**  Special filing provisions for inmates are discussed below.

(b)   **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c)   **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d)   **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend or reopen the time to file a notice of appeal.  Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause.  Under Rule 4(a)(6), the time to file an appeal may be reopened if the district court finds, upon motion, that the following conditions are satisfied: the moving party did not receive notice of the entry of the judgment or order within 21 days after entry; the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice, whichever is earlier; and no party would be prejudiced by the reopening.

(e)   **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing.  Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

Rev.: 3/2011

**3.**   **Format of the notice of appeal**: Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format.  *See also* Fed.R.App.P. 3(c).  A *pro se* notice of appeal must be signed by the appellant.

**4.**   **Effect of a notice of appeal:** A district court lacks jurisdiction, *i.e.*, authority, to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).